1   DAVID H. KRAMER, State Bar No. 168452
    WILSON SONSINI GOODRICH & ROSATI
2   Professional Corporation
    650 Page Mill Road
3   Palo Alto, CA 94304-1050
    Telephone: (650) 493-9300
4   Facsimile: (650) 565-5100
    DKramer@wsgr.com
5

6   JONATHAN M. JACOBSON, N.Y. State Bar No. 1350495
    WILSON SONSINI GOODRICH & ROSATI
7   Professional Corporation
    1301 Avenue of the Americas, 40th Floor
8   New York, NY 10019-6022
    Telephone: (212) 999-5800
9   Facsimile: (212) 999-5899
    JJacobson@wsgr.com
10

11
    Attorneys for Defendant
12  Google Inc.

                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14
                          SAN JOSE DIVISION
15

16
    CARL E. PERSON,                    )    CASE NO.:  C 06-7297 JF (RS)
17                                      )
                Plaintiff,              )    DEFENDANT GOOGLE INC.'S
18                                      )    NOTICE OF MOTION AND MOTION
         v.                             )    TO DISMISS THE COMPLAINT;
19                                      )    MEMORANDUM OF POINTS AND
    GOOGLE INC.,                        )    AUTHORITIES
20                                      )
                Defendant.             )    Date:   March 2, 2007
21                                      )    Time:  9:00 a.m.
                                        )    Dept:  3
22                                      )    Before:  Hon. Jeremy Fogel
                                        )
23  _____)

24

25

26

27

28

─────────────────────────────────────────────

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ...................................................................................................... 1

INTRODUCTION .............................................................................................................. 1

    A.    The Parties ............................................................................................ 2

    B.    Google's AdWords Program ................................................................ 2

    C.    Person's Participation in AdWords ...................................................... 3

    D.    Proceedings to Date ............................................................................. 4

ARGUMENT ..................................................................................................................... 5

I.     THE ACTION SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED .................................................. 5

II.    PERSON STATES NO MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION CLAIM UNDER SECTION 2 OF THE SHERMAN ACT .......... 5

III.   PERSON STATES NO CLAIM FOR CONSPIRACY TO RESTRAIN TRADE OR TO MONOPOLIZE UNDER THE SHERMAN ACT ............................................... 11

IV.   PERSON STATES NO CLAIM UNDER THE NEW YORK DONNELLY ACT OR THE CALIFORNIA CARTWRIGHT ACT ................................................ 12

V.    PERSON STATES NO SARBANES-OXLEY CLAIM ......................................... 13

VI.   PERSON STATES NO CLAIM UNDER THE NEW YORK GENERAL BUSINESS LAW ........................................................................................... 14

    A.    Person Fails to Allege Consumer Oriented Conduct ............................ 15

    B.    Person Fails to Allege a Misleading Act or Practice by Google ............ 16

CONCLUSION ................................................................................................................ 18

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS
Case No.:  C-06-7297 JF (RS)

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463 (9th Cir. 1986) ............................ 11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ...................................... 9

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ...................................................... 10

*Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196 (7th Cir. 1985) ...................................................... 12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ...................... 10

*CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94 (1973) .......................................................... 8, 9

*Canario v. Gunn*, 751 N.Y.S.2d 310 (App. Div. 2d Dep't 2002) .................................................. 15

*Cort v. Ash*, 422 U.S. 66 (1975) ...................................................................................................... 13

*Cruz v. NYNEX Info. Res.*, 703 N.Y.S.2d 103 (App. Div. 1st Dep't 2000) ............................ 15, 16

*Exxonmobil Inter-America, Inc. v. Advanced Info. Eng'g Servs., Inc.*,
   328 F. Supp. 2d 443 (S.D.N.Y. 2004) .................................................................................. 14, 15

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
   848 F.2d 976 (9th Cir. 1988) ................................................................................................ *passim*

*Ficker v. Chesapeake & Potomac Tel. Co.*, 596 F. Supp. 900 (D. Md. 1984) .............................. 8

*Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171 (1999) ...................................... 13

*Genesco Entm't v. Koch*, 593 F. Supp. 743 (S.D.N.Y. 1984) ...................................................... 15

*Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314 (2002) ...................................................... 15

*In re BISYS Group Inc. Derivative Action*, 396 F. Supp. 2d 463 (S.D.N.Y. 2005) .................... 13

*In re Whitehall Jewellers, Inc. S'holder Derivative Litig.*, No. 05 C 1050,
   2006 WL 468012 (N.D. Ill. Feb. 27, 2006) ............................................................................... 13

*Interface Group, Inc. v. Mass. Port Auth.*, 816 F.2d 9 (1st Cir. 1987) ........................................ 8

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999) ................................................ 8

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ........................................................................ 3

*Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir. 2000) .............................................................. 14, 15

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988) ...................................................... 8

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir. 1989) .......................... 10

*Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835 (9th Cir. 2002) .............................................. 5

*Neer v. Pelino*, 389 F. Supp. 2d 648 (E.D. Pa. 2005) ................................................. 13

*North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578 (9th Cir. 1983) .................................... 5

*Official Airline Guides, Inc. v. F.T.C.*, 630 F.2d 920 (2d Cir. 1980) ..................................... *passim*

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
    85 N.Y.2d 20 (1995) ................................................................................ 15

*Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512 (S.D.N.Y. 2003)................................... 16, 17

*People v. Rattenni*, 81 N.Y.2d 166 (1993) ........................................................ 13

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) .......................................... 12

*Reeves, Inc. v. Stake*, 447 U.S. 429 (1980) ........................................................ 8

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*,
    637 F.2d 1376 (9th Cir. 1981) ...................................................................... 11

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*,
    783 F.2d 1347 (9th Cir. 1986) ................................................................. *passim*

*Soap Opera Now, Inc. v. Network Publ'g Corp.*,
    737 F. Supp. 1338 (S.D.N.Y. 1990) ................................................................ 8

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001) ...................................................................... 11

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).......................................... 6, 9

*Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377 (9th Cir. 1983)............................. 10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*,
    540 U.S. 398 (2004) ......................................................................... *passim*

