# KRAMER EXHIBIT F

Dockets.Justia.com

69dQperA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CARL E. PERSON,

4                    Plaintiff,

5              v.                          06 CV 04683 (RPP)

6    GOOGLE, INC.,

7                    Defendant.

8    ------------------------------x
                                          New York, N.Y.
9                                         September 13, 2006
                                          11:00 a.m.
10
     Before:
11
                    HON. ROBERT P. PATTERSON, JR.,
12
                                          District Judge
13
                              APPEARANCES
14
     CARL E. PERSON
15        Attorney for Plaintiff

16   WILSON, SONSINI, GOODRICH & ROSATI, PC
          Attorneys for Defendant Google, Inc.
17   JONATHAN JACOBSON
     SARA CIARELLI
18   DAVID H. KRAMER

19

20

21

22

23

24

25

1                    (In open court)

2                    THE DEPUTY CLERK:  Is the plaintiff ready?

3                    MR. PERSON:  Plaintiff is ready.

4                    THE COURT:  Good morning Mr. Person.

5                    MR. PERSON:  Good morning.

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 3 of 70

6                    THE DEPUTY CLERK:  Is defendant ready?

7                    MR. JACOBSON:  Defendant is ready, your Honor.

8                    THE COURT:  Mr. Jacobson?

9                    MR. JACOBSON:  Yes, your Honor.

10                   THE COURT:  You have Mr. Kramer and Ms. Ciarelli with

11   you?

12                   MR. JACOBSON:  Yes, your Honor.

13                   THE COURT:  Ms. Ciarelli.  Sorry.

14                   MR. JACOBSON:  Your Honor, Mr. Kramer is admitted to

15   the bar of the State of California.  We will be getting his

16   pro hoc papers in, but with your permission, I've asked him to

17   sit with us at counsel table today.

18                   THE COURT:  Any objection?

19                   MR. PERSON:  No objection, your Honor.

20                   THE COURT:  All right.  I'll hear from the defendants

21   on their motion to dismiss.

22                   MR. JACOBSON:  Thank you, your Honor.

23                   Your Honor, the complaint in this case asserts claims

24   first for antitrust violations under the Sherman Act and New

25   York and California law, and, second, under the New York

1    General Business Law for allegedly deceptive practices.  My

2    client is Google.  Google is a well-known and very popular

3    internet web site that consumers use to search and to locate

4    information over the internet.  We have moved to dismiss the

5    complaint on two grounds; first, under Rule 12(b)(6) for

6    failure to state a claim, and, second, under Rule 12(b)(3) for

7    improper venue.

8         I'd like to start with the 12(b)(6).  All of

9    Mr. Person's claims are based on the price structure that

10   Google has established for advertising on its site through a

11   program called AdWords.  Mr. Person charges that as a result of

12   pricing changes for AdWords made during 2005, Google's prices

13   to small advertisers are now too high, and that Google

14   discriminates in favor of large advertisers by charging them

15   lower prices.  Of course, this is a 12(b)(6), so we assumed the

16   well-pleaded allegations of the complaint to be true.

17        According to the complaint, advertising under the

18   AdWords program is conducted through an auction process.  A

19   business that has a web site will bid on a searchable keyword

20   or phrase.  For example, the word antitrust by indicating how

21   many cents, pennies, the bidder is willing to pay each time an

22   internet user clicks on his or her ad.  Clicking on the ad

23   takes the user to the advertiser's web site and through that

24   process generates revenue.

25        Mr. Person uses AdWords, his complaint says, to

1    advertise both his law practice and his current candidacy for

2    state attorney general of the State of New York.  He objects to

3    two features of the AdWords pricing.  First, as set forth in

4    paragraph 31 of his complaint, he objects to the quality

5    adjustments that Google has for advertising.  Now, what that

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 5 of 70

6    means is that advertiser web sites are subject to mechanized

7    evaluation by Google on the basis of their design and their

8    expected interest to users.  If a site --

9              THE COURT:  Just a moment.  Of a what?

10             MR. JACOBSON:  If a site is deemed through this

11   process to be less relevant to the user, then the advertiser

12   pays more per click than a different advertiser.  An example,

13   your Honor --

14             THE COURT:  Isn't that a subjective test?

15             MR. JACOBSON:  It is.  It's mechanized, but we can

16   assume it's alleged in the complaint to be subjective.  We can

17   assume that for purposes of the motion.  It doesn't make a

18   legal difference for reasons I will explain.  It is subjective

19   in a sense.  Let me give you an example.  Let's talk about *The*

20   *New York Times* as a more easily understandable example of a

21   similar process.  *The New York Times* --

22             THE COURT:  I just was questioning the use of the word

23   mechanized which indicates it wouldn't be subjective.  It would

24   seem to me it has to be subjective, but maybe I'm wrong.

25             MR. JACOBSON:  It is subjective.  It's a mechanized

1    process.  It is subjective in the sense that the process

2    reaches results that differ based on what appears on the

3    advertiser's web site.  So it is not subjective in the sense

4    that there's someone in a room deciding I like this web site

5    better than another, although we can assume that to be the case

6    for purposes of this motion.

7              It's in fact mechanized because there are millions of

8    advertisers and millions of users and as a practical matter

9    could not be done any other way.  The example I was going to

10   use is, let's say, you are an auto dealer and you are

11   advertising.  *The New York Times* might say well, we're going to

12   charge you one price if you place your ad in the auto section

13   with everyone else's, but we may charge you a different price

14   to advertise in the home and garden section or in the news

15   pages of the paper.  This is a determination that's like that.

16             Google, and this is right in the complaint, wants to

17   make the user experience more rewarding, and, therefore, the

18   advertisements that are favored through the process are ones

19   that are more relevant to the search.  Another example --

20   Mr. Person complains in the complaint that he's used words like

21   jelly bean and bear hug and that his per click price to use

22   those phrases is too high based on his allegations.  Now, bear

23   hug and jelly bean are interesting words that you might search

24   for on the internet, but they really don't have anything to do

25   with Mr. Person's law practice, or, I don't believe, his

1  candidacy for state attorney general.  Perhaps so, but one

2  could see that they would be deemed less relevant through this

3  mechanized process.

4       THE COURT:  He might have a picture of himself and

5  Eliot Spitzer bear hugging.

6       MR. JACOBSON:  Or eating jelly beans.  But in general

7  this process will determine that that is a less relevant word

8  for someone who's running for attorney general than other ones.

9       So, Mr. Person's objection is based on these quality

10  determinations that affect the pricing, and he alleges -- and

11  we can assume this to be true for purposes of the motion --

12  that the result of this is that large advertisers such as eBay,

13  an auction site, and Amazon.com wind up paying less on a per

14  click basis and maybe significantly less than he would pay for

15  the same word.

16       Now, what are the legal theories alleged in the

17  complaint that suggest that that might be a violation of the

18  Sherman Act?  The theory is that Google is a monopoly or near

19  monopoly, and, again, we certainly dispute that, but we can

20  assume it to be true for purposes of the motion, and, he says,

21  it is illegal for Google as a monopoly --

22       THE COURT:  Monopoly in what market?

23       MR. JACOBSON:  According to the complaint, the

24  internet search advertising market, your Honor.  The

25  allegations are that Google is a monopolist in that market.  We

1  would dispute the proposition that that's a properly defined

2  relevant market.

3          THE COURT:  The national market or New York market?

4          MR. JACOBSON:  It's not specified, but I believe it's

5  global.  As alleged in the complaint, it's either national or

6  global, your Honor.  The theory is that it's illegal for a

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 8 of 70

7  monopolist to discriminate against its customers where the

8  effect of the monopoly may be to favor one customer against the

9  other and allow that customer a competitive advantage.  That is

10  the theory of the complaint.

11          The problem with that theory is that it is contrary to

12  law.  The Supreme Court said just two years ago in the Trinko

13  case 540 U.S. 398, that charging of high or monopoly prices is

14  not only not unlawful, but now I'm going to quote the Court,

15  but is an important element of the free market system.  So

16  charging high prices is not illegal under the antitrust laws

17  nor is it illegal to charge discriminatory prices under the

18  Sherman Act.  There is nothing illegal about charging lower

19  prices, assuming this to be true, to advertisers who are bigger

20  or are judged to have a better quality score.

21          There are numerous cases to that effect that we cite

22  in the brief.  Let me mention a couple.  First is the Official

23  Airlines Guide case, a Second Circuit decision from 1981, your

24  Honor.  Another is a decision by Justice Brier when he was

25  sitting on the First Circuit in a case called Monahan's Marine.

1   There's another case cited in the brief called Soap Opera Now.

2   There are numerous cases.  They're all cited in our briefs, and

3   they basically establish the proposition -- and there's no

4   authority to the contrary -- that it is not a violation of the

5   Sherman Act for a firm, whether it's a monopolist or not, to

6   charge discriminatory prices to its customers.

7           There is a federal statute that addresses price

8   discrimination.  It's called the Robinson Patent Act, and your

9   Honor is very familiar with that statute.  But the Robinson

10   Patent Act does not apply to services and in particular does

11   not apply to advertising services, and Mr. Person concedes that

12   in his papers.  There is nothing under the Sherman Act that

13   renders this conduct illegal, and, therefore, the claims under

14   section two of the Sherman Act must be dismissed, with all

15   respect, your Honor, under Rule 12.

16           Now, Mr. Person also advances a conspiracy claim under

17   section one of the Sherman Act and also under the Donnelly Act

18   and the Cartwright Act.  The theory of the conspiracy is that

19   Google's contracts with eBay or with Amazon amount to a

20   conspiracy among those competitors to receive unlawful

21   discriminatory prices from Google.  That claim is also

22   dismissible, your Honor, because there are no facts alleged in

23   the complaint and no conceivable way to allege facts, certainly

24   to our knowledge, to suggest that any of the customers have

25   conspired among themselves.  There's no allegation that eBay

1   and Amazon have conspired.  It's just that they have contracts

2   with Google.  The Second Circuit's decision in Pepsi against

3   Coke, your Honor, 315 F.3d 101 --

4           THE COURT:  Did they enter different contracts than --

5   this is all AdWords, isn't it?

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 10 of 70

6           MR. JACOBSON:  Yes, it's the same AdWords contract.

7           THE COURT:  I'll have to hear from Mr. Person, but

8   everyone adheres under the same AdWords contract.  It's the

9   only one offered?

10          MR. JACOBSON:  Mr. Person alleges that there are

11  secret deals.  This is completely untrue, but there are

12  allegations that there are secret deals that favor Amazon and

13  favor eBay.  We can assume that to be true for purposes of the

14  motion.  It's not, but we can assume it to be true.  It still

15  doesn't state a claim of conspiracy unless there are

16  allegations that Amazon and eBay or other advertisers conspired

17  among themselves.  That's the square holding Pepsi against

18  coke, your Honor.

