GO_2AmCompF.docF

CARL E. PERSON, Plaintiff, *Pro Se*
325 W. 45th Street – Suite 201
New York NY 10036-3803
Telephone: (212) 307-4444
Facsimile: (212) 307-0247
carlpers@ix.netcom.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ECM FILING

| | |
|---|---|
| CARL E. PERSON, ) | CASE NO.: C 06-7297 JF (RS) |
| ) | |
| Plaintiff, ) | **SECOND AMENDED COMPLAINT** |
| ) | |
| v. ) | (Jury Demand) |
| ) | |
| GOOGLE INC., ) | |
| ) | |
| Defendant. ) | |

COUNT I

**[Violation of Sherman Act, § 2 - Monopolizing and Combining to Monopolize the Search Advertising Market and Submarket for Monetizing the Traffic of Community Search Websites]**

Plaintiff, an attorney acting *pro se*, as and for his Second Amended Complaint, respectfully alleges:

Dockets.Justia.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Jurisdiction

1..    This controversy involves § 2 of the Sherman Act (15 U.S.C. § 2); §§ 1, 4B, 12 and 16 of the Clayton Act (15 U.S.C. §§ 12, 15b, 22 and 26); and 28 U.S.C. § 1337.

2..    This Court has original jurisdiction over the federal antitrust claims under 28 U.S.C. § 1337(a) and 15 U.S.C. § 15(a).

### Summary

2A..    This action has two counts (alleging monopolization and attempted monopolization of Search Advertising and website monetizing [using Search Advertising or the alternative of "all Internet advertising") under § 2 of the Sherman Act, based on Google's 65 acquisitions of related technology businesses, patents, know-how, copyrights, algorithms, competitors and high-traffic community search websites – see **Exhibit A** and ¶¶ 99-A and 99-B below) to enable Google, with its two alleged U.S. monopolies, to injure and drive competitors out of business and maintain and increase market share for Google's monopolies (i) by anticompetitive AdWords pricing and auction practices, (ii) by allowing some community search websites (including MySpace.com, AOL.com, YouTube.com and other high-volume community search website customers) to monetize their website traffic by sharing in Google's monopolistic AdWords Search Advertising revenues, but denying the same website monetizing opportunity to Plaintiff as to his 10 competing community search websites.

**Plaintiff**

3.. Plaintiff, **Carl E. Person** ("Person" or the "Plaintiff"), is a website developer, practicing attorney and past candidate for elective office residing in New York, New York, with his offices at 325 W. 45th Street, New York, NY 10036-3803.

4.. Person develops websites and website traffic to (i) create website income through use or sale of Search Advertising directed to website visitors; (ii) create capital values for his 10 Community Search Websites (including myclads.com) under development; (iii) market his candidacy for public office in New York, (iv) obtain clients; (v) market non-commercial, political and information websites to obtain website traffic; and (vi) market his self-published books.

5.. Person is in the business of building and monetizing website traffic for his Community Search Websites (10 under development, featuring visitor-supplied content and a search engine for locating desired content) through planned sale of Search Advertising to advertisers, to appear when website visitors express what they are then seeking through any website or Internet searches they conduct from Person's websites.

6.. In this respect, Person is an actual competitor of Google (in the submarket or market of monetizing the traffic of Community Search Websites). Person's websites include myclads.com (for completion in April, 2007), attydb.com (May, 2007) and late-fees.com (May, 2007), ZIPcomplaints.com (June, 2007), MyTelNos.com (June, 2007), e-listparty.org (July, 2007) and others, including lawmall.com, all designed to accommodate the sale and placement of Search Advertising for placement in the right sidebar for website or web searches made from any of Person's websites.

7. Plaintiff's first website with Google-type (but in-house) advertising is rebate-fraud.com. This website (through its administration panel) will enable Plaintiff to

3

display the same Google-type ads across all of Plaintiff's 85-90 websites (including the numerous subdirectories of Plaintiff's lawmall.com).

8.. Person has used Search Advertising of approximately 10 search engines including Google's AdWords, Yahoo, MSN and 7Search in Person's above-described marketing activities. From 2003 to September 18, 2006, Person has had 1,417,314 ads presented to Google users in a total of 20 campaigns, and has paid Google a total of $1,466.67 for a total of 3,533 user clicks at an average cost of $.42 per click, and a clickthrough rate ranging from a high of 3.09% to a low of zero % according to Plaintiff's records maintained by AdWords.

9.. Person ran, unsuccessfully, for the office of Attorney General of New York State during 2006. He was unable to get on the ballot. Google's activities in increasing Person's pay-per-click fee from 1 cent to approximately 50 cents per click prevented Person from building an email list of potential voters. This 50 times increase in price to Person of AdWords advertising increased his cost of building a list of 1,000,000 permissive email addresses from an affordable $10,000 to a wholly unaffordable $500,000, and contributed to Plaintiff's failure to get on the ballot and his failure to obtain any significant percentage of the total vote for Attorney General.

### Defendant

10.. Defendant, **Google Inc.** ("Google"), is a Delaware corporation incorporated in 2002 with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

11.. Google is in the business of "maintain[ing] the world's largest online index of web sites and other content, and ... mak[ing] this information freely available to

anyone with an Internet connection" through tools for searching the content; and deriving income from these unpaid content search activities by selling keyword targeted advertising for display together with the search results. From inception through 2006, advertising income has produced 99% of Google's revenues. Also, it is in the business of creating, acquiring, building and monetizing Community Search Websites for its own account, and monetizing Community Search Websites owned by a limited number of Google's competitors.

12..    Upon information and belief, through 2006, more than 95% of Google's sale of Internet advertising comes from Google's AdWords and any other search advertising, and less than 5% comes from Google's AdSense advertising and all other Internet advertising not based on searches, net after deducting "TAC" or Traffic Acquisition Costs.

