corporate advertisers; and (iii) to make it difficult for anyone but favored advertisers to use AdWords to jumpstart traffic to newly-created websites.

72..     This practice of pulling perfectly good English words off of the keywords market to require the Plaintiff and other small businesses to bid for the keywords wanted by the large corporate, high-volume AdWords advertisers is another predatory, anticompetitive practice by Google, and misuse of its monopoly of the market for keyword-targeted Internet advertising.

**Google's AdWords Is an Essential Facility**

73..     Google has two primary businesses: (i) selling AdWords advertising to advertisers; and (ii) using its AdWords system to convert the traffic of selected websites into money (in amounts established by Google's AdWords auctions), through licensing the right to place Google AdWords advertising on websites owned by others (such as MySpace.com) or by developing and purchasing websites (such as YOUTube) and converting traffic at its own websites into money by running AdWords ads on these Google websites.

74..     Google is able to do for itself what no competitor can do without use of the Essential Facility, which is to convert or "monetize" website traffic into its monetary value as established by competition among AdWords advertisers for the placement of keyword-targeted advertising on the website. Google has agreements with various leading websites to enable them to monetize or partially monetize their websites through revenue sharing agreements involving Google's Search Advertising income derived from the publisher's website, but Google refuses to enter into any agreement with the Plaintiff for sharing of Google's Search Advertising revenues.

Dockets.Justia.com

75.. Many website owners including the Plaintiff are creating new websites and attempting to build traffic at their respective websites to be able to monetize the website traffic in competition with Google, but nobody has been able to build a monetizing system to compete effectively with Google's system. Only two search engines are in the running: (i) Yahoo, which is now running backwards or losing ground at a precarious rate: and (ii) MSN, which has started in competition with Google during the past year with billions of dollars to spend in its announced effort to try to compete with Google, but is now relegated to attempting to resist Google's considerable efforts to take Microsoft's customers away from Microsoft by offering competing products through Google's plug-in compatible system (starting with a free word processing program, and a free spreadsheet program).

76.. There are no other companies or individuals or governments anywhere that have any presently-perceived possibility of catching up to Google and becoming a significant and growing competitor to Google. During the 3rd Quarter of 2006, Yahoo's net earnings dropped 60% while Google's net earnings quadrupled. During Q3 2006, Google's revenues were $2.69 billion, increased 70% compared to 3Q 2005; whereas Yahoo's revenues were $1.58 billion, up only 19% from 3Q 2005. Google-owned websites generated $885,000,000 in revenues during this 3Q 2006. Google's 4Q 2006 earnings tripled on a revenue increase of 67% over 4Q 2005. Yahoo's 4Q 2006 net earnings declined 67% from 4Q 2005, mostly attributable to a one-time backdated option charge. See 1/22/07 Forbes.com article "Yahoo!'s Quarter to Forget".

77.. Google is in a position to under pay for (or steal) the work of all website developers for a pittance because Google alone can convert the website hits into their

competitive market value (as determined by AdWords auctions). Other search engines cannot do this and are not even in a position to acquire high-traffic websites for this purpose because they lack the stock price, cash reserves and huge anticipated market-value cash income to make the purchase (in competition with Google), and could not use their own search engines to make as much money as the acquisitions are worth (at market value) when a company such as Google acquires the website. This explains how a startup organization, YOUTube, with no record of earnings, was acquired by Google during October, 2006 for $1.65 billion, with a possible $4 billion more depending on increased hits; and Google's August, 2006 payment of $900,000,000 to Ruppert Murdoch's MySpace.com for the privilege of putting AdWords before MySpace visitors or hits for a 3-1/2 year period. Murdoch bought a 100% interest in MySpace for $580,000,000 during July, 2005, only 13 months earlier, showing that a website is more valuable to Google than to its owner or other sophisticated internet companies because of Google's monopoly power with its Essential Facility and resulting unique ability to "monetize" traffic (i.e., convert website traffic or hits into actual market value in a huge competitive market for keyword-targeted advertising), giving Google more prospective income and stock price to outbid any competitor or other person trying to buy a specific website.

78..    On February 11, 2007, the Plaintiff observed no Google ads at the moment of visiting MySpace.com and Google.com but, upon searching the MySpace website for "gardens" (using a search engine "powered by Google"), 8 AdWords "sponsored links" appeared (for Shopping.MSN.com, gardeners.com, superpages.com, eBay.com, move.com, michiganbulb.com, VirtualPlantTags.com and cotswoldheritagetours.co.uk) together with 231,000 MySpace links related to the keyword "gardens", showing how

38

Google is able to run AdWords ads on sites not owned by Google. At the same time, when searching for "gardens" on Google's search website, 26 AdWords "sponsored links" appeared for the "gardens" keyword together with 99,600,000 garden-related links.

79..    Google's AdSense is different. AdSense ads appear, if at all, at the moment of visitation to the website homepage or other pages of the website. For example, on February 11, 2007, the Plaintiff visited Kinderstart.com and (without conducting any search) saw 3 "Ads by Google", for AreYouASlackerMom.com, TutorTime.com and NYSC.com, together with a Google notice "Advertise on this site" with a link to Googlesnydication.com. When searching the website for "gardens", no "sponsored links" appeared, only a Google AdSense ad (raftforkids.com, occupying the same space previously occupied by the 3 ads described above), together with 75 Kinderstart garden-related links. Goodle is not running any AdWords ads on Kinderstart.com, only AdSense ads, which are not keyword-targeted ads in response to any search term.

80..    AdWords is an "Essential Facility" because it has not been able to be duplicated, competitively, by Yahoo or MSN, and the cost of even trying to do so is an estimated $25-$50 billion dollars (with Google having spent $7-$8 billion in acquisitions so far) and having reached in excess of $10 billion in revenues for 2006. MSN (Microsoft) announced that it was setting aside almost $2 billion to attempt to compete with Google's AdWords. See ¶¶ 49-A to 49-II above for an analysis of the barriers to entry. Specifically. (i) the Plaintiff competes with Google and Google controls AdWords, an Essential Facility; (ii) the Plaintiff cannot duplicate that facility, nor can anyone else over the past years; (iii) Google has denied Plaintiff reasonable, non-

discriminatory use of the Essential Facility for the purchase of keyword-targeted ads by the Plaintiff, at non-discriminatory prices fixed by auction (and not by Google)) and has denied Plaintiff and (upon information and belief) all other website owners (other than AOL and MySpace) any use of the Essential Facility for the website owner to sell and place keyword targeted ads by third-party advertisers on the owner's own website(s) for visitors conducting website or Internet searches from the websites; and (iv) Google could feasibly have granted Plaintiff the use of the Essential Facility for both desired uses on a reasonable, non-discriminatory basis.

