Dockets.Justia.com

113..   Many website owners including the Plaintiff are creating new websites and attempting to build traffic at their respective websites to be able to monetize the website traffic in competition with Google, but nobody has been able to build a monetizing system sufficient to be effective competition for Google. Only two search engines are in the running: (i) Yahoo, which is now running backwards or losing ground at a precarious rate: and (ii) MSN, which has started in competition with Google during the past year with billions of dollars to spend in its announced effort to try to compete with Google, but is now relegated to attempting to resist Google's considerable efforts to take Microsoft's customers away from Microsoft by offering competing products through Google's plug-in compatible system (starting with a free word processing program, and a free spreadsheet program).

114A..   News Corp.'s President and C.E.O., Peter Chernin, is reported by a 1/24/07 Forbes.com cover story entitled "Murdoch 2.0" as saying that News Corp. will try to concoct the next YouTube on its own, via an in-house R&D group, then quoting Chernin: "I think we should be striving to create as many businesses ourselves as we can". Also, News Corp. is a competitor of Google, having lost the YouTube acquisition to Google because Google had the stock price and cash hoard to pay more for YouTube than News Corp. could afford.

115..   There are no other companies or individuals or governments anywhere that have any presently-perceived possibility of catching up to Google and becoming a significant and growing competitor to Google.  During the 3rd Quarter of 2006, Yahoo's net earnings dropped 60% while Google's net earnings quadrupled. During Q3 2006, Google's revenues were $2.69 billion, increased 70% compared to 3Q 2005; whereas Yahoo's revenues were $1.58 billion, up only 19% from 3Q 2005. Google-owned websites generated $885,000,000 in revenues during this 3Q 2006. Google's 4Q 2006 earnings tripled on a revenue increase of 67% over 4Q 2005. Yahoo's 4Q 2006 net earnings declined 67% from 4Q 2005, mostly attributable to a one-time backdated option charge. See 1/22/07 Forbes.com article "Yahoo!'s Quarter to Forget".

116.    Google is in a position to under pay for (or steal) the work of all website developers
for a pittance because Google alone can convert the website hits into their competitive market value
(as determined by AdWords auctions). Other search engines cannot do this and are not even in a
position to acquire websites for this purpose because they lack the stock price, cash reserves and
huge anticipated market-value cash income to make the purchase, and could not use their own search
engines to make as much money as the acquisition is actually worth (at market value) when a company

such as Google acquires the website. This explains how a startup organization, YOUTube, with no
record of earnings, was acquired by Google during October, 2006 for $1.65 billion, with a possible
$4 billion more depending on increased hits; and Google's August, 2006 payment of $900,000,000
to Rupert Murdoch's MySpace.com for the privilege of putting AdWords before MySpace visitors
or hits for a 3-1/2 year period.  Murdoch bought a 100% interest in MySpace for $580,000,000
during July, 2005, only 13 months earlier, showing that a website is more valuable to Google than to
its owner or other sophisticated internet companies because of Google's monopoly power with its
Essential Facility and resulting unique ability to "monetize" traffic (i.e., convert website traffic or
hits into actual market value in a huge competitive market for keyword-targeted advertising), giving
Google more prospective income and stock price to outbid any competitor or other person trying to
buy a specific website.

117A.  On February 11, 2007, the Plaintiff observed no Google ads at the moment of
visiting  MySpace.com  and Google.com but, upon searching the MySpace website for "gardens"
(using a search engine "powered by Google"), 8 AdWords "sponsored links" appeared (for
Shopping.MSN.com, gardeners.com, superpages.com, ebay.com, move.com, michiganbulb.com,
VirtualPlantTags.com and cotswoldheritagetours.co.uk) together with 231,000 MySpace links
related to the keyword "gardens", showing how Google is able to run AdWords ads on sites not
owned by Google. At the same time, when searching for "gardens" on Google's search website, 26
AdWords "sponsored links" appeared for the "gardens" keyword together with 99,600,000 garden-
related links.

51

117B:.  Google's AdSense is different. AdSense ads appear, if at all, at the moment of visitation to the website homepage or other pages of the website. For example, on February 11, 2007, the Plaintiff visited Kinderstart.com and (without conducting any search) saw 3 "Ads by Google", for AreYouASlackerMom.com, TutorTime.com and NYSC.com, together with a Google notice "Advertise on this site" with a link to Googlemydication.com. When searching the website for "gardens", no "sponsored links" appeared, only a Google AdSense ad (raffforkids.com, occupying the same space previously occupied by the 3 ads described above), together with 75 Kinderstart garden-related links. Goodle is not running any AdWords ads on Kinderstart.com, only AdSense ads, which are not keyword-targeted ads in response to any search term.

118..    AdWords is an "Essential Facility" because it has not been able to be duplicated, competitively, by Yahoo or MSN, and the cost of even trying to do so is several billion dollars or more. MSN (Microsoft) announced that it was setting aside almost $2 billion to attempt to compete with Google's AdWords. See ¶¶ 70-71 above for an analysis of the barriers to entry. Specifically, (i) the Plaintiff competes with Google and Google controls AdWords, an Essential Facility: (ii) the Plaintiff cannot duplicate that facility, nor can anyone else over the past years: (iii) Google has denied Plaintiff reasonable, non-discriminatory use of the Essential Facility for the purchase of keyword-targeted ads by the Plaintiff, at non-discriminatory prices fixed by auction (and not by Google)) and has denied Plaintiff and (upon information and belief) all other website owners any use of the Essential Facility for the website owner to sell and place keyword targeted ads by third-party advertisers on the owner's own website(s) for visitors conducting website or Internet searches from the websites: and (iv) Google could feasibly have granted Plaintiff the use of the Essential Facility for both desired uses on a reasonable, non-discriminatory basis.

119.    Unless Google is required to let users use its Essential Facility on equal terms, Google will be depriving Plaintiff and others of the opportunity of building their internet businesses (such as Plaintiff's classified advertising website, www.myclads.com, Plaintiff's late-fee avoidance

52

website, now located at www.lawmall.com/lawfees and other websites for creating traffic) and other website-supported interests (such as Plaintiff's efforts to run for and obtain political office).

120.. Not only does Google prevent Plaintiff from bidding for keyword-targeted advertising on a non-discriminatory (and wholly prohibitive basis), Google also prevents Plaintiff and other website owners from selling AdWords to their visitors and makes them settle for letting Google place its (low-value) low-income AdSense ads on the website. This means that when Google owns a website, it can and does use its AdWords system to extract huge amounts of money for itself from the traffic created by the website, but when the same website is owned by someone else, such as Kinderstart.com, Google pays a mere fraction of the revenue to Kinderstart.com for placing AdSense ads on Kinderstart.com.

121.. Google is engaged in two types of exclusion of the Plaintiff and other website owners from use or non-discriminatory use of Google's AdWords Essential Facility. The first is Google's refusal to let Plaintiff and (upon information and belief) about 95% or more of all other PPC advertisers from using AdWords on a non-discriminatory basis. Google is charging most of its AdWords customers prohibitively high prices as alleged above, for the reasons set forth above. Secondly, AdWords is not permitting website owners to turn their website traffic into money at (competitively-created values) through sale and placement of ads on the owners' websites using the AdWords Essential Facility, where the advertising revenues are huge, being based on competition among advertisers for use of highly-specific, targeted keywords. Instead, the website owners have to settle for a small fraction of the market-value amount obtained by Google on its AdWords ads, by having to accept the lower-paying, less-effective, non-targeted AdSense ads.

121A... Google's purpose in not giving Plaintiff and others reasonable access or any access to its AdWords Essential Facility is to foreclose competition in the business of developing website traffic and monetizing (or converting to market-value revenue) the website traffic or hits for the benefit of the website owner, and to reduce the value of websites to their owners and enable Google

53

to purchase or otherwise acquire them at less than their fair market value in a non-monopolized market.

122. Because Google's AdWords facility is an Essential Facility, the Plaintiff is entitled to make use of it on reasonable, non-discriminatory terms.

123. Plaintiff has been denied this access, both as to non-discriminatory purchase (through AdWords auctions) and placement of keyword-targeted ads displayed with the results of Google searches on websites owned by others, and as to the sale and placement of keyword-targeted AdWords ads on Plaintiff's websites, using the AdWords Essential Facility, with Plaintiff as the seller of the key-word targeted advertising (and recipient of revenue on a reasonable, non-discriminatory basis, comparable to the income being received by MySpace.com).

124. Google's withholding of both types of use (on reasonable terms) of its Essential Facility is a violation of § 2 of the Sherman Act.

125. Plaintiff has been damaged as a result and is suffering from continuing and irreparable damages by reason of Plaintiff's continuing (i) business efforts to create and build websites and traffic for such websites and monetize the value of such traffic at market-value rates; and (ii) and efforts to be nominated and elected to political office, using permissive e-mail mailing lists, which require AdWords pay-per-click advertising to build, especially during the infancy of the websites.

126. Plaintiff is entitled to a preliminary and permanent injunction requiring Google to provide access to Google's AdWords system (the Essential Facility) on reasonable, non-discriminatory terms, as to both the purchase and placement of AdWords keyword-targeted Internet pay-per-click advertisements, as well as the sale and placement of AdWords keyword-targeted, pay-per-click advertisements on Plaintiff's own websites (in response to Google-powered website and web searches conducted by visitors from Plaintiff's websites) with Plaintiff receiving a reasonable, non-discriminatory percentage of the revenues derived from such advertising.

54

127.. Plaintiff is entitled to treble damages under the Sherman Act, together with
reasonable attorney's fees and costs.

## COUNT III

[Violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1 – Conspiracy to Fix Prices and
Unreasonably Restrain Trade]

128.. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-127 above and
in ¶¶ xx167-178xx of Count VII below, and further allege that the activities of Google and the Co-
Conspirators, as alleged in ¶¶ 35-40A above, amount to a violation of § 1 of the Sherman Act, 15
U.S.C.A. § 1 as an illegal price-fixing conspiracy and unreasonable restraint in trade.

