# EXHIBIT 3

Dockets.Justia.com

1

GO_2AmComp4.wpd

CARL E. PERSON, Plaintiff, *Pro Se*
325 W. 45th Street – Suite 201
New York NY 10036-3803
Telephone: (212) 307-4444
Facsimile: (212) 307-0247
carlpers@ix.netcom.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ECM FILING

| | |
|---|---|
| CARL E. PERSON, | CASE NO.: C 06-7297 JF (RS) |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| GOOGLE INC., | (Jury Demand) |
| Defendant. | |

## COUNT I

**[Violation of Sherman Act, § 2 – Monopolizing and Combining to Monopolize the Search Advertising Market and Submarket for Monetizing the Traffic of Community Search Websites]**

Plaintiff, an attorney acting *pro se*, as and for his Second Amended Complaint, respectfully alleges:

### Jurisdiction

1. This controversy involves § 2 of the Sherman Act (15 U.S.C. § 2); §§ 1, 4B, 12 and 16 of the Clayton Act (15 U.S.C. §§ 12; 15b, 22 and 26); and 28 U.S.C. § 1337.

2. This Court has original jurisdiction over the federal antitrust claims under 28 U.S.C. § 1337(a) and 15 U.S.C. § 15(a).

### Summary

2A. This action has two counts (alleging monopolization and attempted monopolization of Search Advertising and website monetizing [using Search Advertising or the alternative of "all Internet advertising") under § 2 of the Sherman Act, based on Google's 65 acquisitions of related technology businesses, patents, know-how, copyrights, algorithms, competitors and high-traffic community search websites – see Exhibit A and ¶¶ 99-A and 99-B below) to enable Google, with its two alleged U.S. monopolies, to injure and drive competitors out of business and maintain and increase market share for Google's monopolies (i) by anticompetitive AdWords pricing and auction practices, (ii) by allowing some community search websites (including MySpace.com. AOL.com, YouTube.com and other high-volume community search website customers) to monetize their website traffic by sharing in Google's monopolistic AdWords Search Advertising revenues, but denying the same website monetizing opportunity to Plaintiff as to his 10 competing community search websites.

**Plaintiff**

3..     Plaintiff, **Carl E. Person** ("Person" or the "Plaintiff"), is a website developer, practicing attorney and past candidate for elective office residing in New York, New York, with his offices at 325 W. 45th Street, New York, NY 10036-3803.

4..     Person develops websites and website traffic to (i) create website income

through use or sale of Search Advertising directed to website visitors; (ii) create capital values for his 10 Community Search Websites (including myclads.com) under development; (iii) market his candidacy for public office in New York, (iv) obtain clients; (v) market non-commercial, political and information websites to obtain website traffic; and (vi) market his self-published books.

5..     Person is in the business of building and monetizing website traffic for his Community Search Websites (10 under development, featuring visitor-supplied content and a search engine for locating desired content) through planned sale of Search Advertising to advertisers, to appear when website visitors express what they are then seeking through any website or Internet searches they conduct from Person's websites.

6..     In this respect, Person is an actual competitor of Google (in the submarket or market of monetizing the traffic of Community Search Websites). Person's websites include myclads.com (for completion in April, 2007), attydb.com (May, 2007) and late-fees.com (May, 2007), ZIPcomplaints.com (June, 2007), MyTelNos.com (June, 2007), e-listparty.org (July, 2007) and others, including lawmall.com, all designed to accommodate the sale and placement of Search Advertising for placement in the right sidebar for website or web searches made from any of Person's websites.

7.     Plaintiff's first website with Google-type (but in-house) advertising is rebate-fraud.com. This website (through its administration panel) will enable Plaintiff to

display the same Google-type ads across all of Plaintiff's 85-90 websites (including the numerous subdirectories of Plaintiff's lawmall.com).

8.. Person has used Search Advertising of approximately 10 search engines including Google's AdWords, Yahoo, MSN and 7Search in Person's above-described marketing activities. From 2003 to September 18, 2006, Person has had 1,417,314 ads

Case 5:06-cv-07297-JF    Document 47-4    Filed 04/30/2007    Page 5 of 70

presented to Google users in a total of 20 campaigns, and has paid Google a total of $1,466.67 for a total of 3,533 user clicks at an average cost of $.42 per click, and a clickthrough rate ranging from a high of 3.09% to a low of zero % according to Plaintiff's records maintained by AdWords.

9.. Person ran, unsuccessfully, for the office of Attorney General of New York State during 2006. He was unable to get on the ballot. Google's activities in increasing Person's pay-per-click fee from 1 cent to approximately 50 cents per click prevented Person from building an email list of potential voters. This 50 times increase in price to Person of AdWords advertising increased his cost of building a list of 1,000,000 permissive email addresses from an affordable $10,000 to a wholly unaffordable $500,000, and contributed to Plaintiff's failure to get on the ballot and his failure to obtain any significant percentage of the total vote for Attorney General.

### Defendant

10.. Defendant, Google Inc. ("Google"), is a Delaware corporation incorporated in 2002 with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

11.. Google is in the business of "maintain[ing] the world's largest online index of web sites and other content, and ... mak[ing] this information freely available to

anyone with an Internet connection" through tools for searching the content; and deriving

income from these unpaid content search activities by selling keyword targeted

advertising for display together with the search results. From inception through 2006.

advertising income has produced 99% of Google's revenues. Also, it is in the business of

creating, acquiring, building and monetizing Community Search Websites for its own

account, and monetizing Community Search Websites owned by a limited number of

Google's competitors.

      12..    Upon information and belief, through 2006, more than 95% of Google's

sale of Internet advertising comes from Google's AdWords and any other search

advertising . and less than 5% comes from Google's AdSense advertising and all other

Internet advertising not based on searches, net after deducting "TAC" or Traffic

Acquisition Costs.

      13.    Google has more information databases of stored information than any

competitor, including databases referred to by Google under names or descriptions such

as "Internet"; "Website"; "Find on this site"; "Google Free web search"; "Google Free

SafeSearch"; "Google Free web search with site search"; "Google Free customizable"

searches; Google "Public Service Searches"; Google "Wireless Searches"; "Google

Mini" searches; "Google Search Appliance" searches "across virtually all the information

in your company"; Google searches triggered by use of any of Google's plug-in

compatible desktop or other applications, features or options; and intra-company searches

using "Google Enterprise products". Each search of a Google database is the occasion for

sale and display of Search Advertising together with display of the search results.

5

1    13A..   Google's leadership in number of indexed pages started during 2000 and

2  has steadily increased, up to the present. In a 2/14/04 CNET article, Google co-founder

3  Sergey Brin reportedly said: "Ultimately we want to have all the world's information,

4  whatever medium it is," [source:

5  http://news.com.com/Google%2C+Yahoo+duel+for+documents/2100-1038_3-

7  5160480.html]

8                        3 Stages of Internet, an Overview

9  Publishing and Searching for Information

10

11    14..    Starting after the release of the Mosaic web browser in November, 1991,

12  millions of websites were created in the United States and elsewhere publishing

13  information across the vast spectrum of information categories.

14

15    15..    Upon information and belief, Plaintiff was the first lawyer (or among the

16  very first lawyers) in the United States with a website in 1992 (lawmall.com) providing

17  legally oriented information.  Contemporaneously, Plaintiff had conducted a search for

18  attorney or lawyer websites and found only one, which provided the attorney's name,

19  address and telephone number, but no significant information about any area of law or

20  any legal problems.

21

22    16..    To organize the growing body of Internet-published information, various

23  search-engine websites got started, providing free search services that enable users to

24  searches for desired text or information and obtain links to the information located by the

25  search engine. Archie (1990) and Gopher (1991) and related Veronica and Jughead

26  programs were the first search engines. WebCrawler, starting in 1994, was Internet's

27  first "crawler-based", "full-text" search engine. Google's founders developed the initial

28

                                    6

Google search engine during 1995-1997, commenced business in September, 1998, and

PC Magazine named Google one of its Top 100 Web Sites and Search Engines for 1998.

17..    Up to 1996, website publishers (such as AOL.com and prodigy.com) were

relying on subscriber fees to support the website, or the website owner (such as Plaintiff)

was hoping for customers for the described services or products to cover the costs of the

website publishing activities. During 1996, AOL changed its business model and

switched from an hourly fee for services to a flat fee of $9.99 per month.

18..    As of mid-1998, the main search engines were (in alphabetical order):

AltaVista, Excite, HotBot, Infoseek, Lycos and Yahoo! (source: Search Engines for the

World Wide Web, by Alfred and Emily Glossbrenner, © 1998 by PeachPit Press,

Berkeley, CA). [Google was not even mentioned anywhere in the book.]  These search

engines were available for free, but they had no workable business model to be profitable.

**Stage 2 - Internet Advertising**

19..    The nature of websites is that their own owners are able to place "free"

advertising on the websites (banner, display or text ads); and some were able to sell

advertising to third-person advertisers for placement on the website. Very few if any

websites appeared to be making money with their website operations through selling

banner, display or other Non-Search Advertising for placement on the website.

20..    The transformation of Internet to a money-making potential arrived when

search engine GoTo.com. in 1998, started offering paid advertising to be presented

together with search results. A substantial controversy over this development apparently

caused the originator to back back off, and the concept was pursued, successfully, by

others, including Overture.com (which acquired GoTo.com), Yahoo.com (which acquired

Overture.com but used the Google search engine for yahoo.com up to 1994), and later

Google.com (financed by Yahoo's backers, Sequoia Capital). From 1999 to February

2004, Google's search engine was used to power Yahoo searches, under license by

Google.

21.   The sale of sponsored ads for display alongside search results became

successful and demonstrated how a search engine could offer free search services and

become profitable through monetizing its search traffic by the sale of advertising for

display with the search results.

22..   Subsequently, the search engines started selling and placing ads on

websites having a perceived or arguable relevance to the advertiser's product, service or

advertisement, with a clickthrough rate approximately $1/50^{th}$ to $1/20^{th}$ of the rate achieved

by successful Search Advertising. The main difference (advertising written to be

presented alongside keyword search results, versus advertising displayed to whoever

happens to visit a website category) prevented the two types of advertising from being

reasonably interchangeable under antitrust caselaw standards for determination of

"reasonable interchangeability".

23..   At all times from 2000 to the present, one or more major search engines

(e.g., Inktomi, Ask Jeeves, Google, Yahoo) have been licensing other search websites to

use their search engine in exchange for a percentage of the Search Advertising displayed

by the search engine together with the search results. The search industry is presently

capable of joining with Community Search Websites to monetize their website traffic

(and Google is doing so with AOL.com, MySpace.com and YouTube.com), but refusing

to do so for the Plaintiff and most Community Search Websites.

24..   Internet advertising falls into two main categories: (1) advertising selected by use of the search term(s) and presented together with the search results ("Search Advertising") and (2) any advertising displayed when a person visits a website or any pages within a website ("Non-Search Advertising"), often called display, banner or context advertising.

25..   Non-Search Advertising was first, starting with banner advertising. Later forms of Non-Search Advertising include pop-up advertising, (possibly) permissive email advertising and RSS website update email feeds, context advertising (such as with Google's AdSense in which advertising is selected for specific websites based on their content).

26..   Starting in 1998, Search Advertising appeared, in which the search term of a user resulted in Search Advertising if one or more advertisers had previously selected the search term and created one or more ads to be displayed with the search results, assuming the advertiser prevailed in the accompanying auction among competing advertisers for use of the search term.

27..   Search Advertising grew faster than any other segment of Internet advertising and now accounts for about 50% of all Internet advertising. From inception to the present, Search Advertising has been sold to advertisers only by search engines or their joint-venture partners or licensees, although both Forbes and FIM/MySpace have publicly indicated during the past 6 months that they are going to break into the market (of monetizing their own Community Search Websites with Search Advertisements).

28..   The sellers of Search Advertisements (including Google and Yahoo) and independent companies have developed and acquired software tools for advertisers to

1  determine the efficiency of their search advertising, and the management of potentially

2  tens of thousands of ads and search terms to be used in Search-Advertising campaigns.

3       29..     Search Advertising, having a specific maximum number of characters in

4  any ad, is fast and easy to create, and enables advertisers to get online (after an ad

5  approval process) immediately or within a day or so, depending on the seller, with

7  advertising budgets that can be as low as $1 to $5 per month, in contrast to Non-Search

8  Advertising that is generally more costly. requires more time and personal involvement to

9  create and get on line, and is substantially less cost effective as Search Advertising.

10

11      30..     Upon information and belief, when a Search Advertiser is offered an

12  opportunity to add Non-Search Advertising to his/her Search Advertising purchase (such

13  as adding AdSense-type advertising to an AdWords-type purchase), the advertiser refuses

14  the offer more than 80% of the time. because of the inherent differences between the two

15  advertising media. They are not reasonably interchangeable, and this is understood or

16  reinforced by the substantially lower efficiency of Non-Search Advertising.

