# EXHIBIT 2

Dockets.Justia.com

1

2  CARL E. PERSON, Plaintiff, *Pro Se*
3  325 W. 45th Street – Suite 201
   New York NY 10036-3803
4  Telephone:  (212) 307-4444
   Facsimile:  (212) 307-0247
5  carlpers@ix.netcom.com

6

7                        UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9                              SAN JOSE DIVISION

10                                              ECM FILING

11  CARL E.  PERSON,                    )       CASE NO.: C 06-7297 JF (RS)
                                        )
12                         Plaintiff,   )       [PROPOSED] AMENDED AND
13                                      )       SUPPLEMENTAL COMPLAINT
                                        )
14                  v,                  )       (Jury Demand)
                                        )
15  GOOGLE INC.,                        )       CLASS ACTION
                                        )
16                        Defendant.    )       ALLEGATIONS IN COUNT XIII
                                        )       [as to Counts VIII, IX, X, XI and XII]
17

18                                  COUNT 1

19
20  [Violation of Sherman Act, § 2 - Monopolizing, Attempting to Monopolize, and Combining or
    Conspiring to Monopolize the Keyword-Targeted Internet Advertising Market]
21

22      Plaintiff, an attorney acting *pro se*, as and for his Amended and Supplemental Complaint,

23  respectfully alleges:

24                              Jurisdiction and Venue

25      1.     This controversy involves §§ 1-2 of the Sherman Act (15 U.S.C. §§ 1-2); §§ 1, 4,

26  4B, 12 and 16 of the Clayton Act (15 U.S.C. §§ 12, 15(a), 15b, 22 and 26); 28 U.S.C. § 1337; and

27  state statutes: California Cartwright Act [§ 16720]: §§ 17500-17509 of the California Business and

28

                              Exhibit E
                                 1

Professions Code: the California Unfair Practices Act, §§ 17000, et seq. [§ 17045]: California Civil

Code § 1689(b): California Consumer Legal Remedies Act, §§ 1770(a); and §§ 340, 349, 349-c, 350

and 350-e of the New York General Business Law.

2.     This Court has original jurisdiction over the federal antitrust claims under 28 U.S.C.

§ 1337(a) and 15 U.S.C. § 15(a), and supplemental jurisdiction as to the state claims alleged in Count

IV through Count XV, as hereinafter more fully appears. Also, jurisdiction for the state claims exists

under 28 U.S.C. § 1332, with diversity of citizenship between the parties, and the amount in

controversy exceeding $75,000. [A list of the 15 Counts is annexed as Schedule A.]

3.     The defendant is doing business (and, alternatively, "transacting business") in New

York State and in the Southern District of New York, which gives the Court personal jurisdiction

over the defendant, and venue in the Southern District of New York is appropriate under 15 U.S.C.

§§ 15(a) and 22, and 28 U.S.C. § 1391(b). [Note: The District Court in the Southern District of New

York decided on October 11, 2006 that the proper venue for this action is in Santa Clara County,

California, pursuant to a choice-of-venue provision in Google's agreement with the Plaintiff. The

Plaintiff disagrees with this decision - see Count IX and ⁺ 223 (19) in Count X below.]

**Plaintiff**

4.     Plaintiff, Carl E. Person ("Person" or the "Plaintiff"), is an attorney,

businessperson and consumer residing in New York, New York, with his offices at 325 W. 45th

Street, New York, NY 10036-3803.

5.     Person is over age 65 (relevant as to § 1761 of the California Civil Code and § 349-c

of the New York General Business Law) and a "consumer" as to (i) his candidacy for public office in

New York, (ii) the marketing of his numerous non-commercial, political websites to obtain visitors,

and (iii) the sporadic marketing of his politically-oriented book *Saving Main Street and Its* Retailers

to promote Plaintiff's political concept of the "Town Attorney General" (to provide local

2

1  governments an official with powers similar to an Attorney General, to enforce rights of citizens and

2  residents at public expense).

3       5A.,    Also, Person is in the business of creating websites, creating traffic (or "hits") for

4  them for the purpose of monetizing the traffic through sale of keyword-targeted, pay-per-click

5  advertising to internet advertisers, and placement of such ads on Person's websites for visitors to see

6  when conducting website or internet searches from the website. In this respect, Person is an actual or

7  potential Competitor of Google as to its AdWords keyword-targeted internet advertising system.

8  Person's websites include lawmall.com. myclads.com (for completion in April, 2007 and

9  lawmall.com/latefees or late-fees.com (for completion in May, 2007), ZIPcomplaints.com (for

10 completion in April, 2007). MyTelNos.com (for completion in May, 2007), e-listparty.org (for

11 completion in April, 2007), all designed to accommodate the sale and placement of keyword-targeted

12 ads for placement in the right sidebar for Google-powered websites or web searches made from any

13 of the websites.

14      6..     Person has used Google's AdWords (a) to market each of three books written and

15 published by Person in 2004; (b) market various websites written and owned by Person, including

16 websites designed to create legal business for Person and to sell books written and published by

17 Person; (c) to create permissive email mailing lists as a marketing medium for the foregoing and

18 other activities by Person; and (d) to market his candidacy for elective office. From 2003 to

19 September 18, 2006, Person has had 1,417.314 ads presented to Google users in a total of 20

20 campaigns, and has paid Google a total of $1.466.67 for a total of 3.533 user clicks at an average

21 cost of $.42 per click, and a clickthrough rate ranging from a high of 3.09% to a low of zero %

22 according to Plaintiff's records maintained by AdWords.

23      7..     Person ran. unsuccessfully. for the office of Attorney General of New York State

24 during 2006. On May 20, 2006. Person received 40% of the Green Party nominating convention vote

25 for the New York Attorney General nomination, which was insufficient.  Person then became an

26 independent candidate for the same office, but was unable to get on the ballot. Google's activities in

3

depriving Person of the advertised and promised price per click for AdWords advertising was a contributing factor to Plaintiff's failure to get on the ballot.

8..     Person's activities as an attorney, businessperson, consumer and candidate for statewide public office in New York have made him (since November, 2003) a customer (no. 894-537-6549) of defendant Google Inc. as to Google's "AdWords" advertising services offered by Google in its website, at www.adwords.google.com.

## Defendant

9..     Defendant, Google Inc. ("Google"), is a Delaware corporation incorporated in 2002 with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

10..     Google is doing business in New York, with a place of business in the Southern District of New York at 437 Fifth Avenue - 8th Floor, New York, New York 10016: and, alternatively, Google is "transacting business" in New York State and in the Southern District of New York.

11..     A description of Google's business, as described at page 57 (under "Business - Overview") in its Form S-1 Registration Statement filed with the Securities and Exchange Commission on April 29, 2004, follows:

> Google is a global technology leader focused on improving the ways people connect with information. Our innovations in web search and advertising have made our web site a top Internet destination and our brand one of the most recognized in the world. We maintain the world's largest online index of web sites and other content, and we make this information freely available to anyone with an Internet connection. Our automated search technology helps people obtain nearly instant access to relevant information from our vast online index.
>
> We generate revenue by delivering relevant, cost-effective online advertising. Businesses use our AdWords program to promote their products and services with targeted advertising. In addition, the thousands of third-party web sites that comprise our Google Network use our Google AdSense program to deliver relevant ads that generate revenue and enhance the user experience.

4

11A.: The AdWords ads (identified by Defendant as "sponsored links") are displayed to the right of (as a 4-line ad) and sometimes above (as a longer, 3-line ad) the search results displayed by Defendant in response to a Google searcher's search term. AdWords advertisers are required to participate in an electronic auction in which the potential advertisers bid as little as \$.01 up to \$100 to be paid to Defendant each time a searcher clicks on the advertiser's ad. The auction determines the position of the various ads with the top position going to the highest bidder and the lowest (least

favorable) position going to the lowest bidder. Any one advertiser could be bidding on as little as 1 keyword up to many (or even tens of) thousands of active keywords during a period of several hours or days. AdWords supplies ads with the search results for about 300 million searches per day, and any one advertiser with thousands of active keywords could obtain many tens of thousands of clicks per day (to the advertiser's designated website "landing page") at a cost as low as \$.0) per click, if the advertiser concentrates on advertising as the lowest bidder (by selecting the keywords having little or no demand).

11B.. Pay-per-Click pricing is advertised by Defendant to be a way of advertising in which the risk of loss is transferred from the advertiser (such as the risk of loss in cost-per-impression advertising in newspapers, magazines, radio, television and billboards) to the advertising medium, which only charges if the ad produces a response (i.e., a "click").

11C.. To determine which ads get the best placement, Defendant has created an auction system, with the advertiser bidding the highest amount getting the best ad position (and, it is expected, a higher return for the advertiser's advertising dollar). See https://adwords.google.com/select/afc/pricing.html for Google's explanation of how its auction pricing system works. It fails to disclose the extent to which Google's Quality Score is used to require or demand that small-business advertisers increase their bid many (up to 100) times (or more) higher than the bid of advertisers with high CTR's.

11D.. All AdWords advertisers have assented to essentially the same terms and conditions as the Defendant's AdWords Advertiser Agreement and agree to be bound to Defendant and all other

1  advertisers by the manner in which the auction for ad position and auction price takes place

2  (including any rules that enable larger advertisers to get better positions and lower prices than

3  smaller advertisers, such as the Plaintiff, seeking use of the same keywords.

4      11E.    An industry analyst (ClickZ Expert Kevin Lee, article dated 12/09/05) confirms

5  Plaintiff's allegations (e.g., see ¶¶ 49-52 below) that Defendant is now charging its AdWords per-

6  click advertisers on the rate they would have been paying on a "CPM" (cost-per-thousand-

7  impressions basis), saying: "Google's AdWords system is agnostic when the choice is between a

8  CPM or CPC ad because the AdRank score is a predicted effective CPM"

9

10 http://www.clickz.com/showPage.html?page=3569251

11

12                          Summary

13     11F..    Google has created through its own efforts, together with numerous acquisitions of

14 technology companies, a unique wholly automated facility (the "Essential Facility") for the

15 conversion of website traffic into almost immediate monetary revenues through an auction process

16 for selling online keyword-targeted advertising of website advertisers for display to users of a variety

17 of Google search engines together with the search results, with payment for the advertising at a per-

18 click price set by auction or Google. Google is using this system (a) to purchase high-traffic websites

19 for substantially less than they are worth to Google - to enable Google alone to extract the full value

20 of the traffic using Google's AdWords system; (b) to license favored high-traffic websites such as

21 MySpace.com to obtain such monopolistic advertising revenues in a revenue-sharing arrangement

22 with Google; (c) denying the use of the Essential Facility (see ¶ 12 below) to Plaintiff and 99.999%

23 of the other websites in the geographic market of the United States, including Kinderstart; and (d)

24 offering a low-revenue wholly inadequate alternative called "AdSense" to Kinderstart, Plaintiff and

25 99.999% of the other websites, which does not use the searcher's keywords to determine relevance

26 for the advertiser or the auction process to determine and create maximum value for the sale of the

27 advertising by the website owner.

28

6

11G.. Also. Google is fixing the price of its AdWords auctions by requiring Plaintiff and the other disfavored AdWords advertisers to pay 50 to 100 times more than the favored advertisers such as eBay.com as a condition to using the auction system. so that eBay.com pays as little as one-half a cent per click (upon information and belief) and the Plaintiff often pays, or would be required to pay. 50 cents or $1.00 or more per click for advertising displayed at the same time in response to a single User's search request using the keyword for which the simultaneous auction was held.

