1    GOCal_mem04_052307A.doc

2    CARL E. PERSON, Plaintiff. *Pro Se*
       325 W. 45th Street – Suite 201
3    New York NY 10036-3803
       Telephone: (212) 307-4444
4    Facsimile: (212) 307-0247
       carlpers@ix.netcom.com

5

6                   UNITED STATES DISTRICT COURT

7               NORTHERN DISTRICT OF CALIFORNIA

8                      SAN JOSE DIVISION

9

10   CARL E. PERSON,         )   CASE NO.: C 06-7297 JF (RS)
                        )
11         Plaintiff,     )   **PLAINTIFF'S MEMORANDUM OF**
                        )   **POINTS AND AUTHORITIES IN**
12      v.             )   **OPPOSITION TO DEFENDANT**
                        )   **GOOGLE'S MOTION TO DISMISS**
13   GOOGLE INC.,         )
                        )   Date:   June 15. 2007
14         Defendant.   )   Time:   9:00 a.m.
                        )   Dept:   3
15                        )   Before: Hon. Jeremy Fogel

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION..................................................................................................................1

BACKGROUND ..................................................................................................................2

A.   The Parties and Google's Website-Traffic Monetizing System ...................................2

B.   I am a Competitor of Google, YouTube, eBay, MySpace...........................................2

C.   Articles Annexed As Exhibits A-T to Person Declaration
     Support Plaintiff's Allegations that Search Advertising Is a
     Separate Market and that Google Dominates Such Market ..........................................3

D.   Plaintiff and Other Competitors Are Being Injured
     By Google's Activities and Plaintiff Is Being Deprived
     of Meaningful Alternatives to Google's AdWords to Create
     and Monetize Traffic for Plaintiff's Community Search Websites ...............................7

E.   Google's Acquisition of DoubleClick Indicates that
     Search Advertising Is a Different Market from
     Banner/Display Advertising ........................................................................................8

F.   ARGUMENT................................................................................................................9

     A.   The Legal Standard for a Rule 12(b)(6) Motion  ...............................................9

     B.   Plaintiff's Service-Market Allegations Are Pleaded Sufficiently...................10

     1.   The Court's Prior Rejection of the Search Ad Market
          Was Based on Different Allegations................................................................10

          a.   Google's acquisition of DoubleClick during April, 2007
               (subject to regulatory approval). .......................................................10

          b.   Google's 69% increase in profitability while Yahoo and
               Microsoft's search advertising businesses are declining in
               profitability and market share. .........................................................10

          c.   Yahoo's "Panama" efforts to emulate and catch up with Google.. ...............10

          d.   Demands by non-search advertisers for a search basis for their
               Internet advertising. ..........................................................................10

          e.   Articles questioning the ability of Yahoo and Microsoft to
               compete with Google's search advertising business............................10

          f.   Google's ability to outspend Yahoo and Microsoft for acquisitions..............11

TABLE OF CONTENTS (Cont'd)

Page

g.   The multi-billion dollar amount of the alleged search market. ................... 11

h.   Yahoo's inability with its emulating "Panama" system to
     take back market share.. ................................................................. 11

i.   Industry articles stating Google has a monopoly. ........................................... 11

2.   *The Market for Monetizing Community Search
     Websites Is Not Too Narrow* ................................................................. 11

C.   Google's Acquisitions Created Google's Monopoly and Were
     Anticompetitive Practices; and the Discriminatory and Fraudulent
     Activities of Google in Using Its Illegally-Acquired Monopoly Are
     also Anticompetitive Activities ................................................................. 13

D.   Google's Purpose Is to Restrain Competition, Enhance or Expand
     Its Monopoly in the Keyword-Targeted Internet Advertising
     Market, and Do This through Coercive and Collusive
     Activity with Plaintiff's Competitors ............................................................. 17

E.   Plaintiff Has Met the § 2 Requirement of Alleging that Google
     Has a Dangerous Probability of Achieving Monopoly Power ....................... 18

F.   Plaintiff Has Met the § 2 Requirement of Alleging that Google
     Has an Intent to Monopolize the Keyword-Targeted Internet
     Advertising Market ................................................................................. 18

G.   Application of the Essential Facilities Doctrine to
     Non-Physical Facilities Is Essential for the Economy
     And Would Be Achieved By Relief Requiring Google
     To Make Its Search-Advertising Services Available for
     All at Non-Discriminatory Prices ........................................................... 19

H.   The 2nd Amended Complaint Complies with Rule 8 ..................................... 19

CONCLUSION ................................................................................................... 20

# TABLE OF CASES AND AUTHORITIES

Page(s)

*Allis-Chalmers Mfg. Co. v. White Consol. Industries. Inc.,* 414 F.2d 506, 510 (3rd Cir. 1969)......... 16

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 729 F.2d 1050, 1052 (6th Cir.. 1984) ............. 15-16

*Berkey Photo, Inc. v. Eastman Kodak Company,* 457 F.Supp. 404, 422. 1978-1 Trade
Cases P 62.092. 1978-2 Trade Cases P 62.174 (SDNY 1978). aff'd in part and
rev'd in unrel. part. 603 F.2d 263. 53 A.L.R. Fed. 768, 1979-1 Trade Cases
P 62.718 (2nd Cir.1979). cert. den.. 444 U.S. 1093. 100 S.Ct. 1061.
62 L.Ed.2d 783. 1980-1 Trade Cases P 63.182 (1980) ...................................................... 14

*Blue Shield of Virginia v. McCready,* 457 U.S. 465. 102 S.Ct. 2540. 73 L.Ed.2d 149 (1982).......... 17

*E. I. du Pont de Nemours,* 351 U.S. 377. 391-92, 76 S.Ct. 994 (1956) ............................................. 18

*Greyhound Corporation v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 98 S.Ct. 2370.
57 L.Ed.2d 239. 1978-1 Trade Cases P 62,088 (1978) ............................................................... 15

*J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557. 562 (1981) ........................................ 9

*Kinderstart.com LLC v. Google, Inc.,* Not Reported in F.Supp.2d,
2006 WL 3246596 (N.D. Cal. 2006)............................................................................................. 19

*Nat'l Audubon Soc'y, Inc. v. Davis,* 307 F.3d 835. 855 (9th Cir. 2002) ............................................ 9