*Vitolo v. Mentor H/S Inc.*, No. 06-1794-CV, 2007 WL 28302 (2d Cir. Jan. 3, 2007) ................ 16

*Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169 (E.D. Va. 1995)............................ 12

*Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870 (9th Cir. 1982) ...................................... 10

## STATUTES

15 U.S.C. § 13 ......................................................................................... 9

15 U.S.C. § 7244(a) ................................................................................... 13

18 U.S.C. § 1514A(b)(1)(B)............................................................................ 13

Cal. Bus. & Prof. Code §§ 16700-70 .................................................................. 12

N.Y. Gen. Bus. Law §§ 340-47.......................................................................... 12

N.Y. Gen. Bus. Law §§ 349-350.......................................................................... 14

1

**RULES**

2

Fed. R. Civ. P. 12(b)(6) ............................................................................ 1, 3, 5

3

**MISCELLANEOUS**

4

3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2002) ............................. 9, 12

5

3 Phillip E. Areeda & Donald F. Turner, *Antitrust Law* (1978) ....................................... 6

6

ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed. 2002) .......................... 8, 11

7

ABA Section of Antitrust Law, *State Antitrust Practice and Statutes* (3d ed. 2004) .................. 12

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION**

2      PLEASE TAKE NOTICE that on March 2, 2007 at 9:00 a.m., or as soon thereafter as

3  counsel may be heard by the above-entitled Court, located at 280 South First Street, Courtroom

4  3, 5th Floor, San Jose, California, 95113, in the courtroom of the Honorable Jeremy Fogel,

5  defendant Google Inc. ("Google") will and hereby does move the Court, pursuant to Rule

6  12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing Carl E. Person's

7  Complaint ("Person"), as amended in its entirety.  This motion is based on this Notice of Motion

8  and Motion, the Memorandum of Points and Authorities filed herewith, the Declaration of David

9  H. Kramer and the exhibits attached thereto, the pleadings and papers on file herein, and upon

10 such other matters as may be presented to the Court at the time of the hearing.

11

**INTRODUCTION**

12      Through this action, attorney Carl Person has launched a badly misguided attack on

13 Google's Adwords advertising program.  Originally and improperly filed in New York, the

14 action was ordered transferred here on Google's motion.  It should now be dismissed under Rule

15 12(b)(6) for failure to state a claim.

16      Person's antitrust claims (asserted under the Sherman Act and its New York and

17 California counterparts) fail as a matter of law.  Person's basic contention is that Google charges

18 him more to advertise than it charges large corporate advertisers.  Even if that were true,

19 controlling Supreme Court and Ninth Circuit precedent make clear that the Sherman Act

20 recognizes no cause of action for discriminatory pricing or for charging prices perceived to be

21 too high.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP,* 540 U.S. 398, 407

22 (2004); *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir.

23 1988); *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 783 F.2d 1347 (9th Cir. 1986).

24      Person's remaining claims under the Sarbanes-Oxley Act and New York's General

25 Business Law are equally meritless.  There is no private right of action for the violations of

26 Sarbanes-Oxley he alleges, and nothing in the General Business Law makes it unlawful for a

27 company to revise its pricing structure as the need may arise.   Person's action should go no

28 further.

**BACKGROUND**

A.    **The Parties**

Person is an attorney and business person – and frequent and experienced litigant – residing in New York, New York.  Complaint ¶ 4 ("Compl.") (annexed as Ex. C to the Declaration of David H. Kramer ("Kramer Decl."), executed January 25, 2007, ("Kramer Decl.").  He claims to have run for Attorney General of New York State in the November 2006 election as a Green party candidate.  *Id*. ¶ 7.

Google is a "global technology leader focused on improving the ways people connect with information."  *Id*. ¶ 11.  According to Person, Google operates the fastest Internet search engine in the world, handles 46.3% of Internet searches, and has the largest and most comprehensive collection of information online.  *Id.* ¶ 71.

B.    **Google's AdWords Program**

Google generates revenue through its advertising programs.  *Id*. ¶ 11.  The advertising program at issue in this case is called AdWords.  AdWords allows an advertiser to bid for the right to have its advertisement shown when a user searches for a particular term or "keyword."  *Id.* ¶ 31.  When a Google user types in a search term that contains the keyword, short advertisements from advertisers that have placed winning bids for that keyword appear on the right margin of the webpage listing the user's search results.  *Id.* ¶¶ 20, 23.  If and when a user "clicks" on the advertisement, the user is taken to the webpage promoted by the advertiser.  *Id.*  As relevant to this lawsuit, AdWords advertisers are charged for each click that an AdWords advertisement attracts.  *Id.*  Prior to 2005, the minimum per-click price was 5 cents per-click with a maximum of $50 per-click.  *Id.* ¶ 24.  In 2005, Google changed its pricing to set a 1 cent per-click minimum and a $100 per-click maximum.  *Id.*

Google aims to provide its users with the highest quality and most relevant advertisements.  *Id*. ¶ 31.  To determine the offered price for an advertiser's use of a keyword, Google employs a complex formula that considers a keyword's click-through rate, the relevance of an ad, and the quality of the "landing page" linked to the ad.  *Id.*  This is referred to as an advertiser's Quality Score.  *Id.*  The Quality Score is then factored into a formula based on other

1  advertisers' bids for the use of the keyword, and how prominent a space in the margin the

2  advertiser would prefer for the advertisement to appear. *Id.* ¶¶ 13, 13A (citing

3  https://adwords.google.com/select/afc/pricing.html). If the content of an ad and its landing page

4  are relatively less robust and relevant, an advertiser's Quality Score decreases and the minimum

5  bid required for the keyword increases. *Id.* ¶ 31. The ad with the least prominent placement will

6  always pay 1 cent per-click no matter what was bid. *Id.* ¶ 13A.

7      Not every word is a keyword available for use. *Id.* ¶ 33. Certain keywords are inactive,

8  and demand a higher bid than the minimum 1 cent per-click to "activ[ate.]" *Id.* ¶¶ 32-34.