19          THE COURT:  In what market are you talking about?  Are

20  you saying that they are conspiring amongst themselves to

21  eliminate competition from other advertisers, or are you saying

22  they're conspiring with Google to eliminate competition from

23  other advertisers?

24          MR. JACOBSON:  Well, I would deny all of the above,

25  your Honor, but...

69dQperA

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 11 of 70

1        THE COURT:  I mean, what does the complaint allege?

2        MR. JACOBSON:  The theory of the complaint is that

3    there's a conspiracy between eBay and Google, and then between

4    Amazon and Google and between other large advertisers and

5    Google through their separate customer supplier relationships

6    that Mr. Person alleges amount to a horizontal conspiracy

7    because Google has agreements with each of these companies.

8    The gap in that, the reason that the allegations are legally

9    deficient is that kind of hub-and-spoke sort of conspiracy

10   argument is not an allegation of a horizontal conspiracy under

11   the antitrust laws.  Again, that's Pepsi against Coke.  There's

12   a Fifth Circuit case called Spectators that we also cite in the

13   brief.  It's a well-established proposition in antitrust law

14   that you can't have a hub-and-spoke conspiracy.  You have to

15   allege that there is a rim to the conspiracy, to use the

16   criminal law context; that there is a conspiracy among those

17   participating the rim, and that there's no allegation of that

18   sort in this complaint nor can there be, your Honor,

19   consistently with Rule 11.

20        So those are the antitrust theories both under the

21   state law claims and the antitrust claims.  Let me mention the

22   remaining claims which are under Section 349 and Section 350 of

23   the General Business Law.

24        Mr. Person contends that Google has falsely advertised

25   the AdWords program, and that the program amounts to a

1   deceptive practice.  Now, we vigorously deny all of that, but

2   let's assume that the allegations in the complaint are

3   accurate.  The complaint still fails to state a claim because

4   Sections 349 and 50 of the GBL apply only to consumer-oriented

5   conduct.  There is an appellate division decision called Cruz

6   which is cited in the brief, your Honor, which establishes that

7   advertising, small business advertising, and deception which,

8   again, we dispute here, but let's assume there was deception,

9   that deception affecting small business advertisers does not

10  state a claim under the General Business Law.

11         Here the allegations are not that consumers have been

12  deceived.  Consumers go to the web sites, and they'll go to

13  eBay or Amazon.  The AdWords program is not directed at

14  consumers.  It's just as in the Cruz case where you're dealing

15  with the Yellow Pages.  The Court said, well, advertising in

16  the Yellow Pages is something for businesses.  Consumers may

17  read the Yellow Pages, but the advertising and, therefore, the

18  deception is not directed at consumers.  It's directed against

19  the businesses, and that is insufficient under the General

20  Business Law to state a claim.

21         Now, there's another reason why the General Business

22  Law claims are insufficient, your Honor; that is, assuming all

23  the facts alleged in the complaint to be true, there is no

24  deception.  All of the discrimination and pricing practices

25  that Mr. Person complains about are described in detail on the

69dQperA

1   very Google web sites that he attacks in the case.  It's all

2   laid out.  He doesn't like the pricing.  We understand and

3   respect that.  We regret it.  He doesn't like the pricing.  We

4   would like him to like the pricing, but he doesn't, but he's

5   not misled.  All of the bases for his allegations that the

6   description of the advertising are misleading are in fact from

7   those very descriptions.  So how could it be misleading?  He

8   doesn't like the effect of the practice.

9          We don't prognosticate on our web site that the effect

10  of the practice may be to give Mr. Person a disadvantage on a

11  particular word as opposed to eBay, but if businesses such as

12  Google had to get in the business of prognosticating the

13  effects of their programs on each consumer, then we would run

14  into deception problems.  We don't run into deception problems

15  from explaining exactly what the process is and letting it work

16  itself out in the marketplace.

17         So, for these reasons, your Honor, we believe that

18  none of the claims in the complaint come close to stating a

19  claim, and that dismissal under 12(b)(6) is appropriate.

20         THE COURT:  What about the California law?  Isn't

21  there a claim under California consumer laws?

22         MR. JACOBSON:  No, it's under the Cartwright Act, your

23  Honor.  It's the antitrust claim.  It's the same as the

24  Donnelly Act claim.  It's the same as section one of the

25  Sherman Act claim.

1        Now, your Honor, our papers leave with the point, and

2 I certainly want to emphasize, that there is a separate and

3 independent ground for dismissal of the complaint, and that's

4 for improper venue under Rule 12(b)(3). The AdWords program

5 includes a venue selection clause, and the form of agreement

6 that, I believe it's undisputed, Mr. Person assented to in

7 November of 2003 when he joined the AdWords program, says as

8 follows: Any dispute or claim arising out of or in connection

9 with this agreement shall be adjudicated in Santa Clara County,

10 California. So there is a venue selection clause. It requires

11 any litigation to be brought in Santa Clara County, either

12 federal or state court, and, therefore, the complaint here

13 should be dismissed for the additional reason that the venue

14 alleged in the complaint is improper.

15        Now, Mr. Person argues that this is an antitrust case

16 and his choice of forum should be respected. Of course his

17 choice of forum should be respected, but it doesn't overcome a

18 venue selection clause. The courts have been very clear. The

19 Supreme Court decision in *Alberto v. Sherk* from 1974. The

20 Supreme Court decision in the Mitsubishi case in 1985. There's

21 a Second Circuit case called *Bense v. Interstate Battery*, 683

22 F.2d 718, states that notwithstanding that the plaintiff has

23 filed an antitrust case, a venue selection clause is

24 appropriate and will be enforced, and with respect to

25 Mr. Person, there's no argument that really can be made

1     otherwise.

2              So, your Honor, we have brief --

3              THE COURT:  Applied to a false advertising claim?

4              MR. JACOBSON:  Yes, your Honor, because all of the

5     claims arise out of the AdWords agreement or relate to the

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 15 of 70

6     AdWords agreement.

7              THE COURT:  But if it's false advertising, it doesn't

8     necessarily depend on a contract, does it?

9              MR. JACOBSON:  But it's false advertising relating --

10    I'm troubled with the word false because it's not false for the

11    reasons I've been talking about, but assuming that it is, it

12    still is an allegation that relates to the agreement, and,

13    therefore, is encompassed by the scope of the venue clause,

14    your Honor.

15             So, your Honor, we ask that you dismiss the case on

16    both grounds.  If there are no further questions at this time,

17    I'd like to hear what Mr. Person says, and I'd like a few

18    minutes to rebut him when he's finished.  Thank you, your

19    Honor.

20             MR. PERSON:  Good morning, your Honor.

21             THE COURT:  Good morning, Mr. Person.

22             MR. PERSON:  The venue issue is one that really

23    doesn't hold any water at all.  They didn't put in any

24    agreement that I signed in their moving papers, and they say

25    somehow that they didn't know from my complaint when I started

69dQperA

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 16 of 70

1    as a customer of AdWords.

2         THE COURT:  Well, don't you have to sign mini

3    agreements under this arrangement?  Don't you have to sign mini

4    agreements depending on when you enter the system?  Your first

5    agreement might have been in 2003, but in your motion for

6    preliminary injunction, I noticed you quoted 2006 agreements.

7         MR. PERSON:  That was what they have today.  That's

8    the agreement today that they're having newcomers to the

9    system.

10         THE COURT:  But every time you bid on, don't they

11    offer you a different -- the current contract?

12         MR. PERSON:  I am unaware of that.  I don't believe

13    that I went through that, but I'm not sure.  I can't answer

14    that, your Honor.

15         THE COURT:  You have to mark that or click on the --

16    you have to click in, don't you, to show your acceptance?

17         MR. PERSON:  Well, you have a code word already.  They

18    give you a password, and you go right into the system and you

19    put in the new changes.  I don't think you go through another

20    agreement.  Everyone signs an agreement along the way, so that

21    we're all tied into taking Google and every other person's bid.

22    It's really a price fixing scheme, but let me get back to that.

23         I wanted to talk about the venue.  They didn't put in

24    the agreement that I signed, and then they say I didn't give

25    them any date when I started.  In paragraph eight of my

69dQperA

1  complaint, I gave the November 2003 and I gave my customer

2  number, so they had every opportunity to look me up and provide

3  the papers, but instead they come back in what is really

4  sandbagging to say, oh, now they've found an agreement.  It

5  really isn't a formal agreement.  It isn't what I had agreed to

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 17 of 70

6  because there were clicks and other things that gave me

7  options, and I don't see them in whatever they're producing the

8  second time.

9          THE COURT:  Well, do you have the agreement that you

10  agreed to?

11          MR. PERSON:  No, they don't give you a chance to down

12  load it.  They just tell you to click here and you go ahead and

13  click.

14          THE COURT:  You mean you don't down load the agreement

15  that you're signing?

16          MR. PERSON:  There's no facility to do that, your

17  Honor.  They don't encourage you to do it.  They don't make it

18  available.  It's all gone as data that leaves the screen and

19  now you're in their system.  So I don't know what I signed, but

20  I'm assuming I signed whatever they were offering back in 2003.

21          THE COURT:  How are you prejudiced by using the

22  current contract?  Their moving papers and then their reply

23  papers giving you the language of the earlier agreement.

24          MR. PERSON:  Well, in their motion they should prove

25  in the moving papers what it is that entitles them to venue.  I

1    don't think they've done that at all, and now they come back

2    and sandbag me and say, well, here's something else, how about

3    this?

4          THE COURT:  Don't both of them call for California law

5    to be applied and for jurisdiction of California?

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 18 of 70

6          MR. PERSON:  They say that that's true, and I haven't

7    seen a document that shows that I signed it.  I signed a

8    document, but they haven't shown it to me, and they haven't

9    shown a facsimile of what I did sign because it had options.  I

10   don't even see these options on the paper they show today.  So

11   I don't know what it is that I signed.  I do know that I signed

12   something.

13         THE COURT:  What were the nature of the options?

14         MR. PERSON:  Do you agree with it?  Don't agree,

15   disagree, so on and not be allowed in the system.  So I went

16   ahead and assented to whatever it was they gave me.  I don't

17   know what it was, but I did assent to it.  Everyone assents to

18   it.  We're all bound with all of the activities that go around

19   with each of us.  We're all in a single price fixing scheme.

20   That's really the heart of the problem; that we're all part of

21   an agreement to fix prices of the bid.