13.    Google has more information databases of stored information than any competitor, including databases referred to by Google under names or descriptions such as "Internet"; "Website"; "Find on this site"; "Google Free web search"; "Google Free SafeSearch"; "Google Free web search with site search"; "Google Free customizable" searches; Google "Public Service Searches"; Google "Wireless Searches"; "Google Mini" searches; "Google Search Appliance" searches "across virtually all the information in your company"; Google searches triggered by use of any of Google's plug-in compatible desktop or other applications, features or options; and intra-company searches using "Google Enterprise products". Each search of a Google database is the occasion for sale and display of Search Advertising together with display of the search results.

13A..  Google's leadership in number of indexed pages started during 2000 and has steadily increased, up to the present. In a 2/14/04 CNET article, Google co-founder Sergey Brin reportedly said: "Ultimately we want to have all the world's information, whatever medium it is," [source:

http://news.com.com/Google%2C+Yahoo+duel+for+documents/2100-1038_3-5160480.html]

### 3 Stages of Internet, an Overview

**Publishing and Searching for Information**

14..  Starting after the release of the Mosaic web browser in November, 1991, millions of websites were created in the United States and elsewhere publishing information across the vast spectrum of information categories.

15..  Upon information and belief, Plaintiff was the first lawyer (or among the very first lawyers) in the United States with a website in 1992 (lawmall.com) providing legally oriented information.  Contemporaneously, Plaintiff had conducted a search for attorney or lawyer websites and found only one, which provided the attorney's name, address and telephone number, but no significant information about any area of law or any legal problems.

16..  To organize the growing body of Internet-published information, various search-engine websites got started, providing free search services that enable users to searches for desired text or information and obtain links to the information located by the search engine. Archie (1990) and Gopher (1991) and related Veronica and Jughead programs were the first search engines.  WebCrawler, starting in 1994, was Internet's first "crawler-based", "full-text" search engine. Google's founders developed the initial

1  Google search engine during 1995-1997, commenced business in September, 1998, and

2  PC Magazine named Google one of its Top 100 Web Sites and Search Engines for 1998.

3      17..    Up to 1996, website publishers (such as AOL.com and prodigy.com) were

4  relying on subscriber fees to support the website, or the website owner (such as Plaintiff)

5  was hoping for customers for the described services or products to cover the costs of the

6

7  website publishing activities. During 1996, AOL changed its business model and

8  switched from an hourly fee for services to a flat fee of $9.99 per month.

9      18..    As of mid-1998, the main search engines were (in alphabetical order):

10

11  AltaVista, Excite, HotBot, Infoseek. Lycos and Yahoo! (source: Search Engines for the

12  World Wide Web, by Alfred and Emily Glossbrenner, © 1998 by PeachPit Press,

13  Berkeley, CA). [Google was not even mentioned anywhere in the book.] These search

14  engines were available for free, but they had no workable business model to be profitable.

15

16  **Stage 2 - Internet Advertising**

17      19..    The nature of websites is that their own owners are able to place "free"

18  advertising on the websites (banner, display or text ads); and some were able to sell

19  advertising to third-person advertisers for placement on the website. Very few if any

20

21  websites appeared to be making money with their website operations through selling

22  banner, display or other Non-Search Advertising for placement on the website.

23      20..    The transformation of Internet to a money-making potential arrived when

24  search engine GoTo.com. in 1998, started offering paid advertising to be presented

25  together with search results. A substantial controversy over this development apparently

26

27  caused the originator to back back off, and the concept was pursued, successfully, by

28  others, including Overture.com (which acquired GoTo.com), Yahoo.com (which acquired

7

Overture.com but used the Google search engine for yahoo.com up to 1994), and later Google.com (financed by Yahoo's backers, Sequoia Capital). From 1999 to February 2004, Google's search engine was used to power Yahoo searches, under license by Google.

21..    The sale of sponsored ads for display alongside search results became successful and demonstrated how a search engine could offer free search services and become profitable through monetizing its search traffic by the sale of advertising for display with the search results.

22..    Subsequently, the search engines started selling and placing ads on websites having a perceived or arguable relevance to the advertiser's product, service or advertisement, with a clickthrough rate approximately 1/50th to 1/20th of the rate achieved by successful Search Advertising. The main difference (advertising written to be presented alongside keyword search results, versus advertising displayed to whoever happens to visit a website category) prevented the two types of advertising from being reasonably interchangeable under antitrust caselaw standards for determination of "reasonable interchangeability".

23..    At all times from 2000 to the present, one or more major search engines (*e.g.*, Inkomi, Ask Jeeves, Google, Yahoo) have been licensing other search websites to use their search engine in exchange for a percentage of the Search Advertising displayed by the search engine together with the search results. The search industry is presently capable of joining with Community Search Websites to monetize their website traffic (and Google is doing so with AOL.com, MySpace.com and YouTube.com), but refusing to do so for the Plaintiff and most Community Search Websites.

24..    Internet advertising falls into two main categories: (1) advertising selected by use of the search term(s) and presented together with the search results ("**Search Advertising**") and (2) any advertising displayed when a person visits a website or any pages within a website ("**Non-Search Advertising**"), often called display, banner or context advertising.

25..    Non-Search Advertising was first, starting with banner advertising. Later forms of Non-Search Advertising include pop-up advertising, (possibly) permissive email advertising and RSS website update email feeds, context advertising (such as with Google's AdSense in which advertising is selected for specific websites based on their content).

26..    Starting in 1998, Search Advertising appeared, in which the search term of a user resulted in Search Advertising if one or more advertisers had previously selected the search term and created one or more ads to be displayed with the search results, assuming the advertiser prevailed in the accompanying auction among competing advertisers for use of the search term.

27..    Search Advertising grew faster than any other segment of Internet advertising and now accounts for about 50% of all Internet advertising.  From inception to the present, Search Advertising has been sold to advertisers only by search engines or their joint-venture partners or licensees, although both Forbes and FIM/MySpace have publicly indicated during the past 6 months that they are going to break into the market (of monetizing their own Community Search Websites with Search Advertisements).

28..    The sellers of Search Advertisements (including Google and Yahoo) and independent companies have developed and acquired software tools for advertisers to

determine the efficiency of their search advertising, and the management of potentially tens of thousands of ads and search terms to be used in Search-Advertising campaigns.