81.    Unless Google is required to let users use its Essential Facility on equal terms, Google will be depriving Plaintiff and other website owners of the opportunity of building their internet businesses (such as Plaintiff's classified advertising websites, myclads.com and attydb.com,  Plaintiff's late-fee avoidance website, now located at lawmall.com/latefees and other websites for creating traffic) and other website-supported interests (such as Plaintiff's efforts to run for and obtain political office).

82..    Not only does Google prevent Plaintiff from bidding for keyword-targeted advertising on a non-discriminatory (and wholly prohibitive basis), Google also prevents Plaintiff and other website owners from selling AdWords to their visitors and makes them settle for letting Google place its low-value, low-income AdSense ads on the website. This means that when Google owns a website, it can and does use its AdWords system to extract huge amounts of money for itself from the traffic created by the website, but when the same website is owned by someone else, such as Kinderstart.com, Google pays a mere fraction of the revenue to Kinderstart.com for placing AdSense ads on Kinderstart.com.

83..    Google is engaged in two types of exclusion of the Plaintiff and other website owners from use or non-discriminatory use of Google's AdWords Essential Facility. The first is Google's refusal to let Plaintiff and (upon information and belief) about 95% or more of all other PPC advertisers from using AdWords on a non-discriminatory basis. Google is charging most of its AdWords customers prohibitively high prices as alleged above, for the reasons set forth above. Secondly, AdWords is not permitting website owners to turn their website traffic into money at (competitively-created values) through sale and placement of ads on the owners' websites using the AdWords Essential Facility, where the advertising revenues are huge, being based on competition among advertisers for use of highly-specific, targeted keywords. Instead, the website owners have to settle for a small fraction of the market-value amount obtained by Google on its AdWords ads, by having to accept the lower-paying, less-effective, non-targeted AdSense, banner or context ads.

84...    Google's purpose in not giving Plaintiff and others reasonable access or any access to its AdWords Essential Facility is to foreclose competition in the business of developing website traffic and monetizing (or converting to market-value revenue) the website traffic for the benefit of the website owner, and to reduce the value of websites to their owners and enable Google to purchase or otherwise acquire them at less than their fair market value in a non-monopolized market.

85..    Because Google's AdWords facility is an Essential Facility, the Plaintiff is entitled to make use of it on reasonable. non-discriminatory terms.

86..    Plaintiff has been denied this access, both as to **non-discriminatory purchase (through AdWords auction) and placement** of keyword-targeted ads

41

1    displayed with the results of Google searches on websites owned by others, and as to the

2    **sale and placement** of keyword-targeted AdWords ads on Plaintiff's websites, using the

3    AdWords Essential Facility, with Plaintiff as the seller of the key-word targeted

4    advertising (and recipient of revenue on a reasonable, non-discriminatory basis,

5    comparable to the income being received by MySpace.com).

6

7          87..    Google's withholding of both types of use (on reasonable terms) of its

8    Essential Facility is a violation of § 2 of the Sherman Act.

9          88..    News Corp. / Fox Interactive Media (FIM) and its wholly-owned website

10   MySpace.com, and substantially all of the nation's other 2,500 largest corporations,

11   including media companies Time Warner and NBC Universal, which are victims of

12   copyright infringement by Google (upon its acquisition of YouTube), but are intimidated

13

14   by Google's internet monopoly (the Essential Facility) from bringing infringement

15   lawsuits against Google for fear of losing the possibility of monetizing their website

16   traffic, which because of Google's monopolizing activities now require Google's consent

17

18   (as was recently given to News Corp.'s FIM/MySpace.com interests); but by agreeing to

19   permit Google to infringe their copyrights, these corporations are giving up the value of

20   their copyrights for the opportunity to obtain monopolist Google's consent to and

21   participating in the monetizing of the huge existing website traffic. This is an

22   anticompetitive consequence of Google's monopolistic activities.

23

24

25                        **PLAINTIFF'S INJURIES AND DAMAGES**

26

27         89..    By reason of Google's activities as alleged above, the Plaintiff (and each

28   of others similarly situated) has suffered the following antitrust injuries and damages:

42

1

2  **Plaintiff's Antitrust Injuries**

3      A..    Denial of Google's AdWords facility to monetize Plaintiff's 10

4  Community Search Websites (with damages being the loss of money from website

5  traffic; the loss of capital value for the websites; the loss of borrowing power for the

6  websites; the reduction of compound growth effect for the websites; and the loss of

7  market share for Plaintiff in the market of monetizing Community Search Websites; and

8  a decline in Plaintiff's willingness to innovate with additional websites if the ability to

9

10  adequately monetize their traffic is not available);

11      B..    Google's removal of low-priced keywords from the keywords available to

12  Plaintiff, even though most or all of such keywords were available for less than 1-cent per

13  click to ebay (with damages being the inability to obtain website traffic and a permissive

14  email list at Google's stated low price of 1-cent per click; Google had no business

15  justification for holding back such key words other than to force Plaintiff and others into

16  bidding for higher-cost keywords, which was an illegal controlling of the price of

17  keywords);

18

19      C..    Google's requirement that Plaintiff pay up to 50 times or more Plaintiff's

20  desired 1-cent bid, even though ebay was paying less than 1-cent per bid for low-value

21  keywords; and the related requirement by Google that Plaintiff have the same

22  clickthrough rate as ebay to be able to be able to obtain Google's advertised lowest 1-cent

23  per click price; Google had no business justification for its ad quality and landing page

24  requirements because it is not possible for many advertisers to have better advertising

25  copy; the user clicking on an ad does not see the landing page until after the clickthrough

26  takes place; and Google's stated reason to provide a better quality experience for persons

27

28

clicking on Google ads rings hollow because as long as the advertisers pays Google the demanded tribute Google will allow the alleged low quality experience to take place.

D..    Google's systematic failure to include all advertisers bidding for use of a keyword, by routinely leaving one or more of the lowest bidders (such as the Plaintiff) off the list of bidders whose search advertisements are displayed together with the keyword search results, for the purpose of not having to give the lowest bidder the automatic 1-cent (or previously 5-cent) per click price, when Google's technology allows placement of, and Google does sometimes place, at least 16 pages of ads (at 10 ads per page). (Plaintiff is injured by being denied the opportunity to place his search advertising at Google's lowest per-click price, thereby depriving Plaintiff of a low-cost opportunity to obtain a website visitor, potential client, book purchaser, or an addition to Plaintiff's permissive email mailing list.