129.. The pricing and other practices of Google as alleged in ¶¶ 12, 13, 13A, 19, 25-34
and 45-70 above are the published and unpublished Google rules under which more than an
estimated one million keyword-targeted Internet advertisers, including each of the Co-Conspirators,
place an estimated 1-1/2 billion targeted ads each day with Google (300 million searches times an
average of 5 ads per search).

130.. The structured market is pursuant to an agreement (the AdWords Advertiser
Agreement), combination and conspiracy in which competitors purchase their keyword-targeted
Internet advertising from Google, knowing that the less successful advertisers (i.e., small advertisers
such as the Plaintiff with a substantially lower percentage of clickthroughs and website landing
pages or products and services that are new, unknown and presently less successful) wind up paying
many more times per click than the large, most successful AdWords advertisers, including all of the
Co-Conspirators.

131.. Plaintiff is a Website Monetizing Competitor of Google, News Corp.
(MySpace.com) and others, as well as a competitor of law firms and law-related organizations
bidding for use of the keyword (or term) "commercial litigator" (including Mitchell Law Offices,
FindLaw.com, Legal Match.com, Small Business Law Firms.com - a national directory of lawyers .

1  and Bosco Law Office) where the per click price is getting near Google's stated maximum of $50 or

2  $100 per click, upon information and belief, a price that can be afforded by the type of client or

3  customer normally obtained by such advertisers, but wholly non-affordable for the Plaintiff with his

4  individual practice representing small businesses. Plaintiff is also a competitor of major publishers in

5  the advertising of books using AdWords; and was (and remains today) a competitor of various

6  better-financed Attorney General candidates using AdWords (i.e. Richard Brodsky-Democrat;

7  Denise O'Donnell-Democratic; Jeanine Pirro-Republican) using AdWords to promote their

8  respective candidacies for New York Attorney General during the November, 2006 New York

9  elections.

10

11     132..   Also, the eBay.com (one of Google's largest and most favored AdWords advertisers)

12  and the Plaintiff are Google Competitors, as AdWords advertisers for the auction purchase of

13  targeted-keyword for AdWords advertising and as Website Monetizing Competitors.

14     133..   The purpose and known effect of the agreement, combination and conspiracy is to

15     (i) provide low per-click prices to the high-volume users of AdWords with high clickthrough

16  rates, some of which are in competition with Plaintiff as Website Monetizing Competitors;

17     (ii) discourage small-business advertisers such as the Plaintiff, with substantially lower

18  clickthrough rates, from bidding for use of the keywords being used by the high-volume, high CTR

19  users by increasing the per-click prices to unprofitably high levels for such small-business, low CTR

20  advertisers such as the Plaintiff;

21

22     (iii) remove keywords not wanted by high-volume advertisers to prevent low-volume

23  advertisers such as Plaintiff from having a low-cost alternative; and ultimately allowing Google to

24  participate in the monopolistic profits of the favored users of AdWords and helping their companies

25  and websites grow, while trying to put low-volume users out of business or require them to pay

26  unprofitably high per-click rates until they are driven out of business by the excessive charges for

27  AdWords advertising;

28

56

(iv) suppress the growth of traffic and monetizing value for Plaintiff and the other disfavored advertisers;

(v) take away customers, sales, income, profits and market share from the respective smaller search-engine submarket competitors of Google (including Yahoo Search Marketing and MSN Ad Center); and

(vi) assist in exploiting Google's Essential Facility, and each of its components through concerted activity with favored advertisers including News Corp. (MySpace.com) and eBay.com.

134.. High-volume, high-CTR advertisers are able to figure this out for themselves, but as beneficiaries of Google's pricing scheme they have no incentive to remove themselves from the agreement, combination and conspiracy.

135.. The AdWords advertising placed by any advertiser goes to each state of the United States, unless the advertiser opts to have the advertising placed with searchers whose email addresses appear to be from servers located in specific geographic areas of the country.

136. The agreement, combination and conspiracy is for the unlawful purpose and objective of providing (a) to favored AdWords advertisers (with high CTR and volume) low per-click prices , and eliminating competition for their keywords from low-volume, low-CTR advertisers such as Plaintiff; such purpose has been accomplished by Google setting up a series of unworkable rules resulting in inordinately high per-click prices to discourage Plaintiff and other low-volume users from competing (and thereby bidding up the prices) for the keywords being used by the high-volume advertisers. Until Google drives away its small-business customers, Google derives undeserved income by having such advertisers bid up the keywords made available to them (instead of the ones they want); but this benefit ceases when the advertisers stop using AdWords, and the benefit is then shifted to Google's major advertisers who now have less competition in business and less competition for the keywords desired by the favored advertisers.

137. Also, in return for providing the preceding benefit to the high-volume, high-CTR advertisers, Google is able to participate in their profitable use of the protected keywords

57

immediately and, as to the future, by helping the high-volume advertisers become monopolists in their respective markets, if they are not monopolists already. Google and the favored competitors obtain an additional advantage of placing a major obstacle in front of small Website Monetizing Competitors such as Plaintiff to inhibit Plaintiff from creating traffic for his websites, especially during the critical infancy period, when the main way of obtaining hits is to use AdWords advertising to start creating traffic for the new websites.

138.. The arrangement with Google makes it impossible for any of the high-volume, high-CTR advertisers to be acting independently. Google's software ties everyone in by the Google-written software instructions that result in very low per-click prices for the high-volume, high-CTR users and per-click prices often 50 to 100 times or more as high (but averaging perhaps 10 to 25 times as high) for low-volume, low-CTR advertisers such as the Plaintiff.

139.. The per-click prices for the Plaintiff resulting from Google's auctions in November 2003 through mid-summer 2004 were substantially lower than the per-click prices needed to be incurred after Google changed its pricing scheme to adjust for "Quality" and "Landing Page".

140.. Plaintiff has been injured by the activities of Google by being required to pay excessive per-click prices that are unprofitable for the Plaintiff to incur if the Plaintiff is to be able to use Google's AdWords monopoly, or not use the monopoly advertising service at all. In either case Plaintiff has been sustaining losses, both as to excessively high per-click advertising costs or the sunk costs of trying to prepare websites, products and services for marketing and traffic creation through AdWords, when AdWords cannot be used profitably by Plaintiff or most other small businesses.

141.. Each of the Co-Conspirators joined the agreement (AdWords Advertiser Agreement), combination and conspiracy with the intent and purpose of unreasonably restraining trade, knowing that it would be obtaining unlawfully low per-click prices at the expense of low-volume, low-CTR users such as the Plaintiff.

58

1    142. These activities by Google in concert with monopolist eBay and the other Co-

2 Conspirators (such as News Corp./MySpace) alleged in ¶¶ 35-40 above amount to a per se

3 conspiracy to fix prices and a conspiracy in unreasonable restraint of trade in violation of § 1 of the

4 Sherman Act. 15 U.S.C.A. § 1.

5

6 **Plaintiff's Damages**

7    143. By reason of Google's activities as alleged, the Plaintiff has suffered the damages

8 described in ¶¶ 97-99 above, including the loss of traffic and its monetized value for Plaintiff's

9 various websites, including lawmall.com, started more than 10 years ago (and consisting of about 70

10 distinct websites or intellectual properties created by the Plaintiff).

11

12 **Preliminary and Permanent Injunction**

13    144. The activities of Google are continuing and threaten to prevent Plaintiff from

14 building traffic for his various websites; from monetizing at competitively-created values the traffic

15 being created at Plaintiff's websites; and from being able to run and run successfully for public

16 office in New York State (as New York Attorney General during the November 2006 elections and

17 future elections) and from other elected offices after November, 2006.

18    145. Plaintiff realleges the allegations set forth in ¶¶ 99-101 and subparagraphs A

19 through H of ¶ 102.

20

21 **Other Relief Sought**

22    146. The Plaintiff is entitled to an award of treble damages.

23    147. The Plaintiff is entitled to an award of attorneys' fees.

24

25

26

27

28

59

# COUNT IV

**[Violation of § 16720 of the California Cartwright Act – Monopolizing, Conspiracy to Fix Prices, and Discriminatory Pricing in Google's Keyword-Targeted Internet Advertising and Unlawful Exclusion from Use of Google's Essential Facility]**

148.. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-147 above and ¶¶ 167-178 xxx below, and further alleges that the activities of Google and the Co-Conspirators amount to a violation of various subparagraphs of the Cartwright Act, § 16720 of the California Business and Professions Code.

149.. The Plaintiff has suffered damages as alleged in ¶¶ 97-99 above, and is authorized to sue under § 16750 of the California Cartwright Act.

150.. The activities of Google are prohibited restrictions in trade or commerce (subparagraph a of § 16720); limit or reduce the productions, or increase the price of merchandise or of any commodity (subparagraph b); prevent competition in the sale or purchase of merchandise, produce or any commodity (subparagraph c); price fixing (subparagraph d); are contracts, obligations or agreements not to sell below a standard figure (subparagraph e-1); and to keep the price fixed or higher (subparagraph e-2); setting prices to preclude free and unrestricted competition in articles or commodities (subparagraph e-3); and pooling interests to affect price (subparagraph e-4).

151.. Plaintiff's AdWords advertising was distributed by Google to searchers in California and Google was required to obey California law as to such advertising, but failed to do so, causing injury to the Plaintiff.

152.. The Plaintiff is entitled to an award of treble damages under § 16750.

153.. The Plaintiff is entitled to an award of attorneys' fees under § 16750.

154.. The Plaintiff is entitled to a preliminary and permanent injunction under § 16750 prohibiting Google from continued performance of said illegal activities.