17

18      31..     Upon information and belief, Search Advertising is approximately 50 to

19  100 times more effective than Non-Search Advertising, produces more than 20 times the

20  revenue for Google; and the two categories are not interchangeable for advertising

21  customers of Google or its competitors.

22      32..     Upon information and belief, a statistically relevant (projectible) survey

23  can establish that among Search-Advertising advertisers, Search Advertising is not

24  reasonably interchangeable with any form of Non-Search Advertising for a large variety

25  of reasons, including:

26

27

28

10

A..    Customer perception derived from the press that Google has won the search battle and that Google's emphasis on Search Advertising (accounting for 95% of Google's revenues) is superior to Non-Search Advertising; for example, the 3/27/07 *International Herald Tribune* article stating "Yahoo, ...has fallen a distant second behind Google in Internet search and search-related advertising"; also, use of the word "Google" or "Googling" to refer to an Internet search, generically or by actual use of google.com; 50,040,000 hits searching for "Googling" and 20,500 hits searching for "Yahooing" on 4/15/07 (99.59% for "Googling"; and 0.0041% for "Yahooing").

B..    3 Google searches on April 15, 2007 show 8 hits for the search term "Yahoo is King" or "Yahoo! is King"; 9 his for "MSN is King"; and 676 for "Google is King", almost 100 times more hits than the Yahoo or MSN search;

C..    50% of Internet purchases are made after a keyword search to determine where to make the purchase;

D..    Web searchers as a group obtain more relevant information from Search Advertising than any type of Non-Search Advertising;

E.    Search Advertising is less expensive;

F..    Search Advertising is more efficient;

G..    Search Advertising has superior tools to measure and manage the results;

H..    Search Advertising has superior tools to manage the ads and keywords involved in substantial advertising campaigns;

I.    A search advertiser can start with a monthly budget as low as approximately $5.00, but contracts to display banner ads generally involve commitments of several hundred dollars or more;

J.,    A search advertiser can generally withdraw all scheduled advertising at any time without notice and without penalty;

K.,    A Search advertiser does not need any graphics artist or programmer to get started;

L.    Payments are simplified by use of credit cards to ensure payment and

credit;

M.,    Measurement of efficiency of most types of Non-Search Advertising is substantially less possible than with Search Advertising;

N.    The risk of advertiser's loss as to Search Advertising is absorbed to a greater extent by the seller of the advertising than with Non-Search Advertising;

O.,    Selection of advertising targets is more under the advertiser's control with (keyword) Search Advertising than with Non-Search Advertising, which is important to the advertiser because he/she knows more about his/her product or service than the seller of advertising or the seller's automated program;

P.,    Search Advertising is largely automated and immediate, whereas Non-Search Advertising generally is labor intensive and delayed, involving a substantial amount of discussions, negotiations and contractual commitments.

Stage 3 - Monetizing Website Traffic

33.,    Search engines had an inherent advantage over other websites. Search engines had users looking for all types of information, so that searches using the leading search engines created greater opportunities for advertisers than trying to place advertising directly on specialized websites. This created vast amounts of income for

1   search engines which collected and indexed the content provided to the public for free by

2   millions of website publishers, including Plaintiff.

3       34..    In an effort to placate web publishers (who were not getting paid for their

4   content) while the search engines had found a lucrative Search Advertising market for

5   themselves, Google and other search engines started encouraging Search Advertisers to

7   also place context or display ads on websites having revenue-sharing agreements with the

8   search engine to receive a portion of the tiny advertising revenues per ad (in comparison

9   to the substantial revenue per ad for Search Advertising (which revenues were not split

10  by the search engines – other than with other Internet search websites).

11      34A..   In some of its AdSense agreements with website publishers, Google

13  according to its initial registration statement has paid more than 100% of the AdSense

14  income to the website, in what amounts to an agreement by Google to share its related

15  Search Advertising income with the website without publicly revealing that Google is

16  helping any websites monetize their traffic by splitting Google's Search Advertising

17  income.

19      35..    Until Google's deal with AOL (12/05), MySpace (8/06) and YouTube

20  (11/06), search engines kept their Search Advertising monetizing activities to the search

21  traffic (search engine users) of the search engine and its licensee competitors, and website

22  publishers were restricted to the tiny per-ad revenues produced by context or Non-Search

23  Advertising.

25      36..    As a result of Google's 3 transactions described in the preceding

26  paragraph (and Google's history of licensing competing Internet search websites and

27  Google's splitting of Search Advertising income with some publisher websites), it

became clear that Google was in a position to use its Search Advertising facility (and

monopoly) to monetize anyone's website, and that Google chose to do so with search

competitor AOL.com, Community Search Website YouTube.com (which Google

purchased to be able to own and monetize the website without any joint venture

Community Search Website MySpace.com (which Google licensed to have Search

Advertising displayed to MySpace visitors when searching for MySpace or web content

wherein MySpace is guaranteed $900 million in revenues for 3.5 years and Google

apparently keeps the remainder).

37..    These 3 transactions by Google involving the display of Google Search

Advertising on third-party websites (or a website being purchased by Google for such

purpose) is the start of the 3rd stage of Internet – the use of Search Advertising to

compensate web publishers for their efforts through monetizing their website traffic.

38..    The monetizing of website traffic using highly profitable Search

Advertising is a new, emerging market, and most suitable (*i.e.*, most profitable) for large

"community" websites growing through user-created content such as YouTube.com and

MySpace.com, as well as eBay.com, amazon.com, wikipedia.org, craigslist.com – any

website having a vast range of user-created information being added to it -- with a website

search engine to locate information therein (or from the web at large).

39..    Various website owners have recognized this market, including the

Plaintiff, Google (through its 3 transactions described above), MySpace.com's C.E.O.

(see ¶ 40 below). Using Search Advertising to monetize the traffic of a third-party

website is fundamentally different from all other means of monetizing website traffic

1  because Search Advertising is the most profitable (as seen by Google's own revenues

2  from 2000 to the present) and context, banner, display, pop-up and other types of

3  advertising to monetize are too labor intensive and so less profitable that they constitute

4  no significant competition to monetizing by Search Advertising.

5

6        40.    News Corp.'s President and C.E.O., Peter Chernin, is reported by a

7  1/24/07 Forbes.com cover story entitled "Murdoch 2.0" as saying that News Corp. will

8  try to concoct the next YouTube on its own, via an in-house R&D group, then quoting

9  Chernin: "I think we should be striving to create as many businesses ourselves as we can

10  [for purposes of monetizing the website traffic with Search Advertising]". Also, News

11  Corp. is a competitor of Google, having lost the YouTube acquisition to Google because

12  Google had the stock price and cash hoard to pay more for YouTube than News Corp.

13  could afford.

14

15

16

17                               **Definitions**

18        41.    The following terms shall have the meaning set forth below, or in a

19  paragraph to which reference is made:

20        A.    "AdSense" – Google's version of context or banner advertising in which

21  advertisers pay to have their banner, pop-up, display or other ads displayed to visitors at

22  websites selected by the seller or advertiser as having website material and visitors

23  relevant to the ads.  AdSense also enables Google with high-traffic websites to pay the

24  website more than Google receives from the AdSense advertising, which amounts to

25  partial monetizing of the website with Search Advertising income. Upon information and

26

27

28

1  belief, Google has a 25% to 30% cost of sales for its AdSense net income (after

2  deducting Traffic Acquisition Costs).

3      A-i..   On 12/15/06, CNNMoney.com (David Kirkpatrick, *Fortune* senior editor)

4  in an article entitled "Can Yahoo catch Google?" stated that keyword-targeted advertising

5  [e.g., AdWords] gets a 10% or 20% clickthrough rate whereas conventional banner ads

6

7  (not keyword based [e.g., AdSense]) have a clickthrough rate not exceeding 1%. Also,

8  the article states that "Today Google overwhelmingly dominates the search business."

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 5:06-cv-07297-JF    Document 47-4    Filed 04/30/2007    Page 17 of 70

B..    "AdWords" – Google's Search advertising system enabling advertisers to

hold back their ads until potential customers were seeking information through a search,

with the advertiser's ad being delivered to together with the search results; this enabled

advertisers for the first time to reach potential customers at the precise moment of their

demonstrated interest, which makes this type of ad much more cost effective than other

types of advertising (including newspaper and internet context, banner or display

advertising).

C.    "Community Search Websites" – refers to websites (such as

youtube.com, myspace.com, craigslist.com, eBay.com, monster.com, wikipedia.org and

approximately 10 websites being created by Plaintiff [starting with myclads.com and

attydb.com] for which users create and/or provide the website's content on an ongoing

basis, the website provides a search facility for visitors to find web pages or other

material of interest to them on the visited website, or other Internet websites; the owner

of the website provides the structure for website growth and regulation but creates a

miniscule percentage of the website's content; and the websites are often referred to as

communities or social websites with user-created content.

D..    "Essential Facility" – Google's system for selling and placing Search

Advertising on Community Search Websites to monetize the website traffic. Google's

website monetizing system is so efficient and profitable that (with an 8% cost of sales

during 2006) that no competing system based on any competing search engine is

reasonably interchangeable with Google's system, and the advertisers will pay about

twice as much per click for use of a specific keyword than they will pay per click to

competing companies such as Yahoo and MSN. This means that Google monetizes

17

website traffic at about twice the rate as its nearest Search Advertising competitor and many times more than the top context or display ad competitor, DoubleClick, which Google acquired during April, 2007.

D-1..  Search Advertising sold by lesser competitors of Google cannot become

reasonably interchangeable with Google by lowering their prices because their inventory of searches is substantially less (requiring the website to return to Google to obtain the benefits of the larger inventory and the temporary use of the lesser competitor exhausts part of the Search Advertising market available more efficiently through Google). Google's competitors do not effectively compete. They merely sell an incremental expansion of the website's monetizing program, primarily to unsophisticated website owners who are unaware of the differences between Google and its Search Advertising competitors.

E..   "Google Competitors" – Google competes with Yahoo Search Marketing, MSN Ad Center, 7Search and other search engines offering search advertising. but the competition is ineffective and Google has a monopoly in the Search Market and Website Monetizing Submarket, making Google's AdWords business an Essential Facility, both as to advertisers seeking to advertise on Internet for website visitors (in competition with Google) through Search Advertising (including Plaintiff) and as to all Community Search Website owners attempting or potentially attempting to create Community Search Websites and increase and monetize the traffic on their websites in competition with Google (including Plaintiff).

F..   "Non-Search Advertising" – any Internet advertising that is not Search Advertising, such as banner, space. context or pop-up advertising.

1    G.    "Relevant Market" - defined in ¶ 45 below.

2    H.    "Relevant Submarket" - defined in ¶ 45 below.

3    I.    "Search Advertising" — website advertising that is triggered by a website

4    or Internet search, with the advertisement (and any others) displayed alongside the search

5    results. Such advertising could be purchased on a pay-per-click ("PPC"), cost-per-

6

7    thousand ("CPM") or other basis.

8                                    **Relevant Period**

9    42.    The relevant period ("Relevant Period") for the antitrust claims alleged

10   herein is the 4-year period preceding the filing of this complaint (during June, 2006) as to

11

12   all claims under the Sherman Act, 15 U.S.C.A. § 2.

13                      **The Relevant Market and Submarkets Defined**

14

15   43.    For purposes of this action, the alleged geographic market is the United

16   States.

17   44.    The alleged service market at issue in this action is **Search Advertising**

18   (as defined in ¶ 41-1 above), and the submarket of monetizing the traffic of

19   Community Search Websites through use of Search Advertising. Alternatively, if the

20   market turns out to be "all Internet advertising" and not "Search Advertising", the

21

22   submarket becomes the market for monetizing the traffic of Community Search

23   Websites through the use of Internet Advertising. Upon information and belief,

24   Google dominates such alternative market.

25   45.    Upon information and belief, Google has a monopoly in the United States

26   geographic market of Search Advertising (the "Relevant Market") and the Relevant

27   Submarket of monetizing the traffic of Community Search Websites through the use of

28

Search Advertising or, alternatively, Internet advertising (the "Relevant Submarket" or

Relevant Alternative Market).

46..    Upon information and belief, Google has more than a 70% share of the

dollar amount of the Search Advertising market, which percentage is steadily increasing.

47..    Upon information and belief, Google has more than a 80% share of the

dollar amount of revenue obtained from monetizing the traffic of Community Search

Websites using Search Advertising or more than a 67% share of the dollar amount of

revenue obtained from monetizing the traffic of Community Search Websites using any

type of Internet Advertising, and the markets and submarkets dominated by Google are

Essential Facilities with access so such facilities needed by the Plaintiff to be able to

compete effectively with Google for the monetizing of traffic of Community Search

Websites.

### Monopolization of the Relevant Market

48..    Google has a monopoly in the Relevant Markets and Submarkets,

including the power to control prices and the power to exclude competitors from such

markets, and is exercising such power unlawfully.