**Definitions**

11H.. The following terms shall have the meaning set forth below, or in a paragraph to which reference is made:

A.. "AdSense" – defined and distinguished from AdWords in ¶¶ 11F, 71-J, 117B. and 120 below. On 12/15/06. CNNMoney.com (David Kirkpatrick, Fortune senior editor) in an article entitled "Can Yahoo catch Google?" stated that keyword-targeted advertising [e.g.. AdWords] gets a 10% or 20% clickthrough rate whereas conventional banner ads (not keyword based [e.g.. AdSense]) have a clickthrough rate not exceeding 1%. Also, the article states that "Today Google overwhelmingly dominates the search business."

A.. "Essential Facility" - defined in ¶ 12 below.

B.. "Five Product/Service Submarkets"- defined in ¶ 12B below.

C.. "Website Traffic Monetizing Market" - defined in ¶¶ 12 and 12A below.

D.. "Google Competitors" – Google competes with Yahoo Search Marketing. MSN Ad Center. 7Search and other search engines offering pay-per-click advertising. but the competition is ineffective and Google has a monopoly in the "Website Traffic Monetizing Market". and "Five Product/Service Submarkets". making Google's AdWords business an Essential Facility. both as to advertisers seeking to advertise on internet (in competition with Google) through pay-per-click advertising (including Plaintiff and Kinderstart – with at least one keyword: "kindergarden") and as to all website owners (including the Plaintiff) attempting or potentially attempting to create websites

7

and increase and monetize the traffic on their websites in competition with Google (including Plaintiff and Kinderstart).

     E.  "Relevant Market" - defined in ¶ 12 below.

     F.  "Relevant Submarkets" - defined in ¶ 12A below.

     G.  "User-Designated Information Databases" shall refer to databases referred to by Google under names or descriptions such as: "Internet"; "Website"; "Find on this site" or Google Free web search"; "Google Free SafeSearch"; "Google Free web search with site search"; "Google Free customizable" searches; Google "Public Service Searches"; Google "Wireless Searches"; "Google Mini" searches; "Google Search Appliance" searches "across virtually all the information in your company"; Google searches triggered by use of any of Google's plug-in compatible desktop or other applications, features or options; and intra-company searches using "Google Enterprise products".

     H.  "Website Monetizing Competitor" means an individual or other entity creating and/or purchasing websites and increasing the traffic to them for the business purpose of monetizing or converting the traffic into the maximum revenues obtainable through sale of keyword-targeted advertising for display to website users who conduct any type of searches on the website (such as website searches or web searches).

## The Relevant Market and Submarkets Defined

     12.  Google has created a monopoly in the United States geographic market (the "Relevant Market") for monetizing traffic at any one or more websites through a distributed computing system enabling the auction or sale of keyword-targeted internet advertising to competing advertisers from a database of advertisers with ads triggered by the specific search words used by free or paid, online Google-powered searches, initiated by users from browsers or www.google.com or other websites, of User-Designated Information Databases, and payment for the advertising, at a price per click determined by auction and/or Google, for each click on any of the displayed ads, collected by Google on an immediate or periodic basis, from a previously-designated and current

8

source of payment for the advertiser, with the payments divided by agreement among Google, the owner of the website initiating the search, the advertiser, any agencies or brokers, and any others. Hereinafter, this described system is referred to as the "Website Traffic Monetizing Market" and Google dominates this market. Google's sytems for Website Traffic Monetizing is an "Essential Facility" needed by competitors to compete with Google. From time to time Google during past years has licensed its major competitors to use Google's system including Yahoo, MSN, AOL and News Corp./Fox Interactive Media.

12A. The Website Traffic Monetizing Market consists of the following distinct elements and product or service submarkets (the "Relevant Submarkets"):

(a) a variety of indexed information databases for search upon a user's request to the appropriate search engine;

(b) search-engine searches of indexed information bases;

(c) keyword-targeted Internet advertising displayed simultaneously with search-engine search results (with Pay-Per-Click or "PPC" pricing simultaneously set by auction and/or the owner or licensee of the search engine);

(d) a database of keyword-targeted advertisers with pre-arranged ways to make payment on a simultaneous or periodic basis; and

(e) distributed computing platform including simultaneous integrated use of each of submarkets "(a)" through "(d)" above, by which the search engine or its licensee, through the search engine's multiplicity of interconnected computers, is able to monetize traffic (i.e., convert website traffic into revenue based on advertisers' price competition for use of keywords) at any website, whether or not owned or controlled by the search engine.

12B. Hereinafter, the submarkets described in subparagraphs "(a)" through "(e)" in ¶ 12A above are hereby referred to as the "Five Product/Service Submarkets".

12C. Google is unlawfully using its monopoly power over the Website Traffic Monetizing Market and each of the Five Product/Service Submarkets, through anticompetitive practices.

9

including (A) the refusal to permit website owners such as Plaintiff and Kinderstart to monetize their respective website traffic through use of the Essential Facility, as described while providing such website-traffic monetizing service to Google competitor Fox Interactive Media and its websites including MySpace.com; and (B) through the fixing of AdWords auction prices, in violation of §§ 1-2 of the Sherman Act, 15 U.S.C.A. §§ 1-2, by

(i) refusing to accept advertising by the Plaintiff and other small-business advertisers unless they pay usually 5 to 100 times or more per click than monopolizing and other large favored companies are charged per click by Google when bidding for use of the same keyword;

(ii) giving special deals (separate and apart from the AdWords Advertiser Agreement) to monopolizing and other major advertisers (such as eBay.com at reduced advertising rates without announcing or making available any of these special deals to the Plaintiff or other small-business advertisers (including the use of some of the removed keywords, not available to the Plaintiff or other small-business advertisers).

(iii) denying the Plaintiff and other small-business advertisers the right to use AdWords as to advertisements containing wholly lawful copy but not meeting Google's impersonal, automated and subjective review procedure that requires advertisers to rewrite, and often adversely change, their perfectly lawful copy;

(iv) removing a high percentage of all English words from the list of available keywords to force Plaintiff and other small-business advertisers to compete for and use the higher-cost keywords being used by monopolizing and other large companies; such companies are able to bid higher amounts because of their more profitable use of the per-click lead and their ability through the popularity of their name, products and trademarks to obtain a higher clickthrough rate ("CTR"); and

(v) breaching its AdWords Advertiser Agreement with, and AdWords Promises to, the Plaintiff and (upon information and belief) many hundreds of thousands of other small-business and consumer advertisers, as described in ¶¶ 172-183 below.

10

12D.  From 2001 to the present. Google has created its monopolies (as described in the preceding ¶¶ 12 and 12A-12D) by its own engineers as well as a series of acquisitions of information databases, other intellectual property, search-engine users, customers, technology, and technology teams as follows:

a.  Deja, 2/01 (Usenet archive database)

b.  Outride Inc., 9/01 (a spin-off from Xerox PARC; Google immediately integrated the technology into Google's search engine)

c.  Pyra Labs / Blogger, 2/03 (a weblogging provider and owner of *Blogger*, subsequently built up by Google to be one of the most-used blogging tools)

d.  Neotonic Software, 4/03 (to bring Google's CRM technology inhouse)

e.  Applied Semantics, 4/03, $102 million (context-sensitive ad company integrated into Google's AdWords/AdSense to enable Google to compete with Yahoo's *Overture*)

f.  Kaltix, 9/03 (company acquired to develop and launch *Personalized Search*)

g.  Sprinks, 10/03 (acquired to enhance Google's AdWords and AdSense programs)

h.  Genius Labs, 10/03 (acquired a second weblog provider)

i.  Ignite Logic, 4/04 (a company building websites for law firms, adding to Google's expertise in distributed computing and extending Google's distributed computing platform)

j.  Baidu, 6/04, $5 million (2.6% ownership in the leading web search firm in China, a competitor of Google; China is the 2nd largest internet market; sold for $60 million in 6/06)

k.  Picasa, 7/04 (picture management tools for *Blogger*)

l.  Keyhole, 10/04 (to provide the core mapping capabilities in Google Earth)

m.  ZipDash, 9-12/04 (to develop and launch Google Ride Finder)

n.  Where2 LLC, 9-12/04 (to provide the core mapping capabilities in Google Maps)

o.  9 companies and substantially all of the assets of another 6 companies, during 2005, for a combined purchase price of $131 million (according to Google's 10-K filing)

p.  2Web Technologies, 2004/2005 (spinoff of ITK Software, key part of Google's plan to develop and launch Google Spreadsheets to compete with Microsoft; acquired spreadsheet team)

q.  Urchin Software Corporation, 3/05 (web analytics and statistics technology used to develop and launch Google Analytics)

r.  Dodgeball, 2/05 (a 2-person cell phone social networking software provider for mobile devices)

s.  Current Communications Group, 7/05 (Google together with Goldman Sachs and Hearst Corporation invest $100 million)

t.  Akwan Information Technologies, 7/05 (part of plan to open an R&D office and expand Google's presence into Latin and South America) [one of 3 companies acquired by Google for $22.5 million]

u.  Reqwireless, 7/05 (web browser and mobile email software developer for wireless devices, as part of Google's initiative to develop a version of Gmail for the mobile device) ) [one of 3 companies acquired by Google for $22.5 million]

v.  Android Inc., 8/05 (software provider for mobile devices) ) [one of 3 companies acquired by Google for $22.5 million]

w.  Time Warner's AOL division, 12/05, $1 billion (for 5% stake)

x.  DMarc Broadcasting, 1/06, $102 million plus additional maximum of $1.136 billion (creator and operator of an automated platform that lets advertisers more easily schedule, deliver and monitor their ads over radio, and radio broadcasters to automate schedules and advertising spots)

y.  Measure Map, 2/06 (from Adaptive Path, a product to help with Blog analytics)

z.  Writely, 3/06 (company with online word processing program of same name)

aa.  Sketchup, 3/06 (using a plugin, this program allows one to place 3D models into Google Earth)

bb.  Advanced text search algorithm, 4/06 (from the University of New South Wales in Australia)

cc.  GTalkr, 5/06 (web-based, Flash-based IM client focused exclusively on interfacing with Google's GTalk)

dd.  Neven Vision, 8/06 (company that specializes in biometric identification, to make it easier for Google's Picasa to organize and search for photos)

11

ee.. MySpace, 8/06, $900,000,000 minimum over 3-1/4 years for licensing use of Google's search engine, keyword-targeted AdWords advertising system and advertiser database (the "AdWords Platform") by MySpace and other News Corporation's Fox Interactive Media ("FIM"); with all revenues from use of the AdWords Platform being paid to FIM until $900,000,000 minimum is received by FIM; the licensing includes, upon information and belief. the non-exclusive licensing of use of various patents owned by Google; an example of Google permitting FIM, a favored customer (and competitor of Google in monetizing website traffic). to use the Essential Facility for the essential purpose of monetizing YouTube's traffic, and dividing the revenues by agreement between Google and FIM

ff.. JotSpot. 10/06 (an application Wiki company to offer enterprise social software; product is targeted mainly to small and medium-sized businesses; company was founded by Joe Kraus and Graham Spencer, co-founders of Excite)

gg.. YouTube. 11/06, $1.65 billion in stock (online video sharing website, with company retaining its brand), an example of Google using its Essential Facility to monetize YouTube's traffic, but only after it was acquired by Google

hh.. Endoxon. 12/06 (an Internet and mobile mapping developer)

ii.. Xunlei. a Chinese company, 1/07 (buys a stake in company, a person-to-person file sharing service)

jj.. AdScape Media, 2/18/07 Reuters news story. $23,000,000 (technology that places dynamic ads on billboards, or vending machines that appear in video games).

12E.. In addition. from 2001 to the present. Google has acquired users for Google's search engine by licensing use of its search engine to various competitors of Google including: Yahoo (ending in 2/04). AOL-Time Warner, Earthlink and FIM which agreements have enabled Google to dominate the relevant geographic and service or service/product market and submarkets defined above.