*Official Airline Guides, Inc. v. Federal Trade Commission,* 630 F.2d 920, 927-928.
1980-2 Trade Cases P63.544 (2d Cir. 1980)................................................................................ 17

*Rebel Oil Co., Inc. v. Atlantic Richfield Company,* 51 F.3d 1421. 1432-33 (9th Cir. 1995) ............... 9

*Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458-459. 113 S.Ct. 884.
122 L.Ed.2d 247. 1993-1 Trade Cases P70.096 (1993) .............................................................. 18

*United States v. Grinnell Corporation,* 384 U.S. 563. 570-571.
86 S.Ct. 1698. 16 L.Ed.2d 778 (1966) ......................................................................................... 18

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398, 124 S.Ct. 872. 878 (2004) ..................................................................................... 14

# TABLE OF CASES AND AUTHORITIES (Cont'd)

Page(s)

**Federal Statutes and Rules:**

Sherman Act. Section 2 ............................................................................ 16, 17. 18

Rule 8. Fed. R. Civ. P. ............................................................................ 19

Rule 12(b)(6). Fed.R.Civ.P.. .................................................................... 1, 9, 20

## INTRODUCTION

I. Carl E. Person, as plaintiff *pro se*, submit this Memorandum of Points and Authorities (and my accompanying declaration) in opposition to the motion of defendant Google Inc. ("Google") to dismiss my 2nd Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Google has created, through its skill, insight and 25 acquisitions, a monopoly in the United States geographic market for the monetizing of website traffic through its AdWords system of keyword-targeted Internet advertising. In other words, Google has assembled a monopolizing system for turning billions of website visits into vast sums of money, and is denying use of that system to all but favored customers, such as YouTube.com, MySpace.com and AOL.com. With their system, unless it is declared an Essential Facility, open for all to use on reasonable, non-discriminatory terms, Google (as a Wal-Mart of the Internet), in the not-so-long long run, will be able to buy up most or all of the valuable website properties (such as wikipedia.org, craigslist.com, ebay.com, amazon.com) and underlying companies (Time-Warner, Fox Interactive Media, Microsoft) and put most of the rest out of business. This monopoly is based on Google's superior search engine, multiplicity of superior databases, superior advertiser database and guaranteed payment system, and superior distributed computing system consisting of hundreds of thousands of Google interconnected computers enabling Google to send information from its databases and keyword-targeted ads into every website and online browser in the United States in response to queries from the browser or website using Google's plug-in compatible search engine. There may never have been a faster-growing, more profitable monopoly asserting its monopolistic powers and it needs to be brought under appropriate judicial review.

The market affected by Google's monopoly was not evident at the filing of my complaint in June, 2006, but has come to light with Google's October, 2006 $1.65 billion acquisition of YouTube, Google's August, 2006 $900 million AdWords agreement with the recent purchaser of competitor MySpace.com from Murdoch's Fox Interactive Media ("FIM"). Google's April, 2007 acquisition of

DoubleClick.com, and various articles indicating that search advertising is a different market from other Internet advertising.

I have reflected these new facts and my new understanding of the relevant market and submarkets, and my participating therein as a competitor, in my accompanying declaration dated May 25, 2007 and my 2nd Amended Complaint.

## BACKGROUND

A.    **The Parties and Google's Website-Traffic Monetizing System**

Google has acquired a monopoly in the gathering, organization, free search for and distribution of substantially more information than any other search-engine computer (such as Yahoo and Microsoft's MSN Search) and with this free-search monopoly as a platform has developed its AdWords system of selling keyword-targeted Internet advertising for display simultaneous to and alongside the search results distributed to users making free Google search-engine searches from websites or online browsers.

I, the Plaintiff, have been a customer of Google's AdWords as well as a competitor of Google in the business of building website traffic and monetizing the traffic for my various websites, but have been deprived of Google's essential facility to enable me to both build traffic (using AdWords advertising on a reasonable, non-discriminatory basis, to build website traffic, and using Google's monetizing system of placing keyword-targeted advertising on my websites, to enable me to monetize the traffic. Google has priced me out of the market of building my websites by charging me 50 to 100 times more per click than it charges ebay and other competitors for website development; and Google has excluded me entirely from using its monetizing system to monetize the traffic at my website, even though Google has been sharing the huge revenues from its monetizing system with competitors (YouTube.com and MySpace.com).

B.    I am a Competitor of Google, YouTube, eBay, MySpace

Google, the owners of YouTube (before merging with Google), eBay, the owners of MySpace before its purchase by FMI, FMI (new owner of MySpace) and I are competitors in the new, just

recently recognized service market of creating or purchasing, and then building. website traffic for the

purpose of monetizing the traffic through use of keyword-targeted pay-per click advertising. The fact

that I am a very small competitor is attributable in part to Google's refusal to enable me to build my

website traffic using AdWords to generate traffic on a reasonable. non-discriminatory basis. afforded

by Google to competitors eBay. YouTube and FMI/MySpace.

**C.    Articles Annexed As Exhibits A-T to Person Declaration
       Support Plaintiff's Allegations that Search Advertising Is a
       Separate Market and that Google Dominates Such Market**

Plaintiff is not only an antitrust lawyer but is a developer and marketer of websites. and is in a

position to understand "markets" more readily than other website developers. Also, this insight has

assisted the Plaintiff in understanding industry articles and enabled him to identify articles supporting

his allegations concerning market definition and Google's domination of such market. Some relevant

quotations from the articles are set forth below (but a very large amount of relevant material remains

without quotation):

> [T]oday's agreement [to acquire YouTube] demonstrates that the firm required
> Google's ad placement technology and advertiser client base to generate meaningful
> revenue growth. Although YouTube has begun to build a copyright recognition platform
> to screen videos. the firm could not easily replicate Google's ad bidding system. So. in
> joining forces to realize the potential of both companies. one could say that the next
> Google is likely Google. * * * Yahoo would have diluted its existing shareholder base by
> about 4.3%, and has yet to complete its ad placement technology that provides the user
> base reach (Google performs twice the number of searches as Yahoo each day), breadth of
> advertiser clients, and the quality of ad placements that Google does. * * * While regional
> and small town newspapers had formerly been touted as "natural monopolies" because of
> their gatekeeper role in allowing advertisers to reach the local population. Google has
> quickly become that type of monopoly. * * * ... I think that Google and YouTube
> founders/investors realized that if you could combine one existing natural monopoly with
> a rapidly developing one, maintain "independence" as a service. and capitalize on the
> tendency for viewers to prefer one site. the combined firm's future growth could be pretty
> significant. * * * Although MySpace's competitive position seems unbreakable right now.
> Google's advertising client list and technology seems to be much more difficult to replace.
> * * * ... News Corp. (Fox) Chairman Rupert Murdoch may have complained to Google
> execs regarding the acquisition following MySpace's agreement to use Google search
> technology. Of course he's worried. He doesn't want to complete against a firm whose
> technology he needs to help him fully monetize MySpace's user traffic. technology that he
> does not control. cannot develop quickly, and cannot get from Google's competitors.
> [Exhibit A]