9      **C.    Person's Participation in AdWords**

10      Every participant in AdWords is required to enter into an agreement with Google setting

11  forth the terms and conditions of participation (the "AdWords Agreement" or "Agreement").

12  *See* Agreement at 1 ("These Terms govern Google's advertising program(s) . . . and, as

13  applicable, Customer's participation in any such Program(s)") (annexed as Ex. A to the Kramer

14  Decl.). The AdWords Agreement includes both a forum selection clause and a choice-of-law

15  provision, mandating suit in Santa Clara County, California and application of California law.

16  Agreement at 2 ("The Agreement must be construed as if both parties jointly wrote it, governed

17  by California law except for its conflicts of laws principles and adjudicated in Santa Clara

18  County, California.").[1]

19      The AdWords Agreement also provides Google with absolute discretion to reject any or

20  all ads of an advertiser, including Person, "for any or no reason." Agreement ¶ 2. Person has

21  _____

22      [1] The current version of the AdWords Agreement can be found at Google's website, at
    www.AdWords.google.com/select/_TCUSbilling0406.html.  Person cites this website in his

23  Complaint. *See* Compl. ¶ 8. As such, the Court can consider the AdWords Agreement in
    adjudicating this motion under Federal Rules of Civil Procedure 12(b)(6). *See Knievel v. ESPN*,

24  393 F.3d 1068, 1076 (9th Cir. 2005). Person was required to sign a similar version of the
    Adwords Agreement when he first purchased AdWords advertising in November 2003. *See*

25  Declaration of David DiNucci ("DiNucci Decl."), executed August 28, 2006, at ¶¶ 3-8 (annexed as
    Exhibit B to the Kramer Decl.). The Adwords Agreement that Person signed also included a

26  forum selection clause and choice-of-law provision requiring suit in Santa Clara County,
    California and application of California law. *See* DiNucci Decl. Ex. B ("This Agreement shall be

27  governed by the laws of California, except for its conflicts of laws principles. Any dispute or
    claim arising out of or in connection with this Agreement shall be adjudicated in Santa Clara

28                                                                          (continued...)

-3-

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS
Case No.:  C-06-7297 JF (RS)

1    used AdWords to advertise and market several books, his legal practice, and his candidacy for

2    elective office.  Compl. ¶¶ 6, 8.

3         **D.      Proceedings to Date**

4         Person's Complaint was filed June 19, 2006 and assigned to Judge Patterson in the

5    United States District Court for the Southern District of New York.  Kramer Decl. Ex. C.

6    Shortly thereafter, Mr. Person filed a motion for a preliminary injunction.  *See* Kramer Decl. Ex.

7    D.  On June 29, 2006, Judge Patterson ordered, consistent with the agreement of the parties, that

8    Google's time to respond to the Complaint be extended until July 27, 2006, and that

9    consideration of the motion for preliminary injunction be deferred until consideration of

10   Google's motion to dismiss.  *Id.*

11        Google filed its motion to dismiss on July 27, 2006, seeking dismissal for improper venue

12   and failure to state a claim.  *Id.*  In opposing the motion, Person amended his Complaint and

13   sought a transfer to California.  *Id.*  (A copy of the amendment to the Complaint is annexed as

14   Exhibit E to the Kramer Decl.)  On September 13, 2006, Judge Patterson heard argument from

15   both parties on Google's motion to dismiss.  Kramer Decl. Ex. D.  (A copy of the transcript from

16   oral argument is annexed as Exhibit F to the Kramer Decl.).  Person moved to amend his

17   Complaint again on September 15, 2006, but the Court denied that motion on September 20,

18   2006 citing his previous amendment.  Kramer Decl. Ex. D.

19        On October 11 2006, Judge Patterson issued an order (1) granting Google's motion to

20   dismiss for improper venue, and (2) transferring the dispute to the Northern District of

21   California.  Kramer Decl. Ex. G.  Given the transfer, the Court found it unnecessary to reach

22   Google's motion to dismiss for failure to state a claim.[2]

23

24

25   _____

          (...continued from previous page)

26   County, California.").   The DiNucci Declaration was previously submitted in this case in
     connection with Google's motion to dismiss for improper venue.

27   [2] On January 9, 2007, this Court accepted the matter as related to *Kinderstart.com, LLC v.
     Google Inc.*, Case No. C 06-2057 JF (RS).

28

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS
Case No.:  C-06-7297 JF (RS)

1

**ARGUMENT**

2     **I.     THE ACTION SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM
      UPON WHICH RELIEF CAN BE GRANTED**

3

4     In evaluating a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), the

5     court accepts the complaint's factual allegations as true, and construes the complaint in the light

6     most favorable to the plaintiff, drawing all reasonable inferences in his favor. *Nat'l Audubon*

7     *Soc'y, Inc. v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002). If it nevertheless appears that the

8     plaintiff can prove no facts in support of his claim for relief, the action should be dismissed. *Id.*

9     Person states no claim under Sherman Act Sections 1 or 2, The New York Donnelly Act,

10    the California Cartwright Act, the Sarbanes-Oxley Act, or the New York General Business Law,

11    for reasons discussed below. As Person's complaint "does not set forth any material facts in

12    support of the allegations" contained therein, his claims should be dismissed. *North Star Int'l v.*

13    *Arizona Corp. Comm'n*, 720 F.2d 578, 583 (9th Cir. 1983).

14    **II.    PERSON STATES NO MONOPOLIZATION OR ATTEMPTED
      MONOPOLIZATION CLAIM UNDER SECTION 2 OF THE SHERMAN ACT**

15

16    Person charges Google with violating Section 2 of the Sherman Act by charging high and

17    discriminatory prices for keyword-targeted Internet advertising. These claims should be

18    dismissed because it is not unlawful for an alleged monopolist to charge high or discriminatory

19    prices. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP,* 540 U.S. 398, 407

20    (2004); *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir.

21    1988); *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 783 F.2d 1347 (9th Cir. 1986).

22    ***Person's claim.*** The core of Person's Complaint is that Google charges high and/or

23    discriminatory prices to Person and other "small-business advertisers," and low and/or

24    discriminatory prices to "major corporate advertisers" (such as eBay). Specifically, Person

25    alleges that Google requires plaintiff and other "small business advertisers" to pay "sometimes

26    50 or 100 times as much per click" than large corporate advertisers with low per-click prices.