22         THE COURT:  It's my practice if someone feels that

23   they're sandbagged to, of course, raise the -- to object to the

24   reply papers and file a surreply if they've been sandbagged or

25   raise it at the time of argument.  I just want to decide the

69dQperA

1    case in the appropriate way on the basis of the facts that are

2    agreed exist.  If you want more time to respond to the reply

3    papers, you should have asked for it, and I would even consider

4    allowing you to have more time to file a surreply to --

5            MR. PERSON:  Your Honor, I don't have any additional

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 19 of 70

6    information than what I'm saying.  I don't think that what

7    they've shown you either way is not way signed.  They're saying

8    in substance it is, but I don't know.

9            THE COURT:  It isn't the complete agreement is what

10   you're saying?

11           MR. PERSON:  It's not the complete agreement, and you

12   can't be bound by an agreement unless they show what the

13   agreement is, and they haven't done that.  They haven't shown

14   the whole agreement.  They have parts of what purports to be,

15   according to them, an agreement that I signed, but it isn't the

16   whole agreement, and I don't think they should be able to --

17           THE COURT:  Well, if it purports to be the whole

18   agreement, it starts on paragraph one and goes through to

19   paragraph whatever with a signature page.

20           MR. PERSON:  The signature clauses, preliminary

21   matters.  I mean, it isn't what I signed, but it's something

22   that they say is the substance of what I signed, but it's not

23   the agreement, so they don't have the agreement.  I don't have

24   the agreement.  So that's my position, your Honor.  I don't

25   need a surreply or further reply with respect to that.

69dQperA

1        The question, however, of -- let's say if WalMart

2    would have a sign in the door that anyone who purchases any

3    goods at all in WalMart is required to sue WalMart in

4    Bentonville, Arkansas, otherwise don't bother to come in the

5    door.  Clearly, that is unreasonable and against public policy.

6    It's unconscionable for somebody that's a major corporation

7    that's dealing with everyone in the world to require everyone

8    to go to Bentonville, Arkansas if they planned to sue WalMart.

9        Google is the WalMart of the electronic world.

10   Everyone in the world deals with Google.  Here they're trying

11   to direct any complaints against Google to their hometown in

12   what is obviously a forum selection scheme that they have.  The

13   ability to destroy the judiciary, your Honor, is inherent in

14   any scheme like that where major corporations will start

15   looking at the most favorable judicial place for themselves and

16   then everyone moves to that one judicial district, and it

17   really will be destructive of the judicial system.  We

18   shouldn't allow that.  It's unconscionable, and it's against

19   public policy.

20       THE COURT:  In your papers you suggested that they

21   move from one district to another -- move the location of their

22   business, as I recollect, during the periods involved.  And

23   then you seem to consent to Santa Clara County in the

24   alternative.

25       MR. PERSON:  Well, your Honor, rather than having my

69dQperA

1    action dismissed -- may I take a detour for about a minute to

2    explain why I brought the action?

3              THE COURT:  Sure.

4              MR. PERSON:  I'm running for attorney general as

5    minority candidate.  I figured out how I can win this election.

6    All I need is to have a permissive list on e-mail of about

7    1 million people who have come into my list, are willing to

8    receive my e-mails in which I'm pushing my candidacy, getting

9    contributions, getting volunteers.

10             I can do so at their advertised lowest per click rate

11   of a penny per click when I use words that other people don't

12   like.  All I have to do is find words that have no demand.

13   Then I can get in at a penny a click and develop a list of

14   1 million people.

15             THE COURT:  How can you develop a list on that basis?

16             MR. PERSON:  By advertising -- I wasn't planning to do

17   it, but with one of those words, numbskull or whatever those

18   words are.  Do you want to vote for a numbskull?  Here's the

19   real person to vote for.  You can use words and convert them

20   into a political context.

21             THE COURT:  So let's use numbskull.

22             MR. PERSON:  I can get them to click on my web site,

23   and the issues I have are very much in favor of the people.  I

24   fully expect that people for a penny or maybe 20 percent more

25   than a penny, having had maybe only an 80 percent click-through

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 21 of 70

69dQperA

1    rate or something like that, I would be able to develop a list

2    of 1 million people, my own newspaper, in effect, for about

3    $12,000.

4              THE COURT:  I hear you, but let me ask you a question.

5              MR. PERSON:  Sure.

6              THE COURT:  It depends on if they're clicking on your

7    ad.

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 22 of 70

8              MR. PERSON:  The only ad.  It would be the only ad up

9    there because I was choosing ads to make words that aren't

10   wanted.

11             THE COURT:  Did you select a word and buy an ad?

12             MR. PERSON:  I did, your Honor.  I tried, and they

13   said these words aren't available.

14             THE COURT:  In other words, you never had the

15   experience of having an ad displayed on Google at all?

16             MR. PERSON:  I've advertised quite a bit on Google,

17   your Honor.

18             THE COURT:  How many words are clicked?

19             MR. PERSON:  The click-through rate is under

20   one percent general for the ads that I have.

21             THE COURT:  What does one percent mean in terms of the

22   numbers?

23             MR. PERSON:  It means if they display my ad 100 times,

24   my web site, whichever ones, will get one click only out of a

25   hundred, whereas eBay might get 40 clicks out of a hundred.

69dQperA

1         THE COURT:  How long did you run your ad?

2         MR. PERSON:  I'm willing to run them forever, your

3  Honor.

4         THE COURT:  How long did you run them?

5         MR. PERSON:  From 2003 up to the present.  I'm still

6  running ads, your Honor.

7         THE COURT:  How many clicks have you gotten in that

8  period?

9         MR. PERSON:  This isn't on the political ads because

10  they cost -- they want too much money.  They want like 50 cents

11  a click instead of the penny that they've advertised.  Even

12  when I'm at the bottom of the list, so I can't afford it.

13         THE COURT:  I understand, but how many clicks have you

14  had?

15         MR. PERSON:  I'm sorry?

16         THE COURT:  How many clicks have you had?

17         MR. PERSON:  I've had -- I can only give you the rate,

18  your Honor.  I know what my rate is.  It's about one percent or

19  under.

20         THE COURT:  What I'm trying to determine is whether

21  there's any -- whether your thoughts of getting 10,000

22  responses from New York State for your political site is even

23  within the realm of likelihood?

24         MR. PERSON:  It's only a function of money.  If I get

25  a penny per click, I only need to put in $10,000 worth to get a

1  million clicks.

2      THE COURT:  Why would that be?

3      MR. PERSON:  Because of the price they have.  At the

4  lowest price, it's one cent per click.

5      THE COURT:  Why would that low price guarantee you're

6  getting 10,000?

7      MR. PERSON:  I would be the only person showing an ad.

8      THE COURT:  But that doesn't mean that anyone would

9  click on it.

10     MR. PERSON:  But those that do click on it -- I

11  already have a one percent click-through rate, so those that do

12  click on it only cost a penny.  So I develop a list of a penny

13  per name on the list.

14     THE COURT:  You mean you take so many words that you

15  develop a list?

16     MR. PERSON:  You develop a list by the people who

17  click on your web site.  Then you ask them to join your e-mail

18  list where I will give them additional information.  It becomes

19  a permissive list at that point.

20     THE COURT:  Of the ones you have gotten, what

21  percentage are New York State residents?

22     MR. PERSON:  I would be targeting it for New York

23  State people.

24     THE COURT:  How do you do that?

25     MR. PERSON:  And Google does that for you.  They allow

1   you to limit your ad to New York State or what they feel are

2   New York State.  They have a system where they can evaluate the

3   source of the click -- of the person.

4          THE COURT:  Oh.

5          MR. PERSON:  And they know as a practical matter if it

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 25 of 70

6   comes from a New York server or not, so they give you that

7   option as part of their service.

8          THE COURT:  I see.  So they do that for you.

9          MR. PERSON:  Yes, your Honor.

10         THE COURT:  All right.

11         MR. PERSON:  So, basically, I'm saying that having

12  every one of their customers have to go to California when

13  they're a major company like that is not what our venue

14  provision -- that is, the Supreme Court says that if it's

15  unreasonable, if it's against public policy, and I see clearly

16  that if every big corporation selected its own district or

17  found the most favorable judicial district and had all of its

18  complaints there -- because that's what they put in.  They

19  don't even have to move anywhere.  They only have to put in a

20  provision directing everyone to their --

21         (Brief pause)

22         MR. PERSON:  So the case cited by my opponent *Bense v.*

23  *Interstate Battery* even says that the clause invalid for such

24  reasons as fraud or overreaching or unreasonable and unjust.

25  Those are the words from the case they're citing that say

1   that's when you stop giving -- you stop honoring a venue

2   selection agreement.

3       Everyone is forced into doing this thing to use a

4   monopolistic facility, and you don't really read this stuff

5   because if you do and you say no, then what are you going to

6   do?  Where are you going to go to get the service that you

7   need?

8       So in the case of major corporations that have

9   monopolistic businesses, it's really totally unreasonable to

10  say that everyone has to litigate in a place selected by them.

11  That is my position here, your Honor.

12      THE COURT:  You're arguing it's a contract of

13  adhesion.

14      MR. PERSON:  I'm sorry, yes, adhesion, a contract of

15  adhesion.

16      The Supreme Court has numerous cases.  There's ample

17  cases.  I can cite a few I found, but *Brown v. Flowers* and --

18  I'm sorry.  That's a different one.

19      I'm going to switch now to the substance, the motion

20  to dismiss under 12(b)(6).  First of all, AdWords is not

21  limited to business web sites.  It's any web site.  Anyone can

22  run ads on AdWords.  You can be a consumer.  You can be a

23  business person.  You can be somebody running for office.  In

24  that connection, I think running for office puts me in the

25  consumer side of things rather than on the business side of

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 26 of 70

1    things for a good part of what I'm trying to do with AdWords.

2        Their system of mechanical evaluation of hundreds of

3    millions of web sites is not disclosed.  They don't tell people

4    how this evaluation takes place where my willingness to pay a

5    penny in competition with others is suddenly elevated to 20

6    cents or a dollar.  They say, well, it's other reasons that

7    they don't even bother to disclose.  They candidly say, well,

8    it's other things as well.

9        THE COURT:  But it is disclosed, isn't it?  The fact

10   that you will not necessarily get your one cent is disclosed.

11       MR. PERSON:  They disclose this by saying that we

12   evaluate -- and the very method of evaluation winds up being

13   impractical for them to do, but they're doing it, and they're

14   looking essentially at my profitability to them, and that's

15   really the basis upon which they're doing it.

16       THE COURT:  Isn't that fair?

17       MR. PERSON:  When you have a monopoly, and you have a

18   purported auction, they're tipping the scale of the auction,

19   and they're turning it into a price fixing scheme rather than

20   an auction, and that's what I'm complaining about.

21       THE COURT:  Let's ask you.  If you went to *The New*

22   *York Times* and you wanted to buy an ad for your political

23   campaign, and you offered them $25 or $50 for your ad, and

24   requested it on the front page or perhaps you might get one of

25   those squibs where people are looking for their lost spouse or

1    what have you, but it would be about that big (indicating) on

2    the front page, or you could be relegated to the classified.