29.. Search Advertising, having a specific maximum number of characters in any ad, is fast and easy to create, and enables advertisers to get online (after an ad approval process) immediately or within a day or so, depending on the seller, with advertising budgets that can be as low as $1 to $5 per month, in contrast to Non-Search Advertising that is generally more costly. requires more time and personal involvement to create and get on line, and is substantially less cost effective as Search Advertising.

30.. Upon information and belief, when a Search Advertiser is offered an opportunity to add Non-Search Advertising to his/her Search Advertising purchase (such as adding AdSense-type advertising to an AdWords-type purchase), the advertiser refuses the offer more than 80% of the time. because of the inherent differences between the two advertising media. They are not reasonably interchangeable, and this is understood or reinforced by the substantially lower efficiency of Non-Search Advertising.

31.. Upon information and belief, Search Advertising is approximately 50 to 100 times more effective than Non-Search Advertising, produces more than 20 times the revenue for Google; and the two categories are not interchangeable for advertising customers of Google or its competitors.

32.. Upon information and belief, a statistically relevant (projectible) survey can establish that among Search-Advertising advertisers, Search Advertising is not reasonably interchangeable with any form of Non-Search Advertising for a large variety of reasons, including:

A..    Customer perception derived from the press that Google has won the search battle and that Google's emphasis on Search Advertising (accounting for 95% of Google's revenues) is superior to Non-Search Advertising; for example, the 3/27/07 *International Herald Tribune* article stating "Yahoo, …has fallen a distant second behind Google in Internet search and search-related advertising"; also, use of the word "Google" or "Googling" to refer to an Internet search, generically or by actual use of google.com; 50,040,000 hits searching for "Googling" and 20,500 hits searching for "Yahooing" on 4/15/07 (99.59% for "Googling"; and 0.0041% for "Yahooing").

B..    3 Google searches on April 15, 2007 show 8 hits for the search term "Yahoo is King" or "Yahoo! is King"; 9 his for "MSN is King"; and 676 for "Google is King", almost 100 times more hits than the Yahoo or MSN search;

C..    50% of Internet purchases are made after a keyword search to determine where to make the purchase;

D..    Web searchers as a group obtain more relevant information from Search Advertising than any type of Non-Search Advertising;

E..    Search Advertising is less expensive;

F..    Search Advertising is more efficient;

G..    Search Advertising has superior tools to measure and manage the results;

H..    Search Advertising has superior tools to manage the ads and keywords involved in substantial advertising campaigns;

I..    A search advertiser can start with a monthly budget as low as approximately $5.00, but contracts to display banner ads generally involve commitments of several hundred dollars or more;

J..    A search advertiser can generally withdraw all scheduled advertising at any time without notice and without penalty;

K..    A Search advertiser does not need any graphics artist or programmer to get started;

L..    Payments are simplified by use of credit cards to ensure payment and credit;

M..    Measurement of efficiency of most types of Non-Search Advertising is substantially less possible than with Search Advertising;

N..    The risk of advertiser's loss as to Search Advertising is absorbed to a greater extent by the seller of the advertising than with Non-Search Advertising;

O..    Selection of advertising targets is more under the advertiser's control with (keyword) Search Advertising than with Non-Search Advertising, which is important to the advertiser because he/she knows more about his/her product or service than the seller of advertising or the seller's automated program;

P..    Search Advertising is largely automated and immediate, whereas Non-Search Advertising generally is labor intensive and delayed, involving a substantial amount of discussions, negotiations and contractual commitments.

**Stage 3 - Monetizing Website Traffic**

33..    Search engines had an inherent advantage over other websites. Search engines had users looking for all types of information, so that searches using the leading search engines created greater opportunities for advertisers than trying to place advertising directly on specialized websites. This created vast amounts of income for

search engines which collected and indexed the content provided to the public for free by millions of website publishers, including Plaintiff.

34.. In an effort to placate web publishers (who were not getting paid for their content) while the search engines had found a lucrative Search Advertising market for themselves, Google and other search engines started encouraging Search Advertisers to also place context or display ads on websites having revenue-sharing agreements with the search engine to receive a portion of the tiny advertising revenues per ad (in comparison to the substantial revenue per ad for Search Advertising (which revenues were not split by the search engines – other than with other Internet search websites).

34A.. In some of its AdSense agreements with website publishers, Google according to its initial registration statement has paid more than 100% of the AdSense income to the website, in what amounts to an agreement by Google to share its related Search Advertising income with the website without publicly revealing that Google is helping any websites monetize their traffic by splitting Google's Search Advertising income.

35.. Until Google's deal with AOL (12/05), MySpace (8/06) and YouTube (11/06), search engines kept their Search Advertising monetizing activities to the search traffic (search engine users) of the search engine and its licensee competitors, and website publishers were restricted to the tiny per-ad revenues produced by context or Non-Search Advertising.

36.. As a result of Google's 3 transactions described in the preceding paragraph (and Google's history of licensing competing Internet search websites and Google's splitting of Search Advertising income with some publisher websites), it

became clear that Google was in a position to use its Search Advertising facility (and monopoly) to monetize anyone's website, and that Google chose to do so with search competitor AOL.com, Community Search Website YouTube.com (which Google purchased to be able to own and monetize the website without any joint venture agreement, other than an incentive payment promised to the sellers of YouTube); and Community Search Website MySpace.com (which Google licensed to have Search Advertising displayed to MySpace visitors when searching for MySpace or web content wherein MySpace is guaranteed $900 million in revenues for 3.5 years and Google apparently keeps the remainder).

37..    These 3 transactions by Google involving the display of Google Search Advertising on third-party websites (or a website being purchased by Google for such purpose) is the start of the 3rd stage of Internet – the use of Search Advertising to compensate web publishers for their efforts through monetizing their website traffic.

38..    The monetizing of website traffic using highly profitable Search Advertising is a new, emerging market, and most suitable (*i.e.*, most profitable) for large "community" websites growing through user-created content such as YouTube.com and MySpace.com, as well as eBay.com, amazon.com, wikipedia.org, craigslist.com – any website having a vast range of usercreated information being added to it -- with a website search engine to locate information therein (or from the web at large).