E..    Google's monetization of selected Community Search Websites (including Google's acquired YouTube.com) through sharing of Google's Search Advertising placed on the websites, while refusing to enter into an agreement with Plaintiff for the sharing of Google's Search Advertising revenues on any of Plaintiff's 10 Community Search Websites, amounting to highly discriminatory website-traffic monetizing practices by Google favoring competitors of Google and Plaintiff. (Plaintiff is injured by being unable to monetize his Community Search Website traffic, with the same consequences as alleged above).

F..    Forced to pay monopolistic charges to Google for use of Google's monopolizing AdWords Search Advertising system to build website traffic, but denied use of the same facility to monetize the website traffic (and obtain payback for the

developed website traffic at the monopolistic rate enjoyed by Google) after paying Google for building the traffic;

G.. Deprived of a market to sell successful (high-traffic websites) at the value they represent to Google because the only company that can monetize website traffic at such high rates is Google, so that Google has the ability to outbid any possible purchaser and prevent the development of a market for monetizing websites. In fact, to suppress such market, Google acquired during April, 2007 the number one competitor (DoubleClick.com) in the market of monetizing websites through the substantially inferior system of context or display (or banner) advertising.

**Plaintiff's Damages** (in addition to damages described in A-G above)

H.. Moneys paid to Google by the Plaintiff as an AdWords advertiser ($1,466.67);

I.. Moneys paid by the Plaintiff to develop various websites and create website traffic using AdWords and other search services (approximately $15,000);

J.. Ongoing loss of the monetary value of website traffic for Plaintiff's 85 to 90 websites ($10,000,000 or more, depending on the success of Plaintiff's 10 Search Websites starting with myclads.com and attydb.com); and

K. Loss of the value of an email list of 1,000,000 members that could have been built by Plaintiff under his business plan to use low-demand Google keywords, at a cost of 1 cent per click, but for the illegal activities of Google (estimated at more than $1,000,000).

90..    Upon information and belief, the total provable damages suffered by Plaintiff amount to more than $11,000,000, and will be proven with certainty at the time of trial.

## PRELIMINARY AND PERMANENT INJUNCTION

91..    The activities of the defendant are continuing and threaten to prevent Plaintiff from being elected as the New York Attorney General during the November 2010 elections, and any other political offices the Plaintiff may seek between now and 2010.

92..    If the Plaintiff is not able to enjoin Google from its predatory pricing activities, as alleged, the Plaintiff will suffer irreparable injury by not being able to compete for (or win) the election for New York Attorney General or any other offices which the Plaintiff plans to seek.

93..    Plaintiff is entitled to (i) a preliminary injunction to enjoin Google from its alleged predatory practices during the pendency of this litigation; and (ii) a permanent injunction to enjoin Google from the same predatory practices. as part of the relief in the final judgment in this action. Specifically, without limiting the injunctive relief being sought, Plaintiff seeks an injunction or mandatory injunction

A..    Requiring Google to provide access to Google's AdWords system (the Essential Facility) on reasonable, non-discriminatory terms, as to both the purchase and placement of AdWords keyword-targeted Internet, pay-per-click advertisements.  as well as the sale and placement of AdWords keyword-targeted, pay-per-click advertisements on Plaintiff's own websites (in response to Google-powered website and web searches

conducted by visitors from Plaintiff's websites) with Plaintiff receiving a reasonable, non-discriminatory percentage of the revenues derived from such advertising.

B.. Requiring Google to let Plaintiff and other advertisers pay the lowest available price per click as determined by Google's auction process without any adjustment of the price by Google to reflect "quality", "landing page", clickthrough rate of the advertiser or any other advertisers using the same or similar keyword;

C.. Requiring Google to charge the same price or same position price (either per-click price or price per 1,000 impressions) to all advertisers seeking to use a specific keyword;

D.. Requiring Google to let advertisers use any English words (other than illegal words due to obscenity, copyright, trademark, secrecy or similar laws); and

E.. Requiring Google to list in its website all words not available to any AdWords advertiser.

## OTHER RELIEF SOUGHT

94.. The Plaintiff is entitled to an award of treble damages.

95.. The Plaintiff is entitled to an award of attorneys' fees.

96. Plaintiff is entitled to a judgment as to liability against Google for violation of § 2 of the Sherman Act by reason of the facts alleged in ¶¶ 1 through 93 above.

## COUNT II

**[Violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 – Attempting to Monopolize – Alternative Allegation to Count I Claims]**

97..    Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-96 above, and further alleges, alternatively to Count I above, that Count II is being brought under § 2 of the Sherman Act, 15 U.S.C.A. § 2 for attempted monopolization of the Relevant Markets and Submarket.

**Attempted Monopolization by Google (Alternative Allegation)**

98..    Alternatively, by its actions as alleged, Google demonstrates that it has a dangerous probability of achieving monopoly power (to control prices and exclude competition) in these alleged service markets in the United States geographic market (defined in ¶ 44 above):

A..    Search Advertising market;

B..    Submarket of monetizing the traffic of Community Search Websites through use of Search Advertising; and, alternatively. if the market turns out to be "all Internet advertising" and not "Search Advertising"; and

C..    Market for monetizing the traffic of Community Search Websites through the use of Internet Advertising.

99..    Google has a specific intent to control prices in each of the Relevant Markets and Submarket and to destroy competition and unreasonably restrain trade in such markets, evidenced by

-

A..     Google's acquisition of the patents, know-how, software copyrights, management and employees of the following companies listed in **Exhibit A** hereto that related directly to the improvement of Google's search engine, AdWords, AdSense or marketing thereof: acquisition ## 2 (Outride), 4 (Neotonic), 5 (Applied Semantics), 6 (Kaltix), 7 (Sprinks). 10 (Baidu), 13 (ZIPDash), 15 (possibly, 15 undisclosed companies or asset acquisitions), 17 (Urchin), 23 (AOL 5% interest), 28 (orion advanced text search algorithm), 30 (Neven), 31 (MySpace monetization agreement), 32 (Jot Spot), 33 (YouTube), 35 (Xunlei), 37 Trendalyzer), 38 (DoubleClick). 39 (Performics), 40 possibly some of numerous foreign subsidiaries);

B..     Google's acquisition of direct competitors in the Internet Advertising Market: 38 (DoubleClick), 23 (AOL 5% interest), 31 (MySpace monetization agreement), 33 (YouTube, competitor in the market for monetizing Community Search Websites; and

C..     each of the anticompetitive activities alleged in ¶¶ 50-72 above.