60

## COUNT V

**Violation of the California Unfair Practices Act, §§ 17000, et seq. [§ 17045] of the Business and Professions Code – Secret Rebates Injuring Competition]**

155. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-154 above, and further alleges that this Count V is being brought under the California Unfair Practices Act, §§

17000. et al., including § 17045. of the Business and Professions Code.

156. Section 17045 of the Business and Professions Code provides:

> The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful.

157. Upon information and belief, from the time the Plaintiff became a customer of Google's AdWords, starting in November, 2003, to the present, Google has been providing secret allowances, rebates, refunds and/or unearned discounts and/or secret special services and privileges to various categories of AdWords customers (including eBay, Amazon, and other unknown customers having a high clickthrough rate in their AdWords pay-per-click advertising) (the "Secret Discounts").

158. During this period, Google has not provided any of these Secret Discounts to the Plaintiff. Specifically, upon information and belief (based on inductive reasoning), Google has provided to its favored customers, and not to the Plaintiff, the following discriminatory and unlawful Secret Discounts:

A. Use of keywords that are not permitted to be used by the Plaintiff: these keywords could number many thousands of English words, made available for use by eBay and to a lesser extent to Amazon and perhaps to other unknown AdWords customers, but not to the Plaintiff;

61

B.   Upon information and belief, based on inductive reasoning, not requiring the websites and advertising of the secret favored AdWords customers (including eBay.com) to meet Google's subjective and other requirements for the customer's landing-pages and ads;

C.   Charging the Plaintiff 50 times or more the amount per click charged to Google's favored customers who are displaying their ads at the same time for the same keyword without telling the Plaintiff or other disfavored customers that they are paying 50 times or more than these favored customers;

D.   Providing the Plaintiff and other disfavored customers with false and misleading information, assurance and promise that to obtain the lower prices enjoyed by some of Google's unnamed favored customers, the disfavored customers should undertake the impossible task of changing their landing pages and ads, without identifying what ads of what advertisers for what type of goods or services AdWords is setting as the standard for the disfavored advertisers such as the Plaintiff, and without stating to Plaintiff that the task may be impossible, depending on the type of secret, favored advertiser that Google is using, secretly, as the standard for the Plaintiff. In other words, Google may be using advertisers of books about politics as the standard for Plaintiff's advertising to try to obtain votes during an election, with no known or demonstrated correlation;

E.   Upon information and belief, providing the discrimination against Plaintiff and other disfavored AdWords customers as a secret benefit to Google's favored advertisers by enabling them to have less competition and a lower price for the keywords, when the disfavored advertisers find it too costly to compete for the keywords; and, upon information and belief, not requiring the favored advertisers to bid as high as the Plaintiff (when Plaintiff is still willing to bid and pay Google's discriminatory high per-click prices set by Google for the Plaintiff) to obtain the most favored ad positions when the advertising is displayed on the page with the search results;

F.   Upon information and belief, Google is permitting some of its favored advertisers to use keywords that Google has not permitted Plaintiff to use.

62

159.. Advertising is essential for businesses (including professionals) to remain in business and Google, through its secret, discriminatory advertising AdWords rates, set secretly by Google rather than by free and open auction, is injuring the competition for use of keywords by forcing many advertisers out of the market through arbitrary imposition of high pay-per-click auction prices on many advertisers such as the Plaintiff, and injuring the ability of Plaintiff and such other disfavored advertisers from competing against larger competitors in their own business and professional areas.

160.. Also, Google's alleged secret discriminatory AdWords pricing practices are causing Google's two major competitors (Yahoo Search Marketing and MSN) to lose market share to Google and increase Google's monopoly, because (on information and belief) Google's pricing practices amount to huge discounts for the largest advertisers and are causing them to divert their advertising dollars to Google's AdWords and away from Yahoo and MSN, thereby causing Plaintiff to increasingly lose the opportunity to obtain equal services from these two competitors. For example, Dan Grossman reports that his clickthrough rate with AdWords is 8 times its clickthrough rate with Yahoo Search Marketing, which shows the growing importance of advertising with AdWords and corresponding lack of importance to advertise with Yahoo. See http://www.dangrossman.info/2006/12/31/2006-google-adwords-vs-yahoo-search-marketing-vs-msn-adcenter/

161.. Google, through its unconscionably high pricing demands upon the Plaintiff, has prevented Plaintiff from placing a substantial dollar amount of advertising through AdWords, amounting to a violation by Google of § 17046 of the Business and Professions Code, which states that "it is unlawful for any person to use … boycott… to effectuate any violation of this chapter."

161A.. Upon information and belief, Google is providing a secret benefit to the sellers of YouTube.com and to News Corp./FIM/MySpace.com by structuring Google's agreements with them (see subparagraphs ee and gg of ¶ 12D and ¶ 116 above) to enable them to use and obtain the benefits of Google's Essential Facility, making it appear, falsely, that nobody but Google enjoys the

63

use and benefits of the Essential Facility. when in fact every website owner wanting to monetize website traffic is entitled to use the Essential Facility on non-discriminatory. reasonable terms and conditions.

162.. Plaintiff has been injured by the activities of Google in a dollar amount not now calculable. but which amount will be proven at the time of trial.

163.. Plaintiff is entitled to a preliminary and permanent injunction prohibiting Google from making or providing secret payment or allowance of rebates. refunds. commissions, or unearned discounts, whether in the form of money or otherwise. or secretly extending to certain (i.e., favored) purchasers special services or privileges not extended to the Plaintiff and all other purchasers.

164.. Plaintiff is entitled to treble damages, reasonable attorney's fees and costs under 17082 of the California Business and Professions Code.

## COUNT VI

**[Violation of the New York Donnelly Act, § 340 of the New York General Business Law; Monopolizing, Attempting to Monopolize, and Combining or Conspiring to Monopolize in New York the Website Traffic Monetizing Market and the Relevant Submarkets; Price-Fixing and Unreasonable Restraint of Trade]**

165.. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-164 above and ¶¶ 167-178 xxxbelow. and further alleges that the activities of Google and the Co-Conspirators amount to a violation of § 340 of the New York General Business Law (also known as the New York Donnelly Act).

166.. The Plaintiff has suffered damages as alleged in ¶¶ 97-99 above.

167.. The Plaintiff is entitled to an award of treble damages under the Donnelly Act. [*Cox v. Microsoft*, 1st AD. 2002].

168.. The Plaintiff is entitled to an award of attorney's fees.

64

169. The Plaintiff is threatened with irreparable damages to his planned candidacy for New York Attorney General and/or other elected offices, as alleged in ¶¶ 72-84 and 99-102 above.

170. The Plaintiff is entitled to a preliminary injunction and permanent injunction as alleged in ¶¶ 99-102 above.

COUNT VII

[Breach of Contract; and Breach of Implied Covenant of Good Faith and Fair Dealing]

171. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-170 above, and further alleges that the activities of Google amount to a breach of contract and a breach of the implied covenant of good faith and fair dealing in Plaintiff's November, 2003 Agreement with Google and/or any subsequent agreements or revisions.

172. Under the AdWords Advertiser Agreement (an unlawful contract of adhesion) to which the Plaintiff was required by Google to assent in November, 2003, Google promised an electronic auction among all AdWords bidders for use of any keyword (the "Keyword") with the following governing provisions (hereinafter, the "AdWords Promises"):

A. bidders (who bid the minimum per-click price or higher) would have their ads appear at some position when a Google user conducted a search using the Keyword (if there were not more bids than available positions (an implied promise);

B. the auction would determine the position in which an advertiser's ad would appear in the group of ads delivered to the user at the same time as Google's search results:

C. that Google's AdWords had the same number of ad positions up for bid as to each keyword auction (such as 50 or 100 or 200 or an unlimited number) [the Plaintiff on August 2, 2006 observed 162 ads when searching for "used cars"]:

D. that Google would not vary the number of available ad positions after the number of bidders for a keyword was known (at the moment of the auction or upon display of the ads to the user) (an implied promise):

E. that Google would charge the advertiser with the lowest ad position (i.e., the lowest bidder for the Keyword) Google's advertised lowest price per click of $.05 up to 2005 and $.01 starting in 2005;

F. that Google would not manipulate the number of ads to be displayed to prevent the lowest bidders from having their ads run at the end of the list, at the lowest per-click price of $.05 or $.01 (an implied promise);

G. that Google would not secretly withhold keywords from the AdWords auctions without justification (referring to justifications such as brand names, trademarks, obscene words or justification other than to manipulate or illegally monopolize the keyword auction market) (an implied promise);

H. that Google was not manipulating the keyword auction market by having different rules apply to keyword auctions depending on the number of bidders involved, to deprive the lowest bidders of the promised lowest price of $.05 or $.01 per click (an implied promise);

I. that every sponsored ad presented by Google's AdWords (other than its own ads for Google services or products) in response to a user search was paying the price per click determined pursuant to Google's published AdWords auction rules (an implied promise);

J. that any keyword being used by any AdWords advertiser (including eBay.com, for example) was available for bidding to any other advertiser under the published rules;

K. that no AdWords advertisers (such as eBay.com) were allowed to use any keywords not available to all other keywords advertisers (an implied promise);

L. that Google would not change the way in which the auction price was determined (i.e., at a bid determined by the bidders themselves without any intervention by Google) without publishing or providing the revised rules in a manner enabling the advertisers to verify that the rules were being applied fairly to the advertiser (an implied promise);

66

M..   that Google would not use subjective or mechanical means to evaluate any advertiser's ads, websites or "landing pages" as a basis for requiring a bidder to increase his/her bid (an implied promise);

N..   that Google would not use subjective or mechanical means to evaluate any advertiser's ads, websites or "landing pages" without providing a reasonable description of the filters, tests, arrays, standards or other means used to categorize ads (websites, landing pages) or their quality (an implied promise); and

O..   that Google would not provide false information about (1) its AdWords services; (2) the reasons for requiring an advertiser to increase his bid (or not have his bid submitted to the auction); (3) why keywords selected by the advertiser were being withheld by Google from the auction market; (4) the failure of any ad to be published if the advertiser bid at least the minimum of $.05 or $.01 per click; and (5) any payments by advertisers of less than the advertised minimum price of $.05 (later $.01) per click.