### Facts Supporting Allegation of Google's
### Monopoly Including a $25 Billion Dollar Barrier to Entry

49..    The following facts are barriers to entry facing Google competitors in the

relevant markets and submarket, and support Plaintiff's allegation of Google's monopoly:

A..    Google has acquired about 65 technology companies from 2001 to the

present (a list and description of such acquisitions is set forth in Exhibit A hereto – and

1    see ¶¶ 49-A and 49-B below for a list of the most significant acquisitions which enabled

2    Google to acquire and combine to obtain its present monopolies in the relevant markets

3    and submarket), at a cost of about $7-$8 billion in cash and stock, to enable Google to

4

5    increase its share of Internet searches and of the Relevant Market and Relevant

6    Submarket without growth from within, for the purpose of depriving competitors in the

7    respective markets of market share and drive them out of business.

8        B..    The more recent acquisitions have been made after Google has become a

9

10   monopoly, with Google's monopolistic profits and with highly-priced stock (reflecting

11   Google's monopoly) that enables Google to make its acquisitions at a lower equity cost

12   when using stock, and being able to outbid Google's competitors such as Fox and

13   Microsoft.

14       C..    The acquisition of the largest company in Internet display advertising,

15   including an auction system for Internet display advertising, is a strong indication that

16   Search advertising is a different market from Non-Search advertising, a market so

17   different that Google was not in it to any appreciable extent before the April, 2007

18

19   DoubleClick acquisition.

20       D..    From 2001 to the present, Google has acquired users for Google's search

21   engine by licensing use of its search engine to various competitors of Google including:

22   Yahoo (ending in 2/04), AOL-Time Warner, Earthlink and FIM which agreements have

23

24   enabled Google to dominate the relevant geographic and service or service/product

25   market and submarkets defined above.

26

27

28

E.. Google has a technical team with its secret know-how that enables Google to increase its market share in the Relevant Market over the only two present significant competitors (Yahoo and Microsoft/MSN Ad Center – "MSN").

F.. Microsoft/MSN's dedicated effort, huge cash reserves and other resources, up to this moment, have not been able to purchase or develop any team capable of effectively competing with Google's search-engine business and related AdWords keyword-targeted Internet advertising business. Until May 2006, Microsoft/MSN partnered with Yahoo, but in May 2006 MSN began offering its own keyword-targeted Internet advertising, and upon information and belief the cost of Yahoo, MSN or any other company trying to become competitive with Google (from the standpoint of being able to monetize website traffic within a competitive dollar amount or value) is about $50,000,000,000. based on Google's revenues, acquisitions, physical structure, software, personnel, top management ownership, commanding industry lead, and monopolistic position, among other factors.

G.. Yahoo until recently was a licensee of Google's search engine and has now switched to licensing an inferior engine (created years earlier by Inkomi), which means that Yahoo will not be able to compete with Google unless it solves the problem faced by Microsoft (of creating a team able to compete with Google's team, and to be able to commit the necessary funds, amounting to about $25 billion).

H.. Google has the fastest search engine of all competing search engines with indexes, algorithms, software and systems (including technology acquired through some of the 65 Google acquisitions) to deliver the search results (and accompanying AdWords

ads) substantially faster than any other search website can locate and display its search results;

    I..    Google has about 50% of all internet searches conducted at more than 60 search sites [source: http://searchenginewatch.com/reports/article.php/2156451];

    J..    Google has the world's largest and most comprehensive collection of information online - 8.1 billion pages, compared to Microsoft's 5.0 billion pages, Yahoo's estimated 4.2 billion pages and Ask Jeeves' or Ask's 2.5 billion pages [Source: http://blog.searchenginewatch.com/blog/041111-084221]. Plaintiff's 6/16/06 Yahoo search for "movie cameras" found 26,200,000 pages, whereas Plaintiff's 6/16/06 Google search using the same phrase found 86,800,000 pages or more than 3 times as many pages;

    K...    Overture created the keyword-targeted Internet advertising market but lost its initial domination of the market to Google, because of superiority of Google's databases and software development, acquisitions of technology and other factors;

    L..    Through fiscal year 2006, Google's income has been derived mainly (at least 95%, upon information and belief) from its AdWords business and is more than 71% (2004) and more than 75% (2005) of all income obtained from keyword-targeted Internet advertising of all competitors (based on the figures set forth in the next 2 paragraphs); upon information and belief, in 2006 Google an even higher percentage of overall keyword-targeted income than it obtained in 2005, and that the percentages of Yahoo and MSN are undergoing substantial declines. The reason is that AdWords is substantially more profitable for advertisers and easier and less time-consuming to use

1    than the PPC advertising of MSN and Yahoo (which are distant seconds and not

2    reasonably interchangeable for keyword advertisers including Plaintiff);

3        M..    Google's revenues from sale of keyword-targeted Internet advertising

4    amounted to $3.189 billion during 2004, $6.139 billion during 2005 and more than $10

5    billion during 2006 (without adjustment for the small percentage of income derived from

7    Google's CPM (cost per 1,000 impressions) sales of AdSense advertising), in comparison

8    to Yahoo's sale of keyword-targeted Internet advertising amounting to an estimated $1.3

9    billion during 2004 and an estimated $1.97 billion during 2005. [Estimate assumed 50%

10   of Yahoo's total sales excluding "traffic acquisition cost" or "TAC".]

12       N.    Prior to and during 2004-2005, Microsoft/MSN had no independent

13   revenues from keyword-targeted Internet advertising, so that a substantial part of

14   Microsoft/MSN's revenues are included in Yahoo's revenues.

15       O.    Google's capitalization during late 2005 was $126.7 billion ($428/share)

16   in comparison to Yahoo's capitalization. of $59.7 billion ($42/share), making Google

17   more than twice as valuable as Yahoo, and during 2006 the capitalization difference grew

18

19   substantially, enabling Google to make acquisitions more readily than any of its

20   competitors (e.g., YouTube and DoubleClick).

21       P..    Google states in its S-1 Registration Statement filed April 29, 2004 that

22   Google is the largest of the companies in that market; and that the only other company

23   known to Google is Yahoo (with its purchased Overture search business);

24

25       Q..    The only company publicly stating that it is going to try to challenge

26   Google (and not even mentioning Yahoo) is one of the largest monopolists, Microsoft,

27

28

1    showing that there is a need for huge amounts of capital to challenge Google with only 2

2    challengers for control of Internet.

3        R.    Google states in its S-1 Registration Statement that it has a variety of

4

5    intellectual properties upon which its AdWords technology is based, including patents,

6    trademarks, copyrights, know-how, backed by numerous secrecy agreements; this also

7    includes the know-how in finding, indexing and storing web pages and using hundreds of

8    thousands of servers to speed up information processing and distribution by simultaneous

9    use of many interconnected computers for a single search. See Exhibit A hereto for a list

10   of Google's acquisitions of technology firms, patents and other technology from 2001 to

11   the present. Google did not develop its business from within, but built it over 6 years with

12

13   about 65 acquisitions.

14       S.    Yahoo attempted to compete with eBay recently and found that it could

15   not, and gave up its eBay-type Internet activities, suggesting that Yahoo will not be able

16   to continue its competition with Google.

17

18       T.    Google admits that it has not advertised its AdWords service to any

19   significant extent, and was able to build this monopoly by reason of its existing search

20   business (which itself is perhaps the most effective advertising medium in the world);

21       U.    eBay, a major competitor or potential competitor in other product/service

22   markets, is one of Google's top customers for AdWords advertising services;

23

24       V.    Google is practicing price discrimination that makes some purchasers

25   (such as the Plaintiff) pay up to 100 times more per click than other purchasers (large

26   companies) because of the lack of any alternative market; Google is to increase its per-

27   click price for Plaintiff and a million other small-business AdWords customers 2, 10, 25,

28

1    50 even 100 times the price per click Google is charging its most-favored customers. But

2    the profitability to an advertiser is in the click, and it is unreasonable, unconscionable and

3    anticompetitive for Google (and its monopolies) to charge small business advertisers 2,

4    10, 25, 50 or 100 times the price per click when their expectations for profit is

5    substantially less than the profit being obtained by the high-volume advertiser from one

7    click for the same keyword.

8        W.    Online advertising is causing U.S. daily newspapers to lose advertising

9    revenue and threatening traditional U.S. daily newspapers with extinction ["Online

10   Publishing Insider", 6/8/06]; newspapers are attempting to re-create themselves as online

11   newspapers; and in the UK. online advertising revenues already exceed newspaper

13   advertising revenues [Source: http://news.stepforth.com/2006-news/May31-06.html].

14

15   **Additional Facts (from New York Times Article of 6/8/06):**

16        X. Building a computing center in The Dallas, Oregon as big as two football

17   fields, with twin cooling plants protruding four stories into the sky which, according to

19   *The New York Times*, is Google's "weapon in its quest to dominate the next generation of

20   Internet computing"

21        Y. Such new plant "heralds a substantial expansion of a worldwide

22   computing network handling billions of search queries a day and a growing repertory of

23   other Internet services"

25        Z. The new plant " is the backdrop for a multibillion-dollar face-off among

26   Google, Microsoft and Yahoo that will determine dominance in the online world in the

27   years ahead"

28

AA.    Microsoft and Yahoo have announced that they are building big

data centers upstream in Wenatchee and Quincy, Wash., 130 miles to the north. But it is a

race in which they are playing catch-up. Google remains far ahead in the global data-

center race, and the scale of its complex here is evidence of its extraordinary ambition

BB.    Even before the Oregon center comes online ... "Google has

constructed the biggest computer in the world, and it's a hidden asset,"

CC.    Microsoft stunned analysts after first quarter 2006 when it

announced that it would spend an unanticipated $2 billion next year, much of it in an

effort to catch up with Google.

DD.    Google is known to the world as a search engine, but in many ways

it is foremost an effort to build a network of supercomputers, using the latest academic

research, that can process more data — faster and cheaper — than its rivals.

EE.    "Google wants to raise the barriers to entry by competitors by

making the baseline service very expensive,"

FF.    In March 2001, when the company was serving about 70 million

Web pages daily, it had 8,000 computers.... By 2003 the number had grown to 100,000.

GG.    Today ... [t]he best guess is that Google now has more than

450,000 servers spread over at least 25 locations around the world.

HH.    Microsoft's Internet computing effort is currently based on 200,000

servers, and the company expects that number to grow to 800,000 by 2011 under its most

aggressive forecast, according to a company document.

II.    Yet it is the way in which Google has built its globally distributed network

that illustrates the daunting task of its competitors in catching up.

1      JJ. [S]aid Milo Medin, a computer networking expert ... I know of no other

2   carrier or enterprise that distributes applications on top of their computing resource as

3   effectively as Google."

4

5        **Willful Acquisition, Maintenance, or Use of the**
    **Market Power by Anticompetitive or Exclusionary**
6   **Means or for Anticompetitive or Exclusionary Purpose**

7

8   **Willful Acquisition and Maintenance**

9      50..  Google willfully acquired its monopoly of the Relevant Markets and

10  submarket  partially through in-house growth but mainly through a series of mergers and

11  acquisitions (from 2001 to the present -- see Exhibit A hereto) in a combined cash and

12  stock purchase price of about $7-$8 billion, with purchases acquiring patents, largest

13  competitors in new fields, and immediately usable technology to enable Google to

14  increase its share of Internet searches and to increase Google's Search advertising

15

16  revenues and other revenues.

17     51..  Google has learned that its monopoly enables it to turn website traffic into

18  money far more efficiently than any other search engine (such as Yahoo or MSN) or

19  other company (such as DoubleClick), and by the end of 2006 has changed its business

20  and description of its business to reflect ability to monetize website traffic substantially

21  more efficiently than anyone else. Whereas DoubleClick monetized traffic for other

22

23  website owners, Google does not allow website owners to use Google's Search

24  Advertising to monetize website traffic, and indeed Google has acquired the leading

25  website traffic monetizing company to reduce competition in the field of monetizing

26  website traffic.

27

28   --

Use of the Market Power by Anticompetitive or Exclusionary
Means or for Anticompetitive or Exclusionary Purposes

52.    Google is in a position similar to someone owning the patents and know-

how to extract oil two times more profitably than any competitor, and refusing to let

owners of oil reserves enter into joint ventures or leasing agreements with Google to

Case 5:06-cv-07297-JF    Document 47-4    Filed 04/30/2007    Page 30 of 70
exploit the reserves, with Google instead requiring the reserve owners to sell their wells

to Google (at a higher price than available from any lesser competitor), with Google

keeping the difference, and adding to its monopolistic profits and market share.

53.    Until a competitor is able to offer monetizing services with reasonable

interchangeability with what Google has put together in its 65-company acquisition

monopoly, Google is going to pick off the best websites (having the higher traffic, such

as MySpace.com and YouTube.com) and monetize them for Google's profit, and the

other high-traffic websites will not be able to obtain this monetizing value and will see

the asset wasting until Google finally makes an offer, slightly or even significantly higher

than MSN or other competitor.