12F.. Alternatively. the relevant service or service/product market and submarkets described in this ¶ 12 above include Yahoo Search Marketing. MSN Ad Center, 7 Search, the Plaintiff, Kinderstart and other companies or individuals offering or seeking to offer pay-per click advertising and/or attempting to monetize traffic at websites owned by them

**AdWords "Auctions" Are Not Auctions; the Prices Are Set by Google by Agreement or Conspiracy with Google's Favored Customers**

13.. Google's states that AdWords pricing is derived through an "auction process" [Source: https://adwords.google.com/select/afc/pricing.html under "Bidding" heading] but such description is fraudulent because it fails to tell advertisers that most advertisers with the highest bid per click for a specific keyword are rejected by Google's secret bid system "analyzing your site

content, the content of the page displaying your ad, and other relevant factors" with favored advertisers allowed to advertise at substantially lower prices per click than the rejected advertisers were willing to pay. Google has breached its AdWords Promises to its advertisers and has breached the implied covenant of good faith and fair dealing, as described in Count VII below (¶ 171-189), which is incorporated by reference hereby.

13A. Google's evaluation process according to Google [Source: https://adwords.google.com/select/afc/pricing.html under "Calculating Price" heading] winds up giving the lowest price - of 1 cent per click - to the last ad (herein 5th ad) displayed by Google, even if the Plaintiff or other small business advertiser bid or expressed his/her willingness to pay 100 times more than any of the 5 advertisers selected by Google. The result is that Google's "auctions" are a multi-billion dollar fraud being practiced upon advertisers, Google investors, and the public.

13B. In effect, Google is selling seats on the same Internet bus to hundreds of major corporate advertisers for 1 cent per seat and to the Plaintiff and an estimated one million other small-business advertisers at $1.00 per seat (if willing to sell a ticket at all) - fully aware that the major corporations are to do business at the end of the bus ride 100 times more profitably than the business hoped to be done by the Plaintiff and other small-business advertisers.

14. A 1-cent click for one of Google's college advertisers, for example, could produce revenues to the college of $120,000 (or $30,000 per year for 4 years), whereas a $1.00 click for a small business advertiser selling a $3.00 gasoline tank cap could produce only losses, using Google's discriminatory, predatory, monopolistic pricing system. With 2,700 colleges and universities in the U.S., the annual college advertising potential for Google, when colleges increase their bid for desired keywords, is many multiples of $194,400,000 ($72,000 x 2,700).

## Background - AdWords and Pay-Per-Click Advertising

15. Overture Services, Inc., founded in 1997, pioneered "Pay-Per-Click" or "PPC" Internet advertising. Overture was acquired by Yahoo in July, 2003, and in 2005 Overture's name

13

1  was changed to Yahoo! Search Marketing Solutions. Yahoo's PPC website is at

2  http://searchmarketing.yahoo.com/. Yahoo paid $1.52 billion (after deducting Overture's cash

3  position) for Overture.

4      16.    As of the Overture acquisition in July, 2003 (closing a few months later), upon

5  information and belief, Yahoo had a 70% or dominant or monopoly interest in the developing United

6  States market and California and New York submarkets for PPC or keyword-targeted Internet

7

8  advertising.

9      17.    Google created its initial AdWords service in 2000 (starting off by managing the ad

10  campaigns for its customers) and then added software to allow customers to manage their own

11  campaigns; and in 2005 AdWords extended its advertising to targeted websites.

12     18.    By 2005, AdWords became very complicated for advertisers to handle directly

13  because of numerous tracking and analytical tools, options and "standards" requirements which

14  caused a substantial number of consultants or advertising agencies to enter the field to manage the

15  AdWords campaigns for AdWords advertisers.

16     19.    Somewhere along the way, AdWords was able to start overcharging its smaller

17  customers such as Plaintiff by imposing requirements that increased the cost to Plaintiff and other

18  small-business advertisers and made advertising by them unprofitable, while at the same time

19  reducing the cost to high-volume advertisers (generally large corporations) to increase their

20  profitability and use of AdWords. Upon information and belief, Defendant's purpose is to profit

21  from assisting large corporations to grow in market share and profitability at the expense of smaller,

22  less profitable, competitors such as the Plaintiff, and to take away sales and market share from

23  Defendant's own competitors in the keyword-targeted Internet advertising market (i.e., Yahoo and

24  Microsoft). Also, Defendant's purpose is to foreclose competition in the business of developing

25  website traffic and monetizing (or converting to revenue) the website traffic or hits for the benefit of

26  the website owner, and to reduce the value of websites to their owners and enable Google to

27  purchase or otherwise acquire them at less than their fair market value in a non-monopolized market.

28

14

19A.. From inception to the present, Google has obtained an increased market share for the keyword-targeted Internet advertising market in the United States and during the period from 2004 to the present. Google has continually increased the per-click price to the Plaintiff and other small-business and consumer advertisers while decreasing the per-click price to the largest, highest CTF advertisers including but not limited to eBay. During this period. the minimum per-click price for the favored advertisers declined by 80% or more (from $.05 to $.01 or lower. as to eBay) whereas the per-click cost to the Plaintiff (who always wanted to obtain the lowest per-click price) has increased from a minimum of $.05 per click to the Plaintiff's current average of $.42 per click. and rising. causing the Plaintiff and other small-business advertisers and consumers use AdWords less or not at all. Google's increase in market share in revenue is derived from its lower price to thousands of major (high clickthrough rate) advertisers, not just to the lower per-click prices given to eBay.

20.. Google's main source of revenue comes from its AdWords business. in which Plaintiff and other advertisers are charged on a Pay Per Click (or PPC) basis each time a searcher using the Google search engine (and using in the search term a keyword designated by a Google advertiser) clicks on the ad (hyperlink) and jumps to the advertiser's website.

21.. Keyword-targeted Internet advertising was revolutionary for advertisers because it allowed advertisers to wait until potential customers were seeking information on the advertiser's product or service before the advertiser had its advertisement displayed. and further (as to PPC advertising) that the advertiser only paid if the website searcher clicked on the ad and jumped to the advertiser's website. AdWords and Overture/Yahoo enabled advertisers to reach potential customers at the precise moment of their demonstrated interest and charge the advertiser only if the searcher clicked on the advertiser's ad. in comparison to newspaper. radio. television. cable. magazine and billboard advertising in which millions of impressions are made in the hope that 1 out of a 1,000 may be interested enough to respond to the ad.

15

22.  No other advertising medium provided such a targeted audience, and Yahoo/Overture, soon followed by Google's AdWords became near instant financial successes, with one small college, for example, spending $6,000 per month (or $72,000 per year) with AdWords.

23.  The Google and Yahoo targeted ads (when displayed in the right sidebar) are designated as "sponsored links" and consist of the 1st-line heading not exceeding 25 characters (which usually contains a Keyword), the 2nd and 3rd lines of text (not exceeding 20 characters) explaining more about the offered service or product; and the 4th line, which discloses the link to the advertiser's website or "landing page" (built into the 1st-line heading). Clicking on the 1st line of the ad enables the Google or Yahoo searcher to go to the advertiser's website to obtain more information about the offered product or service. The same ad, when appearing above the searcher's displayed results, appears as a longer, 3-line quasi-banner type ad, for which positioning and appearance the advertiser pays a per-click premium.

24.  Google advertised 5 cents as its minimum per-click price, available to the winners of the continuing Google auction for any given keyword, and a $50 per-click maximum price, and during 2005 started advertising the minimum per-click price to be 1 cent and the maximum as $100.

### Google's Predatory Activities - Part I

25.  Upon information and belief, Google has a hidden set of rules and software instructions that deny the Plaintiff and other small-business users the ability to find and use any keywords at the stated minimum price of $.01 per click or any price 2, 3, 4 or even 5 or 10 times the minimum price. These minimum prices are reserved for Google's favored, high-volume advertisers, such as eBay and the other alleged Co-Conspirators. These hidden rules and instructions include: (i) computer instructions that require small advertisers (such as Plaintiff) to pay per click at a price calculated by Defendant to make Plaintiff's advertising with a single keyword as profitable to Defendant as a major well-known advertiser enjoying a high (say 60%) click through rate by

16

Case 5:05-cv-07212 Document 62 Filed 06/23/2006 Page 17 of 37

requiring the small advertiser to pay 60 times the amount per click as the major advertiser: (ii) rules that fraudulently suggest that the small, unknown advertiser can substantially increase his/her clickthrough rate by creating an improved landing page: (iii) not telling the small advertiser that Defendant is basing its required bid from the advertiser solely on the projected clickthrough rate and not on any other significant factors: (iv) not telling the small advertiser that there is no auction at all when the small advertiser tries to bid at the lowest bid (of $.01 per click) to get his/her ad placed at the bottom of the list – Defendant merely rejects this lowest bid and does not run the ad: (v) stating that the "quality" of the ad is important to Defendant to let Defendant's search customers (called "users") to expect the ads to be relevant to their search, but at the same time allowing the same "irrelevant" ads to run if the customer pays 10 or 100 times as much, either through AdWords directly or by CPM advertising of the same "irrelevant" ad.

26.. Plaintiff has tried without success to advertise using various keywords at the minimum price set by Google and at multiples of 2, 3, 4, 5 and up to 100 times the minimum (1-cent or 5-cent) minimum price. The Plaintiff's average per-click cost is $.42, 42 times the $.01 (or 8 times the $.05) lowest per-click price being offered by Google to its AdWords advertisers.

27.. It is the click on the advertiser's ad by the Google searcher from and at which Google earns its fee from the advertiser through Pay-Per-Click advertising. The advertiser only pays for the clicks, and not for the many more instances (of ad impressions) in which the Google searcher fails to click on the advertiser's ad. It is this per-click method of pricing (instead of charging by the number of impressions) that enables Google to impose discriminatory pricing on the Plaintiff and other small-business advertisers.

28.. Google is requiring Plaintiff and other small-business advertisers to pay as much as 100 times or more per click than the amount per click paid by monopolizing and other large established advertisers who by their established name or trademark or the wholly-different product or service they are offering, are able to get a substantially higher rate of clicks (or "clickthrough rate" or "CTR") for the same number of times their ads are served up to the Google searchers.

Case 5:08-cv-07297-JF    Document 7    Filed 04/07/2008    Page 17 of 50

29.. Google offers no plan by which Plaintiff or other small-business advertiser can rent or use keywords at a fixed price (e.g. for 1,000 impressions), regardless of the type of business or regardless of the results. In other words, Google is requiring each of its advertisers to be as successful as a monopolist, and charging them substantially more (or denying them use of AdWords) if not.

29A.. Google is denying Plaintiff and other owners of 99.999% of websites in the Geographic Market the opportunity to use the Essential Facility to monetize their website traffic (at auction-determined values) while using the Essential Facility for itself and at least one other (FMI/MySpace.com) to monetize their website traffic through use of the Essential Facility. No competitor of Google has a monetizing system to provide as much as 50% of the monetized revenue and value that Google provides, so that Google has monopolistic power over the Website Traffic Monetizing Market and each of its five submarkets.

30.. Google is extending its market monopoly in this way to every aspect of business in the United States and making existing monopolies larger, turning potential monopolies into monopolies, and preventing small and new businesses from competing.

30A.. AdWords has monopoly power for a variety of distinguishing reasons alleged herein, with the result that Yahoo and Microsoft/MSN keyword-targeted Internet advertising are poor, undesirable substitutes for AdWords, producing less than 50% of the productivity and efficiency of Google's AdWords system, upon information and belief, and Yahoo and MSN being unable to overcome such deficiency by simply lowering their prices.