1

2        ... [A]fter a three-month delay, Yahoo! Had launched long-awaited improvements
to its search advertising system to help it better compete with archrival Google. [Exhibit
3   B]

4        ... eMarketer ... estimates Google will pocket 25 percent of the $16 billion spent
on U.S. online advertising this year. Analysts said Google is stretching its lead over rivals
5   in the lucrative paid search market, while benefiting from the continued boom in Internet
advertising. [Exhibit C]
6

7        .. $100 million ... far exceeds what any single broadcast network can extract from
the online world--and drops straight to the bottom line. But taking the dough fortifies an
8   already threatening rival. One executive privy to the discussions [with major programming
and network players] says: "The reality is, if they are able to lock in major media
9   [companies] for three years, then by default YouTube is the place to go" for Web video.
Such fears may be what's spurred several major media players to mull assembling a cross-
10   company Web video destination --a YouTube killer of their very own. [Exhibit D]

11        Google leads the race, by a mile, to sell ads on affiliated Web sites, though Yahoo
... and Microsoft ... have similar programs. But the real money is in ads aligned with
12   search results. The rate at which viewers click on ads in search results can be as high as
20 percent, and never lower than 10 percent. That's a far better money -making
13   opportunity than selling conventional banner ads, which get clicked at most 1 percent of
the time. Yahoo is hoping to get a bigger piece of that business with the launch of its
14   long-awaited "Panama" advertising system. Finally, Yahoo will have modern software for
advertising that compares to Google's. * * * Today Google overwhelmingly dominates the
15   search business. It thus has by far the largest inventory of ad space to sell (especially when
you include the non-search AdSense inventory) as well as the largest number of
16   advertisers seeking to buy advertisers. The risk for Yahoo and Microsoft, Google's top
17   rivals, is that much as eBay ... has developed the de facto dominant marketplace for
buyers and sellers of goods, so Google could start to be seen as the de facto marketplace
18   for ads. Buyers of ad space want to go where there are the most sellers and vice versa.
It's what you call a "network effects" business - the more people who go there the more
19   other people want to go there. Word in the industry is that Yahoo now has about half as
many advertisers as Google (neither company will reveal the actual numbers.  Could
20   Yahoo regain strength with Panama? Perhaps. But it has a better chance if it bands
together with Google's other rivals to offer an alternative marketplace that is competitive
21   in size. It's all about traffic. Google, with its affiliates like AOL and Ask.com, commands
well over 50 percent of all searches in the U.S. in October, according to numbers compiled
22   by Neilsen NetRatings. The combination of Yahoo, with 23.9 percent of searches, and
23   Microsoft, with 8.8 percent, would be, at about 33 percent, a much more formidable rival
than either company can be on its own.  (That's why many believe Microsoft will either
24   try to buy Yahoo or else link up in some other way to sell ads collectively.) * * * Google
won the majority of the lucrative search ad business by creating the search site most
25   people like to use, and by building a wonderfully-efficient engine for placing ads on those
searches. But in a business that good, competitors will spend almost any amount of
26   money to compete. Now we'll see if they can succeed. [Exhibit E]

27        This paper summarizes the situation regarding the possibility of significant
competition for Google search engine and targeted advertising activities and concludes
28   that Google has an unbreakable functional monopoly for the high-quality search business

that is similar to and possibly more extensive and disturbing than Microsoft's position regarding operating systems. * * * [T]he current situation is very different and Google's dominant position regarding high-quality Internet search is very secure because of a number of factors that did not apply to previous search operators including: Massive Investment Requirement; Maturity of Search and Web Technology: Operations Data: Economies of Scale: Tracking Data Volume; Anti-Competitive Practices; Declining Captive Audiences. [Exhibit F]

If they can't prove their business models or break from the pack. Web companies risk becoming part of a shakeup..."We're still a year or two away from the bigger market segments like social networking. user-generated video, and vertical search showing real Darwinism."... Even a search-engine marketing campaign--the most basic means of getting attention--is becoming prohibitive ... estimates that it would cost a startup $20.000 a month now to run a worthwhile campaign, up from $5.000 two years ago. [Exhibit G]

Google has had limited success so far in translating its efficient and automated online-search methods to the $20 billion annual market for radio advertising. [Exhibit H]

[Google's] core online-advertising business is trouncing rivals. generating more than $10 billion in revenue in 2006. Google reported $3.1 billion in profit last year, and its stock-market valuation soared to more than $140 billion. * * *Under the [licensing] terms discussed [with Viacom]. Google would pay Viacom about 70% of any advertising revenue generated by Google from Viacom's videos.... * * * In October. CBS had struck an agreement to make some CBS video available on YouTube, in exchange for a share of ad revenue. * * * We cannot continue to allow YouTube or Google to continue to profit from our content without a reasonable commercial agreement. [Exhibit I]

Our entire industry is scared witless by Google's dominance in search and advertising. Microsoft and Yahoo have been unsuccessful at staunching the bleeding of their search market share. [Exhibit J]

A few days ago I suddenly realized Microsoft was dead. * * * What killed them? Four things, I think. all of them occurring simultaneously in the mid 2000's. The most obvious is Google. There can only be one big man in town. and they're clearly it. Google is the most dangerous company now by far, in both the good and bad senses of the word. Microsoft can at best limp along afterward. * * * [S]econd cause of Microsoft's death: everyone can see the desktop is over. It now seems inevitable that applications will live on the web--not just email, but everything, right up to Photoshop. Even Microsoft sees that now. [Exhibit K]