27    Compl. ¶ 87. He asserts that these aspects of Google's pricing somehow allow Google to

28    maintain its alleged monopoly power, and also constitute an attempt to monopolize, conspiracy

1    to fix prices, and/or a conspiracy to monopolize an alleged market for "key word-targeted

2    Internet advertising." *Id.* ¶¶ 12, 13.[3]

3            ***Person has not sufficiently alleged exclusionary conduct.***    Sufficient allegations of

4    *exclusionary or anticompetitive conduct* are essential elements on both Person's claim for actual

5    monopolization and his claim for attempted monopolization under Section 2 of the Sherman Act.

6    *See Trinko,* 540 U.S. at 407 ("the possession of monopoly power will not be found unlawful

7    unless it is accompanied by an element of *anticompetitive conduct*"); *Spectrum Sports, Inc. v.*

8    *McQuillan*, 506 U.S. 447, 456 (1993) (citing 3 Phillip E. Areeda & Donald F. Turner, *Antitrust*

9    *Law* ¶ 820, at 312 (1978)) (attempted monopolization requires proof "that the defendant has

10   engaged in predatory or *anticompetitive conduct*").

11           Person has failed to allege any conduct regarded as exclusionary under the case law. As

12   the Supreme Court recently explained in *Trinko*, charging monopoly prices is not exclusionary:

> The mere possession of monopoly power, and the concomitant charging of
> monopoly prices, is not only not unlawful; it is an important element of the free-
> market system. The opportunity to charge monopoly prices – at least for a short
> period – is what attracts "business acumen" in the first place; it induces risk taking
> that produces innovation and economic growth.

16   540 U.S. at 407.

17           Conduct is not anticompetitive or exclusionary for purposes of Section 2 unless it

18   expands (or threatens to expand) the defendant's market power by impairing the competitiveness

19   of rivals. *Ferguson*, 848 F.2d at 983; *Seattle Totems*, 783 F.2d 1347; *Official Airline Guides,*

20   *Inc. v. F.T.C.*, 630 F.2d 920 (2d Cir. 1980) ("*OAG*"). Person's claims fail because he does not

21   and cannot allege that he is in competition against Google or that Google has injured him in a

22   manner that enlarges Google's market share by diminishing his own.

---

24           [3] Although Person assails Google's pricing as "discriminatory," his allegations
25   acknowledge that the pricing is the product of a real-time, automatic auction process. His
     complaint is only that larger companies gain more favorable pricing because their advertising is
26   more appealing to consumers, not because the terms that Google offers are different (or
     "discriminatory") in fact. *See* Compl. ¶ 48 ("A successful business . . . is able to obtain a higher
27   percentage of clicks per 1,000 opportunities (i.e., advertising impressions) [and, thus, lower per-
     click prices] than a new, unknown business"). For purposes of this motion to dismiss, however, it
28   can be assumed that the pricing is somehow "discriminatory."

Numerous cases have dismissed Section 2 claims on this basis.  Thus, in *Ferguson*, Defendant Idaho State University (ISU), which leased a stadium to businesses that held annual trade shows, changed the process of assigning leases to allow competitive bidding for trade show slots.  Plaintiffs, the Fergusons, who had staged annual springtime trade shows at defendant's stadium in several prior years, bid less than all competing bidders, and lost the right to produce their springtime trade shows in the defendant's venue to the party who placed the highest bid. Plaintiffs claimed that defendant refused to deal with them by granting the highest bidder an exclusive six-year lease.  The Ninth Circuit dismissed plaintiffs' Section 2 claims, finding that "even assuming that ISU is a monopolist, and that its Minidome is an essential facility, the Fergusons are not in competition with ISU.  Thus, ISU has not refused to deal with a competitor. . . .  The Fergusons simply failed to outbid their competitors."  848 F.2d at 983.

Similarly, in *Seattle Totems*, the defendant National Hockey League declined to award the plaintiffs, a defunct hockey team called the Totems, an NHL franchise because the Totems failed to meet the conditions necessary to be awarded a franchise.  At the time, there was a competing major professional hockey league, the World Hockey Association ("WHA").  The Totems did not seek a WHA franchise; nor did either league award a Seattle hockey franchise to another team.   The plaintiffs brought an action under Section 2, claiming that the NHL monopolized American professional hockey, and wrongfully denied the Totems an NHL franchise.  The District Court dismissed their claims, stating that the defendants' denial was procompetitive in nature.  The Ninth Circuit affirmed, holding that the district court properly dismissed the plaintiffs' claims because the plaintiffs failed to show that the NHL's act in denying them a franchise injured competition, as "[t]he Totems were not competing with the NHL; they were seeking to join it. . . .  There is no contention or showing that the denial was to protect any other major league team in the Seattle market; there was none."  *Seattle Totem*, 783 F.2d at 1350.  Just as in *Ferguson*, the plaintiffs' Section 2 claims failed because they were unable to show that they were in competition with the defendants in the market at issue.

In *OAG*, petitioner, a monopolist publisher of airline schedules, declined to list the schedules for connecting flights of commuter airlines in the manner that it listed the connecting

-7-

1  flights of certificated airlines, severely handicapping the commuter airlines' ability to compete.

2  *OAG*, 630 F.2d at 921-922.  The FTC ordered petitioner to list connecting flight listings for

3  commuter airlines in the same way that it published connecting flight listings for certificated

4  airlines.  *Id.* at 921.  The Second Circuit reversed the FTC's order, finding that "[petitioner],

5  though possibly a monopolist in the airline schedule publishing industry" was "engaged in a

6  different line of commerce from that of the air carriers," where the alleged competitive injury

7  took place.  *Id.* at 926.  Accordingly, the court relied on the "'long recognized right of trader or

8  manufacturer, engaged in an entirely private business, freely to exercise his own independent

9  discretion as to parties with whom he will deal.'"  *Id.* at 927 (quoting *Reeves, Inc. v. Stake*, 447

10  U.S. 429, 438-39 (1980)).

11      These decisions are not outliers.  The basic proposition that a plaintiff must allege

12  misconduct that impairs the competitiveness of rivals is uniformly supported by the case law.