3    You wouldn't get a picture.  You wouldn't get any content of

4    any great significance.

5              MR. PERSON:  Well, all of us have ads that appear at

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 28 of 70

6    the same time with the search using the word elephant.  There

7    may be ten people who have ads for elephant.

8              THE COURT:  I'm looking at you and, say, Andy Cuomo.

9              MR. PERSON:  Well, Andy Cuomo, his ads will be clicked

10   on probably a lot more than mine because of his name

11   recognition and the amount of publicity.

12             THE COURT:  I'm talking with *The Times*.  He'll get a

13   picture.  He'll take a quarter of a page or half a page or full

14   page.

15             MR. PERSON:  *The Times* doesn't bid.  They give you a

16   price, and the one who takes it gets the page even though

17   somebody a week later says, gee, I wish I bought it.  There's

18   no bid.

19             THE COURT:  I don't know how they do it.

20             MR. PERSON:  They have a price sheet where they tell

21   you in advance to buy the back page which is $40,000 or

22   something like that, and he who gets it doesn't get thrown out

23   because someone else comes in a week later saying they're

24   willing to pay $50,000.  You get a price and you pay for it.

25             But Google's AdWords, when I go into their system and

1  I bid my penny or a nickel, they say we're not going to put

2  your penny or nickel bid into the system unless you agree

3  secretly to give them a dollar every time somebody clicks on

4  it, but we're only going to put your bid in at that penny or

5  nickel.  That dollar you're agreeing to pay is not going to put

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 29 of 70

6  you at the top of the list.  You're still only bidding a nickel

7  or a penny, but if we allow you to bid that nickel or penny and

8  you happen to win and come in at the bottom, you're going to

9  have to pay a dollar a play.

10       THE COURT:  Based on the content of your web site?

11       MR. PERSON:  Based upon more than that.  It's not the

12  content, your Honor.  They can't possibly evaluate content that

13  way.  That's just fuzz.  I mean, it's just -- they're

14  complaining about my click-through rate.  If my click-through

15  rate was 80 percent, they wouldn't care about the content

16  because the click-through rate, your Honor--

17       THE COURT:  That's right.  I think that's probably so,

18  but they say they have a method of anticipating your

19  click-through rate.

20       MR. PERSON:  The landing page, your Honor, is not seen

21  by the person who clicks until after the click is done.  So the

22  person who sees my ad has no idea what my landing page is, so

23  his decision to click on my ad has nothing to all to do with my

24  landing page.

25       THE COURT:  But your landing page's relevance to the

1  word may be very attenuated.

2          MR. PERSON:  People who click on my ad do so because

3  I've encouraged them to click.  Whether they buy from me or not

4  is another story, but I'm only paying and they're only

5  advertising a per click basis, and I'm willing to pay five or

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 30 of 70

6  ten cents per click.  So Google is saying that they evaluate my

7  landing page and 30 million others mechanically.  That's very

8  difficult for anyone to do.  They really cannot do that.  I

9  would like to see what it is they think is the software that

10  does that.  They're really looking to increase my price per

11  click in order to give them the same profit margin that eBay

12  and others give to them because they have a higher

13  click-through rate.  It's as simple as that.  I see the picture

14  very clearly.  They're forcing me to pay more.

15          It's like going to an auction for a painting which is

16  up for auction and the auctioneer says, Mr. Person, how much

17  are you bidding?  $5,000.  What are you going to use the

18  painting for?  Then he says, well, we can't accept that.

19  You're going to have to bid $100,000 for us to sell you the

20  painting.  We don't like your use of our painting.  They can't

21  do that.  This is an auction.  All of these people are --

22          THE COURT:  Why is it an auction?

23          MR. PERSON:  Because that's what they bill it as, and

24  we're bidding for the position.  There's a position for all

25  these ads.

69dQperA

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 31 of 70

1          THE COURT:  But don't they also tell you what the

2     entire process is?  It isn't just limited to a bid.  It's more

3     like a bridge game in which you finally bid 4 no trump when you

4     shouldn't.

5          MR. PERSON:  The bid comes up with, what I think they

6     call, arrays of data processing programs.  The minute somebody

7     types in elephant as a search, their arrays, their program

8     looks at all the people that want to bid on the word elephant,

9     and at that moment they hold an auction to determine the

10    relative position of each person that wants to have the ad

11    displayed to the person seeking elephants.  So at that last

12    moment they take a look and they say, in my case that even

13    though I'm only bidding a penny, I've agreed to pay a dollar,

14    but my bid goes in at a penny as the last one, and I might be

15    number 25 on the list and had no one at all ever click on my ad

16    because I'm at the bottom.  The people at the very top are in

17    the priority.

18          Your Honor, the top rate for a position is $100.  Some

19    law firms and others are paying $100 to have a person be --

20    have the opportunity to click on their ad at the very top of

21    the list.  Those that pay less go he to the bottom.  That's the

22    auction system.  It's an auction positioning system.

23          THE COURT:  I'm not a -- I have no expertise in this,

24    but it just seems to me that elephant bears no reference-- has

25    no -- to a viewer would not be likely to attract any clicks to

1  a law firm.

2        MR. PERSON:  Well, there's a million words that can be

3  used here.

4        THE COURT:  And similarly to an attorney general

5  candidate.

6        MR. PERSON:  Okay.

7        THE COURT:  If the word you select is a word that

8  brings to mind the attorney general race, then it seems to me

9  that there's a likelihood that you would get a lot of clicks,

10  and that they might be willing to pay less and have you pay

11  less than a dollar per click.

12        MR. PERSON:  Well, they start off --

13        THE COURT:  But if you pick elephant and bear hug and

14  these other words that don't seem to me to -- bear hug, I was

15  thinking when they were arguing, that bear hugging is a term

16  that is used in certain financial transactions that have been

17  the subject of litigation, so that might have some relationship

18  to law.

19        MR. PERSON:  Your Honor, they're not evaluating the

20  words I choose.  They're evaluating my landing page.

21        THE COURT:  Don't the two have to have a relationship

22  in order for them to be a likelihood of clicks?  It's a loss

23  for them to be -- it seems to me, it would be a loser for them

24  to give you a penny a click for elephant.

25        MR. PERSON:  Well, I never intended to use elephant or

1    numbskull or any of these other words.  I tried to find words

2    that aren't being used at all to show that there was no demand,

3    and they still won't let you use those words for which there's

4    no demand.  In other words, putting in governor New York or

5    something like that, they would want me to pay five cents a

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 33 of 70

6    click, and that's just outrageous when the lowest price is a

7    penny.  I should be able to get it for a penny.  I don't mind

8    being at the bottom of the list, but why do I have to pay 50

9    cents to do what AdWords --

10            THE COURT:  But isn't this all hypothetical, is what

11   I'm getting at.

12            MR. PERSON:  No.

13            THE COURT:  What are the facts that you're basing the

14   complaint on?

15            MR. PERSON:  I've tried this --

16            THE COURT:  What words did you select and try and find

17   that you were being charged exorbitant prices for?

18            MR. PERSON:  They're on the web sites right now.

19   They're active or inactive, but I have that stuff, and I forget

20   if I put it in as an exhibit or something like that.  I'm not

21   sure that I did, but I have been using this since 2003, and my

22   allegations are that when I use a word, they look at my

23   click-through rate, and they charge me more.  It doesn't matter

24   what words I use.  They charge me more.  They won't allow me to

25   go in.

1          THE COURT:  My point is, aren't they entitled to

2     charge you more?

3          MR. PERSON:  It's a scheme they're using to drive

4     people like me out of -- on one hand, it increases the demand

5     for the words they choose by not making the unused words

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 34 of 70

6     available.  They're creating a scarcity.  They're manipulating

7     the market by forcing us to all bid for the same word where it

8     causes a higher overall bid.  That's one thing.

9          Then they're driving us out of the market in another

10     way, and that is by increasing our price so that we don't even

11     participate at the price that the big companies do.  They want

12     to charge 10, 20 or a hundred times more.  So they drive us out

13     of the market by making it unprofitable for us to advertise at

14     these higher rates that they're demanding for us to participate

15     in an auction.  It's an auction.  We should be able to bid the

16     price that we're willing to pay; otherwise, do something else.

17     Don't hold an auction.  It's a manipulation of market and it's

18     an illegal pricing scheme.

19          THE COURT:  You say it's a manipulation of market.

20     Isn't it really -- doesn't that argument go to your false

21     advertising claim and not to your monopoly claim?

22          MR. PERSON:  It's antitrust.  You're manipulating a

23     market to create -- you're taking out your inventory of

24     hundreds of thousands of words that people would want at a low

25     price, and you're not making those words available.  You're

 1    only making words available that people want.

 2              THE COURT:  What obligation do they have to make all

 3    words available?

 4              MR. PERSON:  Well, it's an auction.  They don't list

 5    which words are available.  They pretend that anything is

 6    there.  You bid for it, and then they tell you it's inactive.

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 35 of 70

 7    It's not available.

 8              THE COURT:  Isn't that stated in the agreement --

 9              MR. PERSON:  I doubt it.

10              THE COURT:  -- in advertising, you don't get any word

11    you want.  They have some disclaimer in the contracts I've seen

12    that says that Google reserves the right to not allow the

13    words, not allow --

14              MR. PERSON:  Well, they eliminate --

15              THE COURT:  It's a sort of general disclaimer.

16              MR. PERSON:  They eliminate certain curse words, but

17    to eliminate numbskull or oakwood or something.  I mean, they

18    take out a lot of words to force their customers to bidding and

19    aggregating their bid on words that increases the overall

20    profitability to them, to --

21              THE COURT:  It must cost them something to take your

22    ad and spot it in.

23              MR. PERSON:  It doesn't, your Honor.  It's negligible.

24    It's less than --

25              THE COURT:  It probably very small.

1          MR. PERSON:  It's software.  They have it all built.

2     It's a no cost thing.  It's all profit to the bottom line with

3     them.

4          THE COURT:  Isn't it also the size of your ad too?

5          MR. PERSON:  No, the size of the ad is uniform among

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 36 of 70

6     all people.  We're all using the same form of ad.  It's

7     prescribed, and you don't deviate except if you're --

8          THE COURT:  It appears on the side?

9          MR. PERSON:  On the right side.  Then at the top, they

10    will also will have up to three at the top that are extended

11    out, but it's the same text.  It's a four line ad extended out

12    into three lines at the top.

13         THE COURT:  I see.

14         MR. PERSON:  And they have a greater position at the

15    top.  But they can take a 170, 200 ads and place --

16         THE COURT:  Doesn't where you're located on the page

17    make a difference?