39..    Various website owners have recognized this market, including the Plaintiff, Google (through its 3 transactions described above), MySpace.com's C.E.O. (see ¶ 40 below). Using Search Advertising to monetize the traffic of a third-party website is fundamentally different from all other means of monetizing website traffic

1    because Search Advertising is the most profitable (as seen by Google's own revenues

2    from 2000 to the present) and context, banner, display, pop-up and other types of

3    advertising to monetize are too labor intensive and so less profitable that they constitute

4
5    no significant competition to monetizing by Search Advertising.

6        40..    News Corp.'s President and C.E.O., Peter Chernin, is reported by a

7    1/24/07 Forbes.com cover story entitled "Murdoch 2.0" as saying that News Corp. will

8    try to concoct the next YouTube on its own, via an in-house R&D group, then quoting

9    Chernin: "I think we should be striving to create as many businesses ourselves as we can

10   [for purposes of monetizing the website traffic with Search Advertising]". Also, News

11   Corp. is a competitor of Google, having lost the YouTube acquisition to Google because

12   Google had the stock price and cash hoard to pay more for YouTube than News Corp.

13
14   could afford.

15

16

17                                        **Definitions**

18       41..    The following terms shall have the meaning set forth below, or in a

19   paragraph to which reference is made:

20       A..    "**AdSense**" – Google's version of context or banner advertising in which

21
22   advertisers pay to have their banner, pop-up, display or other ads displayed to visitors at

23   websites selected by the seller or advertiser as having website material and visitors

24   relevant to the ads.  AdSense also enables Google with high-traffic websites to pay the

25   website more than Google receives from the AdSense advertising, which amounts to

26   partial monetizing of the website with Search Advertising income. Upon information and

27
28   –

1 | belief, Google has a 25% to 30% cost of sales for its AdSense net income (after

2 | deducting Traffic Acquisition Costs).

3 |     A-1..    On 12/15/06, CNNMoney.com (David Kirkpatrick, *Fortune* senior editor)

4 |

5 | in an article entitled "Can Yahoo catch Google?" stated that keyword-targeted advertising

6 | [*e.g.*, AdWords] gets a 10% or 20% clickthrough rate whereas conventional banner ads

7 | (not keyword based [*e.g.*, AdSense]) have a clickthrough rate not exceeding 1%. Also,

8 | the article states that "Today Google overwhelmingly dominates the search business."

B..     "**AdWords**" – Google's Search advertising system enabling advertisers to hold back their ads until potential customers were seeking information through a search, with the advertiser's ad being delivered to together with the search results; this enabled advertisers for the first time to reach potential customers at the precise moment of their demonstrated interest, which makes this type of ad much more cost effective than other types of advertising (including newspaper and internet context, banner or display advertising).

C..     "**Community Search Websites**" – refers to websites (such as youtube.com. myspace.com. craigslist.com, eBay.com, monster.com, wikipedia.org and approximately 10 websites being created by Plaintiff [starting with myclads.com and attydb.com] for which users create and/or provide the website's content on an ongoing basis, the website provides a search facility for visitors to find web pages or other material of interest to them on the visited website, or other Internet websites; the owner of the website provides the structure for website growth and regulation but creates a miniscule percentage of the website's content; and the websites are often referred to as communities or social websites with user-created content.

D..     "**Essential Facility**" – Google's system for selling and placing Search Advertising on Community Search Websites to monetize the website traffic. Google's website monetizing system is so efficient and profitable that (with an 8% cost of sales during 2006) that no competing system based on any competing search engine is reasonably interchangeable with Google's system, and the advertisers will pay about twice as much per click for use of a specific keyword than they will pay per click to competing companies such as Yahoo and MSN. This means that Google monetizes

website traffic at about twice the rate as its nearest Search Advertising competitor and many times more than the top context or display ad competitor, DoubleClick, which Google acquired during April, 2007.

D-1..   Search Advertising sold by lesser competitors of Google cannot become reasonably interchangeable with Google by lowering their prices because their inventory of searches is substantially less (requiring the website to return to Google to obtain the benefits of the larger inventory and the temporary use of the lesser competitor exhausts part of the Search Advertising market available more efficiently through Google). Google's competitors do not effectively compete. They merely sell an incremental expansion of the website's monetizing program, primarily to unsophisticated website owners who are unaware of the differences between Google and its Search Advertising competitors.

E..   "**Google Competitors**" – Google competes with Yahoo Search Marketing, MSN Ad Center, 7Search and other search engines offering search advertising. but the competition is ineffective and Google has a monopoly in the Search Market and Website Monetizing Submarket, making Google's AdWords business an Essential Facility, both as to advertisers seeking to advertise on Internet for website visitors (in competition with Google) through Search Advertising (including Plaintiff) and as to all Community Search Website owners attempting or potentially attempting to create Community Search Websites and increase and monetize the traffic on their websites in competition with Google (including Plaintiff).

F..   "**Non-Search Advertising**" – any Internet advertising that is not Search Advertising, such as banner, space. context or pop-up advertising.

G..    "Relevant Market" - defined in ¶ 45 below.

H..    "Relevant Submarket" - defined in ¶ 45 below.

I..    "Search Advertising" – website advertising that is triggered by a website or Internet search, with the advertisement (and any others) displayed alongside the search results. Such advertising could be purchased on a pay-per-click ("PPC"), cost-per-thousand ("CPM") or other basis.

### Relevant Period

42..    The relevant period ("Relevant Period") for the antitrust claims alleged herein is the 4-year period preceding the filing of this complaint (during June, 2006) as to all claims under the Sherman Act, 15 U.S.C.A. § 2.

### The Relevant Market and Submarkets Defined

43..    For purposes of this action, the alleged geographic market is the United States.