100..     Google engaged in predatory or anticompetitive conduct directed to accomplishing the illegal purpose of monopolizing and unreasonably restraining trade in each of the Relevant Markets and Submarket, as follows: the anticompetitive activities alleged in ¶¶ 50-72 above.

101..     Google has or had a dangerous probability of success in its attempt to monopolize the Relevant Markets and Submarket for the reasons and evidence described in ¶ 99-A through ¶ 99-C above.

49

102.. Plaintiff suffered causal antitrust injuries by reason of the following anticompetitive activities of Google: as described in ¶¶ 89A through 89-K above.

103.. The only two significant challengers to Google's AdWords business are Yahoo and Microsoft/MSN, but neither has a database of search pages, or a number of daily searches, or the dollar amount of advertising revenue or profits to be able to stop Google's growth and ever-increasing power in the relevant market.

104.. Google is engaging in predatory and anticompetitive activities as alleged in ¶¶ 50-72 and 89-A through 89-K above.

105.. The barriers to entry are so high (see ¶¶ 49-A through 49-II above) that there appear to be only two actual or potential competitors (Yahoo and Microsoft/MSN), but without any demonstrated ability to put together a team with the know-how to compete effectively against Google. Google's team consists of Google's founders and controlling shareholders of Google, people who cannot be purchased with Microsoft's billions in unused cash reserves. Nobody has the databases to compete with Google and even if they did they may not have the money to purchase and manage 450,000 servers to be able to produce search results in a fraction of a second.

106.. Through its activities as alleged, Google is attempting to monopolize the Relevant Markets and Relevant Submarket described in ¶ 98 above, with a dangerous probability of being able to achieve success in monopolization of the alleged markets and submarket, in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 and during the relevant period for this litigation actually acquired power over each of such markets.

107.. Plaintiff has been damaged as a result and is suffering from continuing and irreparable damages as alleged in ¶¶ 89-92 above.

108.. Plaintiff is entitled to a preliminary and permanent injunction as described above in ¶¶ 93-A through 93-E.

109.. Plaintiff is entitled to treble damages under the Sherman Act, together with reasonable attorney's fees and costs.

## PRAYER

**WHEREFORE**, the Plaintiff demands judgment against Google, as follows:

1.. As to Count I, that it be adjudged and decreed that the activities of Google constitute a violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 (as illegal monopolizing, and combining to monopolize the Relevant Markets and Relevant Submarket defined in ¶ 98 above);

2.. As to Count II, that it be adjudged and decreed that the activities of Google constitute a violation of § 2 of the Sherman Act, 15 U.S.C.A. § 1 (as an illegal attempt to monopolize the Relevant Markets and Relevant Submarket defined in ¶ 98 above);

3.. Awarding damages in favor of the Plaintiff, in an amount of $11,000,000 or more, which will be proved with certainty at the time of trial;

4.. Awarding trebled damages to the Plaintiff as to each of Count I and Count II.

5.. Awarding attorneys' fees to the Plaintiff as to each of Count I and Count II, to the extent the Plaintiff has used the services of any attorneys;

6.. Enjoining Google, preliminarily and permanently, as to each of the anti-competitive practices described in ¶¶ 50-72 above;

1        7..  Granting the Plaintiff such other and further relief as this Court may

2    deem just and proper.

3

4    ### Jury Demand

5        Plaintiff hereby demands a trial by jury of all issues properly triable to a jury

6    pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

7    **Dated:**   **New York, New York**

8           **April 15, 2007**

9

10

11    **Carl E. Person**
      **Plaintiff,** *Pro Se*

12    **325 W. 45th Street - Suite 201**
      **New York, New York 10036-3803**

13    **(212) 307-4444**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# (Google's acquisitions from 2001 to 4/13/07)

1.. **Deja**, 2/01 (Usenet archive database consisting of 500 million messages, including threads and poster email addresses. dating back to 1995)

2.. **Outride Inc.,** 9/01 (a spin-off from Xerox PARC; Google immediately integrated the technology into Google's search engine; in its 9/20/01 press release Google stated:

> "Google Acquires Technology Assets of Outride Inc. - Transaction Complements Google's Technology Development To Provide Search Results with Greater Relevance - Google Inc. today announced the company's acquisition of the intellectual property, including patent rights, source code. trademarks. and associated domain names. from Outride Inc.. a Redwood City, Calif.-based developer of online information retrieval technologies. ... "This acquisition is another example of Google's commitment to providing the highest quality search service in the world," said Larry Page, Google co-founder and president, Products. "Outride has made significant advances in the field of relevance technology and we believe Google provides the ideal vehicle to continue the development of these technologies." Outride. a spin-off from Xerox Palo Alto Research Center (PARC). was created to apply state-of-the-art model-based relevance technology to the challenge of online information retrieval. Outride's technologies were designed to enhance productivity from end-users by simplifying the ability to find the right information at the right time. * * * With the largest index of websites available on the World Wide Web and the industry's most advanced search technology, Google Inc. delivers the fastest and easiest way to find relevant information on the Internet.  [source: http://www.google.com/press/pressrel/outride.html]

3.. **Pyra Labs / Blogger,** 2/03 (a weblogging provider and owner of *Blogger*. with 1 million subscribers at the time of acquisition, subsequently built up by Google to be one of the most-used blogging tools) As stated in a 2/18/03 *Forbes* article:

> With its acquisition of Pyra Labs. Web-search juggernaut Google.com apparently sees dollar signs in the business of letting anyone easily publish their comments and thoughts on the Web.
>
> Blogging. as it's often called. has become. in the last year. a trendy Web toy for

the stream-of-consciousness set. Pyra's Blogger, with more than a million users, allows users to write and publish online almost as quickly as a thought strikes.

As yet the only statement from Google has been a few terse sentences. "Blogs are a global self-publishing phenomenon that connect Internet users with dynamic, diverse points of view while also enabling comment and participation. * * *" [source: http://www.forbes.com/2003/02/18/cx_ah_0218google_print.html]

4.. **Neotonic Software**, 4/03 (to bring Google's Customer Relationship Management (or "CRM") technology in-house; CRM software with application for customizing homepages, to automate and manage customer followup);

5.. **Applied Semantics**, 4/03, $102 million (eventually becoming Google AdSense; context-sensitive ad company integrated into Google's AdWords/AdSense to enable Google to compete with Yahoo's Overture). In its 4/23/03 press release "Google Acquires Applied Semantics - New Technologies and Engineering Team Complement Google's Content Targeted Advertising Programs", Google announced:

> that it acquired Applied Semantics, a Santa Monica, Calif.-based producer of software applications for the online advertising, domain name and enterprise information management markets. Applied Semantics' products and engineering team will strengthen Google's search and advertising programs, including its fast-growing content-targeted advertising offering. * * *
>
> "Applied Semantics is a proven innovator in semantic text processing and online advertising," said Sergey Brin, Google's co-founder and president of Technology. "This acquisition will enable Google to create new technologies that make online advertising more useful to users, publishers, and advertisers alike."
> Applied Semantics' products are based on its patented CIRCA technology, which understands, organizes, and extracts knowledge from websites and information repositories in a way that mimics human thought and enables more effective information retrieval. A key application of the CIRCA technology is Applied Semantics' AdSense product that enables web publishers to understand the key themes on web pages to deliver highly relevant and targeted advertisements.