173..   Google has intentionally failed to live up to; and has breached, each of the AdWords Promises described in subparagraphs A through O of the preceding paragraph.

174..   In November, 2003, Google had an auction system in which the bidders determined the price through their bids, without interference by Google, and the highest bidders obtained the most favorable ad positions and the lowest bidders received the least favorable ad positions (or received no ad display at all).

175..   On April 30, 2004, Google filed its first S-1 Registration Statement to make a public offering of its stock, and on August 18, 2005 sold its stock at an unconventional "Dutch auction". The stock was sold at a price-earnings ratio of 35. Upon information and belief, because of the transition to public status and the resulting value of earnings, Google decided to and did in fact manipulate its AdWords auctions by breaching each of the AdWords Promises. Google's purpose,

67

upon information and belief, was to inflate its lawful earnings with illegal earnings and illegally manipulate and increase the market price of the Google stock.

176. Plaintiff recognized a great potential for small advertisers who used the AdWords auction market as advertised. AdWords enabled small advertisers to reach a national or international Internet online market for prospective customers, associations, partners or persons similarly inclined at an exceedingly attractive price of 5 cents per click as is documented by Google's own blog in 2005.

177.. Plaintiff has spent (from November 2003 to the present) a roughly-estimated 2,500 hours of his valuable time involving AdWords, including time to study AdWords own published pages describing AdWords; reading what others have said about AdWords both in websites and in materials purchased for online download; evaluating the value of AdWords to Plaintiff's varying pursuits (as a lawyer, author, book publisher and consumer [as to the Plaintiff's candidacy for public office and his authorship, publishing and marketing of about 50 politically-oriented, non-profit websites or parts of the lawmall.com website); developing websites for marketing using AdWords (such as myclads.com, lawmall.com, lawmall.com/latefees or latefees.com, ZIPcomplaints.com, MyTelNos.com) developing a campaign platform and running for public office as a Green Party member and then an independent candidate for public office with the knowledge that Plaintiff had an opportunity of winning the election by using Google's AdWords according to Google's promises (see ¶¶ 72-85 above); advising the Green Party to have its candidates use AdWords because of the great promise it offered to small advertisers, including candidates from minority parties; preparing and printing nominating petitions and campaign literature; taking trips, conducting meetings and having innumerable telephone conversations to promote the Plaintiff's candidacy; and other activities.

178.. The Plaintiff's activities as described in the preceding paragraph have caused many persons to waste many more hours (than 2,500) of their collective time based on the false promises of Google.

179.. Under the Plaintiff's agreement with Google, Google had a duty (as an implied covenant of good faith and fair dealing) not to take any action which will or reasonably could have

68

1  the effect of destroying Plaintiff's rights to receive the benefit of Google's contractual promises to

2  the Plaintiff.

3      180.,    Google breached this implied covenant of good faith and fair dealing by

4  intentionally breaching each of its promises to the Plaintiff.

5      181..    Google breached the covenant, upon information and belief, through the advice of

6  officers, investment bankers, accountants and others for the purpose of increasing Google's annual

7  net earnings and the value of Google's publicly-traded stock, without regard to the cost involved to

8  Plaintiff and other consumers and small businesses using AdWords.

9

10      182..    AdWords is inherently complex because of the numbers of keywords, advertisers,

11  user searches, bids and Google management software involved each day (an estimated 1.5 billion ads

12  being served by Google daily) and most small-business and many other advertisers are no longer

13  able to understand how to use AdWords most profitably. The amount of information and software

14  usage skills required for most effective use of AdWords is more than a fulltime job for any single

15  person to have and understand. Thus. most of Google's advertisers (which in number are at least 95%

16  small business or consumers, upon information and belief) do not understand the ever-increasing

17  complexity of AdWords and do not know that Google is engaged in breaching the AdWords

18  Promises.

19      182A..  The ever-increasing complexity of AdWords and resulting inability of most

20  advertisers to follow and understand has been chronicled at Position Concepts, Professional PPC &

21  Search Engine Marketing. see http://www.positionconcepts.com/Search-Engine-Marketing-

22  Research-Analysis-Articles/google-adwords-changes.shtml. It states that in 2005 Google switched to

23

24  a long term plan:

25        to help make sure bid prices could be controlled by Google as well as by the automated
          competition analyzer. Although Google's announcement claimed that you could actually bid

26        as little as $0.01, in reality, the minimum bids were no less than before. And, in some cases.
          MUCH higher than before. * * *

27

28

Advertiser basically lost all control over keywords he/she wanted to use. If Google decided they were not performing properly (based on information only Google had) the keywords were put on the patch to destruction and removal – DISABLED and never to come back! * * *

Google adds something new to the algorithm called (for lack of an official name) a LOCALIZATION FACTOR. Now the ranking formula depends on "who is doing the searching and from where they are doing it from". Meaning a particular ad will rank differently for the exact same search if the search is performed from different locations! * * *

The algorithm gets a LOT more complicated. Raising bids no longer has the same affect on ad positioning. * * *

The algorithm gets a bit more complicated. Adding regional term to keyword no longer made the keyword cheap – Even if you were the only bidder! You were forced to compete with broader, more generic terms and bidders. Cheap keywords all but disappeared.

183.    Google's activities have frustrated the rights and reasonable expectations of the Plaintiff and all other small-business and consumer advertisers under the AdWords Advertisers Agreement, by depriving them intentionally of the AdWords Promises.

**Plaintiff's Damages**

184.    By reason of Google's activities as alleged in breaching its AdWords Promises and the implied covenant of good faith and fair dealing, the Plaintiff has suffered the damages described in ¶¶ 97-99 above.

**Preliminary and Permanent Injunction**

185.    The activities of the defendant are continuing and prevented the Plaintiff from getting nominated, placed on the New York ballot and elected as the New York Attorney General during the November 2006 elections and from obtaining the New York Attorney General position or other elected offices being sought, or to be sought, by the Plaintiff after November, 2006.

186.    Plaintiff realleges the allegations set forth in ¶¶ 99-101 and subparagraphs A through H of ¶ 102.

**Other Relief Sought**

187.    The Plaintiff is entitled to pre-judgment interest on his actual damages.

188.    The Plaintiff is entitled to an award of punitive damages.

70

189.. The Plaintiff is entitled to an award of attorneys' fees.

## COUNT VIII

### [California Civil Code § 1689(b) - Rescission of Agreement
### Based on Fraud - Alternative to Count IX]

190.. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-189 above,

and further alleges that, under § 1689(b) of the California Civil Code, the Plaintiff is entitled to a

rescission of his contract with Google by reason of Google's fraud. [This Count VIII is alleged in the

alternative to Count IX.]

191.. Google made the following representations (the "Representations") to the Plaintiff

prior to entering into the Google Agreement:

A.. That the Plaintiff would be entitled to a per-click price of $.05 (later reduced to $.01)

if the Plaintiff was the only advertiser bidding for the keyword or if the Plaintiff was the lowest

bidder for the keyword;

B.. Impliedly, that all keywords used in searches were available for bidding and use by

the Plaintiff (other than obvious keywords such as "and", obscene words, trademarks, and keywords

used to offer illegal drugs) and that Google was not holding back tens of thousands of keywords to

force the Plaintiff into bidding higher per-click prices for the more desirable, higher-priced

keywords;

C.. That Google was conducting a legitimate auction in which the highest bidder was

able to obtain the best ad position;

D.. Impliedly, that Google was not manipulating the auction results through arbitrary,

subjective evaluations of the Plaintiff's ad copy, website, or landing page to require the Plaintiff to

bid 10, 20, 50 or 100 times the minimum price to be able to have the Plaintiff's ad run at all (in the

least favorable position);

71

E.   Impliedly that Google was not requiring a click price to be equal to a CPM (cost per thousand impressions) price for customers having a substantially lower clickthrough rate (CTR) than Google's customers having the highest clickthrough rates; and

F.   Impliedly that AdWords' per-click auction system was a cost-effective way for the Plaintiff and other consumers and small-businesses to use who because of a variety of known reasons would have a much lower clickthrough rate than Google's customers having the highest clickthrough rates; and

G.   Impliedly, that AdWords would not be charging the Plaintiff or other consumers or small businesses a clickthrough rate designed to provide Google with the same level of profitability as Google's customers having the highest clickthrough rates..

192.   Each of the Representations was material.

193.   The Plaintiff relied reasonably upon each of the Representations.

194.   Each of the Representations was false, and known to be false by Google at the time of making the Representation to the Plaintiff.

195.   Google made each of the Representations with scienter.

196.   The Plaintiff relied upon each of the Representations to his detriment and was injured by having to spend a substantial amount of time learning and experimenting with a fraudulent advertising system not justified in its cost to the Plaintiff and other consumers and small business persons, and which could only produce losses because of the hidden pricing structure being imposed by Google on the Plaintiff.

197.   The Plaintiff is entitled to rescission of the Google Agreement and a return of all moneys the Plaintiff has spent with Google AdWords, together with the value of the Plaintiff's time in learning about and working with the fraudulent system, and that Plaintiff have an option to elect this remedy after a jury has evaluated Plaintiff's other claims against Google.

72

198.. Google's activities in making the Representations were fraudulent, outrageous, with at least reckless disregard, and were done with malice for the purpose of oppressing the Plaintiff and Google's other customers by imposing per-click prices on them up to 100 times (or more) higher than the per-click costs that Google was accepting from its customers with the highest clickthrough rates.

199.. The Plaintiff is entitled to pre-judgment interest, and to punitive damages in an amount to be decided by the trier of fact.