54.    Plaintiff made a request of Google on February 12, 2007 (Exhibit B

hereto) to permit Plaintiff to use Google's monetizing services for Plaintiff's websites on

terms comparable to the terms given by Google to MySpace.com's owner, but got no

reply.

55.    Google has a two-way monopoly that it is exploiting with Plaintiff and

other website-owner advertisers getting caught in a whipsaw: the monopolistic charge by

Google to build Plaintiff's website traffic, followed by the inability to use Google and its

monopolistic monetizing system (also based on Search advertising) to obtain the built up

1  value from this high-cost website traffic. Google reserves the latter for itself, as an

2  anticompetitive practice.

3      56..    Google's practice of exploiting its monopoly in Search Advertising for

4  website owners building their website traffic would be less devastating and injurious to

5  competition if Google allowed these same customers to participate in the monetizing of

7  their high-cost traffic using Google's Search Advertising monopoly.

8      57..    Instead, Google is fixing auction prices for the auctions of key words and

9  forcing Plaintiff and other advertisers to pay 50 to 100 times more per click than Google

10 is charging eBay and other major advertisers, whose clickthrough rates are higher

11

12 because their products and names are well established, and the products and services are

13 often totally different and not comparable as to landing pages and advertisements.

14     58..    On March 24, 2006, the Plaintiff observed that in 33 randomly selected

15 keywords chosen by Plaintiff for their probable lack of demand (problem-3,

16 circumstantial-0, circumstances-1, create-1, expensive-2, expansive-4, silent-2,

17

18 miraculous-1, busybody-1, glowing-7, water-19, welcome-4, tomorrow-0, today-0,

19 history-8, matters-2, purpose-8, major-1, tip-2, prompt-2, general-1, adjective-1, small-

20 0, smell-1, slice-2, cached-2, pertinent-0, zero-1, mustach-1, second-0, seconds-6, mars-

21 8or9 and Issue-2), eBay had its ad displayed for 13 (40%) of such 33 comparatively

22 unwanted keywords (see bold-type words above; 7 had no ads at all (see the underlined

23

24 words above; eBay used only 2 forms of ad: (i) "Whatever you're looking for you can get

25 it on eBay." [apparently selected when the keyword was assessed by AdWords to be an

26 adjective]; and (ii) "Looking for "Matters"?  Find exactly what you want today."

27 [apparently selected when the keyword was assessed by AdWords to be a noun]:

28

30

1    59..    It is an anticompetitive practice to tell advertisers such as the Plaintiff that

2    his landing page and advertising copy can be improved to bring Plaintiff's clickthrough

3    rate up to the level of eBay, and thereby bring Plaintiff's cost per click down to the low

4    price of eBay. This is impossible. Plaintiff's use of the same key word as eBay (for

5    selling Plaintiff's candidacy or Plaintiff's book) does not mean that the Plaintiff's offer

6

7    and landing page could ever be competitive, no matter how hard Plaintiff tried. Google's

8    pricing with this stated premise is false, misleading and anticompetitive, and injurious to

9    competition because it forces higher costs upon new, different and less established

10   businesses making it impossible for many of them to survive, thereby depriving the

11   public of new and improved products and services, and competition, ultimately, to lower

12

13   prices.

14       60..    Google has a practice of cutting off the number of displayed ads at

15   different numbers for different auctions, for the sole purpose of preventing the lowest

16   bidder to be able to benefit from the promised lowest price of 1-cent per click (when

17   there are no bidders whose ads are not displayed). This practice is anticompetitive and of

18

19   no business value other than to deprive bidders of Google's promised lowest price per

20   click (of $.01) for the last advertiser.

21       61..    Google has a practice of blocking use of lower-value keywords and

22   repeatedly told Plaintiff that hundreds of these words were not available for Person to

23   use, but at the same time Google was allowing eBay to use a high percentage of these

24

25   low-demand words. Google is using its monopoly power to withhold keywords from the

26   market for the purpose of forcing advertisers (including Plaintiff) to pay more per click

27   than would otherwise be paid if the lower-value keywords were made available to

28

31

1  advertisers. This is an anticompetitive practice driving up the price of advertising and the

2  price of products and services to consumers, and is of no benefit to Google other than to

3  obtain monopolistic profits from Plaintiff and other small advertisers who in many cases

4  need to compete with lower-priced keywords to keep their advertising expenses low.

5

6      62.    Google's secret practice of looking at the clickthrough rate and adjusting

7  the advertiser's bid price to enable Google to make as much money per displayed ad from

8  Plaintiff as it makes from eBay, but falsely telling advertisers that this fixing of bid prices

9  by Google resulted from an analysis of the advertiser's advertising copy and landing page

10  is an anticompetitive practice that prevents advertisers from understanding how the

11  pricing is really taking place; Google's offered carrot is false, misleading and

12  anticompetitive: that improving the landing page and advertising copy may allow the

13  advertiser to get the lower rate. Advertisers selling elephants will not get the same click

14  through rate as municipal zoos or petting farms offering an opportunity for children to see

15  elephants, or the sale of books about elephants. Changing the advertising copy and

16  landing page has nothing to do with the basic difference in the markets for selling live

17  elephants; viewing live elephants; and purchasing books about elephants.

18

19      63..    Google's alleged reason charging Plaintiff as much as 50 times or more

20  than the per-click price being paid by eBay for displaying eBay ads together with the

21  same search results and the Plaintiff's ad, to create a more satisfying experience for the

22  website user, is not true because Google does not prohibit such less satisfying ads.

23  Instead, Google lets all of them run at 50 times the price, unless the advertiser drops out

24  of the auction.

25

26  **Plaintiff's Rejected Efforts to Use Low-Value Keywords; and**

27

28

eBay's Use of 2 Forms of Ad for All of eBay's AdWords Advertising

64.    On or about April 5, 2006, the Plaintiff attempted to use approximately 50 keywords relating to competition, distribution, pricing, advertising, fees and allowances to obtain traffic for the Plaintiff's Robinson-Patman Act website, at

www.lawmall.com/rpa2d2e. Google stated that most of Plaintiff's selected keywords (almost all not being in any significant demand by other advertisers) were unavailable to the Plaintiff or were taken away from the Plaintiff within hours or days after the advertising commenced. The Plaintiff went through this routine with different sets of keywords at least 10 other times with the same results.

65.    On or about April 9, 2006, the Plaintiff attempted to use the names of each of the approximately 80 statewide candidates and office titles, political parties, and election issues in support of his candidacy for New York Attorney General. Google stated that most of Plaintiff's selected keywords (almost all not being in any significant demand by other advertisers) were unavailable to the Plaintiff or were taken away from the Plaintiff within hours or days after the advertising commenced.

66.    In contrast to the 13 keywords used by eBay (see ¶ 58 above), the Plaintiff's keywords in the two preceding subparagraphs were chosen for their high degree of relevance (when appropriately limited by AdWords to users having a New York email server), whereas eBay's 13 keywords were selected by Plaintiff as keywords that were very unlikely to have any demand; and eBay's use of them was with one of two form ads: one for nouns and the other for adjectives.

67.    Plaintiff's purpose of finding unwanted words was to avoid having to enter into an auction with anyone for keywords. Plaintiff was willing to use almost any

keywords as long as the Plaintiff could obtain their use for the minimum stated Google fee of 5 cents (later 1 cent) per click.

68.. For Plaintiff to create an email list of 1,000,000 email addresses in 100 days (at the rate of $.01 per click), for example, he could obtain 10,000 names per day by having 1,000,000 ads displayed, and 1% of the searchers (also called "users") clicking on

the Plaintiff's ad and accepting Plaintiff's offer of a free PDF copy of one of Plaintiff's three books. At the end of 100 days, the Plaintiff would have his desired list of 1,000,000 New York State email addresses. The cost of $10,000 for such list would have to be adjusted upward by the number of persons dropping off of Plaintiff's list (and requiring replacement) and the percentage of clickthroughs who wind up not subscribing to Plaintiff's list. One million ads in a single day by the Plaintiff is not impossible or impractical. Google serves up an estimated 1,500,000,000 (1.5 billion) ads each day, and plaintiff would be participating in only 1/1500 or .00067 of such ads, as to keywords not in any demand by other advertisers (other than eBay, possibly). Persons who clicked on Plaintiff's website would subscribe to Plaintiff's email list without any human assistance.

69.. The Plaintiff's AdWords strategy as candidate for New York Attorney General was and remains to use the low-demand keywords, where the Plaintiff would be the only, or one of no more than, say, 10 advertisers, and be willing to (and desirous) of obtaining the last position in the displayed ads, as long as the Plaintiff's ad was the lowest bid and entitled to the $.01 per-click price. It makes no difference to the Plaintiff whether it takes 1,000,000 or 10,000,000 impressions to obtain 1,000 clickthroughs. From Google's standpoint, if anyone believes the keywords in question are more valuable to them than the $.01 bid by Plaintiff, they will bid up the auction price and make it

1   impossible for the Plaintiff to obtain use of it through the auction process, and require the

2   Plaintiff to find a replacement keyword. The Plaintiff envisioned that he would be using

3   many hundreds of keywords simultaneously. It should be noted that eBay appears to be

4   using perhaps 100,000 keywords simultaneously (based upon Plaintiff's determination

5   that eBay was using 40% of keywords not in demand by other advertisers).

6

7        70..    Plaintiff found out that Google's stated minimum fee in its auction pricing

8   system does not apply when only one person seeks to use a given keyword. Instead of

9   letting the Plaintiff use the unwanted keyword for 5 cents (or 1 cent) per click, Google

10  stated that the Plaintiff could not use the word at all, and forced the Plaintiff back into an

11  auction with major corporations for the use of keywords of interest to them, with the

12  resulting 5 to 100 times the cost per click that Google forces Plaintiff and other small

13  businesses to pay. This is an anticompetitive activity by Google.

14

15      71..    Google has taken various keywords off its AdWords auction market even

16  if Plaintiff and other small advertisers were willing and able to pay the unconscionable

17  per-click rates of 100 times $.01, further support for Plaintiff's allegations that Google is

18  manipulating the market and auction prices for keywords, as part of Google's plan to

19  drive small advertisers out of its keyword market and give discriminatory prices to major

20  advertisers. All of this if for the purpose of Google to increase the market share and

21  profits for Google and major advertisers at the expense of (i) Google's competitors

22  (Yahoo and Microsoft), (ii) the major advertisers' competitors (including Plaintiff and

23

24  other small advertisers), in what amounts to an unlawful combination and conspiracy

25  among Google and its major advertisers to fix AdWords auction prices in favor of major

26

27

28

1    corporate advertisers; and (iii) to make it difficult for anyone but favored advertisers to

2    use AdWords to jumpstart traffic to newly-created websites.

3        72..    This practice of pulling perfectly good English words off of the keywords

4    market to require the Plaintiff and other small businesses to bid for the keywords wanted

5    by the large corporate, high-volume AdWords advertisers is another predatory,

6

7    anticompetitive practice by Google, and misuse of its monopoly of the market for

8    keyword-targeted Internet advertising.

9

10   **Google's AdWords Is an Essential Facility**

11       73..    Google has two primary businesses: (i) selling AdWords advertising to

12   advertisers; and (ii) using its AdWords system to convert the traffic of selected websites

13   into money (in amounts established by Google's AdWords auctions), through licensing

14   the right to place Google AdWords advertising on websites owned by others (such as

15   MySpace.com) or by developing and purchasing websites (such as YOUTube) and

16

17   converting traffic at its own websites into money by running AdWords ads on these

18   Google websites.

19       74..    Google is able to do for itself what no competitor can do without use of

20   the Essential Facility, which is to convert or "monetize" website traffic into its monetary

21

22   value as established by competition among AdWords advertisers for the placement of

23   keyword-targeted advertising on the website. Google has agreements with various

24   leading websites to enable them to monetize or partially monetize their websites through

25   revenue sharing agreements involving Google's Search Advertising income derived from

26   the publisher's website, but Google refuses to enter into any agreement with the Plaintiff

27   for sharing of Google's Search Advertising revenues.

28

75.: Many website owners including the Plaintiff are creating new websites and attempting to build traffic at their respective websites to be able to monetize the website traffic in competition with Google, but nobody has been able to build a monetizing system to compete effectively with Google's system. Only two search engines are in the running: (i) Yahoo, which is now running backwards or losing ground at a precarious rate; and (ii) MSN, which has started in competition with Google during the past year with billions of dollars to spend in its announced effort to try to compete with Google, but is now relegated to attempting to resist Google's considerable efforts to take Microsoft's customers away from Microsoft by offering competing products through Google's plug-in compatible system (starting with a free word processing program, and a free spreadsheet program).