31.. In 2002, Google let AdWords advertisers bid on the price per click they were willing to pay for specific keywords. Later, Google required small-business advertisers to pay more per click than established-business advertisers to be able to place their ads with the selected keywords. Then, in August, 2005, Google created its "Quality" analysis to require Plaintiff and other small businesses to pay often 5, 10, 25 or 100 times more per click than many high-volume advertisers (without any cost justification).

18

31A. Google's incomplete explanation of its Quality requirement is (as of 6/14/06):

## Quality Score

This is the basis for measuring the quality of your keyword and determining your minimum bid. Quality Score is determined by your keyword's clickthrough rate (CTR) on Google, relevance of your ad text, historical keyword performance on Google, the quality of your ad's landing page, and other relevancy factors.
[https://adwords.google.com/support/bin/answer.py?answer=21388]

[And]

## A new addition to the Quality Score

In August, we introduced the Quality Score along with the launch of quality-based minimum bids, letting you know that we evaluate many factors, such as your ad text and clickthrough rate (CTR) to determine the minimum bid for your keyword. Today, we started incorporating a new factor into the Quality Score -- the landing page -- which will look at the content and layout of the pages linked from your ads.

Why are we doing this? Simply stated, we always aim to improve our users' experience so that these users (your potential customers) will continue to trust and value AdWords ads. Have you ever searched on a keyword, found an ad that seemed to be exactly what you wanted, and then clicked on it only to find a site that had little to do with what you were searching for? It's not a great experience.

Incorporating landing page assessment into the Quality Score will help us improve the overall advertising experience for users, advertisers and partners by increasing the quality of the sites we present in our ad results.

Advertisers who are providing robust and relevant content will see little change. However, for those who are providing a less positive user experience, the Quality Score may decrease and in turn increase the minimum bid required for the keyword to run. To help define site quality, we've created a general set of website design tips and guidelines that should help you evaluate and optimize your site.

So, take a look at these guidelines and remember that the more valuable and relevant your site is to your user, the more effective your advertising will be -- and the better your chance of converting a click to a customer.

Posted by Sarah, *Inside AdWords* crew

12/08/2006 02:41:00 PM -

32. By this 12/08/05 announcement, Google then started to charge Plaintiff and its other small-business advertisers an additional amount per click based on apparent human evaluation (but actually a mechanical, subjective, meaningless "evaluation") of the website "landing page" created

by the advertiser and used in the advertiser's AdWords ad, turning Google's pricing scheme into a non-auction pricing bazaar in which there are no standards to be able to determine if any specific advertiser is paying the correct price for the AdWords advertising. and leaving Google free to charge any price it wants according to the pressure that a major advertiser brings to bear upon Google (to suppress competition for desirable keywords); Plaintiff and one millions other small-business advertisers have little sway with Google, which clearly does not even grant the vast majority of our potential AdWords advertising and has established its predatory pricing scheme to intentionally discourage Plaintiff and other small-business users from using AdWords.

33. Without consulting Plaintiff or other small-business advertisers, Google has turned off most of the ads created by Plaintiff and other small advertisers and labeled them as "inactive", having the effect of upsetting the advertiser's AdWords marketing program or refuses to allow ads to be placed for a variety of reasons, with the same discouraging effect.

34. Several days after Google changed to its "Quality" and "Landing Page" method of determining keyword price, an advertising consultant for small-business Google advertisers posted a complaint, saying:

> Google continue to stun me with their lack of forward focus. The new Adwords system where a keyword is 'active' or 'inactive' is yet another money spinner for them that will send customers fleeing elsewhere.
>
> I understand that they want to ensure that adverts are highly relevant when people type search phrases but they have so got it wrong with what they've set up this time.
>
> The campaigns I run for clients are now swamped with inactive keyword phrases and Google are expecting me to raise the cost per click in line with what THEY think is right. * * *
>
> One client has an advert group of only 4 keywords, all of which refer to the company name or the url and these are highly visible in the advert that appears. And yet, Google have made them inactive, asking for an extra 1p to make them active. Those keyword phrases have no competitors in Adwords and were previously happy at 4p per click, so why the change? The advert text is highly targeted to these keywords and so there is no excuse for them to be made inactive.
>
> Another example is a client who wanted his company site to appear in an advert when someone types his name – this previously worked fine. However, Google now wants 55p per click for the keyword to be made active, presumably because his name isn't mentioned in the advert text. However, if you search on his name in Google, only two sponsored results appear and they're both for Ebay affiliates and are highly non-relevant. So, EVEN if he was positioned above these, it would have previously have cost 4p per click so why is it that Google now want to charge 55p per click when there is no competition? [Emphasis supplied.]

When I started using Adwords the system let us get away with keywords that weren't totally linked to advert text and I accepted that if that keyword didn't have a good enough CTR by 1000 impressions, it would be penalised - I had no problem with that. But now, lets see what happens under the new system ... I have a keyword phrase of 'manual handling rules' that would produce advert text of: "Risk Assessment" - "We help you to assess business risks before they become problems" * * *

So, what do Google do? They instantly make it inactive and want me to pay 11p per click to make it active. If you type 'manual handling rules' into Google you'll see that there is very little competition in sponsored search so how can Google justify me having to pay so much per click?

To me, it's really clear what Google are doing - they want to push everyone towards higher click costs and to destroy those who use niche keyword phrases. I used to have clients that got good leads through niche keyword phrases, purely because we are the optimised for them but now Google are playing God and deciding on what can and can't be displayed and for what cost.

My opinion? Small businesses won't want to play in this Google sandbox anymore and will either go to other pay per click advertisers, or will instead focus on traditional search engine optimisation - neither of which will be good for Googles profits.

The vast majority of businesses in the world are small businesses and with my clients alone I spend thousands a month on their campaign clicks. I am utterly convinced that one year ahead, Google is going to be in a pretty poor state and its market share significantly reduced.

I used to love Google, now they just make me sick. * * *

[Source: http://www.highrankings.com/forum/index.php?showtopic=16253&hl=]

## Co-Conspirators

35.. Upon information and belief, Google has conspired with the following persons (hereinafter, the "Co-Conspirators") in the creation, maintenance, growth and misuse of Google's monopoly in the United States market for keyword-targeted Internet advertising (with Pay-Per-Click pricing), who are receiving the lowest prices per click for the respective keywords being used by them in their AdWords advertising:

A.. eBay, Inc., which corporation is a competitor of Google in a variety of markets including various advertising markets; upon information and belief, eBay is a monopolist in the Internet advertising market defined by eBay's online activities (the heart of which is an auction and payment system for owners of property to offer and sell their property in a single vast, organized market); eBay, upon information and belief, is the primary advertiser of last resort for Google's AdWords advertising system, and the advertiser with the lowest price per click and the only apparent advertiser for many of the estimated tens of thousands of keywords that Google does not make available to the Plaintiff or other small-business advertisers;

21

A2..    The basis for these allegations is that the Plaintiff has observed that eBay is the only
AdWords advertiser at least 25 times more often than any other advertiser and this volume and
eBay's public recognition and popularity would entitle it to the lowest rate if it competed for such
least-favored placement through Defendant's auctions; however, eBay's ads are less relevant than
most other ads (with having only two or three forms of ad for tens of thousands of keywords); eBay
is using established trademarks as keywords (e.g., Jenga, a Hasbro trademark for a toy or game of
that name) even though Defendant does not permit its regular AdWords advertisers to use
established trademarks as keywords; with any major purchasers, one can expect eBay to seek a lower
price than the list price for its vast purchasing volume; eBay and Google are direct competitors and
apparently are engaged in a division of the market by a low-price AdWords agreement;

A3..    On March 24, 2006, the Plaintiff observed that in 33 randomly selected keywords
chosen for their probable lack of demand (problem-3. circumstantial-0, circumstances-1, create-1,
expensive-2, expansive-4, silent-2, miraculous-1, busybody-1, glowing-7, water-19, welcome-4,
tomorrow-0, today-0, history-8, matters-2, purpose-8, major-1, tip-2, prompt-2, general-1,
adjective-1, small-0, smell-1, slice-2, cached-2, pertinent-0, zero-1, mustach-1, second-0, seconds-
6, mars-8or9 and Issue-2), eBay had its ad displayed for 13 (40%) of such 33 comparatively
unwanted keywords (see bold-type words above); 7 had no ads at all (see the underlined words
above; eBay used only 2 forms of ad: (i) "Whatever you're looking for you can get it on eBay."
[apparently selected when the keyword was assessed by AdWords to be an adjective]; and (ii)
"Looking for "Matters"?  Find exactly what you want today." [apparently selected when the keyword
was assessed by AdWords to be a noun];

A2..    News Corp. / Fox Interactive Media (FIM) and its wholly-owned website
MySpace.com, and substantially all of the nation's other 2,500 largest corporations, including media
companies Time Warner, NBC Universal and Viacom, which are victims of copyright infringement
by Google (upon its acquisition of YouTube), but are intimidated by Google's internet monopoly
(the Essential Facility) from bringing infringement lawsuits against Google for fear of losing the

22

1 possibility of monetizing their website traffic, which because of Google's monopolizing activities

2 now require Google's consent (as was recently given to News Corp.'s FIM/MySpace.com interests);

3 but by agreeing to permit Google to infringe their copyrights, these corporations are giving up the

4 value of their copyrights for the opportunity to obtain monopolist Google's consent to and

5 participating in the monetizing of the huge existing website traffic:

6

7

8 A4.. Substantially all of the nation's largest 100 book publishers;

9 A5.. A substantial percentage of the nation's 1,000 businesses marketing goods or

10 services to consumers;

11 A6.. The Democratic and Republican Parties and many of their candidates for statewide

12 office in New York (including election year 2006 Attorney General candidates Jeanine Pirro and

13 Andrew Cuomo);

14 B.. Others, including Schwab & Co., John Hancock Life Insurance Co., Lexus, Honda,

15 Travelocity, Orbitz, Priceline, Expedia, Circuit City, PriceGrabber, AOLShopping, Toshiba Direct,

16 BestBuy;

17 C.. Others (to be identified) having a high volume of AdWords advertising which

18 Google allows to advertise at the lowest available PPC rates; and

19 D.. Others not presently known at this time but will be identified as Co-Conspirators

20 during discovery and pre-trial.

21

22 36.. Upon information and belief, starting in 2003 or 2004 and continuing up to the

23 present, Google has initiated communications and negotiations with various major AdWords

24 advertisers, including but not limited to monopolist eBay, to discuss Google's plan to change its

25 AdWords pricing from straight auction to the highest bidder per click to the present structure, as

26 alleged in ¶¶ 12, 13, 13A, 19, 25 and 31-32 above.

27 37.. The other predatory practices alleged in ¶¶ 25-34 above and 45-70 below also

28 increased the price per click to the Plaintiff and other small business advertisers.

23

38.    Upon information and belief, Google told the major advertisers (directly or by their reading of Google's new "Quality" and "Landing Page" requirements) that such increase in price to the Plaintiff and other small business advertisers would drive them from the market and create less competition for the keywords being used by the major advertisers, making their advertising more profitable as a result.

39.    Upon information and belief, Google is seeking to increase its sales to the major advertisers through these tactics, and reduce if not eliminate the profitable use of AdWords by the Plaintiff and other small businesses, increase Google's income, profits and of the keyword-targeted internet advertising market by giving lower prices to major advertisers; and to deprive competitors Yahoo, MSN and any others of income, profits and market share by depriving them of major, more profitable advertisers and let them service the less profitable advertisers such as the Plaintiff and other small, unrecognized advertisers.