But when it comes to developing a viable Internet strategy. Microsoft may be running out of time. It has long trailed Web leaders Google Inc. and Yahoo!. in the use of its search engine and in search-ad sales. Now it's losing ground. * * * ...Microsoft's rebranded Windows Live Search has a 9.6% share. compared with Google's nearly 56%. That amounts to nearly 300 million lost searches per month. * * * If Microsoft can't keep pace, it risks seeing its Windows and Office software franchises erode as Google and others launch Web-based rivals. * * * Google nets at least 50% higher revenue per search than No. 2 Yahoo and other search sites--allowing Google to keep investing more in improvements. * * *many analysts believe the search world will fragment into vertical sites that focus on niches. The eye-popping success of YouTube Inc.. now owned by

Google. is one example. More than just a place to show off your creations, YouTube has become a place to search for videos. [Exhibit L]

Google said earnings jumped an unexpected 69 percent in its first quarter, largely from its huge online advertising business. * * * "Our core business is very strong. It is the core business that is driving our success." * * *Sales also soared. rising 63 percent to $3.66 billion. including traffic acquisition costs of $1.13 billion that it paid to affiliated Web sites serving as billboards for Google ads. [Exhibit M]

Google's blitzkrieg isn't slowing down. On Apr. 13 the search king announced it will buy online ad placement firm DoubleClick for $3.1 billion. giving it a chance to expand beyond search ads to online display ads. Microsoft and AT&T cried foul and said they'd push for antitrust review. * * * ... a grim first-quarter earnings report on Apr. 17 renewed speculation that [Yahoo] CEO Terry Semel's job may be jeopardy. ... "Google: The ad dominator?" and "Yahoo's next search: A new CEO?" [Exhibit N]

... news first reported in The Post that Microsoft had reignited talks with Yahoo! About a merger or combination that would help both compete with Google. * * * ...there is a renewed urgency on the part of both companies to keep pace with rival Google. [Exhibit O]

Yahoo! hired veteran dealmaker Blake Jorgensen to be its new chief financial officer yesterday in a sing the struggling Internet titan may be looking for its own deals. despite overtures from software giant Microsoft. * * * Since then Yahoo!... has struggled on the acquisition front. losing DoubleClick to Google and flirting with -- but unable to seal a deal for -- social networking site Facebook. * * * ...Yahoo! executives are content to see how its new search-advertising platform. Project Panama. performs over the next quarter or two before revisiting the ideas of such a transformative deal [with Microsoft]. "Investors are looking for Yahoo! to execute on Panama to close the monetization gap with Google".... [Exhibit P]

Afraid of being left behind in the online ad race, Microsoft ponied up $6 billion in cash for Web ad firm aQuantive -- the biggest acquisition in its history -- to catch up to Google and other rivals. * * * The rich price -- especially for a company that has avoided big deals -- underscores the frustration and urgency for Microsoft after it lost to Google in a heated bidding war for DoubleClick. * * * Microsoft continues to trail Google in the search ad business with its share of the market steadily declining. The software giant is in danger of falling further behind Google. which is pushing deep into display advertising with its $3.1 billion purchase of DoubleClick. * * * U.S. spending on Internet advertising is expected to hit $20 billion this year as companies shift more ad dollars online. according to eMarketer. [Exhibit Q]

... [S]ome people think data could be a prime motive behind any partnership that may yet emerge [between Microsoft and Yahoo]: Microsoft's valuable demographic data provided by users of its Hotmail. MSN. and other services combined with data from Yahoo's array of personalized services could offer a credible challenge in ad targeting to Google's highly relevant search ads. In other words, the rest of online advertising, from banner ads to video spots to pop-up ads. is getting Googlified. Google made the business of selling ads against search results a runaway success -- in the process making display ads less attractive to advertisers. No only can advertisers target just the right customers based on search terms they type in. no guessing required. but those advertisers also can

track exactly how many people click on the ad and whether they bought something as a result. ... Now Marketers are spoiled. As an big-brand advertisers move online in greater force, they're demanding the ability to apply the same kind of targeting and measurability they get from paid search to all the other ads they run. * * * While targeted ads online may cost about twice as much as untargeted ads, they can produce twice the return on investment. [Exhibit R]

Web site publishers [with their ads-only websites. game the Google system] by pocketing the difference between what they pay Google [through AdWords] to drive traffic to their site and the amount they get for running Google [AdSense] ads. [Exhibit S]

... [R]enewed speculation that Yahoo! Inc. might be seeking to shed assets or even get acquired as it struggles to catch up with runaway rival Google Inc. * * * The reaction was emblematic of the pall over Yahoo that its leaders seem unable to lift. * * Now, as a steady stream of Yahoos, from vice-presidents to engineers. continues to seek greener stock options at Google .... people close to the company worry that a crisis of morale could cripple its efforts to turn itself around. * * * The company also points to progress since a reorganization last December. It got its long-delayed new search-ad service. Panama, out the door in February to generally positive reviews, though it has yet to boost the bottom line. * * * The question in the minds of many people close to the company is whether all this is too little. too late The key problem, according to many former Yahoos. is an organizational structure that still requires multiple division heads to sign off on big projects. sometimes delaying them for months. * * * Can Semel. who saved Yahoo from dot-com oblivion after he arrived in 2001, do it again? [Exhibit T]

D.     **Plaintiff and Other Competitors Are Being Injured**
       **By Google's Activities and Plaintiff Is Being Deprived**
       **Of Meaningful Alternatives to Google's AdWords to Create**
       **and Monetize Traffic for Plaintiff's Community Search Websites**

By reason of Google's monopoly in the search-ad market. Google is able to effectively raise its

pay-per-click prices to Plaintiff 50 times more (or higher) than others are paying. thereby pricing

Plaintiff out of the market for creating traffic for his websites. And at the same time. Google is causing

its search-ad competitors (including Yahoo, Microsoft and numerous smaller companies) to become

less viable as alternative sources of search advertising needed to create traffic for Plaintiff's websites.

Yahoo is now following Google's pricing policy with implementation of Yahoo's Panama program,

thereby making its use too costly for the Plaintiff (especially because it has lower expected returns and

additional start-up costs to employ). Google has become the de facto marketplace for search advertising

for knowledgeable search-ad purchasers and it is a waste of time and money to try to cobble together a

group of competing search-ad suppliers as a substitute for using Google's AdWords. Even if a group of

1    all competitors could be combined, they would lack the efficiency of AdWords, depth of ad inventory,

2    tracking tools and other features discussed in various articles (see Exhibits E, F and J).