13  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812-13 (9th Cir. 1988) (court dismissed Sherman

14  Act claims of chemical company because they failed to allege injury to competition in the market

15  for pipe fittings); *Ficker v. Chesapeake & Potomac Tel. Co.*, 596 F. Supp. 900, 903 (D. Md.

16  1984) (court dismissed monopolization claims of an attorney against a monopolist publisher of a

17  telephone directory who refused to print the fees the attorney charged when running his

18  advertisements as the attorney "does not allege, nor can he allege, that the defendants' conduct

19  restrained trade in *their own* market for *their own* benefit.  Absent this anticompetitive animus,

20  plaintiff's claims must fail."); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1357 (Fed. Cir.

21  1999) ("the presence of a competitive relationship is fundamental to invoking the Sherman Act

22  to force access to the property of another"); *Interface Group, Inc. v. Mass. Port Auth.*, 816 F.2d

23  9, 12 (1st Cir. 1987) ("it is difficult to see how denying a facility to one who . . . is not an actual

24  or potential competitor could enhance or reinforce the monopolist's market power"); *Soap Opera

25  Now, Inc. v. Network Publ'g Corp.*, 737 F. Supp. 1338 (S.D.N.Y. 1990) (finding summary

26  judgment appropriate in a Section 2 case because "[e]ven assuming that defendant is a

27  monopolist in its product market, unless plaintiff and defendant are in competition with one

28  another, defendant has no duty to deal with plaintiff"); *see also CBS, Inc. v. Democratic Nat'l*

1   *Comm.*, 412 U.S. 94 (1973) (holding that broadcasters are not required to accept paid editorial

2   advertisements); 3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 774d (2d ed.

3   2002) (explaining that non-competitors lack standing to sue in this context).

4          The only federal statute condemning certain types of price discrimination is the

5   Robinson-Patman Act, 15 U.S.C. § 13.  But that Act applies only to physical goods, not services

6   such as Internet advertising, *see* ABA Section of Antitrust Law, *Antitrust Law Developments*

7   ("ALD") 469 & n.95 (5th ed. 2002) – a point plaintiff implicitly concedes, Compl. ¶ 43

8   (referring to "keyword-targeted Internet advertising" as "[t]he relevant service market").

9   Person's efforts to dress up a Robinson-Patman claim in the garb of a Sherman Act claim

10  necessarily fail because the statutes have entirely different (and sometimes conflicting)

11  requirements.  In particular, as discussed above, a seller's discriminatory pricing among its

12  customers – the equivalent of a "secondary line" price discrimination case under Robinson-

13  Patman – is simply not a recognized claim under the Sherman Act.  *See Ferguson*, 848 F.2d at

14  983; *Seattle Totems*, 783 F.2d at 1350; *OAG*, 630 F.2d at 925-28.

15         Absent an allegation that Person is a competitor of Google's – an allegation that he has

16  not made and cannot make – it is beyond question that accusations of high or discriminatory

17  pricing to a customer fail to state a claim under Section 2 of the Sherman Act.

18         ***Person's Amended Complaint fails equally to allege exclusionary conduct.***  Person's

19  belated attempt to address his Complaint's failure to allege exclusionary conduct – the new ¶

20  95A allegation in his Amended Complaint that Google's pricing policies are designed to help it

21  increase its market share at the expense of Yahoo! and MSN – does not address the defect.  All

22  competition is designed to increase the competing firm's market share.  That fact does not make

23  it exclusionary.  *See, e.g.*, *Spectrum Sports*, 506 U.S. at 458 ("The law directs itself not against

24  conduct that is competitive, even severely so, but against conduct with unfairly tends to destroy

25  competition itself.").  There must, instead, be evidence that the conduct is designed to "exclude

26  rivals on some basis other than efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*.,

27  472 U.S. 585, 605 (1985).  In this case, there is no allegation of any tying arrangement, exclusive

28  dealing arrangement, or other conduct of the sort that carries with it the prospect of depriving

1   Google's rivals of access to customers or supplies.  Person only alleges that Google's *pricing*

2   practices are designed to allow it to increase its market share at the expense of Yahoo! and MSN.

3         By allegedly charging discriminatory prices, Google is neither engaging in exclusionary

4   conduct nor "expand[ing its] monopoly."  *OAG*, 630 F.2d at 927-28.  Charging low and/or

5   discriminatory prices to customers is not exclusionary, as a matter of law, absent evidence that

6   the prices are "predatory," that is, below an appropriate measure of cost.  *See, e.g.*, *Brooke*

7   *Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993); *Transamerica*

8   *Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1384-86 (9th Cir. 1983).  Person advances no such

9   allegations here; nor can he.  His concern is not that Google's prices are below cost – since they

10  are not – but that the "lower" prices he alleges are available to larger advertisers are not available

11  to him.  Compl. ¶¶ 12, 13B, 35, 37, 47, 71(S-1) 86-89.  But Google's charging of low, but non-

12  predatory, prices is the essence of competition.  As the Supreme Court has stated, "[l]ow prices

13  benefit consumers regardless of how those prices are set.  As long as they are above predatory

14  levels, they do not threaten competition."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S.

15  328, 340 (1990).   Absent allegations of below-cost predatory pricing, therefore, Person's

16  allegations necessarily fail.  *See Trinko*, 540 U.S. at 407-08; *Ferguson*, 848 F.2d at 983; *Seattle*

17  *Totems*, 783 F.2d at 1350; *OAG*, 630 F.2d at 927-28.

18        The decision in *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525 (1st Cir.

19  1989) (Breyer, J.) is on point.  In *Monahan's*, the plaintiff alleged that defendant Boston Whaler,

20  Inc. sold boats to plaintiff's competitors at prices lower than, and terms better than, it offered to

21  plaintiff.  *Id.* at 526.   The court held that "Whaler's actions (which we shall call 'price

22  discrimination') are not, on balance, anticompetitive for Sherman Act purposes."  *Id.* at 527.  In

23  doing so, the court stated, *inter alia*, that "the Sherman Act does not normally forbid a seller

24  from charging a low, nonpredatory price, even though that price may make it harder for a

25  competitor to enter, or to remain in, the market."  *Id.* at 528.  It also noted that there is "nothing

26  anticompetitive in the simple fact that a seller selectively cuts its prices, or offers other favorable

27  terms, to some of its dealers, even though such discrimination harms the non-favored dealers."