18         MR. PERSON:  That's what the bid is all about, your

19    Honor.  That's why they have the bid.  If you bid a penny, you

20    come in at the bottom.  But they won't accept my penny.  They

21    want me to pay a dollar and still put me at the bottom.  It's

22    destructive of my ability to build a list at a dollar a name.

23    At a penny a name, I can do it.

24         THE COURT:  So what is the competition that you're

25    talking about that is being affected?

1       MR. PERSON:  The competition is that the people that

2  use AdWords, and AdWords, your Honor, is a most remarkable

3  system.  I use about it in the year 2004.  It's is a very

4  remarkable system.  Is so revolutionary that a person selling

5  airplane engines, for example, can get customers at a cost of a

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 37 of 70

6  penny per lead.  The engine might sell for $10 million.

7  Instead of running radio, television, newspaper, other trade

8  magazine advertising, having salesmen go out and visit, you can

9  get customers for your business for a penny per lead.  It is so

10  revolutionary that the newspapers are being affected quite

11  adversely by it.  Even Microsoft is trying to catch up and said

12  it's going to spend billions of dollars to try and catch up

13  with it.

14       THE COURT:  It doesn't seem me that it's likely that

15  airplane engines would get customers at a penny an ad.

16       MR. PERSON:  If a person wants to sell an airplane --

17  if I'm in the business of selling some kind of -- I don't know

18  the names of these airplanes, but a Piper Cub, I can run an ad

19  on Google for a Piper Cub and get people interested at maybe a

20  nickel or a penny a click, a lead, a legitimate lead of a

21  person looking for an airplane to buy at that moment.  But it's

22  so devastating -- I mean, it's so great what their system is,

23  the potential, that it's going to wipe out a lot of other forms

24  of advertising because of its fantastic efficiency.

25       THE COURT:  An airplane might be different, but

69dQperA

1    airplane engines I don't believe you're --

2        MR. PERSON:  It's available for anything that one

3    wants to sell and people disregard Yahoo at their own peril.

4    Not Yahoo, but AdWords at their own peril.

5        THE COURT:  What is the market you're talking about

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 38 of 70

6    here?  The relevant market that's being adversely affected.

7        MR. PERSON:  What I've alleged in my complaint, your

8    Honor, is that it's the keyword targeted internet advertising

9    market.

10        THE COURT:  What is the market that's being -- how is

11    it being affected adversely at the market?

12        MR. PERSON:  By giving the largest advertisers in the

13    nation a tremendous lower cost by charging more to people who

14    get pushed out of the market, and that gives the larger

15    advertiser a lower rate and encourages them to use Google which

16    then takes away -- takes away market share from Yahoo and from

17    Microsoft, who are the only other two real players in the

18    market.

19        THE COURT:  But they're not complaining about what

20    they've done.

21        MR. PERSON:  They generally don't.

22        THE COURT:  What?

23        MR. PERSON:  They generally don't.  Who would they

24    complain to?

25        THE COURT:  Bring an antitrust case.

69dQperA

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 39 of 70

 1          MR. PERSON:  Well, it doesn't happen that often, your

 2     Honor.  You need to rely upon the lower end of the spectrum to

 3     call attention to these things.  You can't expect the people at

 4     the top to be doing that.  They settle their actions by merger

 5     and acquisition quite often.

 6          THE COURT:  Well, how do you answer the cases that the

 7     defendants have brought up here?

 8          MR. PERSON:  They're trying to -- you can have a

 9     monopoly and charge whatever you want.

10          THE COURT:  The Trinko case, how do you answer that?

11          MR. PERSON:  Because the Supreme Court and every court

12     that says it, says that there are limitations on it; that if

13     you're using unfair tactics to increase market share, if you're

14     using your monopoly -- I mean, this is like unconscionable

15     pricing in order to give the big guys --

16          THE COURT:  Well, you don't show me they're using it

17     to increase market share.  What you're showing me is that

18     they're using it -- in terms of market share, you don't have

19     any allegations that they're using it to increase market share.

20          MR. PERSON:  I do, and I'm also asking for --

21          THE COURT:  There aren't any statistics or anything to

22     show that they're increasing the market share vis-a-vis

23     Microsoft or Yahoo.

24          MR. PERSON:  I've shown their growth from nothing.

25     They took over the market from GoTo which became Yahoo, and

1  they've risen to a point where people can't even challenge them

2  any more.  They're doing it by giving a much better pricing to

3  the largest advertisers, and that is driving larger advertisers

4  to Google, and it increases their market share as a result.

5      They don't need people like us.  The small people

6  they've decided they can do without.  Let the onus of the small

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 40 of 70

7  person fall upon the competitor.  So that's really the way that

8  the market is developing; that they're rejecting people like

9  me, and we would have to go then to the smaller --

10      THE COURT:  You don't show that by rejecting people

11  like you that they're gaining market share.

12      MR. PERSON:  They're increasing market share as a

13  monopoly, and they're hurting the others because --

14      THE COURT:  But you haven't shown, it seems to me on

15  the complaint, that by rejecting you, denying you the use, that

16  that's what increases their market share.

17      MR. PERSON:  They do it in two ways.  They do it by

18  forcing me out of the market by causing me to pay

19  unrealistically high prices that are totally impossible for me

20  to pay; and also by not making words available, they're

21  manipulating the market to force those like me who sometimes do

22  stay in to pay more and bid up --

23      THE COURT:  You'll pay more, but that -- you're saying

24  you pay more, but that isn't what you're saying increases the

25  market share.  What you're saying increases the market share is

1    that they have favorable deals with large people like eBay and

2    all that.

3          MR. PERSON:  That that adds to their market share.

4    Market share, your Honor, by the way, I'm talking about

5    percentage of dollars that they take in.  I'm looking at the

6    sales as my estimate of market shares.  They keep increasing it

7    by --

8          THE COURT:  They're increasing their market share, I

9    understand that, but you're not showing that by virtue of the

10   acts that you say affect you, that that's what has increased

11   their market share.  If anything, it would tend to lower their

12   sales, and as whereas if they opened up these words that you

13   wanted to use, they'd have more sales.  What's increased their

14   market share, you say, is by making themselves attractive to

15   the big buyers.

16         MR. PERSON:  Their sales keep going up and up and up.

17   So in fact they're increasing their sales and increasing their

18   market, and they're doing it by catering to the largest

19   corporations that have the best profitability, and they become

20   a partner with monopolies, and they cast us aside.  They're

21   doing it all in the context of a bid which they're not

22   honoring.

23         THE COURT:  Now, that's a separate argument.  One is

24   the argument that has to do with Google's marketing practices.

25   That's one thing.  Now, you're bringing into it that they do it

1      because of the contracts that they have, and there's some kind

2      of a conspiracy with the large dealers.  That's separate.  I

3      have to look at it separately.  I have to first look at whether

4      they can do it as a monopoly; whether their monopoly practices

5      have led to their growth or whether just generally giving a

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 42 of 70

6      large buyer or volume buyer discounts is improper.  I don't

7      believe it is improper.

8             MR. PERSON:  If they keep giving these large discounts

9      to the largest buyers of this type of marketing service in the

10     country, they're going to wind up with most of those people,

11     and that will be like 90 percent of the market, and they're

12     heading that way because of what they're doing.  That's what

13     I'm alleging.  So that they are increasing market share as a

14     result.  In addition, they're using a conspiracy among

15     advertisers with Google in a single agreement --

16            THE COURT:  But the acts that affect you, their

17     dealings with you, aren't the things that are creating the

18     monopoly, as I see it, that you say they're creating here.

19            MR. PERSON:  They're affecting me by charging me far

20     more than my --

21            THE COURT:  But you don't -- they're charging you and

22     you dropped out of the market, so it's the small people because

23     they can't afford it.

24            MR. PERSON:  That's an abusive tactic that they're

25     using to build market share.  They're not allowed to do that,

69dQperA

1      your Honor, as I've been reading the cases.

2               THE COURT:  How does that build market share?

3               MR. PERSON:  Because it favors the rich companies to

4      get favorable pricing, and they gravitate to AdWords because of

5      the better deals that they're getting, and they're getting it

6      over my dead body.  That's what's happening.

7               THE COURT:  That's just a phrase.

8               MR. PERSON:  Well, they're getting it over my dead

9      business and political body, because I have a legitimate

10     interest in trying to use Google to create a list.  They say

11     you can go in at one cent at a minimum.  I'll willing to do

12     that.  Then suddenly they start charging me more, and I analyze

13     it, and I see the effect of this is they made me drop out of

14     the competition.  Number one, they don't offer words.  They

15     take them off the market.  That puts whoever is willing to bid,

16     it forces them into fewer words, and it drives up the price.

17     So they profit from this, and they give the major corporations

18     a very favorable price in relation to what they're giving the

19     rest of us.  That is going to increase their market share.  No

20     one is going to catch it.  They're going to be 90 percent at

21     some point and that's illegal, I am submitting, your Honor.

22              THE COURT:  I think you're entitled to a give the

23     large volume user a lower price.  That's not the problem I have

24     there, but you mentioned that there is an agreement.  What is

25     the nature of the agreement between the large volume user and

1   Google that you say is violative of the antitrust law?

2        MR. PERSON:  The agreement is everyone is bound by

3   what Google does.  Anything that Google does binds everyone so

4   that we're all subject to what Google has defined here.  We're

5   all in an auction market where we've agreed to the rules and

6   the rules are as I've described.

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 44 of 70

7        THE COURT:  Including the large buyers?

8        MR. PERSON:  Of course, they go in there also.  They,

9   in addition, have secret deals, but I never said that that was

10  the heart of my complaint.

11       THE COURT:  What is the secret deal that you allege?

12       MR. PERSON:  Well, both Ad Book and eBay, obviously,

13  when you look at what's happening out there are the advertiser

14  of last resort.  There's no other person that fills that role

15  because I've seen too many ads.  I can see what's happening.

16  EBay is even larger with the number of ads that they have where

17  no one else is present.  See, not anyone else has decided to go

18  in there, but they give it to eBay as an advertiser of last

19  resort.  Sometimes, but not as often, the book seller, Amazon

20  is also in there, but probably to one-third of the extent or

21  less of what eBay does.

22       THE COURT:  Well, eBay has a varied product base.

23       MR. PERSON:  They take any word and say are you

24  missing hug bear or bear hug?  Are you missing bear hug?  Take

25  a look at eBay.  They have it in a name ad, the two forms of ad

1   that they use, basically, and that's it.  They don't have any

2   content or anything else.  They just grab the word, and they

3   don't have anything at all except the same standard phrase.  So

4   it's favoring them, and they won't allow -- they're saying that

5   they evaluate my content?