44..    The alleged service market at issue in this action is **Search Advertising** (as defined in ¶ 41-I above), and the **submarket of monetizing the traffic of Community Search Websites through use of Search Advertising**.  Alternatively, if the market turns out to be "all Internet advertising" and not "Search Advertising", the submarket becomes the **market for monetizing the traffic of Community Search Websites through the use of Internet Advertising**. Upon information and belief, Google dominates such alternative market.

45..    Upon information and belief, Google has a monopoly in the United States geographic market of Search Advertising (the **"Relevant Market"**) and the **Relevant Submarket** of monetizing the traffic of Community Search Websites through the use of

Search Advertising or, alternatively, Internet advertising (the "**Relevant Submarket**" or **Relevant Alternative Market**).

46.. Upon information and belief, Google has more than a 70% share of the dollar amount of the Search Advertising market, which percentage is steadily increasing.

47.. Upon information and belief, Google has more than a 80% share of the dollar amount of revenue obtained from monetizing the traffic of Community Search Websites using Search Advertising or more than a 67% share of the dollar amount of revenue obtained from monetizing the traffic of Community Search Websites using any type of Internet Advertising, and the markets and submarkets dominated by Google are Essential Facilities with access so such facilities needed by the Plaintiff to be able to compete effectively with Google for the monetizing of traffic of Community Search Websites.

**Monopolization of the Relevant Market**

48.. Google has a monopoly in the Relevant Markets and Submarkets, including the power to control prices and the power to exclude competitors from such markets, and is exercising such power unlawfully.

**Facts Supporting Allegation of Google's
Monopoly including a $25 Billion Dollar Barrier to Entry**

49.. The following facts are barriers to entry facing Google competitors in the relevant markets and submarket, and support Plaintiff's allegation of Google's monopoly:

A.. Google has acquired about 65 technology companies from 2001 to the present (a list and description of such acquisitions is set forth in **Exhibit A** hereto – and

see ¶¶ 49-A and 49-B below for a list of the most significant acquisitions which enabled Google to acquire and combine to obtain its present monopolies in the relevant markets and submarket), at a cost of about $7-$8 billion in cash and stock, to enable Google to increase its share of Internet searches and of the Relevant Market and Relevant Submarket without growth from within, for the purpose of depriving competitors in the respective markets of market share and drive them out of business.

B..    The more recent acquisitions have been made after Google has become a monopoly, with Google's monopolistic profits and with highly-priced stock (reflecting Google's monopoly) that enables Google to make its acquisitions at a lower equity cost when using stock, and being able to outbid Google's competitors such as Fox and Microsoft.

C..    The acquisition of the largest company in Internet display advertising, including an auction system for Internet display advertising, is a strong indication that Search advertising is a different market from Non-Search advertising, a market so different that Google was not in it to any appreciable extent before the April, 2007 DoubleClick acquisition.

D..    From 2001 to the present, Google has acquired users for Google's search engine by licensing use of its search engine to various competitors of Google including: Yahoo (ending in 2/04), AOL-Time Warner, Earthlink and FIM which agreements have enabled Google to dominate the relevant geographic and service or service/product market and submarkets defined above.

E..    Google has a technical team with its secret know-how that enables Google to increase its market share in the Relevant Market over the only two present significant competitors (Yahoo and Microsoft/MSN Ad Center – "MSN").

F..    Microsoft/MSN's dedicated effort, huge cash reserves and other resources, up to this moment, have not been able to purchase or develop any team capable of effectively competing with Google's search-engine business and related AdWords keyword-targeted Internet advertising business. Until May 2006, Microsoft/MSN partnered with Yahoo, but in May 2006 MSN began offering its own keyword-targeted Internet advertising, and upon information and belief the cost of Yahoo, MSN or any other company trying to become competitive with Google (from the standpoint of being able to monetize website traffic within a competitive dollar amount or value) is about $50,000,000,000. based on Google's revenues, acquisitions, physical structure, software, personnel, top management ownership, commanding industry lead, and monopolistic position, among other factors.

G..    Yahoo until recently was a licensee of Google's search engine and has now switched to licensing an inferior engine (created years earlier by Inkomi), which means that Yahoo will not be able to compete with Google unless it solves the problem faced by Microsoft (of creating a team able to compete with Google's team, and to be able to commit the necessary funds, amounting to about $25 billion).

H..    Google has the fastest search engine of all competing search engines with indexes, algorithms, software and systems (including technology acquired through some of the 65 Google acquisitions) to deliver the search results (and accompanying AdWords

ads) substantially faster than any other search website can locate and display its search results;

I..     Google has about 50% of all internet searches conducted at more than 60 search sites [source: http://searchenginewatch.com/reports/article.php/2156451];

J..     Google has the world's largest and most comprehensive collection of information online - 8.1 billion pages, compared to Microsoft's 5.0 billion pages, Yahoo's estimated 4.2 billion pages and Ask Jeeves' or Ask's 2.5 billion pages [Source: http://blog.searchenginewatch.com/blog/041111-084221].  Plaintiff's 6/16/06 Yahoo search for "movie cameras" found 26,200,000 pages, whereas Plaintiff's 6/16/06 Google search using the same phrase found 86,800,000 pages or more than 3 times as many pages;

K..     Overture created the keyword-targeted Internet advertising market but lost its initial domination of the market to Google, because of superiority of Google's databases and software development, acquisitions of technology and other factors;

L..     Through fiscal year 2006, Google's income has been derived mainly (at least 95%, upon information and belief) from its AdWords business and is more than 71% (2004) and more than 75% (2005) of all income obtained from keyword-targeted Internet advertising of all competitors (based on the figures set forth in the next 2 paragraphs); upon information and belief, in 2006 Google an even higher percentage of overall keyword-targeted income than it obtained in 2005, and that the percentages of Yahoo and MSN are undergoing substantial declines. The reason is that AdWords is substantially more profitable for advertisers and easier and less time-consuming to use

than the PPC advertising of MSN and Yahoo (which are distant seconds and not reasonably interchangeable for keyword advertisers including Plaintiff);

M..    Google's revenues from sale of keyword-targeted Internet advertising amounted to $3.189 billion during 2004, $6.139 billion during 2005 and more than $10 billion during 2006 (without adjustment for the small percentage of income derived from Google's CPM (cost per 1,000 impressions) sales of AdSense advertising), in comparison to Yahoo's sale of keyword-targeted Internet advertising amounting to an estimated $1.3 billion during 2004 and an estimated $1.97 billion during 2005. [Estimate assumed 50% of Yahoo's total sales excluding "traffic acquisition cost" or "TAC".]