6.. **Kaltix**, 9/03 (company acquired this 3-person personalized search startup company to develop and launch *Personalized Search*). In its 9/30/03 press release entitled

"Google Acquires Kaltix Corp. - New Technologies and Engineering Team

Complement Google Search Engine", Google announced:

> ... it acquired Kaltix Corp., a Palo Alto, Calif.-based search technology start-up.
> * * * "Google and Kaltix share a common commitment to developing innovative
> search technologies that make finding information faster, easier and more
> relevant." said Larry Page, co-founder and president of Products at Google.
> "Kaltix is working on a number of compelling search technologies, and Google is
> the ideal vehicle for the continued development of these advancements."
>
> Kaltix Corp. was formed in June 2003 and focuses on developing personalized
> and context-sensitive search technologies that make it faster and easier for people
> to find information on the web.

7.. **Sprinks**, 10/03 (acquired to enhance Google's AdWords and AdSense programs). In

a 10/24/03 article entitled "Google Acquires Sprinks: Gains Access to Advertiser

Base and Ad Placement on About.com and Primedia Online Publications",

traffick.com stated [source: http://www.traffick.com/2003/10/google-acquires-

sprinks-gains-access.asp]:

> Sprinks, an innovator in the pay-per-click keyword-targeted ad space, is no more,
> following an acquisition by category leader Google, Inc.
>
> Sprinks ads currently show up on 450 topic-specific About.com Guide Sites as
> well as 127 magazine-related websites targeting readers of major Primedia
> publications.
>
> As part of the deal, Google has signed a four-year revenue-sharing agreement to
> show ads on these sites.
>
> In the area of so-called contextual pay-per-click ads (ads near relevant content,
> not triggered by search results). Sprinks had been a recent thorn in the side of the
> industry leaders, Google, Overture, and Findwhat. Its ContentSprinks offering
> gave advertisers superior "channel control" than the often unpredictable
> contextual ads shown by its competitors. It's not clear if the acquisition will lead
> Google to rethink how it shows some of its contextual ads.
>
> According to Marshall Simmonds, Director of Search for Primedia and
> About.com, the two parties have set a 45-day integration schedule to integrate
> Sprinks staff into Google and after which Google AdWords ads will begin
> showing on Sprinks' former network.

As for how the integration might affect Google's approach to contextual advertising, Simmonds says: "It's difficult to speculate. The main thing is that Google will now have access to our large network of topically-relevant sites."

8.. **Genius Labs**, 10/03 (a second weblog provider)

9.. **Ignite Logic**, 4/04 (a company building websites for law firms, adding to Google's expertise in distributed computing and extending Google's distributed computing platform)

10.. **Baidu**, 6/04, $5 million (2.6% ownership in the leading web search firm in China, a competitor of Google; China is the 2nd largest internet market; sold for $60 million in 6/06)

11.. **Picasa**, 7/04 (picture management tools for *Blogger*)

12.. **Keyhole**, 10/04 (to provide the core mapping capabilities in Google Earth)

13.. **ZipDash**, 9-12/04 (to develop and launch Google Ride Finder). A 3/30/05 SiliconBeat article in the *Mercury News* discussing Google's secret, non-reported acquisition revealed:

> Zipdash "... tackles highway congestion by providing individuals with real-time, accurate traffic information." Some of the technology is/was intended to allow mobile phone users to get real-time traffic info using the GPS in their phones.

> **UPDATE:** A Google spokesman got back to us to confirm both acquisitions, which he said were made because of the companies' "talented engineers and great technology." He declined to comment further.

14.. **Where2 LLC**, 9-12/04 (to provide the core mapping capabilities in Google Maps)

15.. **9 companies and substantially all of the assets of another 6 companies**, during 2005, for a combined purchase price of $131 million (according to Google's 10-K filing)

16.. **2Web Technologies**, 2004/2005 (spinoff of ITK Software, key part of Google's plan to develop and launch Google Spreadsheets to compete with Microsoft; acquired spreadsheet team)

17.. Urchin **Software Corporation**, 3/05, $30 million (web analytics and statistics technology used to develop and launch Google Analytics). In John Battelle's 3/28/05 Searchblog, Battle quoted from Google's press release and commented on the acquisition [source: http://battellemedia.com/archives/001360.php]:

> … [the release stated that Google] "has agreed to acquire Urchin Software Corporation, a San Diego, California based web analytics company.
>
> "Urchin is a web site analytics solution used by web site owners and marketers to better understand their users' experiences, optimize content and track marketing performance. Urchin tools are available as a hosted service, a software product and through large web hosting providers. These products are used by thousands of popular sites on the Internet.
>
> "Google plans to make these tools available to web site owners and marketers to better enable them to increase their advertising return on investment and make their web sites more effective.
>
> "'We want to provide web site owners and marketers with the information they need to optimize their users' experience and generate a higher return-on-investment from their advertising spending," said Jonathan Rosenberg, vice president of product management, Google. "This technology will be a valuable addition to Google's suite of advertising and publishing products.'" [end of release]
>
> So this is interesting on a number of levels. Urchin was a third party system that many used to understand their Google ads, among others. As part of a Google suite of tools. it will take on a decidedly different cast. More as the word trickles out. BTW, I was told by the tipster that the price was $30 million.