## COUNT IX

[Reformation of Contract to Delete Illegal Venue Provision - Alternative to Count VIII]

200.. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-199 above, and further alleges that the Plaintiff is entitled to a reformation of his contract with Google through deletion of the illegal provision requiring Plaintiff to commence any action in Santa Clara County, California. . [This Count IX is alleged in the alternative to Count VIII.]

201.. Google required Plaintiff to click his assent to a lengthy agreement ("the Google Agreement") during November, 2003, when Plaintiff signed up to run ads using Google's AdWord services, but did not provide a copy of the agreement (or an opportunity to make a copy of the agreement) to the Plaintiff and did not during the period up to the filing of the within action advise the Plaintiff that if he brought suit against Google for any reason he was obliged under the Google Agreement to commence it in Santa Clara County, California (the "Google Venue Provision").

201A.. The Defendant has presented online substantially the same agreement and venue provision to every AdWords advertiser prior to and as a condition precedent to participating in the AdWords auctions and advertising. Plaintiff and the other AdWords customers were not given an opportunity to negotiate any of the terms or conditions.

201B.. Plaintiff understood that he had to accept whatever terms and conditions were being presented by the Defendant. The AdWords Advertiser Agreement was unconscionable and a contract of adhesion, and any such venue provision is unenforceable (1) as part of a contract of

73

adhesion; (2) as against public policy; and (3) for failure to provide a copy to the Plaintiff and reasonable notice of such venue provision before Plaintiff commenced this action, including the intentional use of the venue provision to coerce the Plaintiff and others into withdrawing their lawsuits against Google.

201C.  On August 22, 2006, Defendant revised its Agreement and required existing AdWords advertisers to agree to the revised Agreement no later than November 27, 2006 or no longer be able to log into AdWords and make changes to the advertiser's AdWords program, stating: "You must accept the above Terms and Conditions by [Nov 27, 2006], or you will no longer be able to login to AdWords and make changes to your Account."

201D.  Google Ireland Limited even requires its users in Ireland to resolve any disputes with AdWords in Santa Clara County, California. See https://adwords.google.com.au/select/TCAustralia0706.html, which states in part: "The Agreement must be construed as if both parties jointly wrote it, governed by California law except for its conflicts of laws principles and adjudicated in Santa Clara County, California."

202.  Google specifically obtained the agreement of every AdWords customer (through a secrecy provision in the Google Agreement) that he/she would not reveal any of the terms of the Google Agreement to anyone, to prevent anyone from learning about the existence of the Google Venue Provision.

203.  The purpose of the Google Venue Provision and Google's extraordinary effort to keep its existence secret was to frustrate the ability of Person and other Google customers with a grievance to obtain relief in the Courts by encouraging the Plaintiff and others to bring suit against Google (if so inclined) wherever the plaintiff was located, without knowing about the Google Venue Provision, to enable Google to defend the lawsuits by extensive, costly litigation of the venue issue coupled with other motions to dismiss to drive up the costs to the Plaintiff and other plaintiffs and to substantially slow down the progress of the lawsuit while the venue issue was being litigated. This intended consequence has occurred in this litigation.

74

204.: In addition, as part of its scheme, after the venue issue was resolved in Google's favor, Google would then attempt to coerce the plaintiff into dropping the lawsuit against Google by threatening to commence a counterclaim against the plaintiff in the California court, after transfer of the action to such court, for an outrageously high, severely inflated amount, as alleged damages for having breached the Google Agreement by commencing the action in a court other than in Santa Clara County, California.

205.. On October 11, 2006, Judge Patterson held that Person was bound by the Google Venue Provision and ordered this action transferred to the United States District Court located in San Jose County, California, and within 24 hours of such decision Google's attorney communicated with the Plaintiff threatening to file a counterclaim in the lawsuit for an amount between $60,000 and $80,000 as Google's alleged damages for the Plaintiff's alleged breach of the Google Venue Provision, but that Google would waive its claim if the Plaintiff withdrew this action with prejudice.

206.. Upon information and belief, the legal work relating to Google's venue motion should not have exceeded 4 hours to prepare (a notice of motion and memorandum of law) and 1 hour to argue the matter, a total of 5 hours, involving a legal fee of about $1,500 (5 hours x $300/hour), so that the threat was based on falsified or artificially inflated time charges.

207.. Upon information and belief, Google and its attorneys in California (the same law firm which represented Hewlett-Packard's Board of Directors in the "pretext" scandal and about 50% of the 30 Silicon Valley companies accused of backdating stock options) have been using this technique with substantially every AdWords customer that has brought suit against Google, in what amounts to a scheme and artifice to defraud Google's customers and deprive them of their benefits under the Google Agreement by use of planned economic coercion, higher litigation costs and planned litigation delays to encourage the customers to give up their lawsuit for relief against Google.

209.. The Plaintiff became aware of Google's fraud on October 13, 2006, during a telephone conversation with Google's attorney, Jonathan Jacobson, in which he (on behalf of

75

1   Google) threatened to sue the Plaintiff in a counterclaim for $60,000 to $80,000 representing

2   Google's alleged costs in pursuing Google's motion to dismiss for improper venue unless the Plaintiff

3   agreed to withdraw this action..

4       210..   When entering into the Google Agreement, Google failed to state clearly and

5   prominently (and provide Plaintiff with a copy of such venue provision for Plaintiff's records) that it

6   wanted the Plaintiff to file any action he might have in the future, against Google or other

7   tribunal located in Santa Clara County, California, so that Google would be able to implement its

8   scheme described above.

9

10      211..   The result is that by failure to prominently disclose and provide a copy of the venue

11  provision and Google's intended use for persons who brought suit against Google other than in Santa

12  Clara County, California, as described above, Google was making a representation to Plaintiff and

13  other AdWords customers that lawsuits against Google could be brought properly in places other

14  than Santa Clara County, California (the "Representation").

15      212..   The Plaintiff relied reasonably upon the Representation.

16      213..   Google made the Representation knowingly and with scienter.

17      214..   The Plaintiff was injured as a consequence.

18      215..   In addition, the Google Agreement itself (including the Google Venue Provision)

19  was forced upon the Plaintiff as part of a sign-in process to start using Google's AdWords and the

20  Plaintiff was not given any opportunity (i) to negotiate any of the terms, (2) to speak or otherwise

21  communicate with any human being at Google about the terms of the Google Agreement, (3) to

22

23  change an obviously incorrect statement that the Plaintiff participated in the drafting of the

24  agreement; (4) to find out about the practices of Google under the agreement because of the secrecy

25  imposed upon each of Google's AdWords customers; (5) to use Google's AdWords services unless

26  the Plaintiff assented to each and every term in the presented agreement; and (6) to make or receive a

27  copy of the Google Agreement or to be notified at any time over the period from November 2003 to

28

76

the date of commencement of this action that Google required that any action brought against it be

brought in Santa Clara County of California.

216.. The Google Agreement was entered into in an unconscionable way, has

unconscionable choice-of-venue terms, and is an unlawful contract of adhesion and as such justifies

reformation of the agreement by the deletion of the Google Venue Provision.

217.. The Plaintiff is entitled to a judgment awarding reformation of the Google

Agreement through deletion of the Google Venue Provision, and that remedy remains available until

sometime after the trier of fact has rendered its decision on Plaintiff's other claims.

218.. Google's activities were fraudulent, outrageous with at least reckless disregard, and

were done with malice for the purpose of oppressing the Plaintiff and Google's other customers, to

deprive them of the benefit of their bargain through illegal, coercive practices.

219.. The Plaintiff is entitled to punitive damages in an amount to be decided by the trier

of fact.

## COUNT X

### [Violation of the California Consumer Legal Remedies Act, §§ 1770(a), subparagraphs (1-3), (5), (7), (9-10), (13) and (16-20)]

220.. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-219 above,

and further alleges that this Count is being brought under § 1770(a) of the California Civil Code (the

"Consumer Legal Remedies Act" or "CLRA").

221.. Section 1770(a) provides in relevant part:

The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

(1) Passing off goods or services as those of another.

(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services.

(3) Misrepresenting the affiliation, connection, or association with, or certification by, another.

77

\* \* \*

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

\* \* \*

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

\* \* \*

(9) Advertising goods or services with intent not to sell them as advertised.

(10) Advertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity.

\* \* \*

(13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions.

\* \* \*

(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

(17) Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

(18) Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer.

(19) Inserting an unconscionable provision in the contract.

(20) Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (1) the total price is set forth in the advertisement....

222..    Google has represented and agreed, through its requirement that the Plaintiff litigate his claims against Google in California that the laws of California apply to Google's dealings with the Plaintiff, in absence of any agreement between Google and Plaintiff that the laws of any other state apply.

223..    In addition to the facts previously alleged herein, Plaintiff alleges that Google has violated said Section 1770(a) as follows:

78

(1) Google's intervention in the bidding process to require the Plaintiff to bid amounts determined by Google is the "passing off services" [of Google] as those of another [Person]."

(2) Google's intervention in the bidding process to require the Plaintiff to bid amounts determined by Google is "misrepresenting the source, sponsorship, approval [and] ... certification of ... services [i.e., Plaintiff's bid]."

(3) Google's intervention in the bidding process to require the Plaintiff to bid amounts determined by Google is "misrepresenting the affiliation, connection, or association with, or certification by, another" as to the relationship between Google as auctioneer and Plaintiff as a bidder.

(5) Google's intervention in the bidding process to require the Plaintiff to bid amounts determined by Google is "representing (falsely) that services [i.e., Person's bids] have sponsorship, approval [and] characteristics [an amount determined by the Plaintiff and not by Google} which they do not have...."

(7) Google's intervention in the bidding process to require the Plaintiff to bid amounts determined by Google is falsely "representing that services [i.e., Plaintiff's bids]... are of a particular standard, quality, or grade [i.e., made at a price selected by the Plaintiff]...."