76.. There are no other companies or individuals or governments anywhere that have any presently-perceived possibility of catching up to Google and becoming a significant and growing competitor to Google. During the 3rd Quarter of 2006, Yahoo's net earnings dropped 60% while Google's net earnings quadrupled. During Q3 2006, Google's revenues were $2.69 billion, increased 70% compared to 3Q 2005; whereas Yahoo's revenues were $1.58 billion, up only 19% from 3Q 2005. Google-owned websites generated $885,000,000 in revenues during this 3Q 2006. Google's 4Q 2006 earnings tripled on a revenue increase of 67% over 4Q 2005. Yahoo's 4Q 2006 net earnings declined 67% from 4Q 2005, mostly attributable to a one-time backdated option charge. See 1/22/07 Forbes.com article "Yahoo!'s Quarter to Forget".

77.. Google is in a position to under pay for (or steal) the work of all website developers for a pittance because Google alone can convert the website hits into their

37

competitive market value (as determined by AdWords auctions). Other search engines

cannot do this and are not even in a position to acquire high-traffic websites for this

purpose because they lack the stock price, cash reserves and huge anticipated market-

value cash income to make the purchase (in competition with Google), and could not use

their own search engines to make as much money as the acquisitions are worth (at market

value) when a company such as Google acquires the website. This explains how a startup

organization, YOUTube, with no record of earnings, was acquired by Google during

October, 2006 for $1.65 billion, with a possible $4 billion more depending on increased

hits; and Google's August, 2006 payment of $900,000,000 to Ruppert Murdoch's

MySpace.com for the privilege of putting AdWords before MySpace visitors or hits for a

3-1/2 year period.  Murdoch bought a 100% interest in MySpace for $580,000,000 during

July, 2005, only 13 months earlier, showing that a website is more valuable to Google

than to its owner or other sophisticated internet companies because of Google's

monopoly power with its Essential Facility and resulting unique ability to "monetize"

traffic (i.e., convert website traffic or hits into actual market value in a huge competitive

market for keyword-targeted advertising), giving Google more prospective income and

stock price to outbid any competitor or other person trying to buy a specific website.

78..    On February 11, 2007, the Plaintiff observed no Google ads at the moment

of visiting MySpace.com and Google.com but, upon searching the MySpace website for

"gardens" (using a search engine "powered by Google"), 8 AdWords "sponsored links"

appeared (for Shopping.MSN.com, gardeners.com, superpages.com, eBay.com,

move.com, michiganbulb.com, VirtualPlantTags.com and cotswoldheritagetours.co.uk)

together with 231,000 MySpace links related to the keyword "gardens", showing how

1   Google is able to run AdWords ads on sites not owned by Google. At the same time,

2   when searching for "gardens" on Google's search website, 26 AdWords "sponsored

3   links" appeared for the "gardens" keyword together with 99,600,000 garden-related links.

4

5       79..    Google's AdSense is different. AdSense ads appear, if at all, at the

6   moment of visitation to the website homepage or other pages of the website. For

7   example, on February 11, 2007, the Plaintiff visited Kinderstart.com and (without

8   conducting any search) saw 3 "Ads by Google", for AreYouASlackerMom.com,

9   TutorTime.com and NYSC.com, together with a Google notice "Advertise on this site"

10  with a link to Googlesnydication.com. When searching the website for "gardens", no

11  "sponsored links" appeared, only a Google AdSense ad (raftforkids.com, occupying the

12  same space previously occupied by the 3 ads described above), together with 75

13  Kinderstart garden-related links. Google is not running any AdWords ads on

14  Kinderstart.com, only AdSense ads, which are not keyword-targeted ads in response to

15  any search term.

16

17      80..    AdWords is an "Essential Facility" because it has not been able to be

18  duplicated, competitively, by Yahoo or MSN, and the cost of even trying to do so is an

19  estimated $25-$50 billion dollars (with Google having spent $7-$8 billion in acquisitions

20  so far) and having reached in excess of $10 billion in revenues for 2006. MSN

21  (Microsoft) announced that it was setting aside almost $2 billion to attempt to compete

22  with Google's AdWords. See ¶¶ 49-A to 49-II above for an analysis of the barriers to

23  entry. Specifically. (i) the Plaintiff competes with Google and Google controls

24  AdWords, an Essential Facility; (ii) the Plaintiff cannot duplicate that facility, nor can

25  anyone else over the past years; (iii) Google has denied Plaintiff reasonable, non-

26

27

28

1   discriminatory use of the Essential Facility for the purchase of keyword-targeted ads by

2   the Plaintiff, at non-discriminatory prices fixed by auction (and not by Google)) and has

3   denied Plaintiff and (upon information and belief) all other website owners (other than

4   AOL and MySpace) any use of the Essential Facility for the website owner to sell and

5

6   place keyword targeted ads by third-party advertisers on the owner's own website(s) for

7   visitors conducting website or Internet searches from the websites; and (iv) Google could

8   feasibly have granted Plaintiff the use of the Essential Facility for both desired uses on a

9   reasonable, non-discriminatory basis.

10

11       81.     Unless Google is required to let users use its Essential Facility on equal

12  terms, Google will be depriving Plaintiff and other website owners of the opportunity of

13  building their internet businesses (such as Plaintiff's classified advertising websites,

14  myclads.com and attydb.com, Plaintiff's late-fee avoidance website, now located at

15  lawmall.com/latefees and other websites for creating traffic) and other website-supported

16  interests (such as Plaintiff's efforts to run for and obtain political office).

17

18       82..    Not only does Google prevent Plaintiff from bidding for keyword-targeted

19  advertising on a non-discriminatory (and wholly prohibitive basis), Google also prevents

20  Plaintiff and other website owners from selling AdWords to their visitors and makes

21  them settle for letting Google place its low-value, low-income AdSense ads on the

22  website. This means that when Google owns a website, it can and does use its AdWords

23  system to extract huge amounts of money for itself from the traffic created by the

24  website, but when the same website is owned by someone else, such as Kinderstart.com,

25

26  Google pays a mere fraction of the revenue to Kinderstart.com for placing AdSense ads

27  on Kinderstart.com.

28

83.:    Google is engaged in two types of exclusion of the Plaintiff and other

website owners from use or non-discriminatory use of Google's AdWords Essential

Facility. The first is Google's refusal to let Plaintiff and (upon information and belief)

about 95% or more of all other PPC advertisers from using AdWords on a non-

discriminatory basis. Google is charging most of its AdWords customers prohibitively

high prices as alleged above, for the reasons set forth above. Secondly, AdWords is not

permitting website owners to turn their website traffic into money at (competitively-

created values) through sale and placement of ads on the owners' websites using the

AdWords Essential Facility, where the advertising revenues are huge, being based on

competition among advertisers for use of highly-specific, targeted keywords. Instead, the

website owners have to settle for a small fraction of the market-value amount obtained by

Google on its AdWords ads, by having to accept the lower-paying, less-effective, non-

targeted AdSense, banner or context ads.

84...    Google's purpose in not giving Plaintiff and others reasonable access or

any access to its AdWords Essential Facility is to foreclose competition in the business of

developing website traffic and monetizing (or converting to market-value revenue) the

website traffic for the benefit of the website owner, and to reduce the value of websites to

their owners and enable Google to purchase or otherwise acquire them at less than their

fair market value in a non-monopolized market.

85.,    Because Google's AdWords facility is an Essential Facility, the Plaintiff is

entitled to make use of it on reasonable, non-discriminatory terms.

86..    Plaintiff has been denied this access, both as to non-discriminatory

purchase (through AdWords auction) and placement of keyword-targeted ads

displayed with the results of Google searches on websites owned by others, and as to the sale and placement of keyword-targeted AdWords ads on Plaintiff's websites, using the AdWords Essential Facility, with Plaintiff as the seller of the key-word targeted advertising (and recipient of revenue on a reasonable, non-discriminatory basis, comparable to the income being received by MySpace.com).

87.. Google's withholding of both types of use (on reasonable terms) of its Essential Facility is a violation of § 2 of the Sherman Act.

88.. News Corp. / Fox Interactive Media (FIM) and its wholly-owned website MySpace.com, and substantially all of the nation's other 2,500 largest corporations, including media companies Time Warner and NBC Universal, which are victims of copyright infringement by Google (upon its acquisition of YouTube), but are intimidated by Google's internet monopoly (the Essential Facility) from bringing infringement lawsuits against Google for fear of losing the possibility of monetizing their website traffic, which because of Google's monopolizing activities now require Google's consent (as was recently given to News Corp.'s FIM/MySpace.com interests); but by agreeing to permit Google to infringe their copyrights, these corporations are giving up the value of their copyrights for the opportunity to obtain monopolist Google's consent to and participating in the monetizing of the huge existing website traffic. This is an anticompetitive consequence of Google's monopolistic activities.

## PLAINTIFF'S INJURIES AND DAMAGES

89.. By reason of Google's activities as alleged above, the Plaintiff (and each of others similarly situated) has suffered the following antitrust injuries and damages:

1

2      **Plaintiff's Antitrust Injuries**

3          A.     Denial of Google's AdWords facility to monetize Plaintiff's 10

4      Community Search Websites (with damages being the loss of money from website

5      traffic; the loss of capital value for the websites; the loss of borrowing power for the

6      websites; the reduction of compound growth effect for the websites; and the loss of

7      market share for Plaintiff in the market of monetizing Community Search Websites; and

8      a decline in Plaintiff's willingness to innovate with additional websites if the ability to

9      

10     adequately monetize their traffic is not available);

11         B.     Google's removal of low-priced keywords from the keywords available to

12     Plaintiff, even though most or all of such keywords were available for less than 1-cent per

13     click to ebay (with damages being the inability to obtain website traffic and a permissive

14     email list at Google's stated low price of 1-cent per click; Google had no business

15     

16     justification for holding back such key words other than to force Plaintiff and others into

17     bidding for higher-cost keywords, which was an illegal controlling of the price of

18     keywords);

19         C.     Google's requirement that Plaintiff pay up to 50 times or more Plaintiff's

20     desired 1-cent bid, even though ebay was paying less than 1-cent per bid for low-value

21     keywords; and the related requirement by Google that Plaintiff have the same

22     clickthrough rate as ebay to be able to be able to obtain Google's advertised lowest 1-cent

23     per click price; Google had no business justification for its ad quality and landing page

24     requirements because it is not possible for many advertisers to have better advertising

25     copy; the user clicking on an ad does not see the landing page until after the clickthrough

26     takes place; and Google's stated reason to provide a better quality experience for persons

27     

28

1    clicking on Google ads rings hollow because as long as the advertisers pays Google the

2    demanded tribute Google will allow the alleged low quality experience to take place.

3        D..    Google's systematic failure to include all advertisers bidding for use of a

4    keyword, by routinely leaving one or more of the lowest bidders (such as the Plaintiff) off

5    the list of bidders whose search advertisements are displayed together with the keyword

7    search results, for the purpose of not having to give the lowest bidder the automatic 1-

8    cent (or previously 5-cent) per click price, when Google's technology allows placement

9    of, and Google does sometimes place, at least 16 pages of ads (at 10 ads per page).

10    (Plaintiff is injured by being denied the opportunity to place his search advertising at

11    Google's lowest per-click price, thereby depriving Plaintiff of a low-cost opportunity to

12

13    obtain a website visitor, potential client, book purchaser, or an addition to Plaintiff's

14    permissive email mailing list.

15        E..    Google's monetization of selected Community Search Websites (including

16    Google's acquired YouTube.com) through sharing of Google's Search Advertising

17

18    placed on the websites, while refusing to enter into an agreement with Plaintiff for the

19    sharing of Google's Search Advertising revenues on any of Plaintiff's 10 Community

20    Search Websites, amounting to highly discriminatory website-traffic monetizing practices

21    by Google favoring competitors of Google and Plaintiff. (Plaintiff is injured by being

22    unable to monetize his Community Search Website traffic, with the same consequences

23

24    as alleged above).

25        F..    Forced to pay monopolistic charges to Google for use of Google's

26    monopolizing AdWords Search Advertising system to build website traffic, but denied

27    use of the same facility to monetize the website traffic (and obtain payback for the

28

developed website traffic at the monopolistic rate enjoyed by Google) after paying

Google for building the traffic;

G.    Deprived of a market to sell successful (high-traffic websites) at the value

they represent to Google because the only company that can monetize website traffic at

such high rates is Google, so that Google has the ability to outbid any possible purchaser

and prevent the development of a market for monetizing websites. In fact, to suppress

such market, Google acquired during April, 2007 the number one competitor

(DoubleClick.com) in the market of monetizing websites through the substantially

inferior system of context or display (or banner) advertising.