40.    Upon information and belief, monopolist eBay and other major advertisers (including all of the alleged Co-Conspirators) agreed to Google's new pricing plan, understanding that the revised pricing plan would increase the profitability for such advertisers, and make it more costly and less profitable for small advertisers such as the Plaintiff, who would then be forced to drop out of competition for the keywords being used by the major advertisers.

40A.    Alternatively, each of the alleged Co-Conspirators not in competition with the Plaintiff (and therefore lacking a direct interest in precluding Plaintiff's competition) was enticed or coerced by Google (with a known anti-competitive motive) into knowingly curtailing competition of the Plaintiff and other small business, consumer and low-CTR advertisers, to enable the Co-Conspirators to obtain lower per-click prices and higher profits from their AdWords advertising. [See *Spectators' Communication Network Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001).]

**Relevant Period**

24

41.    The relevant period ("Relevant Period") for the antitrust claims alleged herein is the 4-year period preceding the filing of this complaint (during June. 2006) as to all claims under the Sherman Act. 15 U.S.C.A. §§ 1. et seq.: the Donnelly Act. § 340 of the New York General Business Law; and the California Cartwright Act. Cal. Bus. & Prof. § 16726. et seq. (2)].

## The Relevant Product and Geographic Markets

42.    The relevant geographic market is the United States, with a relevant geographic submarket consisting of New York State.

43.    "Keyword-targeted Internet advertising" is a relevant service submarket in which advertisers pay to have their advertisements displayed (alone or among an ordered group of ads identified as such) near the search results obtained from Internet search engine (such as the search engines of Google and Yahoo) using the keyword(s) selected by the advertiser.

44.    The displayed ads, usually containing one or more of the search terms or keyword(s) in the 1st line of the 4-line ad. are hoped to be of interest to the searcher and that the searcher will want to obtain more information by clicking on one or more of the displayed ads.

## Google's Predatory Activities - Part II

**Google's Price-Per-Click Is Set at Auction by the Highest Price
a Successful Business Is Willing to Pay for a Click, with Small
Advertisers Being Required By Google to Pay up to 100 Times More Per Click**

45.    Google charges the advertiser only when a user clicks on the ad. which means that the advertiser does not pay directly for the times that a searcher fails to click on the advertiser's ad. This statement is the essence of Google's sales pitch to induce large and small advertisers alike to use AdWords. The sales pitch is false and is false as to most small advertisers. See subparagraphs A through G of ¶ 260 below for some of Google's deceptive practices.

46. Google increases the Pay-Per-Click price to advertisers such as the Plaintiff and other small-business advertisers, by adding to the per-click price demanded by Google for each time a searcher fails to click on the advertiser's ad.

47. The effect is that large, well known companies with strong brands and established, well-known products and services, and different products and services from those offered by small businesses, are able to obtain a substantially higher percentage of clicks (perhaps a 10-50% CTR) because of their dominant, often monopolistic, market position, whereas the Plaintiff and other small-business advertisers can only obtain a low CTR such as 1% (even when their ads for new products and services run in the best position), and find that Google then denies them the opportunity to use the keyword in any Google AdWords advertising unless the Plaintiff or the other small-business advertiser agrees to pay 5, 10, 50, or even 100 times or more than the per-click price paid being the well-known, large corporate advertiser for the same keyword.

48. A successful business (sometimes being or becoming a monopoly) is able to obtain a higher percentage of clicks per 1,000 opportunities (i.e., advertising impressions) than a new, unknown business trying to establish itself or a new product or service. Google requires the unknown business to produce as much income for all of the displayed ads (ad impressions) as the successful business pays Google for the clicks it obtains from the 1,000 impressions. This is accomplished by requiring the small business or Plaintiff to pay many times more per click than the per-click price paid by the large, well-known successful advertiser, and makes it unprofitable for the Plaintiff or the other small-business advertisers to use AdWords. Google does not tell advertisers that it is requiring them to pay a CPM rate instead of a per-click rate.

49. The effect is that AdWords has become an advertising boon for the large, successful monopolizing companies, without having to compete significantly with smaller competitors. The vast majority of smaller competitors is unable to use AdWords economically, because of Google's above-described pricing policy, as well as for other illegal practices of Google, to be described under various subheadings below.

26

50.. ' This pricing scheme of Google makes it impossible for the Plaintiff and an estimated 1 million other small-business advertisers to use AdWords at all, or profitably, because the cost of the click (set at CPM rates) far exceeds the value of such click to the Plaintiff or other small-business advertiser.

51.. Upon information and belief, one million small business owners find themselves in the same position as the Plaintiff, unable to make profitable use of AdWords because of the various restrictions imposed upon them and the Plaintiff, including a substantial increase in the per-click cost over and above the per-click cost to the large corporate advertisers favored by Google.

52.. Google is forcing the Plaintiff and other small-business advertisers to be as profitable as Google's monopolizing and other large corporate customers, or pay an extremely large penalty per click if they want to use this new advertising medium in competition with the major corporations using AdWords. Such pricing activities by Google are intended to and do enable Google and its major advertisers to increase their respective market shares and profitability, and is known by Google and the major advertisers to be driving small advertisers out of the AdWords system and into the competing systems of Yahoo and Microsoft, while the major advertisers gravitate to AdWords.

53.. This activity of Google constitutes unlawful, predatory pricing in violation of §§ 1-2 of the Sherman Act, 15 U.S.C.A. §§ 1-2.

**Google Refuses to Let Plaintiff and Others Small Businesses Use Keywords Having Little or No Demand by the Large, Monopolizing Advertisers**

54.. The Plaintiff, through trial and error, found about 25 English words that when used in a Google search had no Google ads appearing (these keywords include the 7 underlined keywords in ¶ 35-A3 above).

55. Plaintiff then immediately tried to use several different lists of comparatively unwanted keywords for Plaintiff's advertising, but was advised by software response that the words were not available for keyword use.

27

1    55A.:    On or about April 5, 2006, the Plaintiff attempted to use most or all of the following

2    keywords: competition, trade association, buying group(s), purchasing group(s), advertising money,

3    advertising allowance, markdown fee(s), markdown allowance(s), fees and allowances, price

4    discrimination, Robinson-Patman, level playing field, distributor(s), distribution, independent

5    distributor(s), independent distribution, independent retailer(s), independent jobber(s), independent

6    wholesaler(s) independent WD, warehouse distributor(s), promotional fee(s), promotional

7    allowance(s), advertising promotional, advertising fee(s), predatory price(s), predatory pricing,

8    advertising program, promotional program, rebate, rebates, fees, allowances, advertising promotional

9    program, retailer(s), jobber(s), wholesaler(s), advertising rebate(s), freight allowance(s), freight

10   rebate(s), direct purchaser(s), indirect purchaser(s), direct buyer(s), indirect buyer(s), major

11   retailer(s), specialty retailer(s), top 100 retailers, top 50 retailers, top 20 retailers, failing business,

12   and competing with Wal-Mart. Google stated that most of Plaintiff's selected keywords (almost all

13   not being in any significant demand by other advertisers) were unavailable to the Plaintiff or were

14   taken away from the Plaintiff within hours or days after the advertising commenced. The Plaintiff

15   went through this routine with different sets of keywords at least 10 other times with the same

16   results.

17       55B..    On or about April 9, 2006, the Plaintiff attempted to use most or all of the following

18   keywords in support of his candidacy: Eliot Spitzer, Thomas R. Suozzi, Malachy McCourt, George

19   Pataki, Randy Daniels, John Faso, Tom Ognibene, William F. Weld, Bill Weld, Alice P. Green,

20   Joseph Dobrian, Jennifer Liese, Dr. Jon Cohen, Lieutenant Governor New York, Mary Donohue,

21   Tim Demler, David Paterson, State Controller New York, Alan Hevesi, J. Christopher Callahan,

22   NYS Republican Party, NYS Democratic Party, Conservative Part of New York State, New York

23   Right to life Party, Green Party of New York State, Libertarian Party of New York, America First

24   Party of New York State, New York State Constitution Party, Independence Party of New York,

25   New York State Integrity Party, Liberal Party of New York, School Choice Party, Socialist Party of

26   New York, Socialist Workers Party of New York, Working Families Party, Green Party election

28

1 issues. political parties New York. [and the following candidates for Attorney General:] Richard
2 Brodsky. Andrew Cuomo, Mark Green, Charlie King. Sean Patrick Maloney. Denise O'Donnell,
3 Tom Dewey, Jeanine Pirro. Dineen Riviezzo, Dan Conti. Carl Person. Rachel Treichler. [and the
4 following candidates for U.S. Senator from New York:] Hillary Rodham Clinton, Steve Greenfield,
5 Mark Greenstein. Jonathan Tasini, Bill Brenner, Kathleen "K.T." McFarland, John Spencer, Sander
6 Hicks, Steve Kaulick, Joseph Dobrian, Jeff Russell, [and the following politically-related keywords:]
7 political parties. campaign platform, campaign issues. political platform. party convention,
8 nominating convention. state committee, nominating petition, board of elections. constitutional
9 amendment, political candidates. party candidates. ballots. absentee ballots. absentee voting.
10 Congressional candidates. Assembly candidates. Senatorial candidates. Gubernatorial candidates.
11 Attorney General candidates. immigration, immigration policy. Google stated that most of
12 Plaintiff's selected keywords (almost all not being in any significant demand by other advertisers)
13 were unavailable to the Plaintiff or were taken away from the Plaintiff within hours or days after the
14 advertising commenced.
15
16     55C.  In contrast to the 13 keywords used by eBay (see ¶ 35-A3 above). the Plaintiff's
17 keywords in the two preceding subparagraphs were chosen for their high degree of relevance (when
18 appropriately limited by AdWords to users having a New York email server). whereas eBay's 13
19 keywords were selected by me as keywords that were very unlikely to have any demand; and eBay's
20 use of them was with one of two form ads: one for nouns and the other for adjectives. The Plaintiff
21 never tried to use such keywords as "bear hug". "jelly beans" and "numbskull" (probable low-
22 demand keywords provided as examples by the Plaintiff in open court in New York. but never used
23 by the Plaintiff). Plaintiff's list of 13 unwanted keywords was created to see whether there were any
24 advertisers of last resort, and Plaintiff found that eBay was using 40% of these unwanted keywords.
25 See ¶ 35-A3 above.
26
27     56.  Plaintiff's purpose of finding unwanted words was to be able to avoid having to enter
28 into an auction with anyone for keywords. Plaintiff was willing to use almost any keywords as long

as the Plaintiff could obtain their use for the minimum stated Google fee of 5 cents (later 1 cent) per click.

56A.. For Plaintiff to create an email list of 1,000,000 email addresses in 100 days (at the rate of $.01 per click). for example. he could obtain 10,000 names per day by having 1,000,000 ads displayed. and 1% of the searchers (also called "users") clicking on the Plaintiff's ad and accepting Plaintiff's offer of a free PDF copy of one of Plaintiff's three books. At the end of 100 days, the Plaintiff would have his desired list of 1,000,000 New York State email addresses. The cost of $10,000 for such list would have to be adjusted upward by the number of persons dropping off of Plaintiff's list (and requiring replacement) and the percentage of clickthroughs who wind up not subscribing to Plaintiff's list. One million ads in a single day by the Plaintiff is not impossible or impractical. Google serves up an estimated 1,500,000,000 (1.5 billion) ads each day. and plaintiff would be participating in only 1/1500 or .00067 of such ads. as to keywords not in any demand by other advertisers (other than eBay. possibly). Persons who clicked on Plaintiff's website would subscribe to Plaintiff's email list without any human assistance.