3         Google is steadily putting its competitors out of business and will soon be a marketing tool

4    only for large corporations, causing further concentration of the economy. Small business will not be

5    able to compete online under these circumstances, and even companies such as Microsoft and AT&T

6    are being threatened. In fact, Microsoft and AT&T (the two most prominent monopolists in recent

7    years) complained to the Federal Trade Commission about Google's acquisition of DoubleClick

8    (Exhibit N).

9

10 **E.**      **Google's Acquisition of DoubleClick Indicates that**
              **Search Advertising Is a Different Market from**

11               **Banner/Display Advertising**

12         Google did not acquire Yahoo or MSN Search. Google was already in that market, as the

13    dominant company. The FTC antitrust regulators would have prevented any such acquisition. The

14    reason is that Google, Yahoo and MSN are the 3 top competitors in the search-ad market. DoubleClick

15    is not in that market. Google's acquisition of DoubleClick put Google into a new market (the

16    display/banner advertising market), and made Google the top company in such market instantaneously.

17    The FTC may or may not stop this acquisition, but are probably not going to include Google's search-

18    ad market share in the online advertising market in which DoubleClick is participating.

19         Google is undoubtedly preparing documentation to represent to the FTC that the search-

20    advertising market is different from the display/banner advertising market, and it would be interesting

21    to see how Google is justified in maintaining that position to the FTC while maintaining to this Court a

22    totally opposite position. Plaintiff suggests that the Court and Plaintiff be provided with a confidential

23    copy of any communications by Google or its attorneys with the FTC regarding the DoubleClick

24    acquisition before the Court decides Google's motion to dismiss. See Exhibits N, P, Q and R.

25

26

27

28

F.    ARGUMENT

A.    The Legal Standard for a Rule 12(b)(6) Motion

The key allegation upon which Plaintiff's action is based is the existence of a service market involving "search" advertising.  The existence of such a market is provable through traditional antitrust practices involving changing prices and an analysis of market elasticity. Google is claiming. essentially. that small increases in AdWords prices will cause its AdWords advertisers to switch to non-search advertising. But there is no support for such implicit argument.  Google has increased its prices up to 50 times as much and has dramatically increased its income. profits and market share. and has increased market share.  This has caused the industry to wonder whether Yahoo and Microsoft can continue to compete with Google.

Google certainly did not acquire a competitor in search advertising when it acquired DoubleClick, and the acquisition of DoubleClick by Google is an indication that Google is not already dominant in the non-search market in which DoubleClick is a major competitor.

The facts alleged by Plaintiff in his pleading demonstrate that there is a search advertising market distinguished from non-search Internet advertising and that Google is monopolizing and/or attempting to monopolize such market; and that Plaintiff could prove such alleged facts.

Accordingly. Plaintiff's action should not be dismissed under Rule 12(b)(6). Fed.R.Civ.P. *Nat'l Audubon Soc'y, Inc. v. Davis*. 307 F.3d 835, 855 (9th Cir. 2002).

Plaintiff's claims have provided sufficient factual allegations to show (1) a relevant service market, (2) anticompetitive or exclusionary conduct. and (3) injury-in-fact to Plaintiff that was caused by Google's alleged wrongful conduct. *J. Truett Payne Co. v. Chrysler Motors Corp..* 451 U.S. 557, 562 (1981); *Rebel Oil Co., Inc. v. Atlantic Richfield Company*, 51 F.3d 1421. 1432-33 (9th Cir. 1995).

Plaintiff has defined the relevant market. and has alleged anticompetitive conduct.

Accordingly. the 2nd Amended Complaint should not be dismissed under Rule 12(b)(6), Fed.R.Civ.P.

9

B.    Plaintiff's Service-Market Allegations Are Pleaded Sufficiently

1.    *The Court's Prior Rejection of the Search Ad Market Was Based on Different*
*Allegations*

Although the Court already ruled that search-based advertising is "too narrow to form a relevant market for antitrust purposes" (Order at 7), this ruling was based on a different set of facts. Additional facts have developed which further indicate the existence of the search market. These facts include:

a.    **Google's acquisition of DoubleClick during April, 2007 (subject to regulatory approval).** DoubleClick is not in the search advertising market. It is a leading competitor in the non-search market, and was acquired because Google is not the leading competitor in the non-search market. If, on the other hand, Google acquired Yahoo or Microsoft's search advertising business, the acquisition would not be allowed because it would increase Google's share of the search market to a percentage exceeding 70% or 80%. Documents relating to the DoubleClick acquisition and the efforts by Google and DoubleClick to obtain FTC approval will probably contain ample support for the Plaintiff's alleged distinction between search and non-search advertising and their respective markets. See Exhibits N and P.

b.    **Google's 69% increase in profitability while Yahoo and Microsoft's search advertising businesses are declining in profitability and market share.**  See Exhibit N

c.    **Yahoo's "Panama" efforts to emulate and catch up with Google.** See Exhibits B, E, P and T.

d.    **Demands by non-search advertisers for a search basis for their Internet advertising.** See Exhibit R.

e.    **Articles questioning the ability of Yahoo and Microsoft to compete with Google's search advertising business.**  See Exhibits A, F, J, K and L as to Microsoft, and Exhibits A, B, E, F, J and T as to Yahoo.

f.      Google's ability to outspend Yahoo and Microsoft for acquisitions.  See Exhibits A and P.

g.      The multi-billion dollar amount of the alleged search market.  See Exhibits C. L. and Q.

h.      Yahoo's inability with its emulating "Panama" system to take back market share. See Exhibit T.

i.      Industry articles stating Google has a monopoly.  See Exhibits A. E and F.

By reason of these additional facts, the Plaintiff felt justified in re-asserting the search market as the relevant service market in the action.

The facts are overwhelming that there is a search market and that Google is dominant in such market and that the two leading competitors (Yahoo and Microsoft) are struggling to compete. with strong evidence showing that they are falling behind.

The facts are clear and are provable. Banner and display advertising are no substitute for the targeted search advertising, and that proof is available to show (from the recent gigantic price increases by Google and the price increases by Yahoo's emulating Panama program) that major increases in price for search advertising do not drive advertisers into purchasing non-search advertising.

The evidence to prove the alleged market exists, and the Plaintiff suggests that the Court permit the action to proceed with instructions to obtain discovery and oppose a partial summary judgment on the market definition issue before undertaking any discovery relating to the other aspects of the action.