28  *Id.* at 529; *accord, e.g.*, *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 887 (9th Cir. 1982) ("the

1  price discrimination which results where buyers seek competitive advantage from sellers

2  encourages the aims of the Sherman Act"); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs. Inc.*,

3  637 F.2d 1376, 1387 (9th Cir. 1981) ("courts are reluctant to interfere with a company's business

4  decision to distribute products in a particular fashion.").

5  **III.   PERSON STATES NO CLAIM FOR CONSPIRACY TO RESTRAIN TRADE OR TO MONOPOLIZE UNDER THE SHERMAN ACT**

6

7         Person also asserts claims for conspiracy to restrain trade and conspiracy to monopolize.

8  Both claims are based on the same allegations:  purported agreements between Google and its

9  larger customers, such as alleged co-conspirator eBay, to charge prices that Person assails as

10  discriminatory.  *See* Compl. ¶¶ 35-40.

11        ***Conspiracy under Sherman 1.***   It is not "price fixing" or otherwise unlawful for a

12  company to agree with a customer on the price the company will charge and the customer will

13  pay, no matter how discriminatory.  "An agreement between a buyer and a seller regarding the

14  price for the transaction between them is not illegal because the agreement deals with the sale

15  price, not the resale price."  ALD, at 130 n.738 (5th ed. 2002); *see also 49er Chevrolet, Inc. v.*

16  *General Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986) (granting summary judgment on

17  price-fixing claim where there was "no agreement among competitors to set prices").

18        Person's Amended Complaint alleges no horizontal conspiracy.  All it alleges, instead, is

19  a series of vertical agreements, each involving Google and one of Google's customers, as to the

20  price each one will pay.  Compl. ¶¶ 35-40.  That is not a horizontal conspiracy. A valid claim of

21  horizontal conspiracy requires proof of some exchange of commitment *among competitors*, such

22  as, in this case, an agreement among eBay and *its* competitors.  As the Fifth Circuit explained in

23  *Spectators' Communication Network Inc. v. Colonial Country Club*, 253 F.3d 215, 224 (5th Cir.

24  2001), there must be "evidence of the competitors agreeing among themselves.  This hub and

25  spoke sort of proof [of agreements between advertisers at golf tournaments and a golf

26  tournament sponsor] does not establish a horizontal combination."  Person did not allege such an

27  agreement, nor could he.  His allegations of nothing more than a series of separate agreements

28  between Google and its various customers are insufficient to state a claim under Section 1 of the

Sherman Act. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (a claim of horizontal conspiracy requires "an agreement between or among direct competitors"); *Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985) ("[t]he plaintiff cannot make out a cause of action for horizontal price-fixing since the alleged agreement … does not run between competitors").

     ***Conspiracy under Sherman 2.***  Because Person fails to state a claim for conspiracy to restrain trade under Section 1 of the Sherman Act, his claims for conspiracy to monopolize under Section 2 necessarily fail as well.  3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 809 ("[a]ny arrangement that could be considered a 'conspiracy' to monopolize must necessarily also be an unreasonable 'contract,' 'combination,' or 'conspiracy' in restraint of trade offending § 1").

     Furthermore, Person's claims for conspiracy to monopolize fail for the same reason that his other monopolization claims fail:  Where an alleged conspiracy, "if successful, would not amount to illegal monopolization, there may be no liability for conspiracy to monopolize." ALD at 312 & n.467; *Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169, 1175 (E.D. Va. 1995) ("because the gist of monopolization is the power to exclude competition, a conspiracy to monopolize must be one that is *somehow* rationally directed toward the exclusion of competitors").  Google is aware of no cases holding that an agreement or conspiracy between an alleged monopolist and its customers as to the prices that a defendant will charge such customers can ever rise to the level of "conspiracy to monopolize" under Section 2 of the Sherman Act.

## IV.    PERSON STATES NO CLAIM UNDER THE NEW YORK DONNELLY ACT OR THE CALIFORNIA CARTWRIGHT ACT

     In addition to alleging violations of the Sherman Act, Person alleges that Google violated New York's antitrust statute entitled the Donnelly Act, N.Y. Gen. Bus. Law §§ 340-47, and California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-70.  Neither statute has a counterpart to Section 2 of the Sherman Act applicable to unilateral conduct.  ABA Section of Antitrust Law, *State Antitrust Practice and Statutes*, at 6-1 and 35-1 (3d ed. 2004).  While both statutes prohibit agreements in restraint of trade akin to those prohibited by Section 1 of the

1    Sherman Act, the courts of both respective states are guided by federal law.  *Id.* at 6-6 n.56, 35-2

2    n.16; *see also*, *e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 n.9

3    (1999); *People v. Rattenni*, 81 N.Y.2d 166 (1993).  Therefore, for the same reasons that Person's

4    antitrust claims fail under federal law, they fail under New York's Donnelly Act and California's

5    Cartwright Act.

6    **V.    PERSON STATES NO SARBANES-OXLEY CLAIM**

7          Although difficult to discern, Person appears to seek relief under the Sarbanes-Oxley Act.

8    Compl. ¶¶ 102G, 106-08.  Person alleges that Google was required to disclose its alleged

9    violation of Section 2 of the Sherman Act in its Registration Statement.  *Id.* ¶ 106.  This claim

10   fails for several reasons.