Case 5:06-cv-07297-JF     Document 18-7     Filed 01/25/2007     Page 45 of 70

6           THE COURT:  Well, eBay isn't advertising -- I doubt

7   that eBay is advertising to publicize eBay.  I think what

8   they're advertising, and I'll ask you, aren't they advertising

9   that you maybe able to find a product on eBay or through eBay

10  that is for sale?

11          MR. PERSON:  They're advertising their services, as

12  I'm trying to advertise my services.  Ebay has a web site where

13  people go there as an auction market, a more legitimate auction

14  market, and they're advertising that auction market.  They want

15  more people to patronize it, and they're getting a very low

16  rate because they're the advertiser of last resort.  When no

17  one wants it, eBay gets in there.

18          THE COURT:  But eBay, as I understand it, is a very

19  popular -- I've never used it -- but is a very popular place

20  for people to bargain with third parties for used goods.

21          MR. PERSON:  That is correct.  That's what I mean,

22  that the ones that have the higher click-through rate get these

23  favorable lower rates, and I with my product or service don't

24  have that high click-through rate and, therefore, I'm priced

25  out of this.  It's an auction market.

69dQperA

1    THE COURT:  You're not selling goods.  You're selling

2    yourself.

3    MR. PERSON:  It's an auction though.  They have it as

4    an auction where all of us have agreed to be in auction

5    together and to abide by the results.  Then they put their

6    thumb on the scale and say that my bid of a penny or a nickel

7    is no good.  They interfere with my use of that auction with a

8    million people tied in with the same agreement.  They won't let

9    me participate in the auction.

10    THE COURT:  They tell everyone that across the board;

11    that you're going to be -- that the thumb is on the scale.

12    MR. PERSON:  I don't think that people understand it.

13    They don't tell people that the thumb is on the scale.  They

14    announced a landing page quality just recently, and the full

15    impact isn't going to be seen yet.  I'm sure they're losing

16    people like me.  If they treat people like me in the same way,

17    you can't afford a dollar a click.  You can if you're a big

18    company, but you can't afford it for small people like me.  A

19    person selling hot dogs at 99 cents can't afford a dollar a

20    click.  We need to have that right to go into the auction and

21    pay what the auction says that we're entitled to.  We're

22    entitled to a penny if we're the lowest bidder.

23    THE COURT:  If that's the case, then you get your

24    false advertising claim.  What I'm trying to separate in my

25    mind is the claim of antitrust violation versus the claim of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  false advertising.  It seems to me what your saying is that

2  they -- in your last answer that because of the content of the

3  ads, you all are led to believe that you're going to get one

4  cent a click services, and they don't provide you with that.

5          MR. PERSON:  That is correct, your Honor, that's why I

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 47 of 70

6  put that claim in there, but they're also conspiring and having

7  some of those members of the group that have signed the same

8  agreement --

9          THE COURT:  What is the secret agreement that you

10  allege occurs between the big company, eBay and Google?

11          MR. PERSON:  EBay is given --

12          THE COURT:  Not is given.  What is the agreement?

13          MR. PERSON:  That they have the right to go in there

14  as an advertiser of last resort and pay half of a cent for any

15  clicks that they get.  That's my allegation.

16          THE COURT:  What's your information and belief about

17  that?

18          MR. PERSON:  I see that when no one else is

19  advertising at all for hundreds of different words that I've

20  tried, they're the only advertiser.

21          THE COURT:  What's the information that you have?  I

22  understand your belief, but it says information and belief.

23          MR. PERSON:  The lowest click is a penny.

24          THE COURT:  What?

25          MR. PERSON:  The lowest click they advertise is at a

1  penny.  EBay has such volume that I'm sure they're getting in

2  for under a penny, so I said half a cent.

3        THE COURT:  So it's all that you're sure?

4        MR. PERSON:  They wouldn't be paying more.

5        THE COURT:  So, therefore, it's belief rather than

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 48 of 70

6  information?

7        MR. PERSON:  That is correct.  I've given you the

8  information, and I think a business person would conclude -- an

9  expert would conclude, as I've concluded, that they're not

10  paying a penny.  If they could get that for a penny and they

11  have that volume, they're obviously getting it at a lower price

12  especially when there's no other advertiser.  It's unreasonable

13  to think that they're charged a penny or more when they can get

14  that for a penny and they have such volume, they're obviously

15  getting it at much less.  And I said half a cent on information

16  and belief.  I don't know if I used information and belief for

17  that aspect, but as a business person I see what they're doing.

18  And Amazon has a similar deal and they're probably paying more

19  because they're not advertising as often in that residual type

20  of ad as an advertiser of last resort.

21        THE COURT:  So can't they get that same benefit by

22  entering into the AdWords contract?

23        MR. PERSON:  I'm sure they are in the AdWords

24  contracts, and they put their own ads in there in competition.

25  In addition --

1          THE COURT:  Don't they automatically get it in by

2     going into the AdWords contract?  They don't have to have a

3     separate deal?

4          MR. PERSON:  No, I think that the normal contract

5     doesn't give anyone, except those two that I'm aware of, a

6     lower price than a penny, and I think that with their volume

7     and as an advertiser of last resort when they have no one else

8     using that term, they're going in for less than that, and that

9     has to be by a separate agreement because the normal agreement

10    doesn't give anyone the right to be an advertiser of last

11    resort.

12         THE COURT:  Let me understand the process a little bit

13    better.  After you see on the web site that you can go into

14    AdWords, don't you then go through -- what do you do?

15         MR. PERSON:  I've been given a code name and a code

16    password.  When I enter AdWords with my password and my e-mail

17    address, it takes me immediately to my own business, my

18    outstanding ads and my former ads, and I can look and modify

19    them.  I don't go through a new qualification.  I look to see

20    what the results are.  Some ads are put on suspension.  Other

21    ads show a click-through rate and so on.  Then I could change

22    the price.  If they say that really you should be charging --

23    you should be giving us more than a nickel.  If you gave us 35

24    cents, then we would put your ad up again.  That's what I see

25    when I go into the web site.

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 49 of 70

49

1        THE COURT:  Let's go through the contract process.

2    First you read the -- somewhere in here you've got the web

3    site, the Google web site that tells you about the bidding

4    process.  I think it's attached to the defendant's papers.  I

5    may be wrong.  Ms. Ciarelli's affidavit, this shows this help

6    center, Google, ad formats, contextual targeting, etc.

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 50 of 70

7        As I understand it, you have a bidding process, and

8    then you may bid a penny a click, as you say, or 25 cents a

9    click.  I don't see in what she's got, this one cent ad.

10        MR. PERSON:  They'll admit that there is a change.

11   It's now one cent is the minimum click and a hundred dollars is

12   the maximum.  That's what they have on their web site now.

13        THE COURT:  Then they show you there are other people

14   who will be bidding.  They use four people or five people, I

15   guess, and they show that you have your bid, and then you get

16   an ad rank, and then their ads are ranked.  Then they calculate

17   the price in step one, step two, step three.  Do you see where

18   I am?

19        MR. PERSON:  I understand what that is, and the lowest

20   one should be a penny, your Honor.

21        THE COURT:  Well, maybe this was an earlier date, I

22   don't know.  7/26/06.

23        MR. PERSON:  You don't know if that lowest person had

24   been required to pay a dollar.  All you see is what the bid is;

25   not what he's required to pay.

69dQperA

Case 5:06-cv-07297-JF     Document 18-7     Filed 01/25/2007     Page 51 of 70

1    THE COURT:  They have someone's actual CPC that it's

2    price is a penny.

3    MR. PERSON:  You have a hundred million of these

4    auctions per day.  It's a huge operation.  A hundred million

5    clicks a day and you have all of these auctions going off.

6    THE COURT:  But you're looking at their business.  I'm

7    looking at your contract.

8    MR. PERSON:  Okay.

9    THE COURT:  What you do in the contractual process.

10   And you go through this bidding process, don't you, that

11   they -- in Exhibit B.

12   MR. PERSON:  It's like telephoning a guy at an

13   auction, and I've given in advance what I'm willing to bid, and

14   then when the auction comes up because someone uses the word

15   governor, then they start looking to see who is bidding on

16   governor.  Then they take a look and see what the positioning

17   is, and all of that's done in a split second, and the people

18   that bid the most get the top position, and the one who bids

19   the least should get a penny, but they tell me that even if I

20   get that penny position, I've got to pay 50 cents or a dollar.

21   THE COURT:  This is an example.  They showed that

22   Amber, in this example, gets a penny, but the top position is

23   won by Kim who only pays 34 cents, as I read this.  Maybe I'm

24   wrong.

25   MR. PERSON:  Your Honor, we don't know -- according to

1    my allegations, we don't know that those are the real amounts

2    they're paying.  They are the amounts they bid, but as I've

3    said --

4              THE COURT:  This is an example.

5              MR. PERSON:  It is, but it isn't a truthful example

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 52 of 70

6    because it doesn't take into account when they're adjusting the

7    bid under the table and requiring higher pavement.  Your bid

8    goes in at a penny, but you pay a dollar.  It's manipulating

9    the auction.  It's price fixing the auction.  Price fixing the

10   bids at the auction.

11             THE COURT:  I'm not sure that it's an auction because

12   they do have bids, but I haven't quite -- I don't see that it's

13   an auction.

14             MR. PERSON:  Your Honor, the auction occurs when

15   somebody puts in the word governor and searches.  Then Google's

16   software takes a look for everyone who wanted to use an ad with

17   the word governor, and they see seven people.  They then rank

18   these people according to how much they're willing to pay, and

19   I would come in at the bottom for a penny and you would see

20   those results there.  Then the bill is that I get charged a

21   dollar per click because of this adjustment.  It's an auction

22   that occurs millions of times a day, a hundred million times,

23   and it occurs right at the moment where the searcher is doing

24   his or her search because you're online instantaneously.  Like

25   within a minute you're online.  If you change your ads, it goes

1    on right away.  It goes on within a minute.  It's online

2    capability.  It's a massive, remarkable system, your Honor,

3    very important.

4             THE COURT:  Well, I understand what you're saying, and

5    you're saying that this is price fixing.

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 53 of 70

6             MR. PERSON:  All of the people are bound together by

7    the agreement to accept whatever --

8             THE COURT:  But is the agreement -- do you or don't

9    you -- doesn't the agreement come after this bidding process?

10            MR. PERSON:  No.

11            THE COURT:  After you bid and you get this calculation

12   that you come out at a dollar, don't you at that point have to

13   either accept or reject?

14            MR. PERSON:  No, your Honor.  You can't go into the

15   process of telling Google how much you're willing to bid until

16   you first go through that agreement that they're talking about.

17   In connection with that, after you sign it or check off

18   something, they give you a code word that now allows you to be

19   an advertiser on AdWords.  From thereafter you just put in your

20   code word and you jump right to your little web site within the

21   Google web site.  For my business and no one else's.

22            THE COURT:  You put your bid in after you sign the

23   agreement?