N.    Prior to and during 2004-2005, Microsoft/MSN had no independent revenues from keyword-targeted Internet advertising, so that a substantial part of Microsoft/MSN's revenues are included in Yahoo's revenues.

O..    Google's capitalization during late 2005 was $126.7 billion ($428/share) in comparison to Yahoo's capitalization, of $59.7 billion ($42/share), making Google more than twice as valuable as Yahoo, and during 2006 the capitalization difference grew substantially, enabling Google to make acquisitions more readily than any of its competitors (e.g., YouTube and DoubleClick).

P..    Google states in its S-1 Registration Statement filed April 29, 2004 that Google is the largest of the companies in that market; and that the only other company known to Google is Yahoo (with its purchased Overture search business);

Q..    The only company publicly stating that it is going to try to challenge Google (and not even mentioning Yahoo) is one of the largest monopolists, Microsoft,

24

1    showing that there is a need for huge amounts of capital to challenge Google with only 2

2    challengers for control of Internet.

3           R..      Google states in its S-1 Registration Statement that it has a variety of

4

5    intellectual properties upon which its AdWords technology is based, including patents,

6    trademarks, copyrights, know-how, backed by numerous secrecy agreements; this also

7    includes the know-how in finding, indexing and storing web pages and using hundreds of

8    thousands of servers to speed up information processing and distribution by simultaneous

9    use of many interconnected computers for a single search. See **Exhibit A** hereto for a list

10    of Google's acquisitions of technology firms, patents and other technology from 2001 to

11    the present. Google did not develop its business from within, but built it over 6 years with

12    about 65 acquisitions.

13

14           S..      Yahoo attempted to compete with eBay recently and found that it could

15    not, and gave up its eBay-type Internet activities, suggesting that Yahoo will not be able

16    to continue its competition with Google.

17

18           T..      Google admits that it has not advertised its AdWords service to any

19    significant extent, and was able to build this monopoly by reason of its existing search

20    business (which itself is perhaps the most effective advertising medium in the world);

21           U..      eBay, a major competitor or potential competitor in other product/service

22    markets, is one of Google's top customers for AdWords advertising services;

23           V..      Google is practicing price discrimination that makes some purchasers

24

25    (such as the Plaintiff) pay up to 100 times more per click than other purchasers (large

26    companies) because of the lack of any alternative market; Google is to increase its per-

27    click price for Plaintiff and a million other small-business AdWords customers 2, 10, 25,

28

50 even 100 times the price per click Google is charging its most-favored customers. But the profitability to an advertiser is in the click, and it is unreasonable, unconscionable and anticompetitive for Google (and its monopolies) to charge small business advertisers 2, 10, 25, 50 or 100 times the price per click when their expectations for profit is substantially less than the profit being obtained by the high-volume advertiser from one click for the same keyword.

W.    Online advertising is causing U.S. daily newspapers to lose advertising revenue and threatening traditional U.S. daily newspapers with extinction ["Online Publishing Insider", 6/8/06]; newspapers are attempting to re-create themselves as online newspapers; and in the UK, online advertising revenues already exceed newspaper advertising revenues [Source: http://news.stepforth.com/2006-news/May31-06.html].

**Additional Facts (from New York Times Article of 6/8/06):**

X. Building a computing center in The Dallas, Oregon as big as two football fields, with twin cooling plants protruding four stories into the sky which, according to *The New York Times*, is Google's "weapon in its quest to dominate the next generation of Internet computing"

Y. Such new plant "heralds a substantial expansion of a worldwide computing network handling billions of search queries a day and a growing repertory of other Internet services"

Z. The new plant " is the backdrop for a multibillion-dollar face-off among Google, Microsoft and Yahoo that will determine dominance in the online world in the years ahead"

26

AA.    Microsoft and Yahoo have announced that they are building big data centers upstream in Wenatchee and Quincy, Wash., 130 miles to the north. But it is a race in which they are playing catch-up. Google remains far ahead in the global data-center race, and the scale of its complex here is evidence of its extraordinary ambition

BB.    Even before the Oregon center comes online .... "Google has constructed the biggest computer in the world, and it's a hidden asset,"

CC.    Microsoft stunned analysts after first quarter 2006 when it announced that it would spend an unanticipated $2 billion next year, much of it in an effort to catch up with Google.

DD.    Google is known to the world as a search engine, but in many ways it is foremost an effort to build a network of supercomputers, using the latest academic research, that can process more data — faster and cheaper — than its rivals.

EE.    "Google wants to raise the barriers to entry by competitors by making the baseline service very expensive,"

FF.    In March 2001, when the company was serving about 70 million Web pages daily, it had 8,000 computers.... By 2003 the number had grown to 100,000.

GG.    Today ... [t]he best guess is that Google now has more than 450,000 servers spread over at least 25 locations around the world.

HH.    Microsoft's Internet computing effort is currently based on 200,000 servers, and the company expects that number to grow to 800,000 by 2011 under its most aggressive forecast, according to a company document.

II. Yet it is the way in which Google has built its globally distributed network that illustrates the daunting task of its competitors in catching up.

JJ. [S]aid Milo Medin, a computer networking expert ... I know of no other carrier or enterprise that distributes applications on top of their computing resource as effectively as Google."

### Willful Acquisition, Maintenance, or Use of the Market Power by Anticompetitive or Exclusionary Means or for Anticompetitive or Exclusionary Purposes

**Willful Acquisition and Maintenance**

50.. Google willfully acquired its monopoly of the Relevant Markets and submarket partially through in-house growth but mainly through a series of mergers and acquisitions (from 2001 to the present – see **Exhibit A** hereto) in a combined cash and stock purchase price of about $7-$8 billion, with purchases acquiring patents. largest competitors in new fields, and immediately usable technology to enable Google to increase its share of Internet searches and to increase Google's Search advertising revenues and other revenues.