18.. **Dodgeball**, 2/05 (a 2-person cell phone social networking software provider for mobile devices)

19.. **Current Communications Group**, 7/05 (Google together with Goldman Sachs and Hearst Corporation invest $100 million; an investment in a company which provides broadband services through power lines)

20.. **Akwan Information Technologies**, 7/05 (part of plan to open an R&D office and expand Google's presence into Latin and South America) [one of 3 companies acquired by Google for $22.5 million]

21.. **Reqwireless**, 7/05 (web browser and mobile email software developer for wireless devices, as part of Google's initiative to develop a version of Gmail for the mobile device) ) [one of 3 companies acquired by Google for $22.5 million]

22.. **Android Inc.**, 8/05 (software provider for mobile devices) ) [one of 3 companies acquired by Google for $22.5 million]

23.. **Time Warner's AOL division**, 12/05, $1 billion (for 5% stake, in a competitor of Google, which also enabled Google to run its Search Advertising alongside the search results for AOL website visitors; an example of how Google is monetizing the website of a competitor (in which Google purchased a 5% interest) and could monetize Plaintiff's websites if it chose to do so:

24.. **DMarc Broadcasting**, 1/06, $102 million plus additional maximum of $1.136 billion (creator and operator of an automated platform that lets advertisers more easily schedule, deliver and monitor their ads over radio, and radio broadcasters to automate schedules and advertising spots)

25.. **Measure Map**, 2/06 (from Adaptive Path, a product to help with Blog analytics). On his first day at work for Google, the acquired team leader stated:

> Our goal has been to use the power of web analytics to help bloggers feel that same sense of connection with their audience. Today, as the Measure Map team joins Google, our mission remains the same: to build the best possible user experience so people can understand and appreciate the effect their blogs - their words and ideas - can have. * * *

> Bringing Measure Map to Google is an exciting validation of the user experience work I've been doing with my partners at Adaptive Path for years. By opening up the app to more bloggers through Google, we hope to help even more people become passionate about their blogs.

26.. **Writely**, 3/06 (company with online word processing program of same name, to enable Google to offer a free application to undermine competitor Microsoft's market share for word processing programs)

27.. **Sketchup**, 3/06 (using a plugin, this program allows one to place 3D models into Google Earth)

28.. **Orion, an advanced text search algorithm**, 4/06 (from inventor Ori Allon, an Israeli-born student at the University of New South Wales in Australia; The advanced text-search algorithm…will make searches much less time-consuming; instead of finding pages on the net that contain keywords, then providing links, the new search engine will provide expanded text extracts which will eradicate the need

to open every link. Orion has sparked interest from the likes of Google and Yahoo, with Google acquiring the rights to the algorithm)

29.. **GTalkr**, 5/06 (web-based, Flash-based IM client focused exclusively on interfacing with Google's GTalk)

30.. **Neven Vision**, 8/06 (company that specializes in biometric identification, to make it easier for Google's Picasa to organize and search for photos)

31.. **MySpace**, 8/06, $900,000,000 minimum over 3-1/4 years for licensing use of Google's search engine, keyword-targeted AdWords advertising system and advertiser database (the "AdWords Platform") by MySpace and other News Corporation's Fox Interative Media ("FIM") (competitors of Google); with all revenues from use of the AdWords Platform being paid to FIM until $900,000,000 minimum is received by FIM; the licensing includes, upon information and belief, the non-exclusive licensing of use of various patents owned by Google; an example of Google permitting FIM, a favored customer (and competitor of Google in monetizing website traffic), to use the Essential Facility for the essential purpose of monetizing YouTube's traffic, and dividing the revenues by agreement between Google and competitor FIM

32.. **JotSpot**, 10/06 (an application Wiki company to offer enterprise social software: product is targeted mainly to small and medium-sized businesses; company was founded by Joe Kraus and Graham Spencer, co-founders of Excite)

33.. **YouTube**, 11/06, $1.65 billion in stock (online video sharing website, with company retaining its brand), an example of Google using its Essential Facility to monetize YouTube's traffic, but only after it was acquired by Google; upon information and belief. the agreement eliminated $ billions of copyright infringement liability or potential liability that YouTube.com had to FIM/Murdoch;

34.. **Endoxon**, 12/06, $28 million (an Internet and mobile mapping solutions developer)

35. **Xunlei**, a Chinese company, 1/07, non-disclosed price (buys a stake in company, a person-to-person file sharing service);

36.. **Adscape**, 2/07, $23 million (video game advertising);

37.. **Trendalyzer**, 3/07, undisclosed price (data visualization software as a management tool for use with AdWords and by AdWords advertisers, upon information and belief); 3/16/07 blogspot.com stated:

> Google decided to acquire the technology from Gapminder. "Gathering data and creating useful statistics is an arduous job that often goes unrecognized. We hope to provide the resources necessary to bring such work to its deserved wider audience by improving and expanding Trendalyzer and making it freely available to any and all users capable of thinking outside the X and Y axes." says Marissa Mayer.

38.. **DoubleClick**, 4/07, $3.1 billion (the leading online advertising company with annual revenues of $300 million, enabling its customers to turn website traffic into money through labor intensive online display advertising. but to a much lesser extent than Google is able to do with Google's Search Advertising system with an 8% cost of sales; with an auction market for online advertising; Google outbid Microsoft; enables Google to move into online advertising market where Google had no

presence; purpose of acquisition is to stifle Microsoft's competition; see 4/14/07 *NY Times* article which states "Acquiring DoubleClick expands Google's business far beyond algorithm-driven ad auctions into a relationship-based business with Web publishers and advertisers. Google has been expanding its AdSense network into video and display ads online and is selling ads to a limited degree on television, newspapers and radio."). Google's own lengthy FAQ concerning the acquisition [published at http://216.239.57.110/blog_resources/DC_FAQ.pdf] is compelling evidence supporting Plaintiff's allegation that context advertising is a different market from Search Advertising, as follows:

> * * * "We see this acquisition as bringing the worlds of search and display advertising together. ... DoubleClick currently has approximately 1,200 employees. [p.1]; ... we will provide additional monetization opportunities and efficiencies to maximize their [AdSense publishers'] revenue. ... The acquisition will give advertisers more targeting and buying options and will provide maximum reach for their target audience.... Working with DoubleClick, we will make online text and display advertising more targeted and relevant for the user and therefore more valuable to the advertiser. ... provide additional revenue potential while letting them focus more on creating and maintaining websites that appeal to users. Upon closing, DoubleClick publishers will then have access to our large base of advertisers. ... When done properly, advertising can be useful and provide relevant information at the precise moment when a user is interested in acquiring a service or product. Working with DoubleClick, we are confident that advertisers and agencies will apply that principle to display advertising across the web to not only benefit advertisers and publishers but also [p.2] to ensure a high quality and relevant online experience for users. ... DoubleClick has thousands of clients. There is some overlap with Google's current client base. We believe this offers synergies for advertisers and publishers to place the right ad at the right time to the right user, using both text and display advertising. ... increasing productivity and profitability ...[p.3] Working with DoubleClick, we will increase the relevance of ads online so that we maintain a positive user experience while provid[ing] targeted ad opportunities for advertisers and increased monetization for publishers. ... The majority of Doubleclick's business is in the United States.... **Q. Is this acquisition a response to the minimal traction Google has made thus far on brand advertising efforts?** A. No. it's an opportunity to