(9) Google's advertising that AdWords is an auction market is the "Advertising [of] ... [auction] services with intent not to sell them as advertised" because of Google's intervention in the bidding process to require the Plaintiff to bid amounts determined by Google.

(10) Google's advertising that AdWords is an auction market for keywords is the "Advertising [of] ... [auction] services with intent not to supply reasonably expectable demand [for keywords], unless the advertisement discloses a limitation of quantity" because Google is withholding numerous keywords from the auction market, to force higher winning bids for the keywords allowed to be sold at its auctions.

(13) Google states that it is adjusting keyword prices upwards for some advertisers and downward for other advertisers based on Google's subjective analysis of the quality of the

79

1   advertiser's advertisement and landing page, in comparison to others. This is the "making [by

2   Google of] false or misleading statements of fact concerning reasons for. existence of, or amounts of

3   price reductions" given to some (e.g., Ebay.com) and not to others (such as the Plaintiff). This is

4   especially so because Google is comparing the clickthrough rates of dissimilar but competing

5   advertisers (i.e., Plaintiff in running for Attorney General was seeking to use some of the keywords

6   used by eBay to sell books and merchandise) and misrepresenting to advertisers that they could improve their

7   clickthrough rate in comparison to eBay.com or equivalent by working on their ad and landing page

8   when in fact this was not necessarily so. Google has been falsely representing to advertisers that they

9   

10  can and should create better landing pages and ads to obtain clickthrough rates of advertisers selling

11  wholly unrelated products and services.

12          (16) Google's auction results, based on the foregoing, are "representing that the subject of a

13  transaction [i.e., a keyword auction] has been supplied in accordance with a previous representation

14  when it has not." Google's alleged auction market is not an auction market at all. It is a price-fixing

15  market where prices are set by Google, in a variety of ways, without telling advertisers. Google's

16  manipulation of the auction market has resulted in the fixing of prices at artificially high levels and

17  requiring advertisers such as the Plaintiff to pay per-click prices 50 times (or more times) the click-

18  through price paid at the same moment by advertisers who are offering non-competitive goods

19  and/or services to searchers using a specific keyword.

20

21          (17) By reason of Google's manipulation of its auction market, Google has been falsely

22  "representing that the consumer will receive a rebate, discount, or other economic benefit" by

23  participating in Google's keyword auctions, under Google's terms and conditions. including the

24  making of changes to the advertiser's ads and landing pages. Google has no way of knowing if the

25  advertiser's present ads are as good as they can be. for the type of product or service being offered.

26  and Google forces most of its advertisers, including the Plaintiff, to keep making changes to the ads

27  to achieve a non-obtainable result (e.g.. of making the market for live elephants as large [in number

28

of elephants or customers for elephants] as the market for books on elephants [in number of elephant

books or customers for such books]).

(18) By not explaining how an advertiser can bargain with Google for lower rates (in the

way that eBay.com is obtaining. upon information and belief, a price of about one-half a cent per

click, 50% lower than Google's lowest advertised price per click), Google is "misrepresenting the

authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a

consumer." Google is representing there is no authority on the part of any Google employee to

negotiate lower terms for advertisers when in fact there is, but this is not made known to the vast

majority of AdWords advertisers.

(19) By requiring the Plaintiff to commence its lawsuit against Google in Santa Clara

County, California as a condition to using Google's AdWords, Google has "insert[ed] an

unconscionable provision in the contract." Also, by subject advertisers to making ad and landing-

page changes to obtain, possibly. lower per-click rates. when Google is comparing ads and landing-

page performances of wholly different types of businesses (such as sale of live elephants v. sale of

books on elephants). Google has "insert[ed] an unconscionable provision in the contract." Google is

fully aware that a seller of live elephants cannot sell as many elephants as a book seller can sell

books on elephants (or attract as many customers for live elephants and can be attracted for books on

elephants) and as a result that the efforts to change ads and landing pages put many advertisers.

including the Plaintiff. through needless and useless expense chasing an objective (the same

clickthrough rate for different types of business wanting to use the same keyword) that Google

knows cannot be obtained.

(20) Google's intervention in the bidding process to. require the Plaintiff to bid amounts

determined by Google. is Google's "advertising that a product is being offered at a specific price

plus a specific percentage of that price unless (1) the total price is set forth in the advertisement...."

Because Google is advertising that an AdWords advertiser with the best landing page and ad will be

able to obtain the lowest per-click price for a given keyword. but this is not true because the best ad

81

1  and landing page for the sale of live elephants will not be able to outsell the best ad and landing page

2  for a book on elephants.

3      224..    The Plaintiff has been injured by Google's aforesaid violations of the CLRA through

4  imposition of higher auction prices and by substantial time and some money spent on making

5  revisions to landing pages and ads, to try to obtain improved clickthrough rates by creating various

6  ad campaigns trying without success to obtain a benefit from Google's AdWords advertising system

7      225..    By certified letter (return receipt requested) on February 12, 2007, the Plaintiff has

8

9  notified Google of the above-alleged violations of § 1750(a) and demanded that Google correct or

10  otherwise rectify the AdWords auction services alleged above to be in violation of § 1770(a).

11      226..    Plaintiff is entitled to a preliminary and permanent injunction ordering Google to

12  cease using the methods, acts and practices alleged above in ¶¶ 228 and 230.

13                              COUNT XI

14              [Violation of § 17200 of the California Business and
                Professions Code, the Unfair Competition Law]
15

16      227..    Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-226 above,

17  and further alleges that this Count is being brought under § 17200 of the California Business and

18  Professions Code, known as the Unfair Competition Law.

19

20

21

22

23

24

25

26

27

28

                                   82

228. The activities of Google, as alleged, amount to unfair competition, fraudulent business acts or practices, and deceptive, untrue or misleading advertising, in violation of § 17200 of the California Business and Professions Code.

229. Plaintiff and other persons similarly situated have been injured by reason of such acts.

230. Plaintiff and other persons similarly situated have been and continue to be irreparably injured by reason of Google's activities and are entitled to a preliminary and permanent injunction prohibiting such activities.

231. Plaintiff and the other persons similarly situated are entitled to damages, attorney's fees and costs under said statute.

## COUNT XII

### [Violation of §§ 17500-17509 of the California Business and Professions Code – False and Misleading Advertising]

232. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-231 above, and further alleges that this Count is being brought under §§ 17500-17509 of the California Business and Professions Code, part of the California Unfair Competition Law.

233. Google, with intent to sell its AdWord services, made or disseminated from California to the public in New York, California and other states, including over the Internet, statements about AdWords which were untrue and misleading.

234. Google knew or should have known that such statements were untrue or misleading.

235. Google made these statements as part of a plan or scheme with the intent (i) not to sell its AdWords keyword targeted advertising at the low per-click price of $.05, later $.01, as advertised by Google; (ii) not to let small advertisers such as the Plaintiff bid on low-priced keywords that Google was making available at the $.01 (or $.05) per-click (or lower) prices to Google's most-favored customers; (iii) to make advertisers believe that they could bid on any desired

keyword when in fact Google was withholding a substantial percentage of those keywords from

bidding by most AdWords customers; and (iv) to make advertisers believe the maximum number of

ads to be displayed pursuant to any completed auction was the same for all auctions, when in fact

Google was changing the number of ads to prevent the lowest bidders such as Plaintiff from being

able to run his advertising at the advertised lowest price of $.01 (or $.05) per click.

236.. Google also violated 17507 by failing to clearly and conspicuously identify the

AdWords auction transactions to which applied Google's advertised lowest price of $.01 (or, earlier,

$.05) per click.

237.. Google also violated 17508 by including claims in its sales literature that purported

to be based on factual. objective or clinical evidence when in fact Google's claims were based on

subjective facts created at Google's whim. for the purpose of misleading and defrauding Plaintiff and

other AdWords customers.

238.. Plaintiff has had participated in many tens of thousands of AdWords auctions

subject to these unlawful practices by Google, and Plaintiff has been injured as a consequence.

239.. Under 17505(a). Plaintiff is entitled to $1.500 for the first violation and $2,500 for

each subsequent violation. as Plaintiff's only remedy for such violations.

240.. Plaintiff is entitled to whatever reasonable attorney's fees and costs that are

awardable under said statute.

## COUNT XIII

**[Class Action Allegations under the California Unfair Competition Law; California Consumer
Legal Remedies Act; and Rule 23 of the Federal Rules of Civil Procedure]**

241.. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-240 above.

and further alleges that this Count. and Counts xxxVIII and IX xxx above are being brought as a

class action under Rule 23 of the Federal Rules of Civil Procedure, § 283 of the California Code of

Civil Procedure, § 17200. et. seq. of the California Business and Professional Code (hereinafter

54

sometimes the "Unfair Competition Law" or "UCL", and §1750, et seq. of the California Civil Code (hereinafter sometimes the "Consumer Legal Remedies Act" or "CLRA".

242.. A description of the members of the alleged class is: all customers of Google's AdWords who at any time from January 1, 2003 to the present ran AdWords ads (a) which Google placed in the lowest position (or was the only ad displayed) in which the customer was charged more than the lowest per-click price of $.05 (up to 2005) or $.01 (starting in 2005) and/or (b) was prevented from using keywords due to Google's withholding them (without justification) from the bidding process and the customer used other keywords instead, paying more than the then minimum price per click of $.05 or $.01.

243.. Each of the members of the alleged class, including the Plaintiff, suffered injury by being required by Google to pay more than the minimum per-click price of either $.05 or $.01 to which the customer was entitled (as to ¶ 242-a above) or was required to bid for higher-priced keywords and pay more than the customer would have paid if allowed to bid on the keywords withheld by Google from the bidding process (as to ¶ 242-b above).