**Plaintiff's Damages (in addition to damages described in A-G above)**

H..    Moneys paid to Google by the Plaintiff as an AdWords advertiser

($1,466.67);

I..    Moneys paid by the Plaintiff to develop various websites and create

website traffic using AdWords and other search services (approximately $15,000);

J..    Ongoing loss of the monetary value of website traffic for Plaintiff's 85 to

90 websites ($10,000,000 or more, depending on the success of Plaintiff's 10 Search

Websites starting with myclads.com and attydb.com); and

K.    Loss of the value of an email list of 1,000,000 members that could have

been built by Plaintiff under his business plan to use low-demand Google keywords, at a

cost of 1 cent per click, but for the illegal activities of Google (estimated at more than

$1,000,000).

90..   Upon information and belief, the total provable damages suffered by Plaintiff amount to more than $11,000,000, and will be proven with certainty at the time of trial.

## PRELIMINARY AND PERMANENT INJUNCTION

91..   The activities of the defendant are continuing and threaten to prevent Plaintiff from being elected as the New York Attorney General during the November 2010 elections, and any other political offices the Plaintiff may seek between now and 2010.

92..   If the Plaintiff is not able to enjoin Google from its predatory pricing activities, as alleged, the Plaintiff will suffer irreparable injury by not being able to compete for (or win) the election for New York Attorney General or any other offices which the Plaintiff plans to seek.

93..   Plaintiff is entitled to (i) a preliminary injunction to enjoin Google from its alleged predatory practices during the pendency of this litigation; and (ii) a permanent injunction to enjoin Google from the same predatory practices. as part of the relief in the final judgment in this action. Specifically, without limiting the injunctive relief being sought, Plaintiff seeks an injunction or mandatory injunction

A..   Requiring Google to provide access to Google's AdWords system (the Essential Facility) on reasonable, non-discriminatory terms, as to both the purchase and placement of AdWords keyword-targeted Internet, pay-per-click advertisements.  as well as the sale and placement of AdWords keyword-targeted, pay-per-click advertisements on Plaintiff's own websites (in response to Google-powered website and web searches

conducted by visitors from Plaintiff's websites) with Plaintiff receiving a reasonable, non-discriminatory percentage of the revenues derived from such advertising.

B.. Requiring Google to let Plaintiff and other advertisers pay the lowest available price per click as determined by Google's auction process without any adjustment of the price by Google to reflect "quality", "landing page", clickthrough rate

of the advertiser or any other advertisers using the same or similar keyword;

C.. Requiring Google to charge the same price or same position price (either per-click price or price per 1,000 impressions) to all advertisers seeking to use a specific keyword;

D.. Requiring Google to let advertisers use any English words (other than illegal words due to obscenity, copyright, trademark, secrecy or similar laws); and

E. Requiring Google to list in its website all words not available to any AdWords advertiser.


**OTHER RELIEF SOUGHT**

94.. The Plaintiff is entitled to an award of treble damages.

95.. The Plaintiff is entitled to an award of attorneys' fees.

96. Plaintiff is entitled to a judgment as to liability against Google for violation of § 2 of the Sherman Act by reason of the facts alleged in ¶¶ 1 through 93 above.

1

2                                    **COUNT II**

3    **[Violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 – Attempting to Monopolize –**
     **Alternative Allegation to Count I Claims]**
4

5          97..    Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-96

6    above, and further alleges, alternatively to Count I above, that Count II is being brought

7    under § 2 of the Sherman Act, 15 U.S.C.A. § 2 for attempted monopolization of the

8    Relevant Markets and Submarket.

9
     **Attempted Monopolization by Google (Alternative Allegation)**
10

11         98..    Alternatively, by its actions as alleged, Google demonstrates that it has a

12   dangerous probability of achieving monopoly power (to control prices and exclude

13   competition) in these alleged service markets in the United States geographic market

14   (defined in ¶ 44 above):

15         A.     Search Advertising market;

16         B..    Submarket of monetizing the traffic of Community Search Websites
17
     through use of Search Advertising; and, alternatively, if the market turns out to be "all
18
     Internet advertising" and not "Search Advertising"; and
19

20         C..    Market for monetizing the traffic of Community Search Websites through

21   the use of Internet Advertising.

22

23         99..    Google has a specific intent to control prices in each of the Relevant
24
     Markets and Submarket and to destroy competition and unreasonably restrain trade in
25
26   such markets, evidenced by

27

28   –

                                           48

A..    Google's acquisition of the patents, know-how, software copyrights, management and employees of the following companies listed in **Exhibit A** hereto that related directly to the improvement of Google's search engine, AdWords, AdSense or marketing thereof: acquisition ## 2 (Outride), 4 (Neotonic), 5 (Applied Semantics), 6 (Kaltix), 7 (Sprinks), 10 (Baidu), 13 (ZIPDash), 15 (possibly, 15 undisclosed companies or asset acquisitions), 17 (Urchin), 23 (AOL 5% interest), 28 (orion advanced text search algorithm), 30 (Neven), 31 (MySpace monetization agreement), 32 (Jot Spot), 33 (YouTube), 35 (Xunlei), 37 Trendalyzer), 38 (DoubleClick), 39 (Performics), 40 possibly some of numerous foreign subsidiaries);

B..    Google's acquisition of direct competitors in the Internet Advertising Market: 38 (DoubleClick), 23 (AOL 5% interest), 31 (MySpace monetization agreement), 33 (YouTube, competitor in the market for monetizing Community Search Websites; and

C..    each of the anticompetitive activities alleged in ¶¶ 50-72 above.

100..    Google engaged in predatory or anticompetitive conduct directed to accomplishing the illegal purpose of monopolizing and unreasonably restraining trade in each of the Relevant Markets and Submarket, as follows: the anticompetitive activities alleged in ¶¶ 50-72 above.

101..    Google has or had a dangerous probability of success in its attempt to monopolize the Relevant Markets and Submarket for the reasons and evidence described in ¶ 99-A through ¶ 99-C above.

1

2

102. Plaintiff suffered causal antitrust injuries by reason of the following anticompetitive activities of Google: as described in ¶¶ 89A through 89-K above.

3

4

103. The only two significant challengers to Google's AdWords business are Yahoo and Microsoft/MSN, but neither has a database of search pages, or a number of

5

6

daily searches, or the dollar amount of advertising revenue or profits to be able to stop

7

Google's growth and ever-increasing power in the relevant market.

8

9

104. Google is engaging in predatory and anticompetitive activities as alleged in ¶¶ 50-72 and 89-A through 89-K above.

10

11

105. The barriers to entry are so high (see ¶¶ 49-A through 49-I] above) that

12

there appear to be only two actual or potential competitors (Yahoo and Microsoft/MSN),

13

but without any demonstrated ability to put together a team with the know-how to

14

compete effectively against Google. Google's team consists of Google's founders and

15

controlling shareholders of Google, people who cannot be purchased with Microsoft's

16

billions in unused cash reserves. Nobody has the databases to compete with Google and

17

even if they did they may not have the money to purchase and manage 450,000 servers to

18

be able to produce search results in a fraction of a second.

19

20

106. Through its activities as alleged, Google is attempting to monopolize the

21

Relevant Markets and Relevant Submarket described in ¶ 98 above, with a dangerous

22

probability of being able to achieve success in monopolization of the alleged markets and

23

submarket, in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 and during the

24

relevant period for this litigation actually acquired power over each of such markets.

25

26

107. Plaintiff has been damaged as a result and is suffering from continuing and

27

irreparable damages as alleged in ¶¶ 89-92 above.

28

108. Plaintiff is entitled to a preliminary and permanent injunction as described above in ¶¶ 93-A through 93-E.

109. Plaintiff is entitled to treble damages under the Sherman Act, together with reasonable attorney's fees and costs.

## PRAYER

WHEREFORE, the Plaintiff demands judgment against Google, as follows:

1. As to Count I, that it be adjudged and decreed that the activities of Google constitute a violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 (as illegal monopolizing, and combining to monopolize the Relevant Markets and Relevant Submarket defined in ¶ 98 above);

2. As to Count II, that it be adjudged and decreed that the activities of Google constitute a violation of § 2 of the Sherman Act, 15 U.S.C.A. § 1 (as an illegal attempt to monopolize the Relevant Markets and Relevant Submarket defined in ¶ 98 above);

3. Awarding damages in favor of the Plaintiff, in an amount of $11,000,000 or more, which will be proved with certainty at the time of trial;

4. Awarding trebled damages to the Plaintiff as to each of Count I and Count II.

5. Awarding attorneys' fees to the Plaintiff as to each of Count I and Count II, to the extent the Plaintiff has used the services of any attorneys;

6. Enjoining Google, preliminarily and permanently, as to each of the anti-competitive practices described in ¶¶ 50-72 above;

1    7.    Granting the Plaintiff such other and further relief as this Court may

2    deem just and proper.

3

4                    **Jury Demand**

5        Plaintiff hereby demands a trial by jury of all issues properly triable to a jury

6    pursuant to Rule 38(b) of the Federal Rules of Civil Procedure

7    Dated:    New York, New York

8                April 15, 2007

9

10

11                    Carl E. Person

12                    Plaintiff, *Pro Se*
                    325 W. 45th Street - Suite 201

13                    New York, New York 10036-3803
                    (212) 307-4444

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Exhibit A

## (Google's acquisitions from 2001 to 4/13/07)

1.. Deja. 2/01 (Usenet archive database consisting of 500 million messages, including

threads and poster email addresses. dating back to 1995)

2.. Outride Inc., 9/01 (a spin-off from Xerox PARC; Google immediately integrated

the technology into Google's search engine; in its 9/20/01 press release Google

stated:

> "Google Acquires Technology Assets of Outride Inc. - Transaction
> Complements Google's Technology Development To Provide Search Results
> with Greater Relevance - Google Inc. today announced the company's acquisition
> of the intellectual property, including patent rights, source code, trademarks, and
> associated domain names. from Outride Inc.. a Redwood City, Calif.-based
> developer of online information retrieval technologies. ... "This acquisition is
> another example of Google's commitment to providing the highest quality search
> service in the world," said Larry Page, Google co-founder and president,
> Products. "Outride has made significant advances in the field of relevance
> technology and we believe Google provides the ideal vehicle to continue the
> development of these technologies." Outride. a spin-off from Xerox Palo Alto
> Research Center (PARC), was created to apply state-of-the-art model-based
> relevance technology to the challenge of online information retrieval. Outride's
> technologies were designed to enhance productivity from end-users by
> simplifying the ability to find the right information at the right time. * * * With
> the largest index of websites available on the World Wide Web and the industry's
> most advanced search technology, Google Inc. delivers the fastest and easiest
> way to find relevant information on the Internet. [source:
> http://www.google.com/press/pressrel/outride.html]

3.. Pyra Labs / Blogger, 2/03 (a weblogging provider and owner of *Blogger*. with 1

million subscribers at the time of acquisition, subsequently built up by Google to be

one of the most-used blogging tools) As stated in a 2/18/03 *Forbes* article:

> With its acquisition of Pyra Labs. Web-search juggernaut Google.com apparently
> sees dollar signs in the business of letting anyone easily publish their comments
> and thoughts on the Web.
>
> Blogging. as it's often called. has become. in the last year. a trendy Web toy for

53

the stream-of-consciousness set. Pyra's Blogger, with more than a million users, allows users to write and publish online almost as quickly as a thought strikes.

As yet the only statement from Google has been a few terse sentences. "Blogs are a global self-publishing phenomenon that connect Internet users with dynamic, diverse points of view while also enabling comment and participation. * * *" [source: http://www.forbes.com/2003/02/18/cx_ah_0218google_print.html]

4.. **Neotonic Software**, 4/03 (to bring Google's Customer Relationship Management (or "CRM") technology in-house; CRM software with application for customizing homepages, to automate and manage customer followup);

5.. **Applied Semantics**, 4/03, $102 million (eventually becoming Google AdSense; context-sensitive ad company integrated into Google's AdWords/AdSense to enable Google to compete with Yahoo's Overture). In its 4/23/03 press release "Google Acquires Applied Semantics - New Technologies and Engineering Team Complement Google's Content Targeted Advertising Programs", Google announced:

> that it acquired Applied Semantics, a Santa Monica, Calif.-based producer of software applications for the online advertising, domain name and enterprise information management markets. Applied Semantics' products and engineering team will strengthen Google's search and advertising programs, including its fast-growing content-targeted advertising offering. * * *
>
> "Applied Semantics is a proven innovator in semantic text processing and online advertising," said Sergey Brin, Google's co-founder and president of Technology. "This acquisition will enable Google to create new technologies that make online advertising more useful to users, publishers, and advertisers alike."
> Applied Semantics' products are based on its patented CIRCA technology, which understands, organizes, and extracts knowledge from websites and information repositories in a way that mimics human thought and enables more effective information retrieval. A key application of the CIRCA technology is Applied Semantics' AdSense product that enables web publishers to understand the key themes on web pages to deliver highly relevant and targeted advertisements.