56B.. The Plaintiff's AdWords strategy as candidate for New York Attorney General was and remains to use the low-demand keywords, where the Plaintiff would be the only. or one of no more than. say. 10 advertisers. and be willing to (and desirous) of obtaining the last position in the displayed ads, as long as the Plaintiff's ad was the lowest bid and entitled to the $.01 per-click price. It makes no difference to the Plaintiff whether it takes 1,000,000 or 10,000,000 impressions to obtain 1,000 clickthroughs. From Google's standpoint, if anyone believes the keywords in question are more valuable to them than the $.01 bid by Plaintiff, they will bid up the auction price and make it impossible for the Plaintiff to obtain use of it through the auction process. and require the Plaintiff to find a replacement keyword. The Plaintiff envisioned that he would be using many hundreds of keywords simultaneously. It should be noted that eBay appears to be using perhaps 100,000 keywords simultaneously (based upon Plaintiff's determination that eBay was using 40% of keywords not in demand by other advertisers).

Case 3:06-cv-07297-SI    Document 47    Filed 04/30/2007    Page 31 of 50

57.. Plaintiff found out that Google's stated minimum fee in its auction pricing system does not apply when only one person seeks to use a given keyword. Instead of letting the Plaintiff use the unwanted keyword for 5 cents (or 1 cent) per click, Google stated that the Plaintiff could not use the word at all, and forced the Plaintiff back into an auction with major corporations for the use of keywords of interest to them, with the resulting 5 to 100 times the cost per click that Google forces Plaintiff and other small businesses to pay.

57A.. Google has taken various keywords off its AdWords auction market even if Plaintiff and other small advertisers were willing and able to pay the unconscionable per-click rates of 100 times $.01. further support for Plaintiff's allegations that Google is manipulating the market and auction prices for keywords, as part of Google's plan to drive small advertisers out of its keyword market and give discriminatory prices to major advertisers. All of this if for the purpose of Google to increase the market share and profits for Google and major advertisers at the expense of (i) Google's competitors (Yahoo and Microsoft). (ii) the major advertisers' competitors (including Plaintiff and other small advertisers). in what amounts to an unlawful combination and conspiracy among Google and its major advertisers to fix AdWords auction prices in favor of major corporate advertisers; and (iii) to make it difficult for anyone but favored advertisers to use AdWords to jumpstart traffic to newly-created websites.

58.. This practice of pulling perfectly good English words off of the keywords market to require the Plaintiff and other small businesses to bid for the keywords wanted by the large corporate. high-volume AdWords advertisers is another predatory practice by Google. and misuse of its monopoly of the market for keyword-targeted Internet advertising.

**Google Has Special Deals and Special Pricing with Monopolists and Other Major Advertisers But Does Not Notify Plaintiff or Other Small Businesses About Such Special Deals or Permit the Plaintiff to Participate in Such Deals**

59.. The Plaintiff noticed that some keywords with no use (beyond 1-2 advertisers) had a surprising presence of one advertiser, eBay. owner of another advertising monopoly. Upon

31

information and belief, this can only be explained by a special deal to make eBay the Google advertiser of last resort (at a bargain price per click, without auction – and other reasons set forth at ¶ 35-A above) when Google's discriminatory system (dedicated to chasing away small-business advertisers) apparently failed to produce any advertisers (or more than one bona fide advertiser) interested in bidding for the keywords.

60. Google is favoring advertiser eBay (over and above the favored per-click rates already being given to major advertisers) by letting eBay have extra-low per-click rates, and to do so for keywords where Google has suppressed the competition by not making the keywords available to the Plaintiff or other small-business advertisers.

61. This practice of rigging and manipulating the auction market (by not letting Plaintiff and other small businesses bid for the relatively unwanted keywords) but giving them to favored advertiser and monopolist eBay for an assumed price per click as low as 1 cent (Google's advertised lowest price per click, or even lower) is another predatory practice by Google, and misuse of its monopoly of the market for keyword-targeted Internet advertising.

**Google Prevents Plaintiff and Others from Using Keywords Profitably by Not Allowing Them to Use Lawful Advertising Copy Written by the Plaintiff/Others, and Instead to Use Copy Dictated by Google**

62. Google places a series of copy restrictions on advertisers that prevent the Plaintiff and other small-business advertisers from using lawful copy written by them and forces the Plaintiff and others to use the changes required by Google, thereby decreasing the effectiveness of the advertising, decreasing the clickthrough rate, and increasing the small-advertiser's per-click price demanded by Google.

63. These copy requirements by Google are destructive of the efforts by the Plaintiff and other small businesses to effectively use AdWords, eliminating much of the work done to create AdWords campaigns, and slow down the start of the campaigns, and ultimately (when taken together with the other predatory practices by Google) deter the Plaintiff and other small businesses from

Case 5:06-cv-07297-RMW   Document 1   Filed 03/01/07   Page 33 of 50

32

1  even thinking about using AdWords, with all of its pricing schemes, prohibitions, putting campaigns

2  on hold, and demand for higher prices per click, as well as the subjective standards and lack of any

3  name, telephone number or email address to which any inquiry or complaint can be made.

4        64..    The effect is to reduce AdWords competition for major advertisers, make their ads

5  more profitable, and jack up the AdWords per-click prices charged to Plaintiff and other small-

6  business advertisers.

7

8  **Google Stops the AdWords Campaigns of the Plaintiff and Other Small Business and**

9  **Notifies Them They Have to Pay More to Google to Resume Their Advertising Campaigns**

10        65..    Increasingly after adoption of its "Quality" and "Landing Page" programs during

11  2005-2006, Google has arbitrarily halted the AdWords campaigns of the Plaintiff and other small-

12  business advertisers and demanded a higher price per click to permit the advertising to resume.

13  AdWords never provides any analysis of the competition's per-click price or clickthrough rate or the

14  specific tests or rules used to evaluate the advertising of Plaintiff and other small business advertisers

15  in purported justification for Google's actions. This fact enables the Plaintiff to conclude and allege

16  that part of Google's pricing increases go substantially beyond any stated intention by Google to

17  require Plaintiff and other small business advertisers to pay. Instead, Google has decided without

18  announcement to require small-business advertisers to pay a CPM price for the clicks they receive in

19  a dollar amount equal to the per-click price received by major advertisers for the number of clicks

20  they obtain. In effect, Google is fraudulently and deceptively charging small business advertisers the

21  same price per impression as being paid, in effect, by the higher-volume advertisers who obtain 50 to

22  80 times more responses per thousand impressions than Plaintiff and the other small-business

23  advertisers. See subparagraphs A through G of ¶ 260 below for some of Google's deceptive

24  practices (incorporated by reference hereby).

25

26        66..    Under this new pricing structure, Google started to charge the Plaintiff and other

27  small businesses a substantially higher price per click than was being paid by Google's largest

28  customers, such as monopolist eBay. The new price per click to the Plaintiff and other small

33

businesses was raised so that the price for the number of clicks obtained by the Plaintiff or other small business advertisers was equal to the price paid by a major advertiser who for the same keyword obtained, say, 10 times the number of clicks. This raised the per click price to the Plaintiff and other small business advertisers to 1,000% of the existing price per click, without changing the per-click price to Google's major, favored advertisers.

**Google Has Decided to Maximize Its Profits by Catering to Large, Successful, Monopolizing Corporations and, through Predatory Pricing Practices, by Discouraging Plaintiff and Other Small Businesses from Using AdWords**

67.    Upon information and belief, Google has decided to target, and is targeting, its AdWords services to large, successful and/or monopolizing corporations to maximize Google's revenue and profits; and as a by-product to actively discourage the Plaintiff and other small businesses from using AdWords by a variety of predatory practices, as alleged. This is a major part of Google's scheme to use its monopoly of the keyword-targeted Internet advertising market to participate in the profits of major corporations and monopolies and for Google to help them obtain monopoly or increased monopoly status, and increased profits and monopoly profits, and to take away customers, sales, market share and profits from Google's competitors Yahoo and Microsoft.

68.    The willingness by major corporations to stop servicing their smaller business customers (independent wholesalers, jobbers and retailers) and charge substantially higher, if not confiscatory prices to their small business customers is not new. The toy and game industry in the 1970's stopped sending salespersons to its smaller retail customers, and instead instructed them to telephone in any orders they wished to place; the tire industry is charging its smaller retailers and wholesalers two or three times as much per tire as they charge to the major retailer competitors with the result that an ever-increasing percentage of tires is being sold by fewer and fewer retailers; the auto-parts manufacturers in the United States are being driven into bankruptcy (37 since January 1, 2004) by giving below-cost pricing to major auto-parts retailers and charging twice as much to the

smaller. independent auto-parts wholesalers. There was only one such filing by and auto-parts manufacturer during 2003. [Source: *Business Week*, 10/10/05, p. 40]

69,. When discriminatory pricing is charged by a manufacturer in a competitive industry, the disfavored customer still has choices. But in the instant market, for keyword-targeted Internet advertising there is not much choice. Google has a monopoly, and controls pricing, terms, and whether the Plaintiff and other small businesses are able to make any use of AdWords to compete with AdWords' large corporate customers.

70. The practices of Google as alleged in ¶¶ 12, 13, 13A, 19, 25-34 and 45-70 above are predatory and are in violation of §§ 1-2 of the Sherman Act, 15 U.S.C.A. §§ 1-2.

**Additional Facts Supporting Allegation of Google's
Monopoly Including a $50 Billion Dollar Barrier to Entry**

71,. In addition to the facts alleged in ¶¶ 23-70 above, the following facts support Plaintiff's allegation of Google's monopoly:

A. Google has a technical team with its secret know-how that enables Google to increase its market share over the only two present significant competitors (Yahoo and Microsoft/MSN Ad Center – "MSN").

B. Microsoft/MSN's dedicated effort, huge cash reserves and other resources, up to this moment, have not been able to purchase or develop any team capable of effectively competing with Google's search-engine business and related AdWords keyword-targeted Internet advertising business. Until May 2006, Microsoft/MSN partnered with Yahoo, but in May 2006 MSN began offering its own keyword-targeted Internet advertising, and upon information and belief the cost of Yahoo, MSN or any other company trying to become competitive with Google (from the standpoint of being able to monetize website traffic within a competitive dollar amount or value) is about $50,000,000,000, based on Google's revenues, acquisitions, physical structure, software, personnel, top management ownership, commanding industry lead, and monopolistic position, among other factors.

35

C.. Yahoo until recently was a licensee of Google's search engine and has now switched to licensing an inferior engine (created years earlier by Inktomi), which means that Yahoo will not be able to compete with Google unless it solves the problem faced by Microsoft (of creating a team able to compete with Google's team, and to be able to commit the necessary funds, amounting to about $50 billion).

D.. Google has the fastest search engine of all competing search engines with indexes, algorithms, software and systems to deliver the search results (and accompanying AdWords ads) substantially faster than any other search website can locate and display its search results;

E.. Google has 46.3% of all internet searches conducted at more than 60 search sites [source: http://searchenginewatch.com/reports/article.php/2156451];

F.. Google has the world's largest and most comprehensive collection of information online - 8.1 billion pages, compared to Microsoft's 5.0 billion pages, Yahoo's estimated 4.2 billion pages and Ask Jeeves' or Ask's 2.5 billion pages [Source: http://blog.searchenginewatch.com/blog/041111-084221]. Plaintiff's 6/16/06 Yahoo search for "movie cameras" found 26,200,000 pages, whereas Plaintiff's 6/16/06 Google search using the same phrase found 86,800,000 pages or more than 3 times as many pages;

G.. Overture created the keyword-targeted Internet advertising market but lost its initial domination of the market to Google, because of superiority of Google's databases and software development and other factors;

H.. Google's income is derived mainly from its AdWords business and is more than 71% (2004) and more than 75% (2005) of all income obtained from keyword-targeted Internet advertising of all competitors (based on the figures set forth in the next 2 paragraphs); upon information and belief, in 2006 Google an even higher percentage of overall keyword-targeted income than it obtained in 2005, and that the percentages of Yahoo and MSN are undergoing substantial declines. The reason is that AdWords is substantially more profitable for advertisers and easier and less time-consuming to use than the PPC advertising of MSN and Yahoo:

36

I..    Google's revenues from sale of keyword-targeted Internet advertising amounted to $3.189 billion during 2004 and $6.139 billion during 2005 (without adjustment for the small percentage of income derived from Google's CPM (cost per 1,000 impressions) sales of AdSense advertising). in comparison to Yahoo's sale of keyword-targeted Internet advertising amounting to an estimated $1.3 billion during 2004 and an estimated $1.97 billion during 2005. [Estimate assumed 50% of Yahoo's total sales excluding "traffic acquisition cost") or ("TAC").]