2.      *The Market for Monetizing Community Search Websites Is Not Too Narrow*

There are millions of websites, but they are of limited size because most of them have content created by the publisher of the website. An example of this is Plaintiff's own lawmall.com. in which the Plaintiff wrote virtually all of the material included in the 60+ websites included within www.lawmall.com. The material is organized by topic. with each website having a topic. Organization

11

of the websites at the time of writing the material allows users to find information without the need for a search engine. Also, each lawmall website is relatively narrow and needs no search engine to find the relevant material once a User reaches the lawmall website.

On the other hand, community search websites are fundamentally different. They have content created and added by millions of users each day, as to the more successful websites such as YouTube and MySpace, with a search facility as part of the website itself being the only practical way for a user to locate material of interest buried somewhere within the hundreds of millions of data entries stored in the website.

Thus, at the time the user of a community search website visits such website, he/she conducts one or more searches to find something of interest, and at this moment search advertising is displayed to the User, which monetizes the website traffic. Google monetizes its website traffic for YouTube, which was acquired by Google last September, and monetizes the website traffic for competitor AOL and MySpace, under agreements with them for Google to run its AdWords advertising on the site, for display in response to the terms used by users conducting searches at the websites.

The amount of money involved for the single website MySpace.com is $900,000,000, and for YouTube is expected to be $1.65 billion or more (Google's purchase price for YouTube). These are huge amounts of money and indicate quite clearly that the alleged market exists, has a multi-billion size, and is not "too narrow" to be recognized as a market.

The essential features of the community search website are (i) Users create the content for the website; (ii) the range of content added by users is broad; and (iii) a website search facility is needed to find the user-contributed information.

Plaintiff has identified various websites that meet these conditions: ebay.com, craigslist.com, wikipedia.org, YouTube.com, and MySpace.com. Also, the Plaintiff's existing myclads.com meets the 3-pronged definition. Other classified advertising websites also meet the definition, and possibly blogsites as to which users are permitted to add material to the website.

1    Most websites do not meet the 3-pronged definition because they are static. non-interactive

2    websites. with users not able to add material to the website. The interactive websites are more costly

3    and complicated to create because they involve the use of higher level programming than HTML. such

4    as PHP and MySQL to manage the required databases. website searches and displays of search results.

5    An alleged market involving multiple billions of dollars created during the last few years (and

6    just getting started) cannot be disregarded as "too narrow", especially when Microsoft finds itself

7    unable to become an effective competitor (showing that there is a market with substantial barriers to

8    entry or for effective competition).

9

10

11    **C.    Google's Acquisitions Created Google's Monopoly and Were
        Anticompetitive Practices; and the Discriminatory and Fraudulent
12      Activities of Google in Using Its Illegally-Acquired Monopoly Are
        also Anticompetitive Activities**

13

14    Google allegedly made a series of acquisitions from 2001 to the present that have given Google

15    a monopoly in the search-advertising market (a $15 billion annual market) and the market for

16    monetizing the traffic of community search websites (a multi-billion annual market. judging from

17    Google's deals with YouTube.com and MySpace.com). These allegations are described in Appendix A

18    and collected in paragraph 99 of the 2nd Amended Complaint. as follows:

19    99.    Google has a specific intent to control prices in each of the Relevant
20        Markets and Submarket and to destroy competition and unreasonably restrain
        trade in such markets, evidenced by
21

22        A.    Google's acquisition of the patents. know-how. software
23    copyrights. management and employees of the following companies listed in
      **Exhibit A** hereto that related directly to the improvement of Google's search
24    engine, AdWords, AdSense or marketing thereof: acquisition ## 2 (Outride), 4
      (Neotonic), 5 (Applied Semantics), 6 (Kaltix), 7 (Sprinks), 10 (Baidu), 13
25    (ZIPDash). 15 (possibly. 15 undisclosed companies or asset acquisitions). 17
      (Urchin). 23 (AOL 5% interest). 28 (orion advanced text search algorithm), 30
26    (Neven), 31 (MySpace monetization agreement), 32 (Jot Spot). 33 (YouTube).
      35 (Xunlei). 37 Trendalyzer). 38.(DoubleClick), 39 (Performics). 40 possibly
27    some of numerous foreign subsidiaries);

28

13

       B.    Google's acquisition of direct competitors in the Internet Advertising Market: 38 (DoubleClick), 23 (AOL 5% interest), 31 (MySpace monetization agreement), 33 (YouTube, competitor in the market for monetizing Community Search Websites; ...

Plaintiff alleges that "Google willfully acquired its monopoly of the Relevant Markets and submarket partially through in-house growth but mainly through a series of mergers and acquisitions (from 2001 to the present -- see **Exhibit A** hereto)..." 2nd Am. Compl., ¶ 50.

Accordingly, Google is not a lawful monopolist and its use of its illegally-acquired monopoly power to charge unconscionable, discriminatory prices, and to take away market share from search-advertising competitors (thereby reducing Plaintiff's opportunities to obtain substitute search-advertising services elsewhere at lower prices) is anticompetitive, illegal and actionable.

The general rule permitting monopoly exploitation, relied upon by Google, does not permit use of "anticompetitive conduct" to increase the monopolist's market share. *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 124 S.Ct. 872, 878 (2004).

In *Berkey Photo, Inc. v. Eastman Kodak Company*, 457 F.Supp. 404, 422, 1978-1 Trade Cases P 62,092, 1978-2 Trade Cases P 62,174 (SDNY 1978), *aff'd in part and rev'd in unrel. part*, 603 F.2d 263, 53 A.L.R. Fed. 768, 1979-1 Trade Cases P 62,718 (2nd Cir.1979), *cert. den.*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783, 1980-1 Trade Cases P 63,182 (1980), the District Court stated:

> Stated more fully, the rule on which the verdict rests in this respect is that where a defendant
>
> (i) has monopoly power in a relevant market,
>
> (ii) has acquired or maintained this power by anticompetitive conduct, and
>
> (iii) has employed its monopoly power to charge a price higher than what a competitive market price was or would have been,
>
> a purchaser required to pay the monopoly price may recover the excess. This follows, the court believes, from elementary principles of antitrust law in particular and tort law in general. It may help to explain this view if we refer for a

minute to the more common and familiar situation of the price fixing conspiracy. Where two or more sellers combine to fix prices. it is the unlawful combination that gives them power over price. The results effected through the combination will determine the scope of their liability. If they fix a price below what competitors charge, say for standard predatory reasons. they may be liable to such competitors. but they will not. on that score, be liable to purchasers who pay that lower price.[FN22] If, in the more usual case, the price fixed is higher than a lawful, competitive price. customers may recover the difference.