11         As an initial matter, as described above, Person fails to allege any violation of the

12   Sherman Act.  There can be no duty to report a non-existent violation.

13         Secondly, Person fails to specify which section of the Sarbanes-Oxley Act purportedly

14   gives rise to a duty of disclosure here, or to identify any section of the Sarbanes-Oxley Act that

15   creates a private right of action and thus provides Person with standing to pursue a claim for

16   relief.    The Sarbanes-Oxley Act created only two private rights of action:    section 306,

17   permitting recoupment of profit realized through insider trading during blackout periods; and

18   section 806, providing whistleblower protection to employees of companies.    15 U.S.C. §

19   7244(a); 18 U.S.C. § 1514A(b)(1)(B).  Courts have refused to imply private rights of action for

20   other Sarbanes-Oxley Act provisions.  *See In re BISYS Group Inc. Derivative Action*, 396 F.

21   Supp. 2d 463, 464 (S.D.N.Y. 2005) (refusing to imply private right of action for section 304 of

22   the Act); *accord In re Whitehall Jewellers, Inc. S'holder Derivative Litig.*, No. 05 C 1050, 2006

23   WL 468012, at *7 (N.D. Ill. Feb. 27, 2006); *Neer v. Pelino*, 389 F. Supp. 2d 648, 652-57 (E.D.

24   Pa. 2005); *see generally Cort v. Ash*, 422 U.S. 66, 80 (1975) (refusing to infer private cause of

25   action under criminal statute).

26         Person's claims seeking disclosure of a (non-existent) Sherman Act violation plainly do

27   not fit within the express causes of action created by sections 306 or 806.  Having failed to

28

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS
Case No.:  C-06-7297 JF (RS)

1    identify a section of the Sarbanes-Oxley Act giving rise to a private right of action, Person lacks

2    standing to seek relief under that statute.

3    **VI.    PERSON STATES NO CLAIM UNDER THE NEW YORK GENERAL BUSINESS LAW**

4

5          Person also fails to state a claim under New York General Business Law §§ 349

6    (Deceptive Acts and Practices Unlawful) and 350 (False Advertising Unlawful) for deceptive

7    trade practices or false advertising.  Although again difficult to discern, Person's claims appear

8    to be based on the assertion that he was entitled to pay a certain minimum per-click price,

9    without any change over time.  *See* Compl. ¶¶ 136-58.

10          Specifically, Person alleges that he accepted Google's "offered" bidding price of 1 cent

11    or 5 cents per-click and that he was "entitled" to pay this minimum price on a going-forward

12    basis.  *Id.* ¶ 137.  Several days later, according to Person, Google terminated his advertising and

13    advised that he would have to bid more per click for continued ads.  *Id.* ¶ 138.  Person further

14    alleges that after he increased his price per click bid, Google terminated his advertising and

15    advised that he had to make his advertising more appealing to searchers.  *Id.* ¶ 140.  (As

16    explained elsewhere in the Complaint, Person's Quality Score must have decreased because he

17    was not providing relevant content or landing pages for searchers – and thus his required

18    minimum bid price increased.  *See id.* ¶ 31.)  According to Person, he and "other small

19    businesses" were injured because they "spent time and effort to use AdWords, only to be rejected

20    by Google through substantially higher prices than originally promised, or by complete rejection

21    of the advertisers' advertising."  *Id.* ¶ 146.  Person further alleges that this conduct by Google

22    constitutes "false advertising, including bait and switch advertising."  *Id.* ¶ 152.

23          To maintain a claim under General Business Law § 349 for deceptive acts or practices, a

24    plaintiff must allege (1) a consumer oriented act or practice, (2) that is misleading in a material

25    respect, and (3) injury resulting from such act or practice.  *Exxonmobil Inter-America, Inc. v.*

26    *Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 447 (S.D.N.Y. 2004).  To maintain a

27    claim under General Business Law § 350 for false advertising, a plaintiff must allege the same

28    elements, although with specific reference to a defendant's advertising.  *See Maurizio v.*

1   *Goldsmith*, 230 F.3d 518, 522 (2d Cir. 2000); *accord Goshen v. Mut. Life Ins. Co. of N.Y.*, 98

2   N.Y.2d 314, 324 n.1 (2002).  While Person also references General Business Law §§ 349-c and

3   350-e, those provisions do not create separate liability.  Rather, they address specific remedies

4   for violations of §§ 349 and 350.

5           Person fails to allege the first two elements for a claim under either §§ 349 or 350.

6           **A.      Person Fails to Allege Consumer Oriented Conduct**

7           *First*, Pearson fails to allege any consumer-oriented conduct.  The New York Court of

8   Appeals has made clear that §§ 349 and 350 have a "public focus" and are directed at "wrongs

9   against the consuming public":  A plaintiff must "charge conduct of the defendant that is

10  consumer-oriented" and "demonstrate that the defendant's acts or practices have a broader

11  impact on consumers at large."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland*

12  *Bank*, 85 N.Y.2d 20, 24-25 (1995); *see also Exxonmobil Inter-America, Inc.*, 328 F. Supp. 2d at

13  448 ("New York courts have generally found that business-to-business transactions do not give

14  rise to § 349 claims."); *Genesco Entm't v. Koch*, 593 F. Supp. 743, 751 (S.D.N.Y. 1984) ("The

15  typical violation contemplated by [§ 349] involves an individual consumer who falls victim to

16  misrepresentations made by a seller of consumer goods usually by way of false and misleading

17  advertising."); *Canario v. Gunn*, 751 N.Y.S.2d 310, 311 (App. Div. 2d Dep't 2002) ("Private

18  transactions without ramifications for the public at large are not the proper subject of a claim

19  under General Business Law § 350.").   In contrast, Person's own allegations indicate that

20  Google's challenged conduct is directed at businesses (such as his own) – and not at the

21  consuming public at large.  *See* Compl. ¶¶ 146, 147, 157 (alleging injury to plaintiff and other

22  small businesses).

23          *Cruz v. NYNEX Information Resources*, 703 N.Y.S.2d 103 (App. Div. 1st Dep't 2000), is

24  instructive here.  In *Cruz*, the Appellate Division addressed the question of whether small

25  businesses constitute "consumers" protected by §§ 349 and 350.  *Id*. at 104.  Analogous to the

26  facts here, the plaintiffs in *Cruz* were small businesses that had purchased advertisements in the

27  defendants' "Yellow Pages."  *Id*.  Reversing the trial court, the Appellate Division concluded

28

1    that allegations based on business advertising transactions did not fall within the statutory ambit.