24            MR. PERSON:  Absolutely.

25            THE COURT:  Then don't you have an opportunity to

1    reject the dollar?

2         MR. PERSON:  Well, I put in the money I'm willing to

3    pay.  They make recommendations.  I put in the money I'm

4    willing to pay.  Then when I submit it to them, they come back

5    and say, disabled, can't do it, but if you pay us 50 cents a

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 54 of 70

6    click, we'll be willing to have your ad go in but at the penny.

7    So I'm competing with others still at a penny, but I have to

8    pay 50 sends when someone clicks on my ad.  All of this occurs

9    way after the agreement.  We're all subject to whatever Google

10   does, whatever pricing and everything else they do to tip the

11   scale, we're all bound by what Google does --

12        THE COURT:  Why doesn't everyone put in a bid at a

13   penny?

14        MR. PERSON:  Because they want to be at the top.  The

15   position at the top is a hundred dollars for some words that

16   are really in demand.  A hundred dollars to get to the top.

17        THE COURT:  At the top of the web page?

18        MR. PERSON:  At the top of the list, $100, and the

19   lowest bid is a penny.  It used to be a nickel and $50, and

20   they expanded it in both ways, in both directions.  Whether

21   it's a nickel or a penny, it's the same problem, that they want

22   more money from people who don't have a click-through rate

23   comparable to the major advertiser.  They're forcing us to have

24   a profit margin comparable to a major advertiser, and we can't

25   do it.  We trying to be a new products and services.  We're

1  trying to establish a market for our products and services, and

2  you can't do it by holding us to the standard of a company that

3  has already enjoyed a huge success, but that's what they're

4  doing, and they're profiting from it.  They're participating

5  with monopolies in a conspiracy, as I see it, to really

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 55 of 70

6  restrain this advertising in the keyword internet, the targeted

7  keyword internet advertising market.  And I said it was both

8  national and New York.  Because of my candidacy New York and

9  national, both of those geographic markets I've alleged in my

10  complaint.

11          THE COURT:  All right.  Go ahead, I'm sorry.

12          MR. PERSON:  Okay.  That was just a footnote.  So, in

13  terms of being a consumer -- I think that I qualify in running

14  for office as a consumer -- I should have the same protection

15  as a consumer.  I'm not doing it for profit.  I'm doing it as a

16  public service and the voters are consumers.  I think that I

17  qualify in that aspect as a consumer and deserve the protection

18  of the consumer status such as 349, 350, etc., of the New York

19  General Business Law.

20          I have made, in spite of what they've said that I

21  didn't make the motion, the cross motion to transfer, I did,

22  and it's a two-page document.  It's point number -- it's on the

23  second page of my cross motion where I did in fact ask for that

24  relief.  In your Honor feels like it would be dismissed, and

25  only in that condition, it's a condition or motion that I'm

1  making that if you were going to dismiss this action, then I do

2  ask, and I say that the reason for it is that I have a

3  candidacy, and it's a very legitimate candidacy.  I really am

4  the best candidate for attorney general, and I'm willing to

5  state that publicly because I've been doing it recently, and I

6  have very good issues that the public needs.

7  For example, one of them -- if I can just use one

8  novel issue here?  I want to scale the pricing of gas at the

9  pump using a bar code on the car so that the people with the

10  most efficient vehicles buy it at a dollar a gallon, and those

11  with the least efficient pay, say, $10 a gallon; allow people

12  with the $1 gas to use the HOV with one person only in the car;

13  and to give a 5 percent tuition break at the colleges and

14  university for students that drive the most efficient cars.

15  That way we can solve our oil problem.  I have many solutions,

16  and my ideas need to be heard, and Google is stopping them, and

17  it's not right, your Honor.  That's really the --

18         THE COURT:  That's a First Amendment argument.

19         MR. PERSON:  I'm sorry?

20         THE COURT:  That's a First Amendment argument.

21         MR. PERSON:  Well, it's a Sherman Act problem.  I'm

22  both an antitrust and a civil rights lawyer because, quite

23  often, the problems now are two different sides of the same

24  coin.  The control of big business by the political process is

25  something that needs to be addressed, and sometimes you do it

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 57 of 70

1    with a Sherman Act case and other times with a case to be put

2    on the ballot, which I have here in this court already.  I'm

3    asking a different judge to put me on the ballot because the

4    New York State has a statute that you can't pay people to

5    gather petitions now.  Everyone in politics, according to the

6    attorney general, knows that you can pay people to gather

7    signatures, but the statute of New York says you can't, and it

8    also says you can't pay people for a signature.

9            The Supreme Court in 1988 ruled that it's a

10   constitutional right, a First Amendment associational freedom

11   of speech right to be able to pay people to circulate

12   petitions.  So I'm asking the Court to put me on the ballot to

13   make up for the loss of my constitutional rights.

14           Thank you, your Honor.

15           THE COURT:  All right.

16           Mr. Jacobson?

17           MR. JACOBSON:  Your Honor, I will be brief.  Let me

18   first talk about venue.  We put in in our moving papers the

19   current form of an AdWords agreement.  We didn't believe there

20   would be any dispute about the currency of that, but

21   Mr. Person, quite properly, in his answering papers said the

22   agreement that I clicked yes to was the one in November 2003.

23   So we went into our records, and we have a confident

24   declaration in evidence that has the agreement that was in

25   effect that anyone who clicked yes on in November 2003 assented

69dQperA

1   to.

2          THE COURT:  What about being unreasonable in terms of

3   consumers of product?  Isn't he being treated unfairly as an

4   individual?  Sure he's a lawyer, but litigating the case in

5   Santa Clara County is quite a bit different than -- although I

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 58 of 70

6   don't believe the judges are nominated by Google yet, they have

7   immense power.

8          MR. JACOBSON:  I can assure you that Google would

9   support a dollar a gallon gasoline.  I can assure you of that,

10  your Honor, but let me address that point particularly.  I

11  understand that argument.  That argument has been advanced in

12  many cases.  It has not been advanced recently because every

13  case rejects it.  Sherk against Alberto Culver rejects it in

14  the Supreme Court.  All of the cases that adjudicate these

15  venue clauses have looked at that argument, and they say that

16  there has to be a showing -- to make the clause unenforceable,

17  there has to be a showing of something more than a disparity in

18  bargaining power.

19         THE COURT:  But these contracts are form contracts.

20  Although the contract says they shall be read as if they were

21  drafted by both parties, obviously they aren't.  It's a

22  contract that is completely devised by Google.  There's no

23  input from the viewer.  They either accept or reject it.  And

24  then it has this provision that I noted that says it shall be

25  interpreted as if both parties have had drawn it.  It is a

1   contract of adhesion.  You can't get into the system unless you

2   punch that box.  That's it.

3           MR. JACOBSON:  Your Honor, it is a form contract.  If

4   you want to participate in this program, you have to sign.

5   Absolutely correct.  Is it a contract of adhesion?  It's not a

6   contract for a necessity of life that you have no choice but to

7   sign.  It's one that if you want to participate in the program,

8   you have to sign.  The argument that Mr. Person advanced is a

9   perfectly respectable argument, but the courts have rejected it

10  in every case for the last 30 years, your Honor, and that is my

11  point.  The law is that these provisions are unenforceable.

12  The reason for that -- it's not whim.  It's not that we have

13  some strange appointees to the Supreme Court.  There is a

14  business rationale.  The rationale is businesses will be

15  encouraged to expand and to go into new products and new areas

16  if they can have mechanisms that help them have some measure of

17  control to litigation cost.

18          Does everyone necessarily agree with that point?  No,

19  but, your Honor, the cases are very clear that these provisions

20  are unenforceable.  I certainly understand the points that

21  you're making, and, indeed, prior to 1976, I was making these

22  same arguments myself, your Honor.

23          THE COURT:  I haven't seen a contract that isn't like

24  that one that I just alluded to.

25          MR. JACOBSON:  It's becoming increasingly standard,

1  your Honor.

2          THE COURT:  It should be regarded as being drafted by

3  both parties, okay.

4          MR. JACOBSON:  Your Honor, we can even ignore that

5  provision, but the venue provision is enforceable.  The law is

6  quite clear on that.

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 60 of 70

7          There are a couple of things that I think are

8  important to understand about the merits of the case.  There is

9  nothing that Mr. Person alleges in his complaint or that's on

10 Google's web site or anything to suggest that Google has said

11 to anyone that you will get a penny a click.  What Google has

12 said is we have this process, and you went through the exhibit

13 yourself that's attached to the papers, that explains how the

14 process works.  You might get a penny per click if your quality

15 score is high and if your click-through rate is high.

16         For example, if Mr. Person's word was not numbskull,

17 but instead his words were Carl Person for attorney general,

18 you would like to think that he would get a higher

19 click-through rate for people who were searching for Carl

20 Person for attorney general, more likely to click on an ad for

21 Carl Person for attorney general, and his quality score would

22 be vastly higher because his web site Carl Person for attorney

23 general would be much more relevant to that search.  So

24 Mr. Person would have a significantly lower cost per click

25 using that word rather than using a word like numbskull,

1   whereas your Honor pointed out, the search result is not really

2   germane to that where he is seeking to advertise.

3           THE COURT:  What about the gasoline word?  Let me see

4   what that would be.

5           MR. JACOBSON:  Your Honor, I suspect there's a lot of

6   competition for gasoline related words.

7           THE COURT:  What about attorney general?  I'm trying

8   to --

9           MR. JACOBSON:  Vote gasoline.  If you vote gasoline

10   for Carl Person for attorney general.

11          THE COURT:  Lower gasoline prices.

12          MR. JACOBSON:  Pardon?

13          THE COURT:  Lower gasoline prices.

14          MR. JACOBSON:  Your Honor, that phrase might capture

15   some of Mr. Person's campaign, but it would certainly capture

16   all sorts of other advertisers who are actually in the gasoline

17   business, and you would think that there would be a lot of

18   competition for that particular phrase, and the result of that

19   is that you would have to bid more to get a higher placement on

20   the page for that type of phrase.

21          THE COURT:  Well, what do they do when you have more

22   than five?  You have how many spaces on a page?

23          MR. JACOBSON:  The can be more than five, but at some

24   point, your Honor, there is potentially a cutoff, and what

25   Google does is there is a minimum bid.  This is referred to in

1  the complaint.  There is a minimum bid for a particular

2  keyword.  I'm not relying on this, because it's outside the

3  pleadings, and this is a Rule 12(b)(6), but I did have my

4  colleague, Ms. Ciarelli place a Google ad for Vote for Sara

5  Ciarelli.  I've provided -- these are screen shots or examples

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 62 of 70

6  of what you see on your screen when you do this.  I have

7  provided just before the hearing today a copy of this to

8  Mr. Person.  I don't know if it would be helpful to the Court,

9  but if your Honor would like to see what the process looks like

10 on the actual computer screen, I can present these to your

11 Honor.

12         THE COURT:  I was just thinking if Mr. Person's ad to

13 vote for him for attorney general if it was linked to his

14 gasoline --

15         MR. JACOBSON:  I don't know, your Honor.  I can't

16 answer that.  We did not run that.