51.. Google has learned that its monopoly enables it to turn website traffic into money far more efficiently than any other search engine (such as Yahoo or MSN) or other company (such as DoubleClick), and by the end of 2006 has changed its business and description of its business to reflect ability to monetize website traffic substantially more efficiently than anyone else. Whereas DoubleClick monetized traffic for other website owners, Google does not allow website owners to use Google's Search Advertising to monetize website traffic, and indeed Google has acquired the leading website traffic monetizing company to reduce competition in the field of monetizing website traffic.

-

**Use of the Market Power by Anticompetitive or Exclusionary Means or for Anticompetitive or Exclusionary Purposes**

52.. Google is in a position similar to someone owning the patents and know-how to extract oil two times more profitably than any competitor, and refusing to let owners of oil reserves enter into joint ventures or leasing agreements with Google to exploit the reserves, with Google instead requiring the reserve owners to sell their wells to Google (at a higher price than available from any lesser competitor), with Google keeping the difference, and adding to its monopolistic profits and market share.

53.. Until a competitor is able to offer monetizing services with reasonable interchangeability with what Google has put together in its 65-company acquisition monopoly, Google is going to pick off the best websites (having the higher traffic, such as MySpace.com and YouTube.com) and monetize them for Google's profit, and the other high-traffic websites will not be able to obtain this monetizing value and will see the asset wasting until Google finally makes an offer, slightly or even significantly higher than MSN or other competitor.

54.. Plaintiff made a request of Google on February 12, 2007 (**Exhibit B** hereto) to permit Plaintiff to use Google's monetizing services for Plaintiff's websites on terms comparable to the terms given by Google to MySpace.com's owner, but got no reply.

55.. Google has a two-way monopoly that it is exploiting with Plaintiff and other website-owner advertisers getting caught in a whipsaw: the monopolistic charge by Google to build Plaintiff's website traffic, followed by the inability to use Google and its monopolistic monetizing system (also based on Search advertising) to obtain the built up

value from this high-cost website traffic. Google reserves the latter for itself, as an anticompetitive practice.

56.. Google's practice of exploiting its monopoly in Search Advertising for website owners building their website traffic would be less devastating and injurious to competition if Google allowed these same customers to participate in the monetizing of their high-cost traffic using Google's Search Advertising monopoly.

57.. Instead, Google is fixing auction prices for the auctions of key words and forcing Plaintiff and other advertisers to pay 50 to 100 times more per click than Google is charging eBay and other major advertisers, whose clickthrough rates are higher because their products and names are well established, and the products and services are often totally different and not comparable as to landing pages and advertisements.

58.. On March 24, 2006, the Plaintiff observed that in 33 randomly selected keywords chosen by Plaintiff for their probable lack of demand (**problem**-3, circumstantial-0, circumstances-1, create-1, **expensive**-2, **expansive**-4, **silent**-2, miraculous-1, **busybody**-1, **glowing**-7. water-19, **welcome**-4, tomorrow-0, today-0, history-8, **matters**-2, purpose-8, major-1. tip-2, **prompt**-2, general-1, adjective-1. small-0, smell-1, **slice**-2, **cached**-2, pertinent-0, zero-1, **mustach**-1, second-0, seconds-6, mars-8or9 and **issue**-2), eBay had its ad displayed for 13 (40%) of such 33 comparatively unwanted keywords (see **bold**-type words above); 7 had no ads at all (see the underlined words above; eBay used only 2 forms of ad: (i) "Whatever you're looking for you can get it on eBay." [apparently selected when the keyword was assessed by AdWords to be an adjective]; and (ii) "Looking for "Matters"?  Find exactly what you want today." [apparently selected when the keyword was assessed by AdWords to be a noun]:

59.. It is an anticompetitive practice to tell advertisers such as the Plaintiff that his landing page and advertising copy can be improved to bring Plaintiff's clickthrough rate up to the level of eBay, and thereby bring Plaintiff's cost per click down to the low price of eBay. This is impossible. Plaintiff's use of the same key word as eBay (for selling Plaintiff's candidacy or Plaintiff's book) does not mean that the Plaintiff's offer and landing page could ever be competitive, no matter how hard Plaintiff tried. Google's pricing with this stated premise is false, misleading and anticompetitive, and injurious to competition because it forces higher costs upon new, different and less established businesses making it impossible for many of them to survive, thereby depriving the public of new and improved products and services, and competition, ultimately, to lower prices.

60.. Google has a practice of cutting off the number of displayed ads at different numbers for different auctions, for the sole purpose of preventing the lowest bidder to be able to benefit from the promised lowest price of 1-cent per click (when there are no bidders whose ads are not displayed). This practice is anticompetitive and of no business value other than to deprive bidders of Google's promised lowest price per click (of $.01) for the last advertiser.

61.. Google has a practice of blocking use of lower-value keywords and repeatedly told Plaintiff that hundreds of these words were not available for Person to use, but at the same time Google was allowing eBay to use a high percentage of these low-demand words. Google is using its monopoly power to withhold keywords from the market for the purpose of forcing advertisers (including Plaintiff) to pay more per click than would otherwise be paid if the lower-value keywords were made available to

advertisers. This is an anticompetitive practice driving up the price of advertising and the price of products and services to consumers, and is of no benefit to Google other than to obtain monopolistic profits from Plaintiff and other small advertisers who in many cases need to compete with lower-priced keywords to keep their advertising expenses low.

62.. Google's secret practice of looking at the clickthrough rate and adjusting the advertiser's bid price to enable Google to make as much money per displayed ad from Plaintiff as it makes from eBay, but falsely telling advertisers that this fixing of bid prices by Google resulted from an analysis of the advertiser's advertising copy and landing page is an anticompetitive practice that prevents advertisers from understanding how the pricing is really taking place; Google's offered carrot is false, misleading and anticompetitive: that improving the landing page and advertising copy may allow the advertiser to get the lower rate. Advertisers selling elephants will not get the same click through rate as municipal zoos or petting farms offering an opportunity for children to see elephants, or the sale of books about elephants. Changing the advertising copy and landing page has nothing to do with the basic difference in the markets for selling live elephants; viewing live elephants; and purchasing books about elephants.