combine our business with the complementary capabilities DoubleClick has to offer. Doubleclick and Google will be able to offer a better, more comprehensive experience than either company could offer alone – for advertisers, publishers, and ad agencies. ... This partnership is an obvious opportunity to expand our ads business and have a positive impact on our search users in the process... **Q. Given Google's technology expertise, why is it necessary to acquire Doubleclick?** A. DoubleClick offers a unique opportunity to acquire capabilities that are complementary to Google's existing business. **Q. How does this acquisition broaden Google's market opportunity?** A. This acquisition represents a tremendous opportunity for Google to accelerate our display advertising business and to broaden and deepen the inventory available to all [p.4] advertisers. Advertisers will have the data, tools, and reporting they need to grow their search and display advertising spend. In addition, currently unsold publisher inventory will become more readily available and also contribute to growth in advertising revenues. **Q. Do you believe this acquisition will stifle competition?** A. No. we do not believe this acquisition is anti-competitive, as it promotes a vibrant, healthy market for online advertising. ... We do see the opportunity to monetize more types of inventory as a large opportunity and will address this opportunity through some combination of our existing initiatives and DoubleClick's existing initiatives. Performics is part of DoubleClick, and we are acquiring it as part of the transaction. [p.5]

39.. **Performics**, a company purchased by DoubleClick in May 2004 for $58-65 million (search engine marketing and affiliate marketing products), acquired by Google when acquiring DoubleClick during 4/07;

40.. **Google's foreign subsidiaries** (listed in Google's 2006 Annual Report), some of which (upon information and belief) involve acquisitions by Google of competitors, technology, patents and other assets which any would require expense to offset by any Google competitor in the United States [source: http://www.searchenginejournal.com/googles-30-us-subsidiaries-googles-international-companies/4481/]:

    Aegino Limited : Ireland
    @Last Software, Ltd. : United Kingdom

At Last Software GmbH : Germany
allPAY GmbH : Germany
bruNET GmbH : Germany
bruNET Holding AG : Germany
bruNET Schweiz GmbH : Switzerland
Endoxon Ltd. : Switzerland
Endoxon (India) Private Ltd. : India
Endoxon Prepress AG : Switzerland
Endoxon (Deutchland) GmbH : Germany
Google (Hong Kong) Limited : Hong Kong
Google Advertising and Marketing Limited : Turkey
Google Akwan Internet Ltda. : Brazil
Google Argentina S.R.L. : Argentina
Google Australia Pty Ltd. : Australia
Google Belgium NV : Belgium
Google Bermuda Limited : Bermuda
Google Bermuda Unlimited : Bermuda
Google Brasil Internet Ltda. : Brazil
Google Canada Corporation : Nova Scotia, Canada
Google Chile Limitada : Chile
Google Czech Republic s.r.o. : Czech Republic
Google Denmark ApS : Denmark
Google Finland OY : Finland
Google France SarL : France
Google Information Technology Services Limited Liability Company :
Hungary
Google Germany GmbH : Germany
Google India Private Limited : India
Google International GmbH : Austria
Google Ireland Holdings : Ireland
Google Ireland Limited : Ireland
Google Israel Ltd : Israel
Google Italy s.r.l. : Italy
Google Japan Inc. : Japan
Google Korea, LLC. : Korea
Google Limited Liability Company - Google OOO : Russia
Google Mexico S. de R.L. de C.V. : Mexico
Google Netherlands B.V. : The Netherlands
Google Netherlands Holdings B.V. : The Netherlands
Google New Zealand Ltd. : New Zealand
Google Norway AS : Norway
Google Payment Ltd. : United Kingdom
Google Payment Hong Kong Limited : Hong Kong
Google Payment Singapore Pte. Ltd. : Singapore
Google Poland Sp. z o.o. : Poland
Google Singapore Pte. Ltd. : Singapore

Google South Africa (Proprietary) Limited : South Africa
Google Spain, S.L. : Spain
Google Sweden AB : Sweden
Google Switzerland GmbH : Switzerland
Google UK Limited : United Kingdom
Neven Vision KK : Japan
Neven Vision Germany GmbH : Germany
Leonberger Holdings B.V. : The Netherlands
Reqwireless Inc. : Ontario, Canada
Skydocks GmbH : Germany

# Exhibit B

## CARL E. PERSON, ATTORNEY AT LAW

325 W. 45th St. – Suite 201
New York NY 10036-3803
Phone 212-307-4444
Fax 212-307-0247
carlpers@ix.netcom.com

**REGISTERED MAIL RRR**

**April 15, 2007**

**Eric Schmidt, Chief Executive Officer**
**Google, Inc.**
**1600 Amphitheatre Parkway**
**Mountain View CA  94043**

**Dear Mr. Schmidt:**

This letter is being sent to you pursuant to (a) § 1782(a)(2) of the California Civil Code and (b) judicial decisions concerning the antitrust "Essential Facilities" doctrine under § 2 of the Sherman Antitrust Act, which require that a demand be made as a condition to pursuing certain claims against Google, Inc. ("Google").  Simultaneously, I am sending a copy of this letter to your attorneys, Messrs. Wilson Sonsini Goodrich & Rosati (David H. Kramer, Esq.).

**The first of my two demands**, made pursuant to § 1782(a)(2) of the California Civil Code, is that Google, Inc. cease all of the following activities of Google prohibited by § 1770 of the California Civil Code [contained in ¶ 228 of my revised proposed amended complaint – not yet served, in *Person v. Google*]:

(1) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is the "passing off services" [of Google] as those of another [Person]."

(2) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is "misrepresenting the source, sponsorship, approval [and] … certification of … services [*i.e.*, Plaintiff's or other advertiser's bid]."

(3) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is "misrepresenting the affiliation, connection, or association with, or certification by, another" as to the relationship between Google as auctioneer and Plaintiff as a bidder.

(5) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is "representing (falsely) that services [*i.e.*, bids by Person or others] have sponsorship, approval [and] characteristics [an amount determined by the Plaintiff and not by Google] which they do not have…."

Eric Schmidt, Chief Executive Officer, February 12, 2007, page 2.

(7) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is falsely "representing that services [*i.e.*, bids by Plaintiff or others]... are of a particular standard, quality, or grade [*i.e.*, made at a price selected by the Plaintiff or others]...."