244.. Google's records will provide the email addresses of all members of the class who have not changed their email address from the last time they were customers of Google's AdWords, and the injuries under ¶ 242-a above are readily calculable from Google's records (as the difference between the amount actually paid per click and the lowest per-click price of either $.05 or $.01); and the injuries under ¶ 216-b above are readily calculable from Google's records which show Google's rejection of attempts to use the withheld keywords and subsequent bidding and advertising by the customers using other keywords. (as the difference between the amount actually paid per click and the lowest per-click price of either $.05 or $.01).

245.. Each of the members of the class signed the same agreement with Google and was provided with the same Google descriptions of the Google auction system.

246.. The average loss per member of the alleged class is an estimated $250 and the estimated number of members of the alleged class is 200,000.

85

247.. · The common questions of fact are whether Google promised a lowest price of $.05 (later $.01) per click and then refused to allow the class members to pay the lowest price per click. and the common questions of law are whether Google has the right to fix auction prices on an arbitrary, secret basis while maintaining that the members of the class are participating in an auction to determine the price they pay per click for the keywords chosen by them.

248.. The Plaintiff is adequate to represent all members of the alleged class and upon certification of this action as a class action the Plaintiff will withdraw all of Plaintiff's claims within and as to said Counts that are not part of the allegations applicable to the certified class.

249.. Further.

A.. (1) The alleged class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class. (3) the claims of the representative party (i.e.. the Plaintiff) are typical of the claims of the class, and (4) the Plaintiff as representative party will fairly and adequately protect the interests of the class.

B.. The prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Google; and adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

250.. The Plaintiff is entitled to maintain this action as a class action and pursue the above-described claims on behalf of the alleged class members.

## COUNT XIV

[Violation of §§ 349 and 349-c of the New York General Business Law – Deceptive Acts and Practices in Conduct of Google's Business in New York; Additional Penalty for Elderly-Person Fraud]

251. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-250 above, including ¶¶ 13 and 13A, and further alleges that the activities of Google amount to a violation of §§ 349 and 349-c of the New York General Business Law, as a series of deceptive acts and practices directed against consumers, including consumers such as Plaintiff over the age of 65.

252. Google has fraudulently and deceptively encouraged the Plaintiff and other small-business advertisers to use AdWords and its per-click pricing auction when Google knew that as to Plaintiff and other small-business advertisers with low CTR's (e.g., 1% of the ads displayed to users) the price per click was not to be the amount bid for use of a keyword or the price paid by a large advertiser with a high CTR, but was to be a price often 10 to 100 times higher than the per-click price being paid at the same time by the major advertisers; and that such high per-click price would ordinarily not enable the small-business advertiser or candidate to use AdWords profitably or successfully.

253. Plaintiff has used AdWords as a businessperson, attorney and consumer (in his role running for public office and in advertising to bring consumers to his political websites, including carlperson4NYAG.com, lawmall.com/electionissues, townattorneygeneral.com, americanjobsparty.org, e-listparty.org, lawmall.com/abuse, lawmall.com/criminal, lawmall.com/forfeit, and lawmall.com/forfeit). The request for injunctive relief is based on Plaintiff's use as of AdWords as an ongoing candidate for public office, as to which Google's alleged activities are causing the Plaintiff irreparable injury.

254. The Plaintiff accepted Google's offered price of 1 cent or 5 cents per click and proceeded to build various AdWords campaigns and political websites based on such advertised minimum auction prices. By reason of Google's advertised auction system and advertised minimum price, the Plaintiff was entitled to pay the minimum price for keywords selected by the Plaintiff that

were not being sought at the same time by any other bidder (other than eBay.com, as apparent

purchaser of a substantial number of keywords having little or no demand).

255.    Within days after starting to advertise at 5 cents or 1 cent per click with keywords

selected by the Plaintiff, Google terminated the Plaintiff's advertising for most selected keywords

and informed the Plaintiff that he would have to pay substantially more per click than the 5 cents or 1

cent agreed to.

256.    Plaintiff in some instances agreed to increase the price per click from 5 cents or 1

cent to 50 cents or more, and proceeded with some of the originally selected keywords.

257.    Then, Google advised the Plaintiff through automated messages that the Plaintiff's

advertising was stopped by Google, and that the Plaintiff had to figure out some way to make his

advertising more appealing to Google searchers so that Plaintiff would obtain a higher percentage of

clickthroughs as to the number of Google-search users receiving the Plaintiff's ads.

258.    Google was demanding something that the Plaintiff could not reasonably create or

obtain and Plaintiff was forced to terminate his advertising and lose the value of his investment of

money and time in the AdWords advertising projects.  This occurred about 5-6 times during the

relevant period (during the period from November, 2003 to the present).

259..    At no time has Google explained to its small-business and consumer AdWords

advertisers the way in which AdWords, rather than the advertisers, sets the per-click prices that

supposedly are being determined by auction, with advertisers competing for position on the basis of

price. Instead, Google has created a fraudulent and deceptive way in which advertisers are selected,

auction prices are determined, positions are assigned, advertisers and advertisements are precluded

and favored advertisers are permitted to advertise at the advertised lowest per-click price of $.05 or

$.01 whereas Plaintiff and the other small-business advertisers and consumers are not allowed that

low price, but are not apprised of that fact in any way. This induces them to use AdWords until they

find out in due course that they are being charged perhaps 10 to 100 (or more) times the amount per

88

click than being charged to Google's favored high CTR advertisers, including eBay.com and the other alleged Co-Conspirators.

260.. The activities of Google are deceptive as to the Plaintiff and all other consumers and businesses (generally small and new businesses) with low clickthrough rates for reasons including:

A.. Google's setting of the auction price for advertisers is wholly subjective and not capable of dividing any advertisements or advertisers into meaningful categories by reference to advertising copy, landing pages, or the websites of which the landing page is a part, yet Google tells advertisers that it is going to set prices in an even-handed, objective way (by implication):

B.. Google in fact bases its decision almost exclusively on the clickthrough rate, and because there is no clickthrough rate for any ad before it has run for the first time Google's effort to set a clickthrough rate before the ad has run is wholly subjective, involving much guesswork, and deceptive because Google does not tell advertisers that it is incapable of doing what it purports to do;

C.. Upon information and belief, Google does not adjust the initial (pre-advertising) clickthrough rate to reduce the advertiser's per-click cost when the advertiser achieves a higher clickthrough rate than Google subjectively calculated prior to commencement of the advertising, and fails to tell advertisers about this failure to adjust based on performance: if there is any adjustment, it may occur after months of inaccurate, costly per-click charges based on the disproven lower clickthrough rate estimated by Google:

D.. Google clearly induces advertisers such as the Plaintiff to use AdWords because of the clear statement that the lowest bidder automatically gets the $.01 per-click rate, but Google does not say that 99% of its advertisers (upon information and belief, that 99% of Google's advertisers are consumers and small business, low CTR advertisers) do not and never will obtain the $.01 per-click rate, in what is a highly deceptive marketing tool by AdWords, and caused the Plaintiff to plan a campaign to become New York Attorney General based on Plaintiff's understanding that unwanted keywords would entitle the Plaintiff to the $.01 per-click rate if nobody else wanted the words because the Plaintiff, as the only advertiser, would be the last in line and entitled to the $.01 price:

E.. Google is deceptive in its explanation of the $.01 minimum per-click price by not saying that it uses subjective evaluation at the outset to disqualify the Plaintiff and virtually all small business advertisers from obtaining the price before any clickthrough rate has been established, by pretending to conduct an objective evaluation of the advertiser's website and landing page, when in fact Google is calculating the clickthrough rate of other advertisers wanting to use the keyword and requiring the Plaintiff to pay many times more than the advertiser's initial bid to require the advertiser to be as profitable to Google at a 1% clickthrough rate as the established advertisers for the keyword in question are at clickthrough rates perhaps 30 to 70 times higher than 1%;

F.. Google fails to be up front with the Plaintiff and all others with new businesses, new products and services, unfamiliar names and trademarks, that they cannot profitably use AdWords because AdWords is going to charge them about 50 to 100 times more per click than Google is charging their direct competitors; and

G.. Various other deceptive representations, as described in subparagraphs A through O of ¶ 172 (in Count VII above). xxxxxxxxxxxxxxx

261. The Plaintiff has suffered damages as alleged in ¶¶ 97-99 above.

262. The Plaintiff is entitled to an award of treble damages under § 349(h) (up to $1,000).

263. The Plaintiff is entitled to an injunction under New York General Business Law § 349(h) prohibiting Google from engaging in the conduct described in ¶ 144 above.

264. The Plaintiff is entitled to an award of attorneys' fees under § 349(h) to the extent the Plaintiff has used the services of any attorneys.

265. Google acted willfully, and maliciously, with near criminal indifference to its civil obligations, for the purpose of injuring the Plaintiff and an estimated one million other small businesses that spent time and effort to use AdWords, only to be rejected by Google through substantially higher prices than originally promised, or by complete rejection of the advertisers' advertising.

90

265A.. Plaintiff is a consumer as to his candidacy and part-time book selling activities and, upon information and belief, many hundreds of thousands of AdWords advertisers during the past 3 years are also consumers in their Google advertising activities, including consumers who are (i) candidates for public office, (ii) offering unwanted personal goods for resale and/or (ii) retired or self employed persons, acting part-time, offering goods or services to supplement their income.

266. Google's activities in increasing the offered price to its more than 1,000,000 advertisers through an automated system not enabling customers to obtain an explanation from a human being before Google applied its predatory practices, involved a high degree of moral turpitude and demonstrated such wanton dishonesty as to strongly imply a criminal indifference by Google to its civil obligations to the Plaintiff and one million other small-business advertisers, including advertisers over 65 years of age.