6.. **Kaltix**, 9/03 (company acquired this 3-person personalized search startup company to develop and launch *Personalized Search*). In its 9/30/03 press release entitled

1    "Google Acquires Kaltix Corp. - New Technologies and Engineering Team

2    Complement Google Search Engine", Google announced:

3

4        ... it acquired Kaltix Corp., a Palo Alto, Calif.-based search technology start-up.
         * * * "Google and Kaltix share a common commitment to developing innovative
5        search technologies that make finding information faster, easier and more
         relevant," said Larry Page, co-founder and president of Products at Google.
6        "Kaltix is working on a number of compelling search technologies, and Google is
         the vehicle for the continued development of this technology."
7

8        Kaltix Corp. was formed in June 2003 and focuses on developing personalized
         and context-sensitive search technologies that make it faster and easier for people
9        to find information on the web.

10   7.    Sprinks, 10/03 (acquired to enhance Google's AdWords and AdSense programs). In

11   a 10/24/03 article entitled "Google Acquires Sprinks: Gains Access to Advertiser

12   Base and Ad Placement on About.com and Primedia Online Publications",

13   traffick.com stated [source: http://www.traffick.com/2003/10/google-acquires-

14   sprinks-gains-access.asp]:

15

16       Sprinks, an innovator in the pay-per-click keyword-targeted ad space, is no more,
         following an acquisition by category leader Google, Inc.
17

18       Sprinks ads currently show up on 450 topic-specific About.com Guide Sites as
         well as 127 magazine-related websites targeting readers of major Primedia
19       publications.

20       As part of the deal, Google has signed a four-year revenue-sharing agreement to
         show ads on these sites.
21

22       In the area of so-called contextual pay-per-click ads (ads near relevant content,
         not triggered by search results), Sprinks had been a recent thorn in the side of the
23       industry leaders, Google, Overture, and Findwhat. Its ContentSprinks offering
         gave advertisers superior "channel control" than the often unpredictable
24       contextual ads shown by its competitors. It's not clear if the acquisition will lead
         Google to rethink how it shows some of its contextual ads.
25

26       According to Marshall Simmonds, Director of Search for Primedia and
         About.com, the two parties have set a 45-day integration schedule to integrate
27       Sprinks staff into Google and after which Google AdWords ads will begin
         showing on Sprinks' former network.

28

Case 5:06-cv-07297-JF    Document 24    Filed 12/08/2006    Page 56 of 70

As for how the integration might affect Google's approach to contextual advertising, Simmonds says: "It's difficult to speculate. The main thing is that Google will now have access to our large network of topically-relevant sites."

8.  Genius Labs, 10/03 (a second weblog provider)

9.  Ignite Logic, 4/04 (a company building websites for law firms, adding to Google's

Case 5:06-cv-07297-JF    Document 47-4    Filed 04/30/2007    Page 57 of 70

expertise in distributed computing and extending Google's distributed computing platform)

10.  Baidu, 6/04, $5 million (2.6% ownership in the leading web search firm in China, a competitor of Google; China is the 2nd largest internet market; sold for $60 million in 6/06)

11.  Picasa, 7/04 (picture management tools for *Blogger*)

12.  Keyhole, 10/04 (to provide the core mapping capabilities in Google Earth)

13.  ZipDash, 9-12/04 (to develop and launch Google Ride Finder). A 3/30/05 SiliconBeat article in the *Mercury News* discussing Google's secret, non-reported acquisition revealed:

> Zipdash "... tackles highway congestion by providing individuals with real-time, accurate traffic information." Some of the technology is/was intended to allow mobile phone users to get real-time traffic info using the GPS in their phones.
>
> UPDATE: A Google spokesman got back to us to confirm both acquisitions, which he said were made because of the companies' "talented engineers and great technology." He declined to comment further.

14.  Where2 LLC, 9-12/04 (to provide the core mapping capabilities in Google Maps)

15.. 9 companies and substantially all of the assets of another 6 companies, during

2005, for a combined purchase price of $131 million (according to Google's 10-K

filing)

16.. 2Web Technologies, 2004/2005 (spinoff of ITK Software, key part of Google's plan

Case 5:06-cv-07297-JF    Document 47-4    Filed 04/30/2007    Page 58 of 70
to develop and launch Google Spreadsheets to compete with Microsoft, acquired

spreadsheet team}

17.. Urchin Software Corporation, 3/05, $30 million (web analytics and statistics

technology used to develop and launch Google Analytics).  In John Battelle's

3/28/05 Searchblog, Battle quoted from Google's press release and commented on

the acquisition [source: http://battellemedia.com/archives/001360.php]:

> ... [the release stated that Google] "has agreed to acquire Urchin Software
> Corporation, a San Diego, California based web analytics company.
>
> "Urchin is a web site analytics solution used by web site owners and
> marketers to better understand their users' experiences, optimize
> content and track marketing performance. Urchin tools are available as
> a hosted service, a software product and through large web hosting
> providers. These products are used by thousands of popular sites on the
> Internet.
>
> "Google plans to make these tools available to web site owners and
> marketers to better enable them to increase their advertising return on
> investment and make their web sites more effective.
>
> "'We want to provide web site owners and marketers with the
> information they need to optimize their users' experience and
> generate a higher return-on-investment from their advertising
> spending," said Jonathan Rosenberg, vice president of product
> management, Google. "This technology will be a valuable addition to
> Google's suite of advertising and publishing products.'" [end of release]
>
> So this is interesting on a number of levels. Urchin was a third party system that
> many used to understand their Google ads, among others. As part of a Google
> suite of tools, it will take on a decidedly different cast. More as the word trickles
> out. BTW, I was told by the tipster that the price was $30 million.

Case 5:06-cv-07297-JF    Document 47-4    Filed 04/30/2007    Page 59 of 70

18.. Dodgeball, 2/05 (a 2-person cell phone social networking software provider for mobile devices)

19.. Current Communications Group, 7/05 (Google together with Goldman Sachs and Hearst Corporation invest $100 million; an investment in a company which provides broadband services through power lines)

20.. Akwan Information Technologies, 7/05 (part of plan to open an R&D office and expand Google's presence into Latin and South America) [one of 3 companies acquired by Google for $22.5 million]

21.. Reqwireless, 7/05 (web browser and mobile email software developer for wireless devices, as part of Google's initiative to develop a version of Gmail for the mobile device) ) [one of 3 companies acquired by Google for $22.5 million]

22.. Android Inc., 8/05 (software provider for mobile devices) ) [one of 3 companies acquired by Google for $22.5 million]

23.. Time Warner's AOL division, 12/05, $1 billion (for 5% stake, in a competitor of Google, which also enabled Google to run its Search Advertising alongside the search results for AOL website visitors; an example of how Google is monetizing the website of a competitor (in which Google purchased a 5% interest) and could monetize Plaintiff's websites if it chose to do so;

24.. **DMarc Broadcasting**, 1/06, $102 million plus additional maximum of $1.136 billion (creator and operator of an automated platform that lets advertisers more easily schedule, deliver and monitor their ads over radio, and radio broadcasters to automate schedules and advertising spots)

25.. **Measure Map**, 2/06 (from Adaptive Path, a product to help with Blog analytics) On his first day at work for Google, the acquired team leader stated:

> Our goal has been to use the power of web analytics to help bloggers feel that same sense of connection with their audience. Today, as the Measure Map team joins Google, our mission remains the same: to build the best possible user experience so people can understand and appreciate the effect their blogs - their words and ideas - can have. * * *
>
> Bringing Measure Map to Google is an exciting validation of the user experience work I've been doing with my partners at Adaptive Path for years. By opening up the app to more bloggers through Google, we hope to help even more people become passionate about their blogs.

26.. **Writely**, 3/06 (company with online word processing program of same name, to enable Google to offer a free application to undermine competitor Microsoft's market share for word processing programs)

27.. **Sketchup**, 3/06 (using a plugin, this program allows one to place 3D models into Google Earth)

28.. **Orion**, an advanced text search algorithm, 4/06 (from inventor Ori Allon, an Israeli-born student at the University of New South Wales in Australia; The advanced text-search algorithm...will make searches much less time-consuming; instead of finding pages on the net that contain keywords, then providing links, the new search engine will provide expanded text extracts which will eradicate the need

1 to open every link. Orion has sparked interest from the likes of Google and Yahoo,

2 with Google acquiring the rights to the algorithm)

3

4 29.. GTalkr, 5/06 (web-based, Flash-based IM client focused exclusively on interfacing

5 with Google's GTalk)

6
7 30.. Neven Vision, 8/06 (company that specializes in biometric identification, to make it

8 easier for Google's Picasa to organize and search for photos)

9

10 31.. MySpace, 8/06, $900,000,000 minimum over 3-1/4 years for licensing use of

11 Google's search engine, keyword-targeted AdWords advertising system and

12 advertiser database (the "AdWords Platform") by MySpace and other News

13 Corporation's Fox Interative Media ("FIM") (competitors of Google); with all

14 revenues from use of the AdWords Platform being paid to FIM until $900,000,000

15 minimum is received by FIM; the licensing includes, upon information and belief,

16 the non-exclusive licensing of use of various patents owned by Google; an example

17 of Google permitting FIM, a favored customer (and competitor of Google in

18 monetizing website traffic), to use the Essential Facility for the essential purpose of

19 monetizing YouTube's traffic, and dividing the revenues by agreement between

20 Google and competitor FIM

21

22 32.. JotSpot, 10/06 (an application Wiki company to offer enterprise social software:

23 product is targeted mainly to small and medium-sized businesses; company was

24 founded by Joe Kraus and Graham Spencer, co-founders of Excite)

25

26

27

28

33.. YouTube, 11/06, $1.65 billion in stock (online video sharing website, with company retaining its brand), an example of Google using its Essential Facility to monetize YouTube's traffic, but only after it was acquired by Google; upon information and belief, the agreement eliminated $ billions of copyright infringement liability or potential liability that YouTube.com had to FIM/Murdoch;

34.. Endoxon, 12/06, $28 million (an Internet and mobile mapping solutions developer)

35. Xunlei, a Chinese company, 1/07, non-disclosed price (buys a stake in company, a person-to-person file sharing service);

36.. Adscape, 2/07, $23 million (video game advertising);

37.. Trendalyzer, 3/07, undisclosed price (data visualization software as a management tool for use with AdWords and by AdWords advertisers, upon information and belief); 3/16/07 blogspot.com stated:

> Google decided to acquire the technology from Gapminder. "Gathering data and creating useful statistics is an arduous job that often goes unrecognized. We hope to provide the resources necessary to bring such work to its deserved wider audience by improving and expanding Trendalyzer and making it freely available to any and all users capable of thinking outside the X and Y axes." says Marissa Mayer.

38.. DoubleClick, 4/07, $3.1 billion (the leading online advertising company with annual revenues of $300 million, enabling its customers to turn website traffic into money through labor intensive online display advertising, but to a much lesser extent than Google is able to do with Google's Search Advertising system with an 8% cost of sales; with an auction market for online advertising; Google outbid Microsoft; enables Google to move into online advertising market where Google had no

presence; purpose of acquisition is to stifle Microsoft's competition; see 4/14/07 *NY Times* article which states "Acquiring DoubleClick expands Google's business far beyond algorithm-driven ad auctions into a relationship-based business with Web publishers and advertisers. Google has been expanding its AdSense network into video and display ads online and is selling ads to a limited degree on television.

newspapers and radio."). Google's own lengthy FAQ concerning the acquisition [published at http://216.239.57.110/blog_resources/DC_FAQ.pdf] is compelling evidence supporting Plaintiff's allegation that context advertising is a different market from Search Advertising, as follows:

* * * "We see this acquisition as bringing the worlds of search and display advertising together. ... DoubleClick currently has approximately 1,200 employees. [p.1]; ... we will provide additional monetization opportunities and efficiencies to maximize their {AdSense publishers'] revenue. ... The acquisition will give advertisers more targeting and buying options and will provide maximum reach for their target audience.... Working with DoubleClick, we will make online text and display advertising more targeted and relevant for the user and therefore more valuable to the advertiser. ... provide additional revenue potential while letting them focus more on creating and maintaining websites that appeal to users. Upon closing, DoubleClick publishers will then have access to our large base of advertisers. ... When done properly, advertising can be useful and provide relevant information at the precise moment when a user is interested in acquiring a service or product. Working with DoubleClick, we are confident that advertisers and agencies will apply that principle to display advertising across the web to not only benefit advertisers and publishers but also [p.2] to ensure a high quality and relevant online experience for users. ... DoubleClick has thousands of clients. There is some overlap with Google's current client base. We believe this offers synergies for advertisers and publishers to place the right ad at the right time to the right user, using both text and display advertising. ... increasing productivity and profitability ...[p.3] Working with DoubleClick, we will increase the relevance of ads online so that we maintain a positive user experience while provid[ing] targeted ad opportunities for advertisers and increased monetization for publishers. ... The majority of Doubleclick's business is in the United States.... Q. Is this acquisition a response to the minimal traction Google has made thus far on brand advertising efforts? A. No. it's an opportunity to