J..    Prior to and during 2004-2005, Microsoft/MSN had no independent revenues from keyword-targeted Internet advertising. so that a substantial part of Microsoft/MSN's revenues are included in Yahoo's revenues.

K..    Google's capitalization during late 2005 was $126.7 billion ($428/share) in comparison to Yahoo's capitalization. of $59.7 billion ($42/share). making Google more than twice as valuable as Yahoo. and during 2006 the capitalization difference grew substantially. enabling Google to make acquisitions more readily than any of its competitors (e.g.. YouTube).

L..    Google states in its S-1 Registration Statement filed April 29. 2004 that Google is the largest of the companies in that market: and that the only other company known to Google is Yahoo (with its purchased Overture search business):

M..    The only company publicly stating that it is going to try to challenge Google (and not even mentioning Yahoo) is one of the largest monopolists. Microsoft, showing that there is a need for huge amounts of capital to challenge Google with only 2 challengers for control of Internet.

N..    Google states in its S-1 Registration Statement that it has a variety of intellectual properties upon which its AdWords technology is based. including patents, trademarks, copyrights. know-how. backed by numerous secrecy agreements: this also includes the know-how in finding, indexing and storing web pages and using hundreds of thousands of servers to speed up information processing and distribution by simultaneous use of many interconnected computers for a single search.

Q. Google is using predatory practices (described in ¶¶ 12, 13, 13A, 19, 25-34 and 35-70 above) whereas its strongest competitor, Yahoo, and new competitor, Microsoft/MSN, do not appear to be using such predatory practices; [Note: during 2006, Yahoo Search Marketing announced its "Panama" program which appears to be an effort to follow AdWords in its discriminatory practices.]

Case 5:06-cv-07297-JF    Document 4-5    Filed 04/30/2007    Page 39 of 50

R. Yahoo attempted to compete with eBay recently and found that it could not, and gave up its eBay-type Internet activities, suggesting that Yahoo will not be able to continue its competition with Google.

Q. Google admits that it has not advertised its AdWords service to any significant extent, and was able to build this monopoly by reason of its existing search business (which itself is perhaps the most effective advertising medium in the world);

R. eBay, a major competitor or potential competitor in other product/service markets, is one of Google's top customers for AdWords advertising services;

S-1. Google is practicing price discrimination that makes some purchasers (such as the Plaintiff) pay up to 100 times more per click than other purchasers (large companies) because of the lack of any alternative market; Google is to increase its per-click price for Plaintiff and a million other small-business AdWords customers 2, 10, 25, 50 even 100 times the price per click Google is charging its most-favored customers. But the profitability to an advertiser is in the click, and it is unreasonable and unconscionable to charge small business advertisers 2, 10, 25, 50 or 100 times the price per click when their expectations for profit is substantially less than the profit being obtained by the high-volume advertiser from one click for the same keyword.

S-2. Online advertising is causing U.S. daily newspapers to lose advertising revenue and threatening traditional U.S. daily newspapers with extinction ["Online Publishing Insider", 6/8/06]; newspapers are attempting to re-create themselves as online newspapers; and in the UK, online advertising revenues already exceed newspaper advertising revenues [Source: http://news.stepforth.com/2006-news/May31-06.html].

38

Additional Facts (from New York Times Article of 6/8/06):

T. Building a computing center in The Dallas, Oregon as big as two football fields, with twin cooling plants protruding four stories into the sky which, according to The New York Times, is Google's "weapon in its quest to dominate the next generation of Internet computing"

U. Such new plant "heralds a substantial expansion of a worldwide computing network handling billions of search queries a day and a growing repertory of other Internet services"

V. The new plant " is the backdrop for a multibillion-dollar face-off among Google, Microsoft and Yahoo that will determine dominance in the online world in the years ahead"

W. Microsoft and Yahoo have announced that they are building big data centers upstream in Wenatchee and Quincy, Wash., 130 miles to the north. But it is a race in which they are playing catch-up. Google remains far ahead in the global data-center race, and the scale of its complex here is evidence of its extraordinary ambition

X. Even before the Oregon center comes online .... "Google has constructed the biggest computer in the world, and it's a hidden asset."

Y. Microsoft stunned analysts last quarter when it announced that it would spend an unanticipated $2 billion next year, much of it in an effort to catch up with Google.

Z. Google is known to the world as a search engine, but in many ways it is foremost an effort to build a network of supercomputers, using the latest academic research, that can process more data — faster and cheaper — than its rivals.

AA. "Google wants to raise the barriers to entry by competitors by making the baseline service very expensive."

BB. In March 2001, when the company was serving about 70 million Web pages daily, it had 8,000 computers.... By 2003 the number had grown to 100,000.

CC. Today ... [t]he best guess is that Google now has more than 450,000 servers spread over at least 25 locations around the world.

DD. Microsoft's Internet computing effort is currently based on 200,000 servers, and the company expects that number to grow to 800,000 by 2011 under its most aggressive forecast, according to a company document.

EE. Yet it is the way in which Google has built its globally distributed network that illustrates the daunting task of its competitors in catching up.

FF. [S]aid Milo Medin, a computer networking expert ... I know of no other carrier or enterprise that distributes applications on top of their computing resource as effectively as Google."

Google's xxx

71A.

The Need of Independent Candidates and Minority Political Parties

39

to Use AdWords to Compete with the 2 Main Parties and Their Candidates

72. Starting in December, 2005, the Plaintiff decided to run for statewide office in New York, to seek the elected office of New York Attorney General.

73. The Plaintiff already had more than two years of working with AdWords, on and off, experiencing various anticompetitive activities imposed by Google on use of AdWords by the Plaintiff and other small-business advertisers.

74. Independent candidates and minority parties have a difficult time trying to get their message across to voters because the main media (television, newspapers, radio and magazines) do not give much or any publicity to anyone other than the two leading parties and their competing candidacies. The Plaintiff decided that it is necessary to create a new type of medium for independent candidates and minority parties to reach voters and party members if the candidates and parties are to be able to compete and win any elections.

75. The Plaintiff was familiar with the earlier successes of MoveOn.Org in the raising of campaign funds for a national political candidate, which success preceded the advent of AdWords, and caused the Plaintiff to develop a program to finance an election campaign based on use of AdWords, assuming that a user could select and use Keywords for 5 cents (or 1 cent) a click, as publicized widely by Google in its AdWords website and by tens of thousands of emails, blogs, websites and other communications purporting to explain AdWords and its pricing.

76. The plan as developed by the Plaintiff required the building of email lists of the "permissive" type, in which the persons on the email list give their written approval to receive emails from the list owner, with the opportunity of each person on the list to easily (through a single click) notify the list owner (i.e., the Plaintiff) that he/she wishes to be taken off of the list.

77. Person's plan was to use the list to educate the list owners with a continuing series of e-mailings as to problems that could be cured or alleviated if they supported and/or voted for the Plaintiff or the Green Party.

40

78.. ·  Prevailing thought among the leading authors of election campaign books and articles was that money could be raised from email lists for a cost of about 5% of the money being raised when the list is in existence. The cost to create an email list using traditional (non-Internet) advertising media was too expensive.

79.. Plaintiff's plan using AdWords was to create a list at a cost of 5 cents (or 1 cent) or slightly higher per name. by using the lowest cost words and offering substantial inducements for searchers to click onto Plaintiff's website (costing Plaintiff 1 cent or 5 cents for the click). subscribing to Plaintiff's email list (an "RSS" or "Really Simple Syndication" feature of Internet). and receiving by email a free PDF copy of one or more of Plaintiff's three full-length books.

80.. At this rate. Plaintiff calculated, the Plaintiff could build a list of 1.000,000 persons (with their email addresses and ZIP codes) at a cost of only marginally more than $10,000 to $50,000. and give Plaintiff the effect of a newspaper or magazine having a similar circulation. The value of the "common stockholders equity" in *The New York Times*. for example. with a comparable circulation. was $1.5 billion on December 25, 2005. according to the newspaper's financial statements. See http://www.nytco.com/pdf-reports/2005-ar10K/selected-financial-data.pdf

81.. A permissive email list of 1.000,000 members could. according to the Plaintiff's plan. finance his election as Attorney General in New York and could be available for various business activities during the same period and after. including the building of an email list for the Plaintiff to seek other elective positions if he fails to win the Attorney General election in November. 2006.

82.. Pursuant to his plan. the Plaintiff wrote a series of websites. from January to May. 2006. for the purpose of using AdWords to create a variety of permissive email lists. These websites include: www.americanjobsparty.com (to interest persons in subscribing to follow economic and political issues of interest to them); www.earlperson4NYAG.com (to participate in Plaintiff's campaign for New York Attorney General); and www.lawmall.com/latefees (to provide a service of email notification to subscribers to notify them in advance of dates at which payment must be made on credit cards. leases, mortgages and the like to avoid imposition of late fees; which would enable

41

the Plaintiff to send his various requests for volunteers, contributions, attendance or other help each time the Plaintiff sent a notice to one of the subscribers).

83.. AdWords, however, never planned to have any keywords available at the low, advertised rate of 1 cent or 5 cents per click, and it became apparent to the Plaintiff that he would be facing costs of 2 to 100 or more times the 1-cent or 5-cent anticipated cost for the planned list development, making the list development impractical.

84.. As a result, Google is preventing independent candidates and minority parties from exercising their right to assemble, vote and speak freely about economic, social and political matters in the United States, through Google's predatory pricing practices with its AdWords monopoly.

85.. When discriminatory pricing is charged by a manufacturer in a competitive industry, the disfavored customer still has choices. But in the instant market, for keyword-targeted Internet advertising there is not much choice. Google has a monopoly, and controls pricing, terms, and whether the Plaintiff and other small businesses are able to make any use of AdWords to compete with AdWords large corporate customers.

## SECTION 2 VIOLATIONS BY GOOGLE

**Monopolization by Google**

86.. By its actions as alleged, Google demonstrates that it has the power to control prices in the relevant geographic markets for keyword-targeted Internet advertising with advertisers such as Plaintiff having to either pay the demanded high price per click often 25 times more than the per-click price paid by major advertisers using the same keywords, or a per-click price often 50 times higher than Google's 1 cent minimum per-click price for keywords that nobody but Plaintiff is seeking to use.

87.. Google created the monopoly with its superior product and business acumen but started to misuse its monopoly through setting up an automated pricing scheme that favored large corporate advertisers (with low per-click prices) and requiring Plaintiff and other small-business

42

1  advertisers to pay sometimes 50 or 100 times as much per click, a price designed and intended to

2  make it unprofitable for small advertisers to compete for the use of keywords used by the favored

3  advertisers, and to deny any use at all of keywords not wanted by major advertisers (thereby forcing

4  Plaintiff and other small-business advertisers to stop using AdWords).

5
6          88..    The activities of Google adversely effect competition in the market for keyword-

7  targeted Internet advertising (as well as the product and service markets in which any competitors

8  use AdWords) and are lessening competition, tending to monopolize, and injuring consumers and

9  competition in such markets.