FN22. It is unnecessary here to conjure with possible later claims of such purchasers after the conspiracy succeeds in destroying competitors.

*423 But the conspiracy in that situation has accomplished what the monopolist achieves by himself, the setting of a price above that which would result from competitive forces.[FN23] If the monopolist has acquired or maintained the power to do that by unlawful means. and is thus an illegal monopolist. his power to set a monopolist's price is exactly the same species of evil. and for at least as compelling reasons. as the unlawful power of conspirators to set Their price. The power to fix prices is after all the gist of monopoly power. When that power is unlawfully obtained or employed. the monopolist pursues the same proximate goal for himself as the price-fixing conspirators aim to share together. It accords with settled tort principles to hold the wrongdoer for the intended and proximate consequences of his conduct.

FN23. "(S)ince . . . (the decisions in Standard Oil Co. v. United States. 221 U.S. 1, 31 S.Ct. 502. 55 L.Ed. 619 (1911). and American Tobacco Co. v. United States. 221 U.S. 106. 31 S.Ct. 632. 55 L.Ed. 663 (1911)) it has been accepted law that not all contracts which in fact put an end to existing competition are unlawful. Starting. however. with the authoritative premise that all contracts fixing prices are unconditionally prohibited. the only possible difference between them and a monopoly is that while a monopoly necessarily involves an equal. or even greater. power to fix prices. its mere existence might be thought not to constitute an exercise of that power. That distinction is nevertheless purely formal; it would be valid only so long as the monopoly remained wholly inert; it would disappear as soon as the monopoly began to operate; for. when it did that is, as soon as it began to sell at all it must sell at some price and the only price at which it could sell is a price which it itself fixed. Thereafter the power and its exercise must needs coalesce. Indeed it would be absurd to condemn such contracts unconditionally. and not to extend the condemnation to monopolies; for the contracts are only steps toward that entire control which monopoly confers: they are really partial monopolies." United States v. Aluminum Co. of America. 148 F.2d 416, 427-28 (2d Cir. 1945).

Misrepresentation of intentions during agency proceedings to obtain regulatory approval for acquisitions is an anticompetitive practice. according to the United States Supreme Court. *Greyhound Corporation v. Mt. Hood Stages, Inc.*. 437 U.S. 322, 98 S.Ct. 2370. 57 L.Ed.2d 239, 1978-1 Trade Cases P 62,088 (1978). Illegal acquisitions are also an anticompetitive practice. *Arthur S.*

15

1     *Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1052 (6th Cir., 1984) (anticompetitive practices

2     under Section 2 of the Sherman Act include illegal acquisitions).

3            In developing the criteria for determining the anticompetitive effects of mergers and

4     acquisitions, the Supreme Court has made it abundantly clear that the focus is on 'probabilities, not

5     certainties. *Allis-Chalmers Mfg. Co. v. White Consol. Industries, Inc.*, 414 F.2d 506, 510 (3rd Cir. 1969).

6

7

8            Plaintiff's allegations of Google's other anticompetitive, as an illegal monopolist, are set forth

9     in ¶¶ 2A, 49-V, 50-88, 99A-99C, 100, 102 and 104 of the 2nd Amended Complaint. Google is alleged

10     to have performed the anticompetitive activities to increase its market share at the expense of

11     competitors (¶¶ 49B, 49E, 50 and 712). The anticompetitive activities include post-monopoly

12     acquisitions (¶¶ 2A, 50, 99-A and 99-B); injuring and driving competitors out of business (¶ 2A);

13     anticompetitive AdWords pricing and auction practices, including charging Plaintiff 10 to 100 times

14     the price per click paid by favored advertisers (¶ 2A); letting some competitors use AdWords to

15     monetize their website traffic but denying that opportunity to Plaintiff and his community search

16     websites and most other customers of AdWords (¶ 2A); charging more for an ad than the Plaintiff

17     could be expected to make as a profit from the advertising (¶ 2A); Google is fixing auction prices for

18     key words by requiring Plaintiff to bid 50 to 100 times more than Google's favored customers for each

19     click for the same key words (¶ 57); Google is letting favored customers use keyword not made

20     available to the Plaintiff (¶ 58); Google is falsely telling Plaintiff and other AdWords customers that

21     they can qualify for the lowest rates by changing their landing pages and ad when in fact that is not true

22     for Plaintiff and many or most other customers (¶ 59, 62); Google cuts off the number of displayed ads

23     to stop persons from qualifying for the lowest per-click price of S.01 (or S.05) (¶ 60); Google blocks

24     use of lower-value keywords to manipulate the demand and price for higher-demand keywords (¶ 61);

25     Google lies to customers when saying that it charges more for Plaintiff's ads because its wants to give

26     Google search users (who buy nothing from Google) a more satisfying experience when Google is

27     reaping in additional S billions by publishing these same ads to its search users, but at a higher price (¶

28

63): Google won't let Plaintiff (as distinguished from favored customer eBay) be the only customer for a keyword because this would require giving Plaintiff the lowest price for the ad under Google's rules (¶ 70): and Google removes keywords from the auction to manipulate auction prices (¶ 71).

These anticompetitive activities can take place because Google. through its acquisitions. has acquired a monopoly and has injured and potentially destroyed any meaningful competition from all of its search-advertising competitors, leaving Plaintiff unable to acquire his desired website building and monetizing services from a competitive marketplace. Customers of the monopolist are protected by the Sherman Act. *Blue Shield of Virginia v. McCready*. 457 U.S. 465. 102 S.Ct. 2540. 73 L.Ed.2d 149 (1982). Also, *Official Airline Guides, Inc. v. Federal Trade Commission*. 630 F.2d 920, 927-928. 1980-2 Trade Cases P63.544 (2d Cir. 1980). under "III. Legal Duty of a Monopolist vis-à-vis its Customers". states that a monopolist with a purpose of restraining competition loses the right to refuse to deal.