2    *Id.* at 107.

3         The *Cruz* court began by noting that the term "consumer" under New York law is

4    "consistently associated with an individual or natural person who purchases goods, services or

5    property primarily for 'personal, family or household purposes'." *Id.* at 106.  The court also

6    observed that the statutes' primary concern was with consumers, and that the statutes'

7    application to disputes between businesses was "severely limit[ed]." *Id*. at 107.  Noting that

8    advertisement space in the Yellow Pages is a commodity available to businesses only, the court

9    reasoned that the advertising transactions at issue fell outside the scope of the consumer

10   protection statutes. *Id*.

11        Similarly, the advertising purchased by Person on AdWords does not constitute a

12   "consumer" *purchase* for "personal, family, or household purposes."  Rather, Person used

13   AdWords to *market* his publications, legal business, and candidacy for elective office.  Compl. ¶

14   6.  As such, Person fails to identify any consumer-oriented conduct by Google.  *See Vitolo v.*

15   *Mentor H/S Inc.*, No. 06-1794-CV, slip op. at 3, 2007 WL 28302 (2d Cir. Jan. 3, 2007)

16   (summary order) (available at www.ca2.uscourts.gov) (affirming finding of no "consumer

17   oriented conduct" where members of public at large were not affected by alleged

18   misrepresentation, and where no agency or consumer group was required to undertake

19   unnecessary investigation due to alleged misrepresentation).

20   **B.        Person Fails to Allege a Misleading Act or Practice by Google**

21        *Second*, Person fails to allege any misleading act or practice by Google.  Person points to

22   two portions of Google's AdWords website, which describe the "[b]idding" and "[c]alculating

23   [p]rice" processes for the auction process through which advertisers bid their desired price and

24   obtain a price for advertising on AdWords.  Compl. ¶¶ 13, 13A (referencing document found at

25   https://adwords.google.com/select/afc/ pricing.html.).

26        Person first complains that Google "offered" him a minimum price of 1 cent and 5 cent

27   per-click for advertising, although he fails to provide specifics as to how those prices were

28   "offered" to him or when.  *See* Compl. ¶ 137; *see also Pelman v. McDonald's Corp.*, 237 F.

1    Supp. 2d 512, 526 (S.D.N.Y. 2003) (dismissing claims under §§ 349 and 350 for lack of

2    specificity; "A plaintiff must plead with specificity the allegedly deceptive acts or practices that

3    form the basis of a claim under the Consumer Protection Act."). Person then claims that Google

4    wrongly required a higher price per-click several days later. Compl. ¶ 138.

5        The AdWords website, however, nowhere states that a price obtained through the bidding

6    process remains constant over time. To the contrary, the website document referenced by Person

7    specifically states that "Ad space is not reserved in advance. Ads compete on a real-time basis

8    and are served immediately." The website document also describes that "[a]dvertisers set the

9    highest amount they would like to spend per day for each campaign." The website document

10   thus indicates that the auction process is ongoing, and that pricing changes over time based on

11   competing bids and an advertiser's Quality Score. As such, while Person charges that he was

12   later required to bid higher prices than he was "originally promised" through an auction process,

13   Compl. ¶¶ 146, 157, his own allegations, the Google website he references, and the very nature

14   of a competitive bidding process all demonstrate that no promise of static pricing was ever made.

15   Indeed, although he never had to reach the issue, Judge Patterson made this very point at the

16   conclusion of oral argument on Google's motion to dismiss, saying:  "As for the deceptive

17   practices, it does seem to me in looking at the website pages that are included in the motion to

18   dismiss that those don't appear to be deceptive." Kramer Decl. Ex. F at 67-68.

19       Person also complains that Google advised him that he had to make his advertising more

20   appealing to searchers and obtain a higher percentage of click-throughs. Compl. ¶ 140. Again,

21   Person's own allegations demonstrate that there was nothing misleading here. To the contrary,

22   Person himself references Google's description of the Quality Score system, which affects an

23   advertiser's required minimum bid price. *Id.* ¶ 31. Google specifically advised advertisers that it

24   was seeking to improve the overall experience for Google searchers, by "increasing the quality

25   of the sites we present in our ad results." *Id.* Google explained to advertisers that it wanted to

26   ensure that their ad text and landing pages were relevant and meaningful for Google searchers:

27       [W]e always aim to improve our users' experience so that these users (your
         potential customers) will continue to trust and value AdWords ads. Have you ever
28       searched on a keyword, found an ad that seemed to be exactly what you wanted,

-17-

1

2

and then clicked on it only to find a site that had little to do with what you were searching for?  It's not a great experience. . . .

3

4

Advertisers who are providing robust and relevant content will see little change. However, for those who are providing a less positive user experience, the Quality Score may decrease and in turn increase the minimum bid required for the keyword to run.

5

6

*Id.*  To help advertisers improve their Quality Score, Google also provided website design tips

7

and guidelines "that should help you evaluate and optimize your site."  *Id.*  Thus, advertisers like

8

Person are fully apprised of the need to make their ads appealing to Google searchers, and

9

advertisers like Person are given tips to help them achieve this goal.

10

Person further complains that his advertising through AdWords was at times rejected or

11

stopped.  *See id.* ¶ 146.  Again, there is nothing misleading here.  To the contrary, the AdWords

12

Agreement expressly instructs advertisers that ads may be removed:  "Google or Partners may

13

reject or remove any ad or Target for any or no reason."  Agreement ¶ 2.  Given the express

14

descriptions and instructions provided to advertisers through the AdWords Agreement and

15

Google website – referenced by Person's own Complaint – Person fails to identify any Google

16

act or practice that was misleading in any material respect.

### CONCLUSION

17

For the reasons stated above, the Complaint should be dismissed.

18

Respectfully submitted,

19

Dated:  January 25, 2007

20

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

21

22

By: _____/s/_____
           David H. Kramer

23

24

Attorneys for Defendant
Google Inc.

25

26

27

28

DEFENDANT GOOGLE INC.'S MOTION TO DISMISS
Case No.:  C-06-7297 JF (RS)