17         THE COURT:  It might have some cash.

18         MR. JACOBSON:  We did run Ms. Ciarelli and we used the

19 word antitrust, and that came out to 15 cents.  She also put in

20 bear hug, and that came out at a dollar.  Jelly bean came out

21 at 30 cents in this process.  Again, I'm not relying on it.  We

22 did this just so you had an opportunity to look and see what it

23 looks like visually.

24         THE COURT:  I still fail to see the link between

25 Ms. Ciarelli and bear hug that requires her to pay that much

1    money to advertise her hugs.

2         MR. JACOBSON:  It's precisely because of the lack of

3    link, your Honor, that the cost is so high; that is, Sara

4    Ciarelli is an irrelevant to the phrase bear hug, and that is

5    the quality score adjustment that you see in that.

6         Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 63 of 70 Your Honor, I believe from the colloquy between your

7    Honor and Mr. Person's that you have a good grasp of the

8    issues.

9         THE COURT:  Well, don't an assume a thing.  I just ask

10    the questions.  You never want to anticipate from an argument

11    before me that I have caught on at all.  If you have anything

12    to say, say it.

13         MR. JACOBSON:  Your Honor, just one last point.  In

14    terms of the competition at issue, I do want to compare this to

15    an old case, the Second Circuit's decision Official Airline

16    Guide which goes back to the time where you didn't use

17    computerized reservations, but you looked them up in the book

18    that came out each month that listed the airlines.  In that

19    case, the OAG, the guide, published the major carriers.  At

20    that time it included Eastern and Pan Am, but it published the

21    major carriers American, United in one part of the listings,

22    but then carried listings for the computer carriers in a

23    separate part of the book that were very difficult to find, and

24    the computer carriers went to the Federal Trade Commission, the

25    Federal Trade Commission said, wait a minute, this

1   discriminates against the smaller carriers and affects their

2   ability to compete against the larger airlines.  The Second

3   Circuit said, well, we can assume that to be true, but that

4   type of discrimination is not reached by the Sherman Act.  At

5   the end of the day, we don't think there's discrimination here.

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 64 of 70

6   We think the factual allegations here are way off in that

7   respect.  But even if there were, even if there were, the

8   Second Circuit has said, and other circuits have said, that

9   this sort of discrimination nation is not within the scope of

10  the Sherman Act, and this sort of complaint does not state a

11  claim.  And that is our major point.

12          THE COURT:  What about his point about this amounts to

13  price fixing?

14          MR. JACOBSON:  Your Honor, it is hornbook law, and,

15  indeed, we cite a hornbook in our book; that an agreement

16  between a supplier and a customer setting a price has to set a

17  price.  That is not pricing.  It is price fixing only where

18  your agreement is one among direct competitors as to the prices

19  each other will charge.  There's no such allegation here.  Or

20  in a vertical context where the supplier and the customer are

21  setting the retail price, and there's none of that here.  Where

22  the supplier and the customer or the web site and the

23  advertiser are reaching agreement as to the price among

24  themselves, that is not price fixing, and that is a glaring

25  deficiency in that claim.

1          THE COURT:  Was Mr. Person's right that he signs the

2     contract first and then you go through the bidding process, and

3     after you bid, you get your final price from Google, and it

4     doesn't bear any resemblance to your -- I mean, you either have

5     to take it or leave it at that point?

Case 5:06-cv-07297-JF     Document 18-7     Filed 01/25/2007     Page 65 of 70

6          MR. JACOBSON:  Let me address that briefly.  The way

7     it works is to participate in the AdWords program, you have to

8     assent to the AdWords program agreement of the sort that is in

9     the record before you.  After that, if you want to advertise on

10    the results of a keyword search such as bear hug or numbskull

11    or antitrust or Carl Person for attorney general, you will post

12    your ad so Google is aware of what your ad is, you will post

13    the landing page, so they're aware of what that is, and then

14    you will bid.  You will enter a value what you are willing to

15    pay for a search that generate rates that result.  That can be

16    viewed in theory as an additional contract each time you do

17    that.

18         Let's say you come in and the result is 25 cents, and

19    you decide a day later that 25 cents is just too much and you

20    want to stop.  You're not in there forever.  You go back to the

21    AdWords web site where you get in through the code name, as

22    Mr. Person's was describing, and you turn it off.  You no

23    longer have any liability for -- first of all, your ad will be

24    removed, and you have no additional financial liability to

25    Google at that point.  So it is entirely within your control

 1  when you start, when you stop.  I don't think there's any

 2  dispute about that.

 3          THE COURT:  Okay.

 4          MR. JACOBSON:  Your Honor, unless the Court has

 5  further questions, I have completed my presentation.  Thank

 6  you.

Case 5:06-cv-07297-JF    Document 18-7    Filed 01/25/2007    Page 66 of 70

 7          THE COURT:  Mr. Person?

 8          MR. PERSON:  Just a very quick, and that is that all

 9  of the advertisers sign in advance, and they're all part of

10  this thing, and they benefit from the fact that I have to pay

11  more.  It's part of the agreement.  They get that as a benefit

12  that when I drop out, that they have one fewer person they're

13  competing against.  Secondly, the OAG case, the Official

14  Airlines Guides, Inc. case, 1980, the Supreme Court said, "We

15  think that even a monopolist as long as he has no purpose to

16  restrain competition or to enhance or expand his monopoly and

17  does not act coercively retains his right to refuse to deal."

18          So I'm saying that the Official Airlines case does

19  have the Supreme Court's thinking about where a monopolist can

20  go wrong in exercising his power.

21          Finally, a housekeeping thing, your Honor, the court

22  clerk pro se suggested that you, at my request, change this to

23  an ECF filing case, if you're willing to do that.

24          THE COURT:  Well, does that represent a problem for

25  anyone?

69dQperA

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 67 of 70

1          MR. JACOBSON:  Your Honor, I think most counsel these

2     days prefer ECF filing.  We're hoping the case won't be here

3     for very long, but we certainly have no objection and would

4     endorse ECF for the case.

5          THE COURT:  I'd still like to have courtesy copies

6     because a lot of the exhibits that come in are pretty

7     voluminous.

8          MR. PERSON:  Thank you, your Honor.

9          THE COURT:  All right.  Well, thank you very much.

10    I'll change it to an ECF case.

11         MR. JACOBSON:  Thank you, your Honor.

12         MR. PERSON:  One final thing, and that is that there

13    is this motion for a preliminary injunction still that's

14    outstanding that's subject to whatever happens here.

15         THE COURT:  Well, what do you want to do about that?

16         MR. PERSON:  Well, I would want to do it as quickly as

17    possible, assuming you're not -- if you're going to transfer

18    it, obviously you're not going to handle it.  If you're not

19    going to transfer it, I'd like to have -- there are papers on

20    it and for you to decide whether any hearing is needed.

21         THE COURT:  I guess you'd better respond to his

22    motion, because I don't think I can -- I'm having difficulty

23    with the monopoly charge but articulating it is really -- not

24    just articulating, it's really being certain that there's no

25    claim, no valid claim of monopolization or conspiracy to

1   monopolize.

2           With respect to the restraint of trade, I don't see

3   that the complaint does articulate a restraint of trade

4   situation based on other than hypothesis by Mr. Person.  I

5   think he is a very intelligent person and has reached that

6   conclusion in his mind, but I don't think that he has

7   information that supports that and did not seem to be able to

8   articulate it, so I don't think there's any showing of a

9   conspiracy between the other users of the Google AdWords

10  program and Google to eliminate Mr. Person and other small

11  business advertisers from the market.

12          I also don't think that there's any showing of a

13  combination between those persons who supplied internet

14  advertising opportunities to eliminate or to -- I shouldn't say

15  eliminate -- to eliminate competition in that area.  In other

16  words, I don't think that there's any showing that Google and

17  Microsoft have any agreement with Google on the face of this

18  complaint.

19          I want to review the cases with respect to the main

20  points that Mr. Jacobson is raising which is the issue of

21  whether Google is discriminating against the smaller users in

22  an improper way, and I have to be sure that his claim that the

23  methodology used by Google to charge higher prices is not

24  violative of the antitrust laws.  I hope to decide that soon.

25          As for the deceptive practices, it does seem to me in

1    looking at the web site pages that are included in the motion

2    to dismiss that those don't appear to be deceptive.  Maybe I'm

3    wrong, Mr. Person, but I don't think you really are claiming

4    that they're deceptive.  You're really claiming that they're

5    unfair.

6              MR. PERSON:  I'm sorry, your Honor?

7              THE COURT:  I don't think you're claiming they're

8    deceptive.  I think you're claiming, rather, that it's an

9    unfair problem; it's an unfair process, not that it's

10   deceptive.

11             MR. PERSON:  I think I've used terms that it's

12   deceptive, your Honor.  I don't think --

13             THE COURT:  I think you used the term, but isn't the

14   nature of your claim really that it's an unfair --

15             MR. PERSON:  They don't know, your Honor, because the

16   methodology of reviewing this is not disclosed.  You don't

17   really know how they evaluate it, so it really is done, I

18   think, and I've alleged, it's done in order to increase the

19   profitability that by the click-through rate.  I think the rest

20   of it is show.  I think the click-through rate is everything,

21   and the rest of it is disguised --

22             THE COURT:  But you know that they're going to come up

23   with a different price than your bid price; that they've

24   reserved an opportunity to raise your price.

25             MR. PERSON:  But why do they do that only with smaller

1  people?

2          THE COURT:  I don't know whether they do it only with

3  smaller people.

4          MR. PERSON:  Well, I've alleged that.  I'm saying the

5  major people get by, and they have the bid that they put in,

6  they get, and then it's the smaller people that have this

Case 5:06-cv-07297-JF   Document 18-7   Filed 01/25/2007   Page 70 of 70

7  increase in price that drives us out of the business, so that

8  it leaves the major advertisers with fewer people competing for

9  those favored words.  So it's manipulative in that respect, and

10  it is not disclosing at all the way they're doing it.  They say

11  "other".  The word "other" is used.  They don't even tell us

12  what they're doing.

13          THE COURT:  All right.

14          MR. PERSON:  Thank you, your Honor.

15          THE COURT:  Thank you very much.

16          (Adjourned)

17

18

19

20

21

22

23

24

25