63.. Google's alleged reason charging Plaintiff as much as 50 times or more than the per-click price being paid by eBay for displaying eBay ads together with the same search results and the Plaintiff's ad, to create a more satisfying experience for the website user, is not true because Google does not prohibit such less satisfying ads. Instead, Google lets all of them run at 50 times the price, unless the advertiser drops out of the auction.

**Plaintiff's Rejected Efforts to Use Low-Value Keywords; and**

**eBay's Use of 2 Forms of Ad for All of eBay's AdWords Advertising**

64..    On or about April 5, 2006, the Plaintiff attempted to use approximately 50 keywords relating to competition, distribution, pricing, advertising, fees and allowances to obtain traffic for the Plaintiff's Robinson-Patman Act website, at www.lawmall.com/rpa2d2e. Google stated that most of Plaintiff's selected keywords (almost all not being in any significant demand by other advertisers) were unavailable to the Plaintiff or were taken away from the Plaintiff within hours or days after the advertising commenced. The Plaintiff went through this routine with different sets of keywords at least 10 other times with the same results.

65..    On or about April 9, 2006, the Plaintiff attempted to use the names of each of the approximately 80 statewide candidates and office titles, political parties, and election issues in support of his candidacy for New York Attorney General.  Google stated that most of Plaintiff's selected keywords (almost all not being in any significant demand by other advertisers) were unavailable to the Plaintiff or were taken away from the Plaintiff within hours or days after the advertising commenced.

66..    In contrast to the 13 keywords used by eBay (see ¶ 58 above), the Plaintiff's keywords in the two preceding subparagraphs were chosen for their high degree of relevance (when appropriately limited by AdWords to users having a New York email server), whereas eBay's 13 keywords were selected by Plaintiff as keywords that were very unlikely to have any demand; and eBay's use of them was with one of two form ads: one for nouns and the other for adjectives.

67..    Plaintiff's purpose of finding unwanted words was to avoid having to enter into an auction with anyone for keywords. Plaintiff was willing to use almost any

33

1    keywords as long as the Plaintiff could obtain their use for the minimum stated Google

2    fee of 5 cents (later 1 cent) per click.

3        68..    For Plaintiff to create an email list of 1,000,000 email addresses in 100

4
5    days (at the rate of $.01 per click), for example, he could obtain 10,000 names per day by

6    having 1,000,000 ads displayed, and 1% of the searchers (also called "users") clicking on

7    the Plaintiff's ad and accepting Plaintiff's offer of a free PDF copy of one of Plaintiff's

8    three books. At the end of 100 days, the Plaintiff would have his desired list of 1,000,000

9
10   New York State email addresses.  The cost of $10,000 for such list would have to be

11   adjusted upward by the number of persons dropping off of Plaintiff's list (and requiring

12   replacement) and the percentage of clickthroughs who wind up not subscribing to

13   Plaintiff's list. One million ads in a single day by the Plaintiff is not impossible or

14   impractical. Google serves up an estimated 1,500,000,000 (1.5 billion) ads each day, and

15   plaintiff would be participating in only 1/1500 or .00067 of such ads, as to keywords not

16   in any demand by other advertisers (other than eBay, possibly). Persons who clicked on

17
18   Plaintiff's website would subscribe to Plaintiff's email list without any human assistance.

19       69..    The Plaintiff's AdWords strategy as candidate for New York Attorney

20   General was and remains to use the low-demand keywords, where the Plaintiff would be

21   the only, or one of no more than, say, 10 advertisers, and be willing to (and desirous) of

22   obtaining the last position in the displayed ads, as long as the Plaintiff's ad was the

23   lowest bid and entitled to the $.01 per-click price. It makes no difference to the Plaintiff

24   whether it takes 1,000,000 or 10,000,000 impressions to obtain 1,000 clickthroughs.

25
26   From Google's standpoint, if anyone believes the keywords in question are more valuable

27   to them than the $.01 bid by Plaintiff, they will bid up the auction price and make it

28

1    impossible for the Plaintiff to obtain use of it through the auction process, and require the

2    Plaintiff to find a replacement keyword. The Plaintiff envisioned that he would be using

3
4    many hundreds of keywords simultaneously. It should be noted that eBay appears to be

5    using perhaps 100,000 keywords simultaneously (based upon Plaintiff's determination

6    that eBay was using 40% of keywords not in demand by other advertisers).

7        70..    Plaintiff found out that Google's stated minimum fee in its auction pricing

8
9    system does not apply when only one person seeks to use a given keyword. Instead of

10   letting the Plaintiff use the unwanted keyword for 5 cents (or 1 cent) per click, Google

11   stated that the Plaintiff could not use the word at all, and forced the Plaintiff back into an

12   auction with major corporations for the use of keywords of interest to them, with the

13   resulting 5 to 100 times the cost per click that Google forces Plaintiff and other small

14   businesses to pay. This is an anticompetitive activity by Google.

15       71..    Google has taken various keywords off its AdWords auction market even

16
17   if Plaintiff and other small advertisers were willing and able to pay the unconscionable

18   per-click rates of 100 times $.01, further support for Plaintiff's allegations that Google is

19   manipulating the market and auction prices for keywords, as part of Google's plan to

20   drive small advertisers out of its keyword market and give discriminatory prices to major

21   advertisers. All of this if for the purpose of Google to increase the market share and

22
23   profits for Google and major advertisers at the expense of (i) Google's competitors

24   (Yahoo and Microsoft), (ii) the major advertisers' competitors (including Plaintiff and

25   other small advertisers), in what amounts to an unlawful combination and conspiracy

26   among Google and its major advertisers to fix AdWords auction prices in favor of major

27

28   –

35