(9) Google's advertising that AdWords is an auction market is the "Advertising [of] ... [auction] services with intent not to sell them as advertised". Such activity is illegal because of Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google.

(10) Google's advertising that AdWords is an auction market for keywords is the "Advertising [of] ... [auction] services with intent not to supply reasonably expectable demand [for keywords], unless the advertisement discloses a limitation of quantity". Such activity is illegal because Google is withholding numerous keywords from the auction market, to force higher winning bids for the keywords allowed to be sold at its auctions.

(13) Google states that it is adjusting keyword prices upwards for some advertisers and downward for other advertisers based on Google's subjective analysis of the quality of the advertiser's advertisement and landing page, in comparison to others. This is the "making [by Google of] false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions" given to some (*e.g.*, Ebay) and not to others (such as the Plaintiff, and other disfavored advertisers). This is especially so because Google is comparing the clickthrough rates of dissimilar but competing advertisers (*i.e.*, Plaintiff in running for Attorney General was seeking to use some of the keywords used by eBay to sell books, and misrepresenting to advertisers that they could improve their clickthrough rate in comparison to eBay or equivalent by working on their ad and landing page when in fact this was not necessarily so. Google has been falsely representing to advertisers that they can and should create better landing pages and ads to obtain clickthrough rates of advertisers selling wholly unrelated products and services.

(16) Google's auction results, based on the foregoing, are "representing that the subject of a transaction [*i.e.*, a keyword auction] has been supplied in accordance with a previous representation when it has not." Google's alleged auction market is not an auction market at all. It is a price-fixing market where prices are set by Google, in a variety of ways, without telling advertisers. Google's manipulation of the auction market has resulted in the fixing of prices at artificially high levels and requiring advertisers such as the Plaintiff and other disfavored advertisers to pay per-click prices 50 times more than the click-through price paid at the same moment by advertisers who are offering non-competitive goods and/or services to searchers using a specific keyword.

(17) By reason of Google's manipulation of its auction market, Google has been falsely "representing that the consumer will receive a rebate, discount, or other economic benefit" by participating in Google's keyword auctions, under Google's terms and conditions, including the making of changes to the advertiser's ads and landing pages. Google has no way of knowing if the advertiser's present ads are as good as they can be, for the type of product or service being offered, and Google forces most of its advertisers, including the Plaintiff [and other disfavored advertisers], to keep making changes to the ads to achieve a non-obtainable result (of making the market for live elephants as large as the market for books on elephants).

(18) By not explaining how an advertiser can bargain with Google for lower rates (in the way that eBay is obtaining, upon information and belief, a price of about one-half a cent per click, 50% lower than Google's lowest advertised price per click), Google is "misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer." Google is representing there is no authority on the part of any Google employee to negotiate lower terms for advertisers when in fact there is, but this is not made known to the vast majority of AdWords advertisers.

Eric Schmidt, Chief Executive Officer, February 12, 2007, page 2.

(19) By requiring the Plaintiff [and other disfavored advertisers] to commence their lawsuits against Google in Santa Clara County, California as a condition to using Google's AdWords, Google has "Insert[ed] an unconscionable provision in the contract." Also, by subject advertisers to making ad and landing-page changes to obtain, possibly, lower per-click rates, when Google is comparing ads and landing-page performances of wholly different types of businesses (such as sale of live elephants v. sale of books on elephants), Google has "Insert[ed] an unconscionable provision in the contract." Google is fully aware that a seller of live elephants cannot sell as many elephants as a book seller can sell books on elephants, and as a result that the efforts to change ads and landing pages put many advertisers, including the Plaintiff [and other disfavored advertisers], through needless and useless expense chasing an objective (the same clickthrough rate for different types of business wanting to use the same keyword) that Google knows cannot be obtained.

(20) Through Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google, Google is "advertising that a product is being offered at a specific price plus a specific percentage of that price unless (1) the total price is set forth in the advertisement...." This is so because Google is advertising that an AdWords advertiser with the best landing page and ad will be able to obtain the lowest per-click price for a given keyword. Yes, this is not true because the best ad and landing page for the sale of live elephants will not be able to outsell the best ad and landing page for a book on elephants.

**As my second demand** [drawn from ¶ 248 of my proposed amended complaint], I hereby demand that Google provide me with reasonable, non-discriminatory use of Google's search engine and related AdWords advertising system (collectively, the "Essential Facility") for the purchase of keyword targeted ads by me, at non-discriminatory prices fixed by auction (and not by Google) as well as the use of the Essential Facility (including Google's advertiser database) by me, as an owner of various active websites (and additional websites under active development), to sell and place keyword-targeted ads by third-party advertisers on my websites for visitors conducting website or Internet searches from my websites. I want to have the same type of AdWords "sponsored-link" advertising appear on my website as Google is placing on www.myspace.com and on www.google.com, with the revenues paid to me on terms comparable to the terms provided in Google's agreement with the owners of MySpace.com. Also, I demand that Google license me to use the same patents Google licensed to the owners of MySpace.com on no less favorable terms.

Very truly yours,

Carl E. Person

cc:

David H. Kramer, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto CA  94304-9300

CARL E. PERSON, Plaintiff, *Pro Se*
325 W. 45th Street – Suite 201
New York NY 10036-3803
Telephone: (212) 307-4444
Facsimile:  (212) 307-0247
carlpers@ix.netcom.com

1
2
3
4

5

### UNITED STATES DISTRICT COURT

6

### NORTHERN DISTRICT OF CALIFORNIA

7

### SAN JOSE DIVISION

8

| | | |
|---|---|---|
| CARL E. PERSON, | ) | CASE NO.: C 06-7297 JF (RS) |
| | ) | |
| Plaintiff, | ) | **CERTIFICATE OF SERVICE** |
| | ) | **VIA MAIL AND EMAIL** |
| v. | ) | |
| | ) | |
| GOOGLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

9
10
11
12
13
14

15      I, Carl E. Person, declare:

16      I am the plaintiff in this action and fully familiar with the facts stated herein, and make this

17   declaration to certify that on April 15, 2007, I served by U.S. Postal Express for postal express

18   delivery on

19
20   David H. Kramer, Esq.
     Wilson Sonsini Goodrich & Rosati
     Professional Corporation
21   650 Page Mill Road
     Palo Alto CA 94304-1050
22

23   addressed as per above and to David H. Kramer, Esq. by email as to the following document: **2nd**

24   **Amended Complaint dated April 15, 2007.**

25   Executed under the penalty of perjury.

26   Dated: April 15, 2007

27

28                                          Carl E. Person