267. The Plaintiff is entitled to punitive damages against Google in an amount to be determined by the trier of fact. [*Lattuk v. Faber*, 4th Dept. 2000]

268. From its marketing studies, Google was fully aware that its activities adversely affected an estimated 50,000 consumers over the age of 65, including the Plaintiff. Google's database includes the age of the Plaintiff as well as the age of the other AdWords advertisers over the age of 65, and that Google's conduct was in willful disregard of the rights of the Plaintiff and the other advertisers over the age of 65.

269. Google's conduct deprived such persons over the age of 65 of the money they intended to use to sustain themselves during the remainder of their lifetime and for most of such person work was not available or possible to replace the money taken unlawfully by Google.

270. The Plaintiff is entitled to an additional civil penalty of $10,000, under subsection 2 (entitled "Supplemental civil penalty") of § 349-c of the New York General Business Law.

## COUNT XV

91

**[Violation of §§ 350 and 350-e of the New York General Business Law – False Advertising; Bait and Switch Advertising]**

271. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-270 above, and further alleges that the activities of Google and the Co-Conspirators amount to a violation of §§ 350 and 350-e of the New York General Business Law (as false advertising, including bait and switch advertising, victimizing an individual consumer).

272. The Plaintiff has suffered damages as alleged in ¶¶ 97-99 above.

273. The Plaintiff is entitled to an award of treble damages under § 350-e of the New York General Business Law (up to $1,000).

274. The Plaintiff is entitled to an injunction prohibiting Google from engaging in the conduct described in ¶¶ 12, 13-13A, 19, 25-34, 45-70 and Count 7, Count 8, Count 10, Count 11, Count 12 and Count XIV above.

275. The Plaintiff is entitled to an award of reasonable attorney's fees to the extent the Plaintiff has used the services of any attorneys.

276. Google acted willfully, and maliciously, with near criminal indifference to its civil obligations, for the purpose of injuring the Plaintiff and one million other small businesses that spent time and effort to use AdWords, only to be rejected by Google through substantially higher prices than originally promised, or by complete rejection of the advertisers' advertising.

277. The Plaintiff is entitled to punitive damages against Google in an amount to be determined by the trier of fact.

**PRAYER**

WHEREFORE, the Plaintiff demands judgment against Google, as follows:

1. As to Count I, that it be adjudged and decreed that the activities of Google constitute a violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 (as illegal monopolizing, attempting to monopolize and combining or conspiring to monopolize the keyword-targeted Internet advertising market);

2.. As to Count II, that it be adjudged and decreed that the activities of Google constitute a violation of § 2 of the Sherman Act, 15 U.S.C.A. § 1 (as an illegal denial of use of an Essential Facility to a competitor and denial of non-discriminatory use of Google's AdWords keyword-targeted advertising system):

3.. As to Count III, that it be adjudged and decreed that the activities of Google constitute a violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1 (as an illegal price-fixing conspiracy to fix prices and a conspiracy in unreasonable restraint of trade);

4.. As to Count IV, that it be adjudged and decreed that the activities of Google constitute a violation of § 16720 of the California Cartwright Act (as illegal monopolizing, conspiracy to fix prices, and discriminatory pricing in Google's keyword-targeted internet advertising system and an unlawful exclusion of Plaintiff and others from use of Google's Essential Facility);

5.. As to Count V, that it be adjudged and decreed that the activities of Google constitute a violation of the California Unfair Practices Act . §§ 17000. et seq. [§ 17045] of the Business and Professions Code (as secret rebates injuring competition);

6.. As to Count VI, that it be adjudged and decreed that the activities of Google constitute a violation of § 340 of the New York General Business Law. also known as the New York Donnelly Act (as unlawful monopolizing, attempting to monolize, and combining or conspiring to monopolize in New York the Website Traffic Monetizing Market and relevant submarkets, and as price-fixing and unreasonable restraint of trade):

7.. As to Count VII, that it be adjudged and decreed that the activities of Google constitute a breach of contract and a breach of the implied covenant of good faith and fair dealing;

8.. As to Count VIII. that it be adjudged and decreed that the activities of Google entitled plaintiff and all others similarly situated to a judgment of rescission of Plaintiff's agreement with Google based on fraud. and a recovery of all moneys paid by Plaintiff and all others similarly situated. an alternative remedy to Count IX:

93

9.. As to Count IX, that it be adjudged and decreed that the activities of Google entitled plaintiff and all other customers of AdWords to a judgment of reformation of Plaintiff's agreement with Google to delete the illegal venue provision, an alternative remedy to Count VIII;

10.. As to Count X, that it be adjudged and decreed that the activities of Google constitute a violation of the California Consumer Legal Remedies Act. §§ 1770(a). subparagraphs (1-3), (5), (7), (9-(ase 5. and (16)202 and that Plaintiff and all others similarly situated be awarded their entitled relief under the Act;

11.. As to Count XI, that it be adjudged and decreed that the activities of Google constitute a violation of § 17200 of the California Business and Professions Code. the Unfair Competition Law and that Plaintiff and all others similarly situated be awarded their entitled relief under the Act;

12.. As to Count XII, that it be adjudged and decreed that the activities of Google constitute a violation of §§ 17500-17509 of the California Business and Professions Code. as false and misleading advertising. and that Plaintiff and all others similarly situated be awarded their entitled relief under the Act;

13.. As to Count XII, that it be adjudged and decreed that Counts VIII, IX. XIV and XV are to be maintained as a class action under the California Unfair Competition Law: California Consumer Legal Remedies Act: Code of Civil Procedure. § 283 and/or Rule 23, F.R.Civ.P. on behalf of the alleged members of the class, and that the members of the class are entitled to recovery of the amounts paid in excess of the lowest price per click then in effect and other damages for the reasons alleged in the respective Counts:

14.. As to Count XIV. that it be adjudged and decreed that the activities of Google constitute a violation of §§ 349 and 349-c of the New York General Business Law (as deceptive acts and practices directed against New York consumers: with an additional penalty for defrauding elderly persons). and that Plaintiff be awarded his entitled relief under the Act:

94

15.. As in Count XV, that it be adjudged and decreed that the activities of Google constitute a violation of § 350 of the New York General Business Law (as false advertising, including bait and switch advertising, victimizing an individual consumer), and that Plaintiff be awarded his entitled relief under the Act;

16.. Awarding damages in favor of the Plaintiff, in an amount of $10,000,000 or more, which will be proved with certainty at the time of trial;

17.. Awarding trebled damages to the Plaintiff as to each of Counts I through VI (with limitations as to Counts IV and V).xxx

18.. Awarding attorneys' fees to the Plaintiff as to each of Counts I through VII, to the extent the Plaintiff has used the services of any attorneys;

19.. Enjoining Google and its Co-Conspirators, preliminarily and permanently, as to each of the anti-competitive practices described in ¶¶ 12, 13, 13A, 19, 25-34 and 45-70 above and requiring Google to notify each AdWords advertiser by email in 3 separate mailings, separated by one month each, about this action and the terms of any preliminary injunction or permanent injunction awarded to the Plaintiff;

20.. Assessing interest against Google (as to Counts IV, V and VII), costs and disbursements; and

21.. Granting the Plaintiff such other and further relief as this Court may deem just and proper.

1
2      **Jury Demand**
3
       Plaintiff hereby demands a trial by jury of all issues properly triable to a jury pursuant

       to Rule 38(b) of the Federal Rules of Civil Procedure.
4
       Dated:   New York, New York
5                February 19, 2007

6
7

8               Carl E. Person
                Plaintiff, *Pro Se*
9               325 W. 45th Street - Suite 201
                New York, New York 10036-3803
10              {212} 307-4444

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SCHEDULE A
## ORDER AND DESCRIPTION OF COUNTS

I.. [Violation of Sherman Act, § 2 - Monopolizing, Attempting to Monopolize, and Combining or Conspiring to Monopolize the Keyword-Targeted Internet Advertising Market]

II.. [Violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 – Denial of Use of Essential Facility to Competitor and Denial of Non-Discriminatory Use of Google's AdWords Keyword-Targeted Advertising System]

III.. [Violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1 – Conspiracy to Fix Prices and Unreasonably Restrain Trade]

IV.. [Violation of § 16720 of the California Cartwright Act  - Monopolizing, Conspiracy to Fix Prices, and Discriminatory Pricing in Google's Keyword-Targeted Internet Advertising and Unlawful Exclusion from Use of Google's Essential Facility]

V.. [Violation of the California's Unfair Practices Act, §§ 17000, et seq. [§ 17045] of the Business and Professions Code – Secret Rebates Injuring Competition]

VI.. [Violation of the New York Donnelly Act, § 340 of the New York General Business Law; Monopolizing, Attempting to Monopolize, and Combining or Conspiring to Monopolize in New York the Website Traffic Monetizing Market and the Relevant Submarkets; Price-Fixing and Unreasonable Restraint of Trade]

VII.. [Breach of Contract; and Breach of Implied Covenant of Good Faith and Fair Dealing]

VIII.. [California Civil Code § 1689(b) - Rescission of Agreement Based on Fraud - Alternative to Count IX]

IX.. [Reformation of Contract to Delete Illegal Venue Provision – Alternative to Count VIII]

X.. [Violation of the California Consumer Legal Remedies Act, §§ 1770(a), subparagraphs (1-3). (5). (7). (9-10). (13) and (16-20)]

XI.. [Violation of § 17200 of the California Business and Professions Code, the Unfair Competition Law]

XII.. [Violation of §§ 17500-17509 of the California Business and Professions Code – False and Misleading Advertising]

XIII.. [Class Action Allegations under the California Unfair Competition Law; California Consumer Legal Remedies Act; and Rule 23 of the Federal Rules of Civil Procedure]

XIV.. [Violation of §§ 349 and 349-c of the New York General Business Law – Deceptive Acts and Practices in Conduct of Google's Business in New York; Additional Penalty for Elderly-Person Fraud]

XV.. [Violation of §§ 350 and 350-c of the New York General Business Law – False Advertising; Bait and Switch Advertising]

97