Case 5:06-cv-07297-JF    Document 47    Filed 04/30/2007    Page 64 of 70

combine our business with the complementary capabilities DoubleClick has to offer. Doubleclick and Google will be able to offer a better, more comprehensive experience than either company could offer alone – for advertisers, publishers, and ad agencies. ... This partnership is an obvious opportunity to expand our ads business and have a positive impact on our search users in the process... Q. Given Google's technology expertise, why is it necessary to acquire Doubleclick? A. DoubleClick offers a unique opportunity to acquire capabilities that are complementary to Google's existing business. Q. How does this acquisition broaden Google's market opportunity? A. This acquisition represents a tremendous opportunity for Google to accelerate our display advertising business and to broaden and deepen the inventory available to all [p.4] advertisers. Advertisers will have the data, tools, and reporting they need to grow their search and display advertising spend. In addition, currently unsold publisher inventory will become more readily available and also contribute to growth in advertising revenues. Q. Do you believe this acquisition will stifle competition? A. No, we do not believe this acquisition is anti-competitive, as it promotes a vibrant, healthy market for online advertising. ... We do see the opportunity to monetize more types of inventory as a large opportunity and will address this opportunity through some combination of our existing initiatives and DoubleClick's existing initiatives. Performics is part of DoubleClick, and we are acquiring it as part of the transaction. [p.5]

39.. Performics, a company purchased by DoubleClick in May 2004 for $58-65 million

(search engine marketing and affiliate marketing products), acquired by Google

when acquiring DoubleClick during 4/07;

40.. Google's foreign subsidiaries (listed in Google's 2006 Annual Report), some of

which (upon information and belief) involve acquisitions by Google of competitors,

technology, patents and other assets which any would require expense to offset by

any Google competitor in the United States [source:

http://www.searchenginejournal.com/googles-30-us-subsidiaries-googles-

international-companies/4481/]:

    Aegino Limited : Ireland
    @Last Software, Ltd. : United Kingdom

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

At Last Software GmbH : Germany
allPAY GmbH : Germany
bruNET GmbH : Germany
bruNET Holding AG : Germany
bruNET Schweiz GmbH : Switzerland
Endoxon Ltd. : Switzerland
Endoxon (India) Private Ltd. : India
Endoxon Prepress AG : Switzerland
Endoxon (Deutchland) GmbH : Germany
Google (Hong Kong) Limited : Hong Kong
Google Advertising and Marketing Limited : Turkey
Google Akwan Internet Ltda. : Brazil
Google Argentina S.R.L. : Argentina
Google Australia Pty Ltd. : Australia
Google Belgium NV : Belgium
Google Bermuda Limited : Bermuda
Google Bermuda Unlimited : Bermuda
Google Brasil Internet Ltda. : Brazil
Google Canada Corporation : Nova Scotia, Canada
Google Chile Limitada : Chile
Google Czech Republic s.r.o. : Czech Republic
Google Denmark ApS : Denmark
Google Finland OY : Finland
Google France SarL : France
Google Information Technology Services Limited Liability Company : Hungary
Google Germany GmbH : Germany
Google India Private Limited : India
Google International GmbH : Austria
Google Ireland Holdings : Ireland
Google Ireland Limited : Ireland
Google Israel Ltd : Israel
Google Italy s.r.l. : Italy
Google Japan Inc. : Japan
Google Korea, LLC. : Korea
Google Limited Liability Company - Google OOO : Russia
Google Mexico S. de R.L. de C.V. : Mexico
Google Netherlands B.V. : The Netherlands
Google Netherlands Holdings B.V. : The Netherlands
Google New Zealand Ltd. : New Zealand
Google Norway AS : Norway
Google Payment Ltd. : United Kingdom
Google Payment Hong Kong Limited : Hong Kong
Google Payment Singapore Pte. Ltd. : Singapore
Google Poland Sp. z o.o. : Poland
Google Singapore Pte. Ltd. : Singapore

Google South Africa (Proprietary) Limited : South Africa
Google Spain, S.L. : Spain
Google Sweden AB : Sweden
Google Switzerland GmbH : Switzerland
Google UK Limited : United Kingdom
Neven Vision KK : Japan
Neven Vision Germany GmbH : Germany
Leonberger Holdings B.V. : The Netherlands
Reqwireless Inc. ; Ontario, Canada
Skydocks GmbH : Germany

# Exhibit B

## CARL E. PERSON, ATTORNEY AT LAW

325 W. 45ᵗʰ St. – Suite 201
New York NY 10036-3803
Phone 212-307-4444
Fax 212-307-0247
carlpers@ix.netcom.com

**REGISTERED MAIL RRR**

April 15, 2007

Eric Schmidt, Chief Executive Officer
Google, Inc.
1600 Amphitheatre Parkway
Mountain View CA 94043

Dear Mr. Schmidt:

This letter is being sent to you pursuant to (a) § 1782(a)(2) of the California Civil Code and (b) judicial decisions concerning the antitrust "Essential Facilities" doctrine under § 2 of the Sherman Antitrust Act, which require that a demand be made as a condition to pursuing certain claims against Google, Inc. ("Google"). Simultaneously, I am sending a copy of this letter to your attorneys, Messrs. Wilson Sonsini Goodrich & Rosati (David H. Kramer, Esq.).

The first of my two demands, made pursuant to § 1782(a)(2) of the California Civil Code, is that Google, Inc. cease all of the following activities of Google prohibited by § 1770 of the California Civil Code [contained in ¶ 228 of my revised proposed amended complaint – not yet served, in *Person v. Google*]:

(1) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is the "passing off services" [of Google] as those of another [Person]."

(2) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is "misrepresenting the source, sponsorship, approval [and] ... certification of ... services [*i.e.*, Plaintiff's or other advertiser's bid]."

(3) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is "misrepresenting the affiliation, connection, or association with, or certification by, another" as to the relationship between Google as auctioneer and Plaintiff as a bidder.

(5) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google. Such activity is "representing (falsely) that service [*i.e.*, bids by Person or others] have sponsorship, approval [and] characteristics [an amount determined by the Plaintiff and not by Google] which they do not have,...."

Eric Schmidt, Chief Executive Officer, February 12, 2007, page 2.

(7) Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google.  Such activity is falsely "representing that services [i.e., bids by Plaintiff or others]... are of a particular standard, quality, or grade [i.e., made at a price selected by the Plaintiff or others],...."

(9) Google's advertising that AdWords is an auction market is the "Advertising [of] ... [auction] services with intent not to sell them as advertised".  Such activity is illegal because of Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts
determined by Google.

(10) Google's advertising that AdWords is an auction market for keywords is the "Advertising [of] ... [auction] services with intent not to supply reasonably expectable demand [for keywords]. unless the advertisement discloses a limitation of quantity".  Such activity is illegal because Google is withholding numerous keywords from the auction market, to force higher winning bids for the keywords allowed to be sold at its auctions.

(13) Google states that it is adjusting keyword prices upwards for some advertisers and downward for other advertisers based on Google's subjective analysis of the quality of the advertiser's advertisement and landing page. in comparison to others. This is the "making [by Google of] false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions" given to some (e.g., Ebay) and not to others (such as the Plaintiff, and other disfavored advertisers). This is especially so because Google is comparing the clickthrough rates of dissimilar but competing advertisers (i.e., Plaintiff in running for Attorney General was seeking to use some of the keywords used by eBay to sell books, and misrepresenting to advertisers that they could improve their clickthrough rate in comparison to eBay or equivalent by working on their ad and landing page when in fact this was not necessarily so. Google has been falsely representing to advertisers that they can and should create better landing pages and ads to obtain clickthrough rates of advertisers selling wholly unrelated products and services.

(16) Google's auction results, based on the foregoing, are "representing that the subject of a transaction [i.e., a keyword auction] has been supplied in accordance with a previous representation when it has not." Google's alleged auction market is not an auction market at all. It is a price-fixing market where prices are set by Google, in a variety of ways, without telling advertisers. Google's manipulation of the auction market has resulted in the fixing of prices at artificially high levels and requiring advertisers such as the Plaintiff and other disfavored advertisers to pay per-click prices 50 times more than the click-through price paid at the same moment by advertisers who are offering non-competitive goods and/or services to searchers using a specific keyword.

(17) By reason of Google's manipulation of its auction market, Google has been falsely "representing that the consumer will receive a rebate, discount, or other economic benefit" by participating in Google's keyword auctions, under Google's terms and conditions, including the making of changes to the advertiser's ads and landing pages. Google has no way of knowing if the advertiser's present ads are as good as they can be, for the type of product or service being offered, and Google forces most of its advertisers, including the Plaintiff [and other disfavored advertisers], to keep making changes to the ads to achieve a non-obtainable result (of making the market for live elephants as large as the market for books on elephants).

(18) By not explaining how an advertiser can bargain with Google for lower rates (in the way that eBay is obtaining, upon information and belief. a price of about one-half a cent per click, 50% lower than Google's lowest advertised price per click). Google is "misrepresenting the authority of a salesperson. representative, or agent to negotiate the final terms of a transaction with a consumer." Google is representing there is no authority on the part of any Google employee to negotiate lower terms for advertisers when in fact there is, but this is not made known to the vast majority of AdWords advertisers.

Eric Schmidt, Chief Executive Officer, February 12, 2007, page 2.

(19) By requiring the Plaintiff [and other disfavored advertisers] to commence their lawsuits against Google in Santa Clara County, California as a condition to using Google's AdWords, Google has "insert[ed] an unconscionable provision in the contract." Also, by subject advertisers to making ad and landing-page changes to obtain, possibly, lower per-click rates, when Google is comparing ads and landing-page performances of wholly different types of businesses (such as sale of live elephants v. sale of books on elephants), Google has "insert[ed] an unconscionable provision in the contract." Google is fully aware that a seller of live elephants cannot sell as many elephants as a book seller can sell books on elephants, and as a result that the efforts to change ads and landing pages put many advertisers, including the Plaintiff [and other disfavored advertisers], through needless and useless expense chasing an objective (the same clickthrough rate for different types of business wanting to use the same keyword) that Google knows cannot be obtained.

(20) Through Google's intervention in the bidding process to require the Plaintiff [and other disfavored advertisers] to bid amounts determined by Google, Google is "advertising that a product is being offered at a specific price plus a specific percentage of that price unless (I) the total price is set forth in the advertisement...." This is so because Google is advertising that an AdWords advertiser with the best landing page and ad will be able to obtain the lowest per-click price for a given keyword. Yes, this is not true because the best ad and landing page for the sale of live elephants will not be able to outsell the best ad and landing page for a book on elephants.

As my second demand [drawn from ¶ 248 of my proposed amended complaint], I hereby demand that Google provide me with reasonable, non-discriminatory use of Google's search engine and related AdWords advertising system (collectively, the "Essential Facility") for the purchase of keyword targeted ads by me, at non-discriminatory prices fixed by auction (and not by Google) as well as the use of the Essential Facility (including Google's advertiser database) by me, as an owner of various active websites (and additional websites under active development), to sell and place keyword-targeted ads by third-party advertisers on my websites for visitors conducting website or Internet searches from my websites. I want to have the same type of AdWords "sponsored-link" advertising appear on my website as Google is placing on www.myspace.com and on www.google.com, with the revenues paid to me on terms comparable to the terms provided in Google's agreement with the owners of MySpace.com. Also, I demand that Google license me to use the same patents Google licensed to the owners of MySpace.com on no less favorable terms.

Very truly yours,

Carl E. Person

cc:

David H. Kramer, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto CA 94304-9300

CARL E. PERSON, Plaintiff, *Pro Se*
325 W. 45th Street -- Suite 201
New York NY 10036-3803
Telephone: (212) 307-4444
Facsimile:   (212) 307-0247
carlpers@ix.netcom.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| CARL E. PERSON, | ) | CASE NO.: C 06-7297 JF (RS) |
|---|---|---|
| | ) | |
| Plaintiff, | ) | **CERTIFICATE OF SERVICE** |
| | ) | **VIA MAIL AND EMAIL** |
| v. | ) | |
| | ) | |
| GOOGLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

I, Carl E. Person, declare:

I am the plaintiff in this action and fully familiar with the facts stated herein, and make this

declaration to certify that on April 15, 2007, I served by U.S. Postal Express for postal express

delivery on

　　　　　David H. Kramer, Esq.
　　　　　Wilson Sonsini Goodrich & Rosati
　　　　　Professional Corporation
　　　　　650 Page Mill Road
　　　　　Palo Alto CA  94304-1050

addressed as per above and to David H. Kramer, Esq. by email as to the following document: 2nd

Amended Complaint dated April 15, 2007.

Executed under the penalty of perjury.

Dated: April 15, 2007

　　　　　　　　　　　　　　　　　Carl E. Person