10         88A..   As a consequence, Google is taking away large advertisers, sales, market share and

11  profits from its two main competitors (Yahoo and Microsoft) and increasing its monopoly share;

12  Plaintiff and other small-business advertisers are priced out of the advertising market and unable to

13  compete with their major competitors who enjoy favored pricing using AdWords; and consumers are

14  deprived of new products and services and better prices from Plaintiff and other small-business

15  advertisers who are rendered less able to use Internet to develop and sell new and improved products

16  and services in competition with the large established businesses competing for sales to consumers;

17  and the voting public throughout the United States, including the submarket of New York State are

18  unable to obtain political discourse and learn about the availability of candidates who are better able

19  to solve the voters' problems than the mainstream candidates.

20
21         89..    Through its activities as alleged, Google is intentionally monopolizing the relevant

22  geographic market for keyword-targeted Internet advertising in violation of § 2 of the Sherman Act,

23  15 U.S.C.A. § 2.

24  Attempted Monopolization by Google (Alternative Allegation)

25         90..    Alternatively, by its actions as alleged, Google demonstrates that it has a dangerous

26  probability of achieving monopoly power (to control prices and exclude competition) in the market

27  for keyword-targeted Internet advertising in the United States and in the submarket of New York

28  State.

Case 5:06-cv-02057-JF   Document 54-4   Filed 04/30/2007   Page 44 of 50

43

91.. The only two challengers to Google's AdWords business are Yahoo and Microsoft/MSN, but neither has a database of search pages, or a number of daily searches, or the dollar amount of advertising revenue or profits to be able to stop Google's growth and ever-increasing power in the relevant market.

92.. Google is engaging in predatory and anticompetitive activities as alleged in ¶¶ 12, 13, 13A, 18-25, 34 and 45-70 above.

93.. The barriers to entry are so high that there appear to be only two actual or potential competitors (Yahoo and Microsoft/MSN), but without any demonstrated ability to put together a team with the know-how to compete effectively against Google. Google's team consists of Google's founders and controlling shareholders of Google, people who cannot be purchased with Microsoft's billions in unused cash reserves. Nobody has the databases to compete with Google and even if they did they may not have the money to purchase and manage 450,000 servers to be able to produce search results in a fraction of a second.

94.. Alternatively, through its activities as alleged, Google is attempting to monopolize the relevant geographic market for keyword-targeted Internet advertising in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 and during the relevant period actually acquired power over the market.

Conspiracy to Monopolize by Google

95.. Google, in conspiracy with the Co-Conspirators (consisting of various large corporate, high-volume advertisers such as eBay and the others described in ¶ 35 (A-D) above) to monopolize the relevant geographic market for keyword-targeted Internet advertising by Google's practices of destroying competition for the keywords being used by the major advertisers and profiting from the higher profitability that these major advertisers can obtain from such non-competitive use of their selected keywords. Google participates in the scheme through the charging of higher prices (through its per-click system of pricing) to successful users of Google's keywords.

44

1 especially when it drives Plaintiff and other small-business purchasers from the market by

2 demanding per-click prices 50 or 100 times as high as those being paid by the high-volume, favored

3 advertisers. But after all pricing is taken into account, the major advertisers obtain lower per-click

4 prices than they could obtain at Yahoo or Microsoft, so that the highly profitable major-advertiser

5 customers are switching to AdWords and the far less profitable small-business and consumer-type

6 customers such as the Plaintiff are being forced through the unconscionably high AdWords prices to

7 try Google's competitors (Yahoo and Microsoft), which are less effective as advertising media in

8 competition with AdWords.

9

10     95A.   Google's anticompetitive activities as alleged are specifically intended to

11 increase Google's large-advertiser customers, sales, income, profits and share of the

12 keyword-targeted internet advertising market, and to deprive competitors Yahoo, MSN and

13 any others of large-advertiser customers, sales, income, profits and market share.

14     96..   Through its activities as alleged, Google is conspiring with the Co-Conspirators to

15 monopolize the relevant geographic market for keyword-targeted Internet advertising in violation of

16 § 2 of the Sherman Act. 15 U.S.C.A. § 2.

17

18

19                         **PLAINTIFF'S DAMAGES**

20     97..   By reason of Google's activities as alleged, the Plaintiff has suffered the following

21 damages and antitrust injury:

22     A..   Moneys paid to Google by the Plaintiff as an AdWords advertiser;

23     B..   Moneys paid by the Plaintiff to develop various websites to be marketed using

24 AdWords;

25     C..   Value of Plaintiff's non-legal time in developing and marketing his products,

26 services, and websites and loss of the opportunity to spend the time needed to find a market

27

28

1  satisfactory to Google before Google imposes its prohibitive pricing scheme on the Plaintiff and one

2  million other small businesses seeking to develop new products, services and markets:

3         D..     Amount spent in promoting Plaintiff's candidacy for New York Attorney General;

4         E..     Loss of income that would have been obtained if Plaintiff won the November, 2006

5  election for New York Attorney General;

6         F..     Irreparable loss of the opportunity to be elected as New York Attorney General

7  during the November, 2006 elections:

8

9         G..     Loss of sales of Plaintiff's 3 books and resulting loss of profits:

10        H..     Loss of income as attorney from new clients: and

11        I..     Loss of the value of the permissive email list of 1,000,000 members that could have

12  been built by Plaintiff under his business plan (described in  ¶¶ 75-82 above) to use Google

13  keywords not in demand, at a cost of 1 cent to 5 cents per click, but for the illegal activities of

14  Google.

15        98..    Upon information and belief, the total provable damages suffered by Plaintiff

16  amount to more than $10,000,000, and will be proven with certainty at the time of trial.

17

18                         **PRELIMINARY AND PERMANENT INJUNCTION**

19        99..    The activities of the defendant are continuing and threaten to prevent Plaintiff from

20  being elected as the New York Attorney General during the November 2006 elections, and other

21

22  political offices the Plaintiff plans to see if he does not win the November 2006 election,

23        100..   This year (2006) is a year of political upheaval with a good chance for an

24  independent candidate to get elected in New York as Attorney General, but this opportunity cannot

25  be realized by the Plaintiff without the use of AdWords at the low rate of 1 cent or 5 cents per click

26  to create a permissive mailing list for Plaintiff to use to obtain volunteers, votes, arrange parties, and

27  obtain and solicit contributions.

28

101.    If the Plaintiff is not able to enjoin Google from its predatory pricing activities, as alleged, the Plaintiff will suffer irreparable injury by not being able to compete for (or win) the election for New York Attorney General or any other offices which the Plaintiff plans to seek if he does not win election as New York Attorney General in 2006.

102.    Plaintiff is entitled to (i) a preliminary injunction to enjoin Google from its alleged predatory practices during the pendency of this litigation; and (ii) a permanent injunction to enjoin Google from the same predatory practices, as part of the relief in the final judgment in this action. Specifically, without limiting the injunctive relief being sought, Plaintiff seeks an injunction or mandatory injunction

A.    Requiring Google to let Plaintiff and other advertisers pay the lowest available price per click as determined by Google's auction process without any adjustment of the price by Google to reflect "quality", "landing page", clickthrough rate of the advertiser or any other advertisers using the same or similar keyword;

B.    Requiring Google to charge the same price or same position price (either per-click price or price per 1,000 impressions) to all advertisers seeking to use a specific keyword;

C.    Requiring Google to let advertisers use any English words (other than illegal words due to obscenity, copyright, trademark, secrecy or similar laws);

D.    Requiring Google to list in its website all words not available to any AdWords advertiser

E.    Requiring Google to permit all advertisers to use any abbreviations or combination of words in their advertisements allowed by law;

F.    Requiring Google to set up a third-party dispute resolution procedure, at Google's expense, for advertisers to challenge any alleged or actual failure by Google to abide by any of the foregoing injunctive terms;

G.    Requiring Google to comply with the requirements of the Sarbanes-Oxley Act regarding Google's AdWords pricing practices (to determine and report the extent to which Google's

47

1  income and profits have been, and are being, derived from Google activities in violation of §§ 1-2 of

2  the Sherman Act; and

3        H.      Requiring Google to notify each AdWords advertiser by email in 3 separate

4  mailings, separated by one month each, about this action and the terms of any preliminary injunction

5  or permanent injunction awarded to the Plaintiff.

6

                                      **OTHER RELIEF SOUGHT**

9        103.      The Plaintiff is entitled to an award of treble damages.

10        104.      The Plaintiff is entitled to an award of attorneys' fees.

11        105.      Plaintiff is entitled to a judgment as to liability against Google for violation of § 2 of

12  the Sherman Act by reason of the facts alleged in ¶¶ 1 through 104 above.

13

14                              **Continuing Violation of the Sarbanes-Oxley Act**

15        106.      Upon information and belief, more than 50% of Google's income and profits is

16  attributable to its violation of § 2 of the Sherman Act, as alleged, and Google's failure to report this

17  fact in its S-1 Registration Statement is a continuing violation of the Sarbanes-Oxley Act and a major

18  reason for Google's ability to continue violating the statute without any enforcement activities by

19  government or by class action lawsuits for recovery of treble damages on behalf of each of the

20  injured small businesses.

21

22        107.      Plaintiff is injured by Google's continuing violation of the Sarbanes-Oxley Act,

23  requiring the Plaintiff to spend time and money to obtain judicial relief as to Google's predatory

24  pricing, which activities would have been unnecessary if Google had reported in its SEC filings that

25  more than 50% of Google's income results from its violation of § 2 of the Sherman Act.

26        108.      Plaintiff is entitled to a permanent injunction requiring Google to make the

27  disclosures required by the Sarbanes-Oxley Act, as alleged above.

28

Possible Class Action Allegations by Amendment

109.. The Plaintiff hereby provides notice that he or appropriate counsel may amend this pleading to convert this action into a class action to establish Google's liability to a defined class of small-business AdWords advertisers under §§ 1-2 of the Sherman Act.

COUNT II

[Violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 –
Denial of Use of Essential Facility to Competitor and Denial of Non-Discriminatory
Use of Google's AdWords Keyword-Targeted Advertising System]

110.. Plaintiff alleges and realleges each of the allegations set forth in ¶¶ 1-109 above, and further alleges that Count II is being brought under the "Essential Facilities" doctrine and § 2 of the Sherman Act, 15 U.S.C.A. § 2 for the unlawful denial to Plaintiff (i) as a competitor of Google, of any use of the Essential Facility and (ii) of non-discriminatory use to Plaintiff as an advertiser of Google's AdWords pay-per-click key-word targeted advertising system.

111.. Google has two primary businesses: (i) selling AdWords advertising to advertisers such as eBay. Yahoo. MSN. Plaintiff. Amazon, Columbia University, Wesleyan University, Doubleday, Isuzu, AOL, Phoenix University, Home Depot, Staples. Starwood Hotels. Beverly Hilton and many hundreds of thousands of others. upon information and belief; and (ii) using its AdWords system to convert hits at other websites into money (in amounts established by Google's AdWords auctions), through licensing the right to place Google AdWords advertising on websites owned by others (such as MySpace.com) or by developing and purchasing websites (such as YOUTube) and converting traffic at its owns websites into money by running AdWords ads on these Google websites.

112.. Google is able to do for itself what no competitor can do without use of the Essential Facility, which is to convert or "monetize" website traffic into its monetary value as established by competition among AdWords advertisers for the placement of keyword-targeted advertising on the website.

49