Google's illegal monopoly should be treated similar to patent licensing. wherein the licensees are entitled to equal pricing or, alternatively. that Google be required to permit Plaintiff to use AdWords to monetize the traffic of his community search websites with advertising revenues for monetizing be based on the prices paid by Plaintiff while using AdWords to build traffic for his websites.

  **D.**  **Google's Purpose Is to Restrain Competition, Enhance or Expand Its Monopoly in the Keyword-Targeted Internet Advertising Market, and <u>Do This through Coercive and Collusive Activity with Plaintiff's Competitors</u>**

Plaintiff has alleged the purpose underlying Google's anticompetitive activities in ¶¶ 49B. 49E. 50 and 71, to monopolize the keyword-targeted Internet advertising market and participate in the profits earned by the favored major advertisers, through elimination of smaller advertisers, with each of the major advertisers having joined the conspiracy.

17

1    Google is doing what is prohibited by *United States v. Grinnell Corporation*, 384 U.S. 563,

2    570-571. 86 S.Ct. 1698. 16 L.Ed.2d 778 (1966): "The offense of monopoly under § 2 of the Sherman

3    Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful

4    acquisition or maintenance of that power as distinguished from growth or development as a

5    consequence of a superior product. business acumen. or historic accident."

6    Also. see *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447. 458-459. 113 S.Ct. 884, 122

7    L.Ed.2d 247. 1993-1 Trade Cases P70.096 (1993) (requires proof of a dangerous probability that they

8    would monopolize a particular market and specific intent to monopolize).

9

10

11    **E.    Plaintiff Has Met the § 2 Requirement of Alleging that Google**
      **Has a Dangerous Probability of Achieving Monopoly Power**

12    A plaintiff is required to prove (1) that the defendant has engaged in predatory or

13    anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of

14

15    achieving monopoly power. *Spectrum Sports, Id.*, at p. 512.  Plaintiff met these pleading requirements

16    by its allegations of predatory and anticompetitive activities at ¶¶ 2A. 49-V. 50-88. 99A-99C. 100. 102

17    and 104 of the 2nd Amended Complaint together with the allegations of "intentionally monopolizing"

18    in ¶ 50 and "dangerous probability of achieving monopoly power (to control prices and exclude

19    competition) in ¶¶ 98. 101 and 106.

20    **F.    Plaintiff Has Met the § 2 Requirement of Alleging that Google Has an**
      **Intent to Monopolize the Keyword-Targeted Internet Advertising Market**

21

22    Showing Google's intent to monopolize can be done through direct evidence demonstrating

23    that Google had the ability to exclude competition from the relevant market or as an inference from

24    Google's possession of monopoly power. *E. I. du Pont de Nemours*, 351 U.S. 377. 391-92. 76 S.Ct.

25    994 (1956). I have made those allegations of being able to exclude competition at ¶¶ 48 and 98 of the

26    2nd Amended Complaint.

27

28

G.    **Application of the Essential Facilities Doctrine to
Non-Physical Facilities Is Essential for the Economy
And Would Be Achieved By Relief Requiring Google
To Make Its Search-Advertising Services Available for
All at Non-Discriminatory Prices**

The essential facilities doctrine should not be discarded as to Internet businesses merely because the monopolized business has one or more competitors. The doctrine can be applied, in cases where use of an illegal monopoly is essential to restore competition, by requiring the illegal monopolist (i.e.. Google) to make its monopolized search-advertising and website monetizing services available for all to use at non-discriminatory prices. This result would be consistent with the relief available without application of the essential facilities doctrine. The Plaintiff's allegations meet the requirements recognized by this Court in *Kinderstart*. "A facility that is controlled by a single firm will be considered 'essential' only if control of the facility carries with it the power to eliminate competition in the downstream market." *Kinderstart.com LLC v. Google, Inc.*, Not Reported in F.Supp.2d. 2006 WL 3246596 (N.D. Cal. 2006).

Plaintiff is a customer and competitor of Google and is being eliminated by reason of Google's alleged monopoly.

H.    **The 2nd Amended Complaint Complies with Rule 8**

The 2nd Amended Complaint was written to allege the facts upon which Plaintiff's Section 2 claims are based and to provide adequate notice to Google of the claims. The claims involve a new and changing industry without a lengthy history of established terms and practices to facilitate Plaintiff's description of the market and activities involved. During the short lifetime of this lawsuit, Google has acted in ways to identify a new market and Google's two principal competitors (Yahoo and Microsoft) have shows they are unable to compete effectively against Google. Plaintiff has tried to capture these developments in a short. comprehensive pleading, and Google seems to have understood what Plaintiff has written in his pleading. The pleading contains no press release material and within the rules of pleading provides simplicity, conciseness and clarity. In short, the Plaintiff's pleading complies with Rule 8. Fed.R.Civ,P.

1

2     I. CONCLUSION

3          For the reasons set forth above, it is respectfully requested that defendant's motion to dismiss

4     under Rule 12(b)(6) be denied in its entirety and that the Plaintiff be granted leave to file a further

5     amended complaint to the extent such amendments are determined by the Court to be non-futile.

6
      **Dated: New York, New York**
7              **May 25, 2007**

8                                                      **Respectfully submitted,**

9

10

                                                          **Carl E. Person**
11                                                        *Plaintiff, Pro Se*
                                                          **325 W. 45th Street - Suite 201**
12                                                        **New York NY  10036-3803**
                                                          **Tel.  (212) 307-4444; Fax  (212) 307-0247**
13                                                        **Email: carlpers@ix.netcom.com**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3

4          I, Carl E. Person, declare:

5          I am the plaintiff in this action and fully familiar with the facts stated herein, and make

6      this declaration to certify that on May 25, 2007, I served on

7

8

9                  David H. Kramer, Esq.
                   Wilson Sonsini Goodrich & Rosati
10                 Professional Corporation
                   650 Page Mill Road
11                 Palo Alto CA  94304-1050

12     by mail addressed as per above and by facsimile the following document:

13

14                 **PLAINTIFF'S MEMORANDUM OF**
                   **POINTS AND AUTHORITIES IN**
15                 **OPPOSITION TO DEFENDANT**
                   **GOOGLE'S MOTION TO DISMISS**

16

17     Executed under the penalty of perjury.

18     Dated:  May 25, 2007

19                                          _Carl E. Person_

20                                          Carl E. Person

21

22

23

24

